UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | |
|---|---|
| GEOFFREY CROWTHER,<br>        Plaintiff,<br>v.<br><br>CSX TRANSPORATION, INC. and<br>CONSOLIDATED RAIL CORP,<br>        Defendant<br><br>AND<br><br>GEOFFREY CROWTHER,<br>        Plaintiff,<br>v.<br><br>CSX TRANSPORTATION, INC. | 3:09-cv-10334-MAP<br><br><br><br><br><br><br><br>3:09-cv-11467-MAP |

## DEFENDANTS CSX TRANSPORTATION, INC. AND CONSOLIDATED RAIL CORPORATION'S MOTION FOR RECONSIDERATION OF THE COURT'S OCTOBER 5, 2010 ORDER

Defendants CSX Transportation, Inc. ("CSXT") and Consolidated Rail Corporation ("Conrail") (hereinafter referred to collectively as "Defendants"), hereby submit the following Motion for Reconsideration of the Court's October 5, 2010 Order denying in part Defendants' Motion for Summary Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Defendants move for reconsideration on the following grounds:

1. This Honorable Court erred when it found that Plaintiff had an expectation of proving at trial that his bilateral knee, neck, left elbow and/or left thumb conditions were caused by Defendants' negligent failure to provide a reasonably safe workplace in violation of 45 U.S.C. § 51;

2. This Honorable Court erred when it found that Plaintiff timely filed his claims within the three year limitations period set forth in 45 U.S.C. § 56 (1976).

## I.    <u>FACTUAL BACKGROUND</u>:

This Court is fully-aware of the facts of this case and as such Defendants will not reiterate them here.  Instead, Defendants refer to and specifically incorporate herein by this reference, as if fully restated and set forth, their Concise Statement of Material Facts Pursuant to Local Rule 56.1.  (Doc. No. 39.)

## II.    <u>DISCUSSION OF LAW</u>:

**A.    Motion for Reconsideration Standard**

The Court may consider a motion for reconsideration under Rule 60(b) of the Fed. R. Civ. P., which states in pertinent part "[o]n motion and just terms, the court may relieve a party or its legal representatives from a . . . order . . . for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect . . . (6) any other reason that justifies relief.  Fed. R. Civ. P. Rule 60(b).  District courts have "substantial discretion" in ruling on motions for reconsideration.  <u>Serrano Perez v. FMC Corp.</u>, 985 F.2d 625, 628 (1st Cir. 1993).  To prevail, the moving party must either present previously unavailable evidence or show that a manifest error of law was committed.  <u>Palmer v. Champion Mortgage</u>, 465 F.3d 24, 30 (1st Cir. 2006).

**B.    Summary Judgment Standard**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. Rule 56; <u>see also</u> <u>Magee v. United States</u>, 121 F.3d 1, 3 (1st Cir. 1997).  Summary judgment is mandated against a party failing to make a showing sufficient to establish an essential element of the case on which he or she bears the burden of proof.[4]  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Taylor v. Hercules, Inc.</u>, 780 F.2d 171, 174 (1st

Cir. 1986); <u>Hahn v. Sargent</u>, 523 F.2d 461, 464 (1st. Cir. 1975), *cert. denied*, 425 U.S. 904 (1976).  The role of a summary judgment motion "is to pierce that boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  <u>Coyne v. Taber Partners I</u>, 53 F.3d 454, 457 (1st Cir. 1995).

## C.     Defendants Are Entitled to Summary Judgment Because No Genuine Issue of Fact Exists Regarding The Cause of Plaintiff's Alleged Conditions

Defendants respectfully request that this Honorable Court reconsider its October 5, 2010 Order denying their Motion for Summary Judgment on the grounds that Plaintiff has no expectation of presenting a scintilla of medical causation evidence.  It is well-settled that a plaintiff must prove medical causation to recover damages for his alleged injuries.  Indeed, a plaintiff filing a FELA action must prove the traditional common law elements of negligence – duty, breach, damages, causation and foreseeability.  <u>Stevens v. Bangor and Aroostook R.R. Co.</u>, 97 F.3d 594 (1st Cir. 1996).  A plaintiff must show that his employer breached its duty to maintain a reasonably safe workplace and, more importantly, **that the employer's breach caused the harm for which the plaintiff seeks to recover damages**.  <u>Id.</u> at 598 (emphasis supplied).  Here, Plaintiff seeks to recover damages for his alleged medical conditions.  When, as here, a question of causation of a medical condition is disputed, expert testimony is necessary.  <u>Laspesa v. Arrowhead Int'l Inc.</u>, No. 07cv12370-NG, 2009 U.S. Dist. LEXIS 121576, at *26 (D. Mass. Dec. 23, 2009).  It is well-settled that "because understanding medical causation is beyond the . . . knowledge of the ordinary layman . . . proof of it must rest upon **expert medical testimony**." <u>Haughton v. Hill Lab. Inc.</u>, No. 06-11217-RGS, 2007 U.S. Dist. LEXIS 64427, at *10 (D. Mass. Aug. 30, 2007) (emphasis supplied); <u>see also</u> <u>Enrich v. Windmere Corp.</u>, 616 N.E.2d 1081 (Mass. 1993) (holding that opinion testimony of non-expert witnesses is no substitute for expert testimony).

Here, Plaintiff cannot meet this burden.  Plaintiff has failed to identify a single medical expert to provide the requisite medical causation testimony linking the development of the multitude of conditions from which Plaintiff now suffers to any negligent failure of Defendants to provide a reasonably safe workplace.  Instead, Plaintiff has identified a number of his treating physicians to give expert testimony on the development of his medical conditions.  None of these physicians, however, have been disclosed for the purpose of opining that any of Plaintiff's conditions were approximately caused by Defendants' negligent failure to provide a reasonably safe workplace in violation of 45 U.S.C.§51.  In fact, all of Plaintiff's doctors testified that his job duties were **not** the underlying cause of his degenerative conditions.  In response to inquiries from Plaintiff's own counsel, Dr. Andrew Lehman, Plaintiff's expert regarding his bilateral knee condition, testified:

> Q.    You're not here telling us that his job as a trackman caused the osteoarthritis, correct?
>
> A.    That's correct.

(Dep. of Andrew Lehman, M.D., at 64, relevant portions of which are attached as Exhibit A.)

In addition, Dr. Steven M. Wenner, Plaintiff's expert regarding his left thumb condition, also testified:

> Q.    Basically, my understanding is that you don't have an opinion, within a reasonable degree of medical certainty, as to whether or not his job duties caused his left thumb arthritis, is that correct?
>
> A.    Caused as the primary event; you don't mean aggravated?
>
> Q.    No.  I mean caused as a primary event?
>
> A.    I can't say for sure.
>
> Q.    And you can't say within a reasonable degree of medical certainty, correct?
>
> A.    Yes.

(Dep. of Steven M. Wenner, M.D., at 13, relevant portions of which are attached as Exhibit B.)

R. Scott Cowan, Plaintiff's expert regarding his alleged neck condition, also testified:

Q.      When I read that, I saw that that was your opinion, that his job duties caused the underlying degenerative disk disease.

A.      No.

Q.      So that's not your opinion?

A.      No.

Q.      So we can agree that his job duties did not cause the underlying degenerative disk disease?

A.      That's correct.

(Dep. of R. Scott Cowan, M.D., at 38-39, relevant portions of which are attached as Exhibit C.)

Finally, Dr. Martin Luber, Plaintiff's expert regarding his alleged elbow condition, testified that there is no way to determine the actual cause of Plaintiff's degenerative condition in his left elbow.  (Dep. of Martin Luber, M.D., at 26, relevant portions of which are attached as Exhibit D.)  More importantly, Dr. Luber confirmed that Plaintiff's CT scans showed an old Osteochondritis Dissecans ("OCD") lesion on his left elbow.  (Id. at 36-37.)  Dr. Luber explained that an OCD lesion is an injury to the bone and cartilage, the end result of which can be arthritis. (Id. at 42.)  Dr. Luber testified that there is no way to determine whether the OCD, as opposed to Plaintiff's work activities, caused Plaintiff's left elbow condition.  (Id. at 42-43.)

To the extent these physicians have expressed any opinion at all on causation, they have focused entirely on the physical activities that Plaintiff encountered in the everyday, routine performance of his job functions as a trackman, and the routine operation of the equipment that he used.  It is not enough in an occupational exposure case for a plaintiff to prove that his normal and routine work activities caused his conditions.  A plaintiff must instead demonstrate that his

conditions were caused by some increased repetition, force, posture, or other exposure, over and above that normally experienced in the workplace, and that these atypical exposures were further caused by the defendant's negligence.  Interestingly, Plaintiff's medical experts have all testified that Defendants could not have changed anything about Plaintiff's working conditions so as to prevent Plaintiff from developing his alleged conditions.  Regarding Plaintiff's alleged bilateral knee condition, Dr. Lehman testified:

> Q.   Is there anything in the scientific literature that shows that a specific change can be made to a job process that would prevent the development of degenerative joint disease in a person like Mr. Crowther?
>
> A.   There is no such study that I'm aware of . . . .
>
> Q.   So you're unaware of any specific scientific literature that indicates a specific change to be made to his job that would prevent him to have symptoms, is that correct?
>
> A.   I don't think a scientific study could ever be done in that regard.
>
> Q.   Are you aware of any specific changes that could have been done to Mr. Crowther's job that would have changed the outcome with regard to his knees?
>
> A.   I think if he was more sedentary, he would have less symptoms.
>
> Q.   And it's impossible to prevent degenerative joint disease in the knees, correct?
>
> A.   Just sitting down on a couch for your entire life, you'd never develop it.

(Ex. A at 51-53.)  Regarding Plaintiff's alleged neck condition, Dr. Cowan similarly testified:

> Q.   Would you agree that you've not given any opinions that there were any specific changes to Mr. Crowther's job that could have been done by the Railroad that would have prevented his injury?
>
> A.   Correct.  I give no such opinions.

(Ex. C at 23.)  Dr. Wenner's testimony pertaining to Plaintiff's alleged left thumb condition simply reiterates the fact that Defendants could not have prevented Plaintiff's degenerative changes:

> Q.   Are you aware of any scientific literature that shows that there are specific changes that could be done to the type of work that Mr. Crowther did, that would prevent him from developing the type of problems he had in his left thumb?

> A.   I'm not.

> Q.   [Y]ou've not seen any objective scientific change in the arthritis that was contained in his left thumb as a result of his job, is that right . . . ?

> A.   I think that's correct.

> Q.   And in terms of his job duty, was there anything in particular . . . causing a problem in terms of his symptoms or aggravation as you've stated?

> A.   Well, the nature of gripping large heavy objects is you have to wrap your thumb around it . . . and his arthritic metacarpal phalangeal joint, will make contact with any large handle.

> Q.   Are there any specific changes that the Railroad could have made in his job, that could have prevented him from having an aggravation . . . ?

> A.   I guess not having him used those tools.

(Ex. B at 41-42, 45, 48-49.)  Lastly, Dr. Luber agreed that Defendants could not have prevented Plaintiff's alleged elbow injury:

> Q.   Is it your opinion that Mr. Crowther's work, his normal every day work on the railroad could cause or contribute to the degenerative changes that he was suffering from in his left elbow?

> A.   It is.

> Q.   Would you agree that any activity could, any repetitive activity at work could cause the degenerative condition that he was suffering from?

> A.   I think any repetitive work could increase the likelihood of developing arthritis.

Q.     So you have not given an opinion regarding whether CSX could have done something differently to prevent Mr. Crowther from developing a degenerative condition?

A.     Correct.

(Ex. D at 18-19.)

Plaintiff apparently relies exclusively on Michael Shinnick ("Mr. Shinnick"), his ergonomic expert, to provide medical causation testimony.  A copy of Mr. Schinnick's report is attached as Exhibit E.[1]  Mr. Shinnick opines that Defendants failed to provide Plaintiff with a reasonably safe place to work.   Mr. Shinnick, however, does not opine in any way that Defendants' alleged negligence caused Plaintiff's conditions.  More importantly, Mr. Shinnick is not a medical doctor and cannot, even if he wanted to, provide an opinion linking Defendants alleged negligence to Plaintiff's medical conditions.  Plaintiff's liability case is, therefore, fatally flawed by the absence of any qualified medical opinion testimony linking Defendants' alleged negligence to the development of the conditions from which Plaintiff allegedly suffers.  Without this missing link, Plaintiff's case must fail as a matter of law.  Indeed, proof of medical causation must rest on medical expert testimony, which is undeniably absent in this case.  Accordingly, Defendants respectfully request that this Court reconsider its October 5, 2010 Order and grant Defendants' Motion for Summary Judgment as no genuine issue of material fact exists regarding the direct cause of Plaintiff's alleged conditions.

**D.     Defendants Are Entitled to Summary Judgment on The Grounds That Plaintiff's Claims are Time-Barred**

Defendants move for reconsideration of the Court's October 5, 2010 Order on the grounds that Plaintiff failed to initiate his claims within the three-year limitations period

---

[1] Defendants additionally note that Shinnick is not a medical doctor and is therefore not qualified to testify about any specific medical condition.  Although he claims to be familiar with the job of a trackman, he has never specifically analyzed Plaintiff's workplace.  For these reasons alone, Shinnick's testimony should be precluded and Defendants expect to move, prior to trial, to preclude Shinnick's testimony on these grounds.

provided for under the FELA.  It is well-settled federal law that no action under the FELA survives unless the claim is filed within three years from the date the action accrues.  45 U.S.C. § 56 (1976).  It is equally well-settled that the three year limitations period applies to alleged injuries sustained over a long period of time.  Albert v. Maine Central R.R. Co., 905 F.2d 541 (1st Cir. 1990).  The Supreme Court has held, specifically in the context of FELA claims, that a claim arising under the FELA begins to accrue when the plaintiff is aware, or should be aware, of his injuries.  Urie v. Thomspon, 337 U.S. 163, 170 (1949) (FELA plaintiff's silicosis claim was deemed to have accrued when it manifested itself to the plaintiff).  This is known as the "discovery rule."  In the context of a cumulative trauma case, such as here, the statute of limitations begins to run when the plaintiff becomes aware of the existence of the disease or illness and its cause.  Id.; Kichline v. Consolidated Rail Corp., 800 F.2d 356 (3rd Cir. 1986).  Awareness is defined as when the plaintiff knows, or in the exercise of due diligence, has reason to know of the existence and cause of the injury which is the basis of his action.  Albert, 905 A.2d at 544.

The discovery rule imposes an affirmative duty on the plaintiff to investigate the potential cause of his injury and only requires a finding that a plaintiff should have known of an injury, not that he possess actual knowledge of the injury and its cause.  The three year statute of limitations begins to run when a plaintiff knew, or should have known, of his injury and its cause.  Id.  Once the plaintiff believes he is injured and believes that the injury is work related, he has a duty to diligently investigate either to confirm or to deny his relief.  Id.; Fries v. Chicago & Nw. Transp. Co., 909 F.2d 1092, 1095-1096 (7th Cir. 1983) ("[T]o allow a plaintiff to unilaterally postpone the running of the statute of limitations by negligently failing to investigate the fact of and cause of his injury would thwart the legislative intent of 45 U.S.C. sec. 56.").

Since the plaintiff has a duty to investigate, a medical diagnosis is unnecessary for the statute of limitations to begin to run.  Albert, 905 F.2d at 544; Whitman v. CSX Transp. Inc., 887 F. Supp. 983, 992 (E.D. Mich. 1995).  When a plaintiff brings a claim for a work-related injury, the question is not whether the plaintiff knew that the repetitive vibrations in connection with his claim for a work-related injury were the specific cause of the injuries.  Rather, the proper question regarding knowledge of causation is at what time did or should the plaintiff have known there was a link between his injury and his employment.[2]  See Matson, 240 F.3d at 1236.

1.     **Plaintiff's Claims That Defendants' Negligence Caused His Alleged Bilateral Knee, Neck, and Left Thumb Conditions Are Time-Barred**

As described, *supra*, Plaintiff's work activities did not cause his arthritic conditions. Assuming arguendo that this Court allows Plaintiff to proceed on his claims absent medical causation, Plaintiff's claims are time-barred because he knew or should have known of his degenerative conditions and that his conditions were potentially caused (at least according to the allegations in his Complaint), more than three years prior to filing his action.  Plaintiff filed his original action on September 21, 2007, thus, if Plaintiff knew or should have known of his degenerative conditions and their potential cause prior to September 21, 2004, his claims are time-barred.

This Court concluded that Defendants must show that Plaintiff's pre-2004 injuries are separate and distinct from his post-2004 complaints in order to prevail on their statute of limitations argument.  Defendants disagree.  The standard is simply whether Plaintiff knew **or should have known** of his alleged injury and its cause more than three years prior to filing his

---

[2] Knowledge of the specific cause of a work-related injury is not required to trigger the FELA statute of limitations; the statute begins to run when the plaintiff knew or should have known that there was a causal connection between his employment with Conrail and CSXT and his alleged knee, neck, elbow and thumb injuries – not when he knew that his occupation was the cause of the alleged injuries.  Matson v. Burlington N. Santa Fe, 240 F.3d 1233 (10th Cir. 2001).

lawsuit.  Here, Plaintiff is complaining, among other things, that Defendants' negligence **caused the underlying arthritic condition** of his knees, left elbow, neck and left thumb.  Based on Plaintiff's medical records as well as his own testimony, it is absolutely indisputable that Plaintiff knew **or should have known** about his alleged underlying degenerative conditions and their potential causes prior to September 21, 2004.

> **a.     Plaintiff Knew or Should Have Known About His Alleged Bilateral Knee Condition and The Potential Cause Thereof Prior to September 21, 2004**

This Court may charge Plaintiff with knowledge of his right knee condition, arthritis, as early as April 24, 1986, given that he was definitively diagnosed with degenerative arthritis of his right knee on that date.  (Berkshire Medical Center records dated April 24, 1986, a copies of which are attached as Exhibit F and which were previously identified as Doc. 39-6.)  In fact, an x-ray of Plaintiff's right knee dated April 24, 1986, indicated an extremely severe degree of osteoarthritis change involving the medial and lateral aspect of the right knee joint.   (Id.) Thereafter, on March 31, 1998, Plaintiff admitted that he had bothersome knees and, more specifically, identified arthritis as his diagnosis.  (Conrail Medical History Form dated March 31, 1998, a copy of which his attached as Exhibit G, and which was previously identified as Doc. 39-7.)

Similarly, Plaintiff knew or should have known of his alleged left knee condition, arthritis, on or before January 17, 2003, when Allan Baustin, M.D., Plaintiff's primary care physician, specifically noted Plaintiff suffered from marked arthritic changes in his left knee. (Allan Baustin, M.D. record dated January 17, 2003, a copy of which is attached as Exhibit H and which was previously identified as Doc. 39-8.)  Most importantly, on April 9, 2007, during a physical examination with his treating physician, John Macatee, D.O., Plaintiff admitted that his bilateral knee pain started in 2002 and "was probably due to overuse at work."  (John Macatee,

D.O. record dated April 9, 2007, copy of which is attached as part of Exhibit I and which was previously identified as Exhibit 39-12.)

Plaintiff's bilateral knee condition, prior to September 21, 2004, was not and cannot merely be labeled "de minimis" aches and pains.  As early as 1986 and no later than 2003, Plaintiff received a clear diagnosis, arthritis, from several physicians and admittedly attributed his conditions to work.  Accordingly, Plaintiff's claim that Defendants' negligence caused his bilateral degenerative knee condition is time-barred and Defendants are entitled to judgment as a matter of law.

**b.     Plaintiff Knew or Should Have Known About His Alleged Neck Condition and The Potential Cause Thereof Prior to September 21, 2004**

As with Plaintiff alleged knee injuries, Plaintiff knew, or should have known, of his alleged neck condition, arthritis, prior to September 21, 2004.  Indeed, on October 4, 2002, Plaintiff presented to Dr. Baustin with complaints of neck pain. (Ex. H.)  An x-ray conducted on October 8, 2002, revealed degenerative disc disease, arthritis, of Plaintiff's cervical spine at multiple levels of his neck including most prominently at the C5-6 level.  (Cooley Dickinson Live record dated October 8, 2002, a copy of which is attached as Exhibit J and which was previously identified as Exhibit 39-9.)  Interestingly, Plaintiff does not dispute telling Dr. Baustin that he suffered from neck pain in 2002, nor does Plaintiff dispute the fact that Dr. Baustin informed him he had degenerative disc disease, arthritis, at multiple levels of his neck.  (Dep. of Geoffrey Crowther dated November 18, 2008 at 100, relevant portions of which are attached as Exhibit K.)   Thereafter, in January 2006, Plaintiff sought treatment from Robert Cowan, M.D. for his continued neck pain, which is the subject of this action, who noted that Plaintiff's pain had been present for "years" and was "somewhat progressive."  (R. Scott Cowan, M.D. record dated January 27, 2006, relevant portions of which are attached as Exhibit L, and which were

previously identified as 39-11.)  Films taken in December 2005 and February 2006 objectively confirmed Plaintiff's degenerative disc disease, arthritis, at the exact same levels identified in 2002.  (Id.)  Accordingly, at the very latest, Plaintiff was aware of his alleged neck injury on April 4, 2002, well before the applicable statute of limitations ran.

Plaintiff's diagnosed neck condition, prior to September 21, 2004, was not and cannot be merely labeled "de minimis" aches and pains.  Undeniably, in 2002 Plaintiff received a clear diagnosis, arthritis, from Dr. Baustin.  In 2006, Plaintiff's neck condition was merely confirmed by Dr. Cowan.  Accordingly, Plaintiff's claim that Defendants' negligence caused his bilateral degenerative neck condition, arthritis, is time-barred and Defendants are entitled to judgment as a matter of law.

c.    **Plaintiff Knew or Should Have Known About His Alleged Left Thumb Condition and The Potential Cause Thereof Prior to September 21, 2004**

Plaintiff admittedly knew about his alleged thumb condition, arthritis, prior to September 21, 2004.  On September 26, 2005, Plaintiff presented to Stephen Wenner, M.D., for treatment of chronic left thumb pain and reported that his symptoms *had been present for several years* and were gradually worsening.[3]  (Stephen Wenner, M.D., record dated September 26, 2005, a copy of which is attached as Exhibit M and which was previously identified as 39-11.)  Dr. Wenner certainly agreed that Plaintiff reported to him symptoms/pain for at least more than two years because he used the word "several."  Importantly, Dr. Wenner testified that the level of arthritis exhibited in the 2005 x-ray indicated Plaintiff had fairly advanced arthritis, which would be consistent with experiencing symptoms for several years before 2005.  (Dep. of Stephen Wenner, M.D., at 28, relevant portions of which are attached as part of Exhibit N.)

---

[3] Dr. Wenner testified that, at the September 26, 2005 appointment, Plaintiff was complaining of a chronic pain in his left thumb and based on his note regarding the use of "several years," it was probable that Plaintiff reported pain for at least more than two (2) years.  (Ex. B at p. 28.)

In addition, Plaintiff testified that, in 2002, while welding in West Springfield, he noticed his hands remained in a "claw like" fashion when he took a break.  In Plaintiff's own words, "I had pain I hadn't felt before," and he confirmed that this included his left thumb.  (Ex. K at 92-93.)  Plaintiff further agreed that the onset of pain in 2002, was what he ultimately underwent surgery for.  (Id.)

Based on Plaintiff's medical records and deposition testimony there is no question that he knew, **or at the very least should have known**, of all of his alleged conditions well before September 21, 2004.  Defendants urge this Honorable Court to consider the well-established case law regarding the discovery rule, that is, that a plaintiff has an affirmative duty to investigate a potential injury and its cause, and, more importantly, that a medical diagnosis is unnecessary for the statute of limitations to begin to run.  Albert, 905 F.2d at 544.  Accordingly, Plaintiff's claim that Defendants' negligence caused his degenerative left thumb condition, arthritis, is time-barred and Defendants are entitled to judgment as a matter of law.

> **d.      Plaintiff Associated, or Should Have Associated, His Alleged Conditions to His Employment Well Before September 21, 2004**

Plaintiff undeniably attributes every single injury he has ever suffered to his work for the railroad.   The evidence before the Court overwhelmingly favors a finding that Plaintiff associated or should have associated (as alleged in his Complaint) his alleged conditions, all of them, to his work for the railroad prior to September 21, 2004.  Indeed, Plaintiff testified that, over the course of his employment, he directly linked any periodic pain he experienced to his job.  (Dep. of Geoffrey Crowther dated August 18, 2006 at 164-65, relevant portions of which are attached as Exhibit O; Dep. of Geoffrey Crowther dated March 30, 2010 at 6, relevant portions of which are attached as Exhibit P.)  In fact, by Plaintiff's own admission, nothing in his life, other than work, could have contributed to the alleged problems he had with his knees in

1998 and 1999. (Ex. K at 129.) Plaintiff also testified that, in his opinion, nothing other than work could have caused or contributed to the development of the degenerative changes in his neck. (Id. at 104.) Importantly, Plaintiff testified that neck injuries were common on the railroad and that he could name several co-workers who suffered the same condition as him as early as 1980 or 1990. (Id. at 117-18.) Plaintiff further admitted he knew in 1992, that the pain he was having in his hands, wrists and fingers were a direct result of welding. (Ex. O at 167-68.) In addition, Plaintiff testified he directly attributed his elbow condition to his employment in 2002. (Ex. K at 97.) In light of these admissions, it is absolutely indisputable that Plaintiff associated his alleged knee, neck, shoulder, back, elbow and thumb conditions to his employment with Defendants as early as the 1980s, and, in any event, long before the statute of limitations ran on September 21, 2004.

Even more convincing of the extent and duration of Plaintiff's knowledge is his admission that, in 2002, he had a conversation with Dr. Baustin during which Dr. Baustin advised Plaintiff to avoid manual labor and to pursue management positions, based on his degenerative conditions. (Id. at 106-07.) Plaintiff testified, "Dr. Baustin advised me to stop. He said, 'whatever you're doing right now' -- this is in 2002. He said, 'whatever you are doing for the railroad, you know, I would get away from it. Find something' -- he said, 'someone like you should have a management job or something.'" (Id.) Based solely on Plaintiff's discussion with Dr. Baustin in 2002, Plaintiff is hard-pressed to stand before this Court and argue he did not associate his pain and conditions to work-related activities before September 21, 2004.

Also of particular importance is the fact that Plaintiff worked for the railroad for over thirty-years. By Plaintiff's own admission, during the course of his career he held supervisory positions which included fielding complaints from co-workers, on a daily basis, regarding work-

related pain and injuries.  (Ex. P at 13-14.)  More importantly, prior to 1999, Plaintiff knew co-workers who underwent elbow, shoulder and neck surgery for work-related conditions.  (Ex. K at 173.)  Plaintiff also testified that, as early as the mid 1980s, he knew that co-workers were filing lawsuits associated with work-related hearing loss.[4]  (Ex. O at 182.)  Again, as Plaintiff was well-aware of his knee, neck, shoulder, back, elbow and thumb conditions as early as 1986, and, as set forth above, admittedly knew co-workers who suffered from the same conditions as early as the 1980s (and who pursued litigation), Plaintiff is in no position to argue he did not associate his conditions with his employment before September 21, 2004.

Finally, as early as the 1990s, Plaintiff knew that co-workers attended screening events sponsored by attorneys to diagnose work-related injuries and then pursued litigation for the alleged work-related injuries.  Plaintiff admittedly had conversations with co-workers about these screening events and their purpose as early as 2002.  (Ex. O at 151-55.)  In fact, Plaintiff himself attended just such a screening event on June 19, 2002, in Greenfield, Massachusetts.  (Ex. P at 17.)  The screening event, as advertised, was to conduct tests and evaluations for work-related carpal tunnel syndrome, asbestos, hearing loss and repetitive stress injuries.  Regarding the June 19, 2002 screening event, Plaintiff testified that, at a minimum, he underwent tests to diagnose hearing loss, Carpal Tunnel Syndrome and asbestosis.  (Ex. P at 18-20.)  It logically follows that if, in 2002, Plaintiff associated Carpal Tunnel Syndrome, hearing loss and asbestosis to his employment, he also associated all of his other ailments to his employment.

In light of the foregoing, Plaintiff cannot claim ignorance to the possible link between his alleged symptoms and his employment.  To the extent he was "ignorant," it is clear that a

---

[4] Interestingly, on June 17, 2005, Plaintiff filed a lawsuit against Defendants alleging he suffered from hearing loss and Carpal Tunnel Syndrome as a direct result of his employment.  See Crowther v. CSX Transportation, Inc., et al., Civ. No. 05-30140 MAP.  On June 8, 2007, this Court dismissed Plaintiff's hearing loss claim on the grounds that Plaintiff's claim was barred by the three-year statute of limitations prescribed under the FELA.  (See Id. at Doc. No. 34.)

reasonable person would have known about his conditions and their potential relationship to work.  As such, no genuine issue of material facts exists and Defendants are entitled to judgment as a matter of law.

> **2.      Plaintiff's Claims That Defendants' Negligence Aggravated His Alleged Bilateral Knee, Left Elbow and Left Thumb Conditions Are Time-Barred**

Again, as described, *supra*, it is Defendants' position that Plaintiff's work activities did not in any way aggravate his arthritic conditions.  Assuming arguendo that this Court allows Plaintiff to proceed on his aggravation claims, Plaintiff's alleged aggravation claims are time-barred because he knew or should have known that his degenerative conditions were being aggravated, and of the potential cause(s) of the aggravation (at least according to the allegations in his Complaint), more than three years prior to initiating his claims.  Plaintiff filed his aggravation claims on March 5, 2009, thus, if Plaintiff knew or should have known that his alleged degenerative conditions were being aggravated, and the potential cause of the aggravation, prior to March 5, 2006, his claims are time-barred.

Despite Plaintiff's own admissions, this Court rejected Defendants' argument that Plaintiff's alleged aggravation claims presented in 2005, well-before the March 5, 2006 limitations period began to run.  Defendants again present the Court with evidence that Plaintiff himself has admitted that the aggravation of his degenerative conditions presented in 2005 when he was working in New Bedford, Massachusetts.  Plaintiff has consistently maintained that **all of his pain**, including bilateral knee, left elbow and left thumb, "resurfaced" in 2005.[5]

---

[5] Although Defendants entirely disagree with Plaintiff's contention that his symptoms first manifested in 2005, Defendants rely on this testimony for the limited purpose of the argument before the Court.

a.    **Plaintiff Knew or Should Have Known About The Alleged Aggravation of His Bilateral Knee Condition and The Potential Cause Thereof Prior to March 5, 2006**

Notwithstanding Plaintiff's own admissions that his knee pain resurfaced in 2005 while working in New Bedford, Massachusetts, (Ex. K at 122.), Plaintiff knew or should have known of his alleged aggravation of his bilateral knee condition as early as 2002.  Indeed, in 2007, Plaintiff presented to John Macatee, D.O, and admitted that his bilateral knee pain began in 2002 and further admitted that it was probably a result of overuse at work.  (Ex. I.)  In addition, on February 28, 2007, Plaintiff presented to Dr. Lehman with complaints of knee pain.  Dr. Lehman noted that Plaintiff "has a history of severe left greater than right knee pain," which "has been significantly bad over the past couple of years[.]"   (Andrew Lehman, M.D. record dated February 28, 2007, a copy of which is attached as Exhibit Q.)  In addition, Dr. Lehman testified:

> Q.    And in fact, I believe Mr. Crowther began – presented to you in February of '07, is that right?
>
> A.    Yes.
>
> Q.    And at that time, you indicated that he was having severe pain and disability in regard to both his knees, is that right?
>
> A.    Yes.
>
> Q.    Okay.  And how long was his symptoms – how long had he been symptomatic at the point he saw you in February '07, do you recall?
>
> A.    He said to me two years.
>
> Q.    Two years? So February 28 of 2005?
>
> A.    I'm sure he was approximating.  But certainly, that's - - I mean, my history said, Pain in the last two years.

(Ex. A at 30-31.)

Again, Defendants urge this Court to consider the well-established case law regarding the discovery rule, that is, that a plaintiff has an affirmative duty to investigate a potential injury and its cause, and, more importantly, that a medical diagnosis is unnecessary for the statute of limitations to begin to run.  Albert, 905 F.2d at 544.  Even if, in 2002 and/or 2005, Plaintiff had not yet received an affirmative diagnosis that the pain he was experiencing was a result of aggravation of his bilateral arthritic knee condition, he had a duty to investigate.  Even taking all of the evidence in the light most favorable to Plaintiff, it is indisputable that Plaintiff knew or should have known about the alleged aggravation of his bilateral knee condition and its potential cause before March 5, 2006.   Accordingly, Plaintiff's claim that Defendants' negligence aggravated his degenerative bilateral knee condition, arthritis, is time-barred and Defendants are entitled to judgment as a matter of law.

   **b.   Plaintiff Knew or Should Have Known About The Alleged Aggravation of His Left Thumb Condition and The Potential Cause Thereof Prior to  March 5, 2006**

Again, notwithstanding Plaintiff's own admissions that his left thumb pain resurfaced in 2005 while working in New Bedford, Massachusetts, (Ex. K at 94, 109.), Plaintiff knew or should have known of his alleged aggravation of his left thumb condition as early as 2003 and no later than September 26, 2005.  Plaintiff knew or should have know of his alleged left thumb aggravation claim as early as September 26, 2005, when he presented to Dr. Wenner for treatment of chronic left thumb pain and reported that his symptoms *had been present for several years* and were gradually worsening.  Dr. Wenner testified that the level of arthritis exhibited in the 2005 x-ray indicated Plaintiff had fairly advanced arthritis, which would be consistent with experiencing symptoms for several years before 2005.  Based on the September 26, 2005 medical record combined with Plaintiff's own testimony that he attributed every single injury to

his work on the railroad (and the fact that Plaintiff has an obligation to investigate under the discovery rule), it is indisputable that Plaintiff's claim that Defendants' negligence aggravated his degenerative thumb condition is time-barred.

      **c.**      **Plaintiff Knew or Should Have Known About The Alleged Aggravation of His Left Elbow Condition and The Potential Cause Thereof Prior to March 5, 2006**

Again, notwithstanding Plaintiff's own admissions that his left elbow pain resurfaced in 2005 while working in New Bedford, Massachusetts, Plaintiff knew or should have known of his alleged aggravation of his left elbow condition no later than March 5, 2006.  On February 26, 2007, Plaintiff presented to Dr. Luber with complaints of left elbow pain and complaints of mechanical symptoms, which had been present "for the past several years."  (Martin Luber, M.D., record dated February 26, 2007, a copy of which is attached as Exhibit R.)  At his deposition, Dr. Luber testified:

> Q.    Okay.  I'm going to refer to, again, back to the February 26, 2007 record.  On the second sentence, it states, "He has had complaints of left elbow pain and some mechanical symptoms for the past several years."  Would Mr. Crowther have provided that information to you?
>
> A.    That would be the likely source of that, if it's in that section of the note, which is related to what the patient tells me upon arrival.
>
> Q.    Okay.  And that's information that you take down, or someone else takes down?
>
> A.    That I take down.
>
> Q.    Okay.  And when you say past several years, is that more than one year?
>
> A.    It is certainly non-specific, but it would be more than one year.
>
> Q.    Is it more than two years?
>
> A.    I don't know.  Several would usually mean more than two.

(Ex. D at 34-35.)

In addition, as noted, in 2007 Plaintiff presented to Dr. Macatee for evaluation.  In a letter dated September 11, 2007 from Dr. Macatee to the Railroad Retirement Board, Dr. Macatee states that Plaintiff "stated that the left elbow pain began after pulling railroad spikes in 2005 in his job as a railroad foreman."  (Letter from John Macatee, D.O. to Railroad Retirement Board dated September 11, 2007, a copy of which is attached as part of Ex. I.)  In Plaintiff's April 9, 2007 record, Dr. Macatee notes that Plaintiff's left elbow pain presented in 2005 while pulling spikes on the railroad and that Plaintiff had experienced previous strains to his left elbow using hand tools.  (Ex. I.)

Based on Plaintiff's February 26, 2007 medical record, his statements to Dr. Luber, Dr. Luber's deposition testimony, the September 11, 2007 letter from Dr. Macatee and Dr. Macatee's April 9, 2007 note, combined with the fact that Plaintiff admitted that his left elbow symptoms presented in 2005 while he was working in New Bedford, Massachusetts and with Plaintiff's own testimony that he attributed every single injury to his work on the railroad (and the fact that Plaintiff has an obligation to investigate under the discovery rule), it is indisputable that Plaintiff's claim that Defendants' negligence aggravated his degenerative left elbow condition is time-barred.  Accordingly, no genuine issue of material fact exists and Defendants are entitled to judgment as a matter of law.

### III.     CONCLUSION:

Based on the foregoing, Defendants respectfully request that this Honorable Court reconsider its October 5, 2010 Order denying in part Defendants' Motion for Summary Judgment and grant Defendants' instant Motion for Reconsideration.

<div style="margin-left:40%">

Respectfully submitted,
Defendants, CSX Transportation, Inc., and
Consolidated Rail Corporation,
By their attorneys,


 /s/ Heather M. Gamache
Michael B. Flynn, Esq., BBO# 559023
mbflynn@flynnwirkus.com
Lori A. Wirkus, Esq., BBO # 635525
lawirkus@flynnwirkus.com
Heather M. Gamache, BBO# 671898
hgamache@flynnwirkus.com
Flynn & Wirkus, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

</div>

DATED: October 20, 2010

G:\F & A\CASE FILES\CSX OCCUPATIONAL\Worn\Crowther - WORN - 61-123\Pleadings\Motion for Summary Judgment\Def Mot for Recon\Mot for Recon 10.19.10

## **CERTIFICATE OF SERVICE**

I, Heather M. Gamache, attorney for Defendants CSX Transportation, Inc. and Consolidated Rail Corporation hereby certify that I have served true and correct copies of the foregoing upon all counsel of record electronically via *CM/ECF* this 20th day of October, 2010.

/s/ Heather M. Gamache
Heather M. Gamache, Esq.