# EXHIBIT "C"

**Steven, M. Wenner, M.D.**
**December 15, 2008**

 **ORIGINAL**

Page 1

1              COURT OF COMMON PLEAS

2         PHILADELPHIA COUNTY - CIVIL DIVISION

3               DOCKET NO. 02389

4

5    ********************************

6    GEOFFREY CROWTHER,

7           Plaintiff,

8    Vs.

9    CONSOLIDATED RAIL CORPORATION

10   and CSX TRANSPORTATION, INC.,

11          Defendants.

12   ********************************

13

14      DEPOSITION OF STEVEN M. WENNER, M.D.

15

16          New England Orthopedic Surgeons

17               300 Birnie Avenue

18           Springfield, Massachusetts

19

20        December 15, 2008      5:25 p.m.

21

22

23             Jonathan P. Lodi

24             Court Reporter

**CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, MA**

0f281510-eeb6-4bd4-965b-fc1c27495147

Steven, M. Wenner, M.D.
December 15, 2008

Page 8

1   years in orthopedic surgery, and one year in

2   surgery of the hand.  I entered practice in July

3   of 1980 doing orthopedic surgery and surgery of

4   the hand.  About ten or twelve years later, I

5   limited myself only to surgery of the hand,

6   exclusively to surgery of the hand, and have

7   continued to do that since that time.

8        Q.   And are you board certified?

9        A.   I am.

10       Q.   And is that in orthopedic surgery?

11       A.   It's in orthopedic surgery.  And I

12  have what's called a certificate of added

13  qualifications in hand surgery.

14       Q.   And have you conducted any research or

15  written any papers?

16       A.   I have.

17       Q.   And do any of those relate to

18  repetitive stress injuries?

19       A.   They do not.

20       Q.   Anything that deals with railroad

21  work?

22       A.   No.

23       Q.   And have you been an expert witness in

24  the past, sir?

Steven, M. Wenner, M.D.
December 15, 2008

Page 10

1    Q.    And in state court or Federal court?

2    A.    I don't know.

3    Q.    And was that in a medical malpractice

4  case?

5    A.    I think that they -- I don't think

6  they were medical malpractice cases.  I think once

7  or twice, for personal injuries, as an expert.

8    Q.    And do you recall the outcome of the

9  cases in which you testified?

10   A.    I don't.

11   Q.    Do you have any connection with the

12  railroad industry?

13   A.    I don't.

14   Q.    Family, friends, anyone else?

15   A.    I took the train to New York last

16  Friday.  Other than that, that's it.

17   Q.    And it's my understanding that you

18  authored a report dated November 11th and an

19  addendum dated November 30th?

20   A.    Correct.

21   Q.    And were you paid by Mr. Joyce's

22  office in that record?

23   A.    I believe I was.

24   Q.    And one of the things that I saw with

Steven, M. Wenner, M.D.
December 15, 2008

Page 13

1    result of what he does at work, "I cannot state

2    whether it is or isn't."

3              Basically, my understanding is that

4    you don't have an opinion, within a reasonable

5    degree of medical certainty, as to whether or not

6    his job duties caused his left thumb arthritis, is

7    that correct?

8         A.   Caused as the primary event; you don't

9    mean aggravated?

10        Q.   No.  I mean caused as a primary event.

11        A.   I can't say for sure.

12        Q.   And you can't say within a reasonable

13   degree of medical certainty, correct?

14        A.   Yes.

15        Q.   And in the addendum report -- well,

16   let me ask you this:  Did you send off this letter

17   to Mr. Joyce's office?

18        A.   I did.

19        Q.   And then were you contacted later to

20   write an addendum report?

21        A.   Well, I was asked if I was willing to.

22        Q.   Okay.  And what do you mean by that?

23        A.   Well, I wasn't told to write one.

24        Q.   Oh, I'm sorry.  You're right.

Steven, M. Wenner, M.D.
December 15, 2008

1       A.      I don't.

2       Q.      **And have you relied on any particular**

3  **literature in coming to your opinion that there**

4  **was a biological worsening?**

5       A.      Well, you know, if you're asking have

6  I relied on a specific article that says that this

7  -- if you do this -- then here's the outcome of

8  it, no.  If you're referring to am I familiar with

9  literature that describes the natural biological

10 processes and disease states, their typical

11 evolution, what factors may aggravate them,

12 contribute to their worsening, et cetera, there's

13 a whole body of medical literature about that.

14 You know, that's what we learn in school and in

15 residencies.

16      Q.      **Is there a leading article that you're**

17 **aware of?**

18      A.      If there is, I couldn't quote it to

19 you.  Sorry.

20      Q.      **And fair to say that there's no**

21 **articles listed in your report, right?**

22      A.      Correct.

23      Q.      **And I didn't see any reference that**

24 **you looked at any particular book, journal, or**

**Steven, M. Wenner, M.D.**
**December 15, 2008**

1   anything like that, correct?

2         A.    That's correct.

3         Q.    And as you sit here today, you can't

4   name any of those studies, is that right?

5         A.    That's correct.

6         Q.    And were you aware of the type of job

7   duties that Mr. Crowther was doing when he

8   presented to you for the first time I think in

9   September of 2005?

10        A.    I was aware of them.  And it was 2005.

11        Q.    Okay.

12        A.    And it looks like it was September.

13        Q.    Okay.  Do you know any specific jobs

14   that he was doing at that time that --

15        A.    Well, I had it -- my understanding was

16   that he was working on the Railroad and repairing

17   track; repairing, laying, et cetera, track.

18        Q.    And is that the sum and substance of

19   your knowledge of his job duties?

20        A.    Well, that's the sum and substance of

21   what it is now.  I've taken care of some number of

22   railroad workers over the years, and I've listened

23   to what they describe as that type of work, so I

24   have a little bit of a sense of it.

Steven, M. Wenner, M.D.
December 15, 2008

1    about his job, other than what he told you?

2        A.    I don't think so.

3        Q.    So fair to say you didn't go out and

4    see the type of work that Mr. Crowther did?

5        A.    I did not.

6        Q.    And you've not seen the videotape of

7    the type of job he did?

8        A.    I have not.

9        Q.    And I assume that you've not seen any

10   ergonomic assessments of the work he did?

11       A.    I have not.

12       Q.    And you've not performed any type of

13   scientific analysis of exposure he had on the job,

14   correct?

15       A.    Correct.

16       Q.    And I guess the same would go for not

17   having done any analysis on the type of rest

18   periods and things like that, or non-work

19   exposures he had?

20       A.    Correct.

21       Q.    And fair to say you wouldn't know how

22   much time during a given shift that Mr. Crowther

23   might use his hands?

24       A.    Correct.

Steven, M. Wenner, M.D.
December 15, 2008

Page 24

1   over a period of years from sustained heavy use of

2   it in the face of that.

3        Q.    But it's still your opinion that you

4   can't say whether or not work caused that?

5        A.    A ligament -- whether it caused a

6   ligament injury?

7        Q.    Or the arthritis.

8        A.    Correct.

9        Q.    And you'd agree with me that you're

10  not an occupational medicine doctor, are you?

11       A.    I am not.

12       Q.    And you're aware of that specialty?

13       A.    I am.

14       Q.    And you would agree, sir, that you're

15  a treating physician; that means that you

16  basically see patients, spend your days with

17  patients and perform surgery, is that correct?

18       A.    That's correct.

19       Q.    And that you don't routinely examine

20  workers to determine if their work caused a

21  problem they might be having, would you agree?

22       A.    I'm not sure I understood the

23  question.

24       Q.    That you don't routinely examine

**Steven, M. Wenner, M.D.**
**December 15, 2008**

1  workers to determine if their work may have caused

2  a particular problem they were having?

3        A.    I'm not sure I would agree with that

4  entirely.  I examine people who are injured on the

5  job, a variety of jobs, regularly.  And I examine

6  -- and I'm frequently asked the question:  Did the

7  particular job that they did cause or result in a

8  problem that they have.

9        Q.    And in your practice, do you

10 ordinarily go out and review the job or get more

11 information about jobs?

12       A.    I never go out and review the job.

13 And I frequently get written reports about what

14 they do on their job.

15       Q.    And did you get a written report of

16 what Mr. Crowther did on his job?

17       A.    I don't recall having gotten one.

18       Q.    Okay.  And it certainly isn't part of

19 your file, is that correct?

20       A.    Correct.

21       Q.    And so at least in this case, in that

22 minor instance you deviated from your normal

23 practice, would you agree?

24       A.    No.  I didn't say that was my normal

Steven, M. Wenner, M.D.
December 15, 2008

Page 41

1      arthrodesis doesn't ordinarily result in any

2      future surgery, is that right?

3              A.      That's correct.

4              Q.      And you don't expect any future

5      surgery with regard to Mr. Crowther?

6              A.      Regarding his thumb?

7              Q.      Regarding his thumb.  I'm sorry.

8              A.      Correct.

9              Q.      You've not treated him for anything

10     else, other than his hand?

11             A.      No, I don't believe I have.

12             Q.      And are you aware of any scientific

13     literature that has shown that the type of work

14     duties that Mr. Crowther does may cause or

15     contribute to the development of problems in the

16     left metacarpal joint?

17             A.      No, not specific literature addressing

18     that.

19             Q.      Are you aware of any scientific

20     literature that shows that there are specific

21     changes that could be done to the type of work

22     that Mr. Crowther did, that would prevent him from

23     developing the type of problems he had in his left

24     thumb?

**Steven, M. Wenner, M.D.**
**December 15, 2008**

Page 42

1      A.     I'm not.

2      Q.     Is there any way to prevent the type

3  of injury or the type of condition that Mr.

4  Crowther had in his left thumb?

5      A.     Well, I think if none of those factors

6  that I mentioned to you before happened to you in

7  your lifetime, then you are likely not to get this

8  kind of arthritis.

9      Q.     Could you explain -- well, maybe

10  that's a bad word, a bad word choice.

11          It's my understanding that, based on

12  all the records I've seen anyway, that the problem

13  he was having was in his non-dominant left hand,

14  is that right?

15      A.     Yes.

16      Q.     And he didn't have similar problems in

17  his metacarpal joint of his right thumb, correct?

18      A.     Not that I know of, right.

19      Q.     And that it's my understanding that,

20  unless -- please correct me, if I'm wrong, Tom --

21  but he's right-handed, and that's his dominant

22  hand?

23      A.     I think so.

24      Q.     And does it make any sense why the

Steven, M. Wenner, M.D.
December 15, 2008

1    A.    Chopping wood, if you do it, you know,

2    once a month for two hours, it would make it hurt,

3    but it probably wouldn't be a true aggravating

4    factor.

5        Q.    **Okay.  How about --**

6        A.    If you chop word every day, all day,

7    that's a different story.

8        Q.    **How about, like, riding a bicycle?**

9        A.    No, I don't think so.

10       Q.    **And I apologize if I'm repeating, but**

11   **in terms of the things that you reviewed, the**

12   **materials you reviewed, I think we were in**

13   **agreement that you've not seen any objective**

14   **scientific change in the arthritis that was**

15   **contained in his left thumb as a result of his**

16   **job, is that right; we don't have any objective**

17   **scientific evidence that the disease process was**

18   **actually increased due to his work, is that right?**

19       A.    I think that's correct.

20       Q.    **If you give me just a minute or two, I**

21   **want to maybe just go through my notes.  And I**

22   **understand you've got to be out of here in fifteen**

23   **minutes, so I'm going to try to speed it up.**

24       A.    Go ahead.

Steven, M. Wenner, M.D.
December 15, 2008

1    comparison to the right hand --

2         A.    Correct.

3         Q.    -- in terms of the range of motion;

4    but did you look for arthritic changes in the

5    other hand, as well?

6         A.    I would have been looking for that.

7         Q.    And in terms of his job duty, was

8    there anything in particular that you thought was

9    problematic, in terms of his hand use

10   specifically, causing a problem in terms of his

11   symptoms or aggravation as you've stated? because

12   I understand you've not given a causation opinion,

13   but you've said there's an aggravation of some

14   sort.

15        A.    Right.

16        Q.    What was it specifically about his job

17   that aggravated his thumb?

18        A.    Well, the nature of gripping large

19   heavy objects is you have to wrap your thumb

20   around it.  And so if you haven't -- and that

21   joint, his arthritic metacarpal phalangeal joint,

22   will make contact with any large handle.  That's

23   how you're -- that's how your hand grips

24   something.  It always makes contact there.  So a

**Steven, M. Wenner, M.D.**
**December 15, 2008**

1    large handle, for example, would be the handle of

2    a sledgehammer, that he would make contact with,

3    and that might be a problematic thing for him to

4    do.  A large handle might be the handle on a big

5    pair of pliers, or maybe large wrenches.

6        Q.    And it's those things that you think

7    aggravated his pre-existing condition?

8        A.    I think so.

9        Q.    And was there anything the Railroad

10    could have done to prevent him from aggravating

11    it; I mean, what could they have done, in your

12    estimation?

13            MR. JOYCE:  Objection.  He's not here

14        as our ergonomic expert; he's here as a

15        medical expert, so I think that opinion is

16        outside the scope of his testimony.  It's a

17        negligence question.

18        Q.    (By Mr. Hall)  Are there any specific

19    changes that the Railroad could have made in his

20    job, that could have prevented him from having an

21    aggravation, as you've described it?

22        A.    I guess not having him used those

23    tools.

24        Q.    So anything that would have him