UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | |
|---|---|
| GEOFFREY CROWTHER,<br>      Plaintiff,<br>    v.<br><br>CSX TRANSPORATION, INC. and<br>CONSOLIDATED RAIL CORP,<br>      Defendant<br><br>AND<br><br>GEOFFREY CROWTHER,<br>      Plaintiff,<br>    v.<br><br>CSX TRANSPORTATION, INC. | 3:09-cv-10334-MAP<br><br><br><br><br><br><br><br><br>3:09-cv-11467-MAP |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO PRECLUDE PLAINTIFF'S EXPERT, MARTIN J. LUBER, M.D. FROM OFFERING ANY TESTIMONY AT TRIAL**

Defendants CSX Transportation, Inc. ("CSXT") and Consolidated Rail Corporation ("Conrail") (hereinafter referred to collectively as "Defendants"), hereby submit the following Memorandum of Law in support of their Motion in Limine to Preclude Martin J. Luber, M.D. from testifying at trial. In support thereof, Defendants aver as follows:

1. Plaintiff's expert, Martin J. Luber, M.D. ("Dr. Luber") is not qualified as an expert under Rule 702 because he is not an ergonomist or an occupational medicine doctor; and

2.     Plaintiff has failed to show that Dr. Luber has any reliable scientific or medical evidence to establish the necessary causal link between the Defendants' alleged negligence and his left elbow arthritis.

Accordingly, Plaintiff should be precluded from using Dr. Luber as an expert witness on causation.

## I.     FACTUAL BACKGROUND:

Defendants will not reiterate the facts of this case in their entirety here, instead Defendants hereby incorporate by this reference their Omnibus Statement of Facts in Support of Defendants' Motions in Limine and exhibits attached thereto. Briefly, Plaintiff disclosed Dr. Luber as a medical causation expert. A copy of Dr. Luber's written report is attached as Exhibit A. Dr. Luber first treated Plaintiff on February 26, 2007, for complaint of left elbow pain and mechanical locking symptoms. See Medical Record from Dr. Luber dated February 26, 2007, a copy of which is attached as part of Exhibit B. Dr. Luber again saw Plaintiff of March 19, 2007, and on January 19, 2009, before Plaintiff underwent surgery on his left elbow on February 27, 2009. See Medical records dated March 19, 2007 and January 19, 2009, copies of which are attached as part of Exhibit B; see also Operative Report dated February 27, 2009, a copy of which is attached as part of Exhibit B.

Dr. Luber admitted at deposition that he does not recall having any conversation whatsoever with Plaintiff regarding Plaintiff's job duties and how his duties would affect his left elbow. (Dep. of Martin Luber, M.D., at 13-14, 17, relevant portions of which are attached as Exhibit C.) Dr. Luber also admitted that he has no connection to the railroad industry nor does he commonly treat railroad employees. (Id. at 10, 25.) In fact, Dr.

Luber could not recall a single railroad employee he treated who presented with the same left elbow condition as Plaintiff. (Id.) More importantly, Dr. Luber testified that he never visited a job site to observe Plaintiff's work duties nor did he assess Plaintiff's active work periods versus his rest periods (i.e., the amount of time he spent performing manual labor versus the amount of time he spent resting and/or performing non-manual labor). (Id. at 35, 36.) In reaching the conclusions set forth in his written report, Dr. Luber apparently relied exclusively on a CSXT general job description of a trackman and welder provided by Plaintiff's counsel. (Id. at 12.)

In addition, Dr. Luber did not review a single medical record outside the New England Orthopedic Surgeons records related to Plaintiff's left elbow, which as we know, included only a handful of appointments. (Id.) Dr. Luber also admittedly did not rely on any medical literature related to Plaintiff's left elbow condition. (Id. at 14.) In fact, although Dr. Luber has published articles, he has never conducted any research or authored any articles related to repetitive stress injuries. (Id. at 9.) A cursory review of Dr. Luber's curriculum vitae also reveals that he is not an ergonomist, has apparently never received any ergonomic training nor is he an occupational medicine doctor. See Dr. Luber's curriculum vitae, a copy of which is attached as Exhibit D.

Based on a review of Dr. Luber's written report, it appears that he believes that Plaintiff's work history at CSXT caused Plaintiff's left elbow arthritis. At his deposition, however, Dr. Luber conceded that there is absolutely no way to determine the cause of arthritis. Indeed, the following exchange occurred at Dr. Luber's deposition:

Q.  Okay. Is there any way to determine the actual cause of the degenerative condition?

A.  No, not to my knowledge. Could I rephrase that?

Q. Sure.

A. It is more likely that you will develop degenerative change after an intra-articular fracture. So if we have a fracture in the knee, it's more likely to develop degenerative change later, but it's a different condition, so.

Q. Are you aware of Mr. Crowther suffering from any intra-articular fracture in any way?

A. Not that I'm aware of.

(Ex. C at 26.)

Dr. Luber further testified that Plaintiff in fact suffers from an osteochondritis dissecans of his left elbow, which he defined as an "injury to the blood supply of a growth plate that leads to a disruption of that blood supply, and . . . [ultimately] an injury to the underlying bone that supports the cartilage." (Id. at 38.) Dr. Luber testified that the osteochondritis dissecans lesion ("OCD lesion") may have caused Plaintiff's left elbow arthritis. Indeed, the following exchange took place at Dr. Luber's deposition:

Q. What other causes, in your opinion . . . other than his work, caused his degenerative condition?

A. Without certain knowledge, but there is a suggestion in his original CT scan that he might have had an old osteochondritis dissescans lesions on his capitellum.

* * *

Q. And it's possible that the OCD caused Mr. Crowther's degenerative condition?

A. It is possible that the OCD lesion was a contributing factor to his development of arthritis.

Q. Is there anyway to determine whether one contributing factor, whether it's the OCD or Mr. Crowther's job duties, caused or contributed more to the development of his degenerative condition?

A. I don't believe that's possible.

(Id. at 36, 38, 39.)

4

Based on a review of Dr. Luber's written report, it appears that he also believes that Plaintiff's work history at CSXT aggravated Plaintiff's left elbow arthritis. Again, however, at his deposition Dr. Luber was forced to admit that there is no objective scientific evidence that Plaintiff's work activities aggravated his left elbow arthritis. Indeed, the following exchange occurred at Dr. Luber's deposition:

Q. Is there - - do you have any objective scientific evidence that . . . Mr. Crowther's elbow disease process was exacerbated by his work activities?

A. No.

(Id. at 22-23.)

Dr. Luber further admitted that, based on the time period during which Plaintiff's left elbow arthritis was apparently aggravated, something other than Plaintiff's work activities caused the aggravation. (Id. at 33.) Indeed, as noted above, Plaintiff initially presented to Dr. Luber in February and March 2007, at least three months after he stopped working. At that time, Plaintiff was admittedly asymptomatic. (Id. at 28-29; Ex. B.) Plaintiff returned to Dr. Luber twenty-two (22) months later with increased mechanical locking symptoms and pain. (Id.) Dr. Luber testified that he considered Plaintiff's complaints to be an aggravation of his left elbow arthritis. (Ex. C at 29, 32.) Interestingly, however, Plaintiff had not worked a single day in the entire twenty-two (22) month period between his visits with Dr. Luber. In fact, Plaintiff never returned to work after December 2006. Upon learning that Plaintiff has not worked a single day between January 2007 and January 2009, Dr. Luber conceded that something other than work aggravated his left elbow arthritis. (Id. at 33.) The following exchange took place at Dr. Luber's deposition:

Q:     If I represent to you that Mr. Crowther did not work at all between when you saw him in 2007 and 2009, is it safe to state that conditions, other than his work, were aggravating his condition?

A.     Other things may have exacerbated his elbow at that time, yes.

(Id.)

Consequently, Dr. Luber cannot opine to a reasonable degree of medical certainty that Plaintiff's work habits caused and/or aggravated his left elbow arthritis. More importantly, although Plaintiff disclosed Dr. Luber as a medical causation expert, Dr. Luber has not provided the requisite medical causation testimony linking the development of Plaintiff's left elbow arthritis to any negligent failure of Defendants to provide a reasonably safe workplace. Instead, to the extent Dr. Luber expressed any opinion at all on causation, he focused entirely on the physical activities that Plaintiff encountered in the everyday, routine performance of his job functions as a trackman and welder, and the routine operation of the equipment he used. (Id. at 18-19.)

## II.   DISCUSSION OF LAW:

**A.   This Court Should Preclude Dr. Luber from Testifying as An Expert Witness Because His Opinion Lacks The Necessary Factual and Scientific Foundation Under Rule 702**

Expert testimony is only admissible when the testimony is reliable and would assist the trier of fact to understand the evidence or determine a fact at issue in a case. See Fed. R. Evid. Rule 702; Daubert v. Merrell Dow Pharm., 509 U.S. 579, 589-91 (1993). The proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies the Daubert standard. Fed. R. Evid. Rule 702 advisory committee's note (2000 Amends.); cf. Bourjaily v. United States, 483 U.S. 171, 175-76 (1987) (holding that the

proponent of hearsay evidence must prove to the court, by a preponderance of the evidence, that the Rules of Evidence have been satisfied).

In Daubert, the Supreme Court held that when faced with the proffer of expert testimony under Rule 702, the trial judge, pursuant to Rule 104(a), must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically or technically valid and can properly be applied to the facts at issue. Daubert, 509 U.S. at 592-93. The Supreme Court noted that the court must consider the following when determining whether an expert's opinion(s) meets the minimum standards of reliability:

   (1)   Whether the theory or technique in question can be (and has been) tested;
   (2)   Whether the theory or technique has been subjected to peer review and publication;
   (3)   The known potential rate of error and the existence and maintenance of standards controlling the techniques, operation; and
   (4)   General acceptance by the relevant scientific community.

Id. at 591-95.

Federal courts have noted that the more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable. O'Conner v. Commw. Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994) (holding Rule 702 requires more than subjective belief or speculation); United States v. Santiago, 156 F. Supp. 145, 147 (D. P.R. 2001) (stating purpose of Daubert inquire is to rule out subjective belief or speculation); Best v. Lowe's Home Ctrs., Inc., 2008 U.S. Dist. LEXIS 45175, at *20 (E. D. Tenn., June 4, 2008) (holding that if expert's methodology cannot be explained in objective terms then methodology is presumptively unreliable). An expert's opinion cannot be based solely on the weight of his own authority. See Gen. Elec. v. Joiner, 522

U.S. 136, 146 (1997). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." Id. "The expert 'must explain precisely how [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field." Lust v. Merrell Dow Pharm., 89 F.3d. 594, 597 (9th Cir. 1996) citing Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1318-19 (9th Cir. 1995).

### 1. Dr. Luber Is Not Qualified to Offer A Medical Causation Opinion in This Case

Dr. Luber is not qualified to provide causation testimony because he lacks the training and experience necessary to link Plaintiff's work activities with his degenerative disc disease. See Ex D. Under Daubert, the trial judge must determine whether a proffered expert is qualified to testify and whether his testimony is scientifically reliable. 509 U.S. at 592-593. As noted by the Seventh Circuit:

> [W]e have no doubt that an expert's qualifications bear upon the scientific validity of his testimony. In United States v. Benson, 941 F.2d 598 (7th Cir. 1991), we stated, "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness's expertise) rather than simply an opinion broached by a purported expert." Id. at 604. Because an expert's qualifications bear upon whether he can offer special knowledge to the jury, the Daubert framework permits – indeed, encourages – a district judge to consider the qualifications of a witness. Cf. Braun v. Lorillard Corp., 84 F.3d 230, 234-35 (7th Cir. 1996).

United States v. Vitek Supply Corp., 144 F.3d 476, 486 (7th Cir. 1998)

Dr. Luber is not qualified to offer an expert opinion in this case because he has no training whatsoever in analyzing work place exposure to risk factors for repetitive stress injuries, let alone railroad work place exposure, to determine whether Plaintiff's arthritic conditions were actually caused and/or aggravated by his work place activities. Ex. D.

More importantly, Dr. Luber is a medical doctor specifically tasked with diagnosing medical conditions. In making a diagnosis, whether in Plaintiff's case or another, Dr. Luber is not concerned with also diagnosing the cause of the condition.

In addition, Dr. Luber has no sound or reliable basis to render an opinion that Plaintiff's left elbow condition is work-related based on the fact that he admittedly did not rely on any medical literature. (Id. at 14.) More importantly, Dr. Luber has never conducted any research or authored any articles related to repetitive stress injuries. (Id. at 9.) The Court should, therefore, preclude Dr. Luber from offering any expert testimony because he is not qualified to opine on medical causation under the circumstances of this case.

### 2. Dr. Luber's Opinions Are Not Based on "Sufficient Facts or Data"

Here, Dr. Luber's opinions do not pass muster under the tests set forth in Rule 702, Daubert, or its progeny. As noted, *supra*, at his deposition, Dr. Luber testified he does not recall having any conversation whatsoever with Plaintiff regarding Plaintiff's work history and how his duties affected his left elbow. (Ex. D at 13-14, 17.) Dr. Luber also admitted that he has no connection to the railroad industry nor does he commonly treat railroad employees. (Id. at 10, 25.) In fact, Dr. Luber could not recall a single railroad employee he treated who presented with the same left elbow condition as Plaintiff. (Id.) The substance of Dr. Luber's knowledge of Plaintiff's work history and job duties is based exclusively on a CSXT general job description of a trackman and welder provided by Plaintiff's counsel. (Id. at 12.)

In addition, Dr. Luber did not review a single medical record outside the New England Orthopedic Surgeons records related to Plaintiff's left elbow, which as we know,

9

included only a handful of appointments. (Id.) Dr. Luber also admittedly did not rely on any medical literature related to Plaintiff's left elbow condition. (Id. at 14.) Dr. Luber clearly based his opinion on insufficient facts and data. Unfortunately for Plaintiff, Dr. Luber's lack of knowledge is exactly what Rule 702 was designed to protect litigants from.

> **3. Dr. Luber's Expert Opinion Is Not Based on Reliable Scientific Methodology**

As noted, *supra*, Dr. Luber did not have a single conversation with Plaintiff about his work history that he ultimately relied on in reaching the opinions expressed in his written report. Dr. Luber also admitted at his deposition that he did not review and/or rely on any medical literature related to Plaintiff's left elbow condition in reaching the opinions expressed in his written report. (Ex. D at 12.) Dr. Luber further conceded that he never visited a job site to observe Plaintiff's work duties nor did he quantify Plaintiff's active work periods verses his rest periods (i.e., the amount of time he spent performing manual labor verses the amount of time he spent resting and/or performing non-manual labor). (Id. at 35, 36.) Instead, Dr. Luber relied exclusively on a CSXT general job description of a trackman and welder, which was provided by Plaintiff's counsel, to reach the opinions expressed in his written report.

Although Dr. Luber provides his written opinions "to a reasonable degree of medical certainty," he testified that there is absolutely no way to determine the cause of arthritis. (Id. at 26.) Dr. Luber further admitted that Plaintiff's OCD lesion may have caused Plaintiff's left elbow arthritis. (Id. at 36, 38, 39.) He was also forced to admit that there is no objective scientific evidence that Plaintiff's work activities aggravated his left elbow arthritis. (Id. at 22-23.) Dr. Luber also ultimately concluded that something

other than his work must have aggravated his elbow based on the fact that Plaintiff's elbow symptoms apparently worsened over the two year period he was out-of-work. (Id. at 33.) Dr. Luber has clearly failed to apply any reliable principles or methods to his analysis of this case. Thus, his opinions are based entirely on the mere weight of his own opinion. This is obviously not permitted under Rule 702 and the corresponding case law mentioned, *supra*. Accordingly, this Court should not permit Dr. Luber to testify as an expert.

    **4.** **Dr. Luber Offers No Opinion Whatsoever Regarding Defendants' Negligence and The Alleged Causal Link Between Defendants' Negligence and Plaintiff's Left Thumb Arthritis**

To the extent this Court finds Dr. Luber qualified to render an opinion in this case and that the foundation of his opinions pass muster under Daubert, Defendants contend that Dr. Luber should be excluded on the grounds that his opinions are based entirely on the physical activities that Plaintiff encountered in the everyday, routine performance of his job functions as a trackman, and the routine operation of the equipment that he used, and not on any negligence of Defendants. It is not enough in an occupational exposure case for a plaintiff to prove that his normal and routine work activities caused his conditions. A plaintiff must instead demonstrate that his conditions were caused by some increased repetition, force, posture, or other exposure, over and above that normally experienced in the workplace, and that these atypical exposures were further caused by the defendant's negligence. Interestingly, Dr. Luber testified that Defendants could not have changed anything about Plaintiff's working conditions so as to prevent Plaintiff from developing his alleged conditions. Indeed, the following exchange took place at Dr. Luber's deposition:

> Q. Is it your opinion that Mr. Crowther's work, his normal every day work on the railroad could cause or contribute to the degenerative changes that he was suffering from in his left elbow?
>
> A. It is.
>
> Q. Would you agree that any activity could, any repetitive activity at work could cause the degenerative condition that he was suffering from?
>
> A. I think any repetitive work could increase the likelihood of developing arthritis.
>
> Q. So you have not given an opinion regarding whether CSX could have done something differently to prevent Mr. Crowther from developing a degenerative condition?
>
> A. Correct.

(Ex. C at 18-19.) Accordingly, this Court should preclude Dr. Luber from offering any medical causation testimony at trial.

### III. CONCLUSION:

Based on the above-stated reasons, this Honorable Court should preclude Martin J. Luber, M.D., from testifying as an expert at trial, and GRANT Defendants' Motion.

### IV. REQUEST FOR ORAL ARGUMENT:

In accordance with Local Rule 7.1(D), Defendants believe that oral argument may assist the Court and wishes to be heard. Defendants, therefore, request that the Court schedule a hearing on the instant Motion.

Respectfully submitted,
Defendants, CSX Transportation, Inc., and
Consolidated Rail Corporation,
By their attorneys,


 /s/ Heather M. Gamache_____
Michael B. Flynn, Esq., BBO# 559023
mbflynn@flynnwirkus.com
Lori A. Wirkus, Esq., BBO # 635525
lawirkus@flynnwirkus.com
Heather M. Gamache, BBO# 671898
hgamache@flynnwirkus.com
Flynn & Wirkus, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

DATED: November 8, 2010
G:\F & A\CASE FILES\CSX OCCUPATIONAL\Worn\Crowther - WORN - 61-123\Trial\Motions in Limine\MIL to Preclude Luber, M.D\MOL re MIL to preclude Luber

## **CERTIFICATE OF SERVICE**

I, Heather M. Gamache, attorney for Defendants CSXT and Conrail hereby certify that I have served true and correct copies of the foregoing upon all counsel of record electronically via *CM/ECF* this 8th day of November, 2010.

/s/ Heather M. Gamache
Heather M. Gamache, Esq.