# EXHIBIT "C"

Martin J. Luber, M.D.
May 24, 2010

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION
3:09-CV-10334-PBS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
GEOFFREY CROWTHER,                    \*
                    Plaintiff    \*
V.                                    \*
CSX TRANSPORTATION, INC.,      \*
and CONSOLIDATED RAIL CORP.,   \*
                    Defendants    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:  DR. MARTIN J. LUBER
OFFICES OF NEW ENGLAND ORTHOPEDIC SURGEONS
300 Birnie Avenue
Springfield, Massachusetts  01107
May 24, 2010, 5:30 p.m.

Michele L. Mariani
Certified Shorthand Reporter
BEACON HILL COURT REPORTING, INC.
44 Bayswater Street
Boston, Massachusetts  02128
617.569.8050

Martin J. Luber, M.D.
May 24, 2010

1        A.      No.

2        Q.      Altered?

3        A.      No.

4        Q.      Has any disciplinary action ever

5    been taken against you?

6        A.      No.

7        Q.      Okay.  Have you authored any

8    papers or conducted any research?

9        A.      I have.  They're listed in my CV.

10        Q.      Are any of them related to

11    repetitive stress injuries?

12        A.      They are not.

13        Q.      Is it your understanding that

14    you've been retained as an expert by Mr. Joyce

15    in this case?

16        A.      I don't believe that I have been.

17    I believe I've been retained as a witness of

18    fact for the services I provided for

19    Mr. Crowther.

20        Q.      Okay.  So were you paid for your

21    narrative report?

22        A.      I believe that I was, yes.

23        Q.      Have you served as an expert

24    witness in the past?

Martin J. Luber, M.D.
May 24, 2010

1     A.     I have not.

2     Q.     Have you testified in court before?

3     A.     No.

4     Q.     But you said you've given prior

5   depositions?

6     A.     Yes.

7     Q.     What were those in connection

8   with?

9     A.     Care rendered to patients.

10     Q.     On a fact witness basis?

11     A.     Yes.

12     Q.     Were they personal injury cases, or

13   medical malpractice cases, if you know?

14     A.     Personal injury cases.

15     Q.     Okay.  Do you have any connection

16   to the railroad industry?

17     A.     I do not.

18     Q.     And referring back your report or

19   your narrative report, does your narrative

20   report contain all of your opinions with regard

21   to Mr. Crowther's condition?

22     A.     It contains my opinion regarding

23   the injury that I treated him for regarding his

24   left elbow.

Martin J. Luber, M.D.
May 24, 2010

Page 12

1  related to Mr. Crowther's job duties at the

2  railroad?

3          A.      I did.

4          Q.      What documents did you review?

5          A.      I had a listing of the job

6  description that he provided for or while on the

7  job at the railroad.

8          Q.      Do you have a copy of that?

9          A.      I don't currently in my possession.

10          MR. JOYCE:  I do.  Do you want what

11      I sent to him, Heather?

12          MS. GAMACHE:  Yes, that would be

13      great.

14          MR. JOYCE:  I sent two.  I sent him

15      the actual trackman.

16          MS. GAMACHE:  Yeah, I'm going to

17      mark them as exhibits.  We can mark them

18      as Exhibit 5.

19

20          (Exhibit 5, CSX Job Description,

21          2 pgs., Marked.)

22

23          Q.      (By Ms. Gamache)  Take a look at

24  those, and let me know if those are the

Martin J. Luber, M.D.
May 24, 2010

Page 13

1  documents you reviewed.

2          A.      (Doctor looks over documents.)

3  Yes, these are what I reviewed when preparing

4  his narrative report.

5          Q.      Do you mind if I take a look at

6  them real quick.

7                  Other than the medical records from

8  your office, the entire NEOS office, did you

9  review any outside medical records?

10         A.      No.

11         Q.      And other than the two documents

12  provided to you by Mr. Joyce, the CSX Position

13  Information document, did you review any other

14  documents related to Mr. Crowther's job duties?

15         A.      No.

16         Q.      Did you have any conversations with

17  Mr. Crowther regarding his job duties?

18         A.      Not that I recall.

19         Q.      So you don't recall discussing his

20  job with him while you were treating him?

21         A.      We did in terms of his abilities to

22  return to work after the fact.  I don't recall

23  any specific other descriptions or conversations

24  regarding his job duties, and how they would

Beacon Hill Court Reporting, Inc.
617.569.8050

Martin J. Luber, M.D.
May 24, 2010

Page 14

1   pertain to his left elbow.

2          Q.      When you say after the fact, are

3   you referring to after the surgery, his left

4   elbow surgery?

5          A.      No.  When we first treated him,

6   when I first treated him in 2007, we did

7   describe how his left elbow pain was associated

8   with, or at least brought upon by his working,

9   i.e., when he worked, he would have elbow pain.

10  And after his elbow surgery, we did discuss how

11  it might impact his ability to return to work.

12         Q.      Okay.  And so am I correct that you

13  don't recall having any conversations with him

14  regarding tools that he used, or the way in

15  which he held the tools, or anything of that

16  nature?

17         A.      I don't recall.

18         Q.      Okay.  Did you rely on any

19  literature in reaching your opinion that's in

20  the narrative report?

21         A.      In my -- the literature I reviewed

22  for my general education and how I provide

23  orthopedic services, but not specifically an

24  article directly related to Mr. Crowther's

Martin J. Luber, M.D.
May 24, 2010

Page 17

1    by CSX Industries, would in fact increase the

2    likelihood that Mr. Crowther would develop

3    degenerative osteoarthropathy of his left elbow

4    and result in mechanical symptoms associated

5    with loose bodies."

6              When you refer to work habits, what

7    are you referring to, that is different from his

8    work requirements?  How is habit different than

9    requirement?

10         A.    I don't believe that they are.

11   Different choice of words.

12         Q.    So you're using habit and

13   requirement synonymously?

14         A.    Yes.

15         Q.    Okay.  And you testified earlier

16   that you did not speak, or you don't recall a

17   specific conversation with Mr. Crowther

18   regarding work habits?

19         A.    I don't recall a specific

20   conversation, no.

21         Q.    Okay.  So in preparing your

22   narrative, you didn't speak to Mr. Crowther

23   beforehand in preparation to prepare the

24   narrative?

Martin J. Luber, M.D.
May 24, 2010

1       A.      No.

2       Q.      Is it your opinion that

3   Mr. Crowther's work, his normal every day work

4   on the railroad could cause or contribute to the

5   degenerative changes that he was suffering from

6   in his left elbow?

7       A.      It is.

8       Q.      You have not given an opinion, am I

9   correct, whether or not anything separate and

10  aside from those daily work habits -- I'm sorry,

11  let me rephrase that.

12          Would you agree that any activity

13  could, any repetitive activity at work could

14  cause the degenerative condition that he was

15  suffering from?

16      A.      I think any repetitive work could

17  increase the likelihood of developing arthritis,

18  yes.

19      Q.      So you have not provided an opinion

20  regarding whether there was something -- whether

21  the position, he was holding something, or the

22  specific work that he was doing, whether there

23  was anything wrong with it, just simply that he

24  was doing it?

Martin J. Luber, M.D.
May 24, 2010

Page 19

1          A.     Correct.

2          Q.     So you have not given an opinion

3     regarding whether CSX could have done something

4     differently to prevent Mr. Crowther from

5     developing a degenerative condition?

6               MR. JOYCE:  Dr. Luber is not our

7          liability expert, he's simply a medical

8          causation expert, so we're not offering an

9          unsafe work place, if that's what you

10         mean.

11              MS. GAMACHE:  I understand.  I'm

12         just confirming that he's not providing an

13         opinion, he's simply saying the repetitive

14         activity at work caused or at least

15         contributed to the degenerative changes.

16              MR. JOYCE:  Okay.

17              MS. GAMACHE:  Is that correct?

18              THE WITNESS:  Correct.

19         Q.     (By Ms. Gamache)  Would you agree

20    that there are other activities can cause

21    degenerative changes in the elbow?

22         A.     Yes.

23         Q.     What types of activities can cause

24    degenerative changes?

Martin J. Luber, M.D.
May 24, 2010

Page 22

1        A.      I have not seen that personally or
2   described in the literature.
3        Q.      How about fly fishing?
4        A.      Fly fishing is in some degree
5   repetitive with casting.  It would depend upon
6   which arm, I guess, you casted with.
7        Q.      And I'm not sure if it's in your
8   record -- it's probably somewhere in your
9   records that Mr. Crowther is right hand
10  dominant, correct?
11       A.      I'd have to review my records.  If
12  that is accurate, I don't know that.
13       Q.      I can represent to you that he's
14  right hand dominant.
15       A.      Fine.
16       Q.      And this injury was his left
17  elbow, correct?
18       A.      Correct.
19       Q.      Is there -- do you have any
20  objective scientific evidence that
21  Mr. Crowther's work activities were exacerbated
22  by -- oh, I'm sorry, Mr. Crowther's elbow
23  disease process was exacerbated by his work
24  activities?

Martin J. Luber, M.D.
May 24, 2010

Page 23

1        A.      No.

2        Q.      Do you have an opinion regarding

3  when Mr. Crowther became symptomatic, when his

4  left elbow became symptomatic?

5        A.       He first complaint of it to

6  Dr. Wenner, who was treating him for or seeing

7  him for his hand, I believe in 2006 or 2007.

8  He was referred to me in 2007.  That was the

9  first knowledge I had of his complaints.

10        Q.      In general, in your opinion, when

11  does a patient become symptomatic?

12        A.      Well, I mean, I would relate being

13  symptomatic to having enough complaints to seek

14  out medical care for.

15        Q.      Were you aware of Mr. Crowther

16  seeking out medical attention prior to 2006?

17        A.      I am not.

18        Q.      If I represent to you that

19  Mr. Crowther sought medical attention in 2002

20  for elbow pain, and was diagnosed with bilateral

21  medial epicondylitis, as well as tennis elbow

22  and cubital tunnel, would that change when you

23  believe he became symptomatic for the disease

24  process in his left elbow?

Martin J. Luber, M.D.
May 24, 2010

Page 25

1          Q.      Is Cubital Tunnel Syndrome in any
2     way indicative of degenerative changes?
3          A.      Not necessarily.
4          Q.      In what way would it be indicative
5     of degenerative changes?
6          A.      There is a condition called Tardy
7     Ulnar Nerve Palsy, which is Cubital Tunnel
8     Syndrome, which develops years after a
9     fracture.  It usually is associated with
10    significant loss of motion.  But those are
11    different than Mr. Crowther's elbow, which had
12    range of motion with mechanical locking
13    episodes, so different disease process.
14         Q.      Have you treated other railroad
15    workers with a similar condition?
16         A.      I have not.
17         Q.      Is the degenerative condition that
18    Mr. Crowther suffers from in his left elbow, is
19    that a common condition?
20         A.      Elbow arthritis is relatively
21    uncommon.
22         Q.      Do you treat other railroad
23    workers, in general?
24         A.      I have seen other railroad

Martin J. Luber, M.D.
May 24, 2010

Page 26

1   workers.  I don't have a large percentage of

2   them in my practice.

3        Q.     The ones that you have seen, do you

4   know whether they have the same position or type

5   of position that Mr. Crowther had?

6        A.     I do not know that for a fact.

7        Q.     Okay.  Is there any way to

8   determine the actual cause of the degenerative

9   condition?

10       A.     No, not to my knowledge.  Could I

11  rephrase that?

12       Q.     Sure.

13       A.     It is more likely that you will

14  develop degenerative change after an

15  intra-articular fracture.  So if we have a

16  fracture in the knee, it's more likely to

17  develop degenerative change later, but it's a

18  different condition, so.

19       Q.     Are you aware of Mr. Crowther

20  suffering from any intra-articular fracture in

21  any way?

22       A.     Not that I'm aware of.

23       Q.     So to diagnose a degenerative

24  condition, you would assess symptoms, and then

Beacon Hill Court Reporting, Inc.
617.569.8050

Martin J. Luber, M.D.
May 24, 2010

Page 28

1   that I have in front of me.

2               MS. GAMACHE:   Then we'll that as an

3         exhibit, as well.

4

5               (Exhibit 6, Office Note, 2/26/07,

6               Marked.)

7

8         Q.      (By Ms. Gamache)  Now, referring

9   back to what was marked as Exhibit 6, is that

10  your office note dated February 26th, 2007?

11        A.      It is.

12        Q.      In your office note, it indicates

13  in the first paragraph, "Since he has been

14  relatively inactive, his left elbow has become

15  relatively asymptomatic for him;" is that

16  correct?

17        A.      Yes.

18        Q.      So at the time you saw him -- at

19  the time that you saw Mr. Crowther, was he --

20  what were his symptoms, if you've written

21  relatively asymptomatic?

22        A.      He was really having little or no

23  symptoms, because, again, recent surgery with

24  Dr. Cowan and separately with Dr. Wenner, he

Martin J. Luber, M.D.
May 24, 2010

Page 29

1   hadn't been using his arm very much.

2        Q.      And that, based on the records, was

3   the first time that you saw --

4        A.      That was the first time I was asked

5   to see him, yes.

6        Q.      Okay.  Do you recall, at any point

7   after seeing Mr. Crowther for the first time on

8   February 26th, 2007, his condition worsening,

9   his left elbow condition?

10       A.      Not until he returned to me in, I

11  believe it was 2009, when he was experiencing

12  more mechanical episodes in his left elbow.

13       Q.      Would you consider that to be an

14  aggravation or exacerbation of his condition

15  from when you saw him on February 26th, 2007?

16       A.      Yes.  As I outlined in that

17  original note, the reason to do surgery would be

18  based upon whether or not he was having

19  mechanical locking episodes.

20       Q.      I'm going to refer you to a note

21  dated March 19th, 2007.

22       A.      I don't have that, as well.

23       Q.      Okay.  That's fine.

24       A.      (Doctor looks over document.)

Beacon Hill Court Reporting, Inc.
617.569.8050

Martin J. Luber, M.D.
May 24, 2010

Page 32

1    had bilateral total knee arthroplasty with

2    Dr. Laymen .   I never treated him for his knee.

3         Q.      Okay.   Although that's in one

4    sentence, when you say he has been having

5    ongoing mechanical symptoms and discomfort, are

6    you referring, then, to his knee or his elbow?

7         A.      To his elbow.

8         Q.      And I believe you testified earlier

9    that that would be -- that based on the times

10   you saw him in February of 2007 and March of

11   2007, that in January of 2009, he is no longer

12   asymptomatic, and is now --

13        A.      Having symptoms.

14        Q.      -- having symptoms?

15        A.      That has brought him back to seek

16   care, yes.

17        Q.      And I believe you testified that

18   that was an aggravation of his condition?

19        A.      At least his symptoms were enough

20   that he cycled back to seek care again regarding

21   his left elbow.

22        Q.      If I represent to you that

23   Mr. Crowther did not work at all between when

24   you saw saw him in 2007 to 2009, is it safe to

Martin J. Luber, M.D.
May 24, 2010

Page 33

1   state that conditions, other than his work, were

2   aggravating his condition?

3           MR. JOYCE:  Objection.

4           THE WITNESS:  I'm answering?

5           MR. JOYCE:  Yes.

6           THE WITNESS:  Other things may have

7       exacerbated his elbow at that time, yes.

8           Q.     (By Ms. Gamache)  I'm going to

9   refer you back to the February 26th, 2007

10  record.

11          A.     Yes.

12          Q.     That was the first day that you

13  that treated Mr. Crowther.  On that date, based

14  on the elbow -- based on the condition of the

15  elbow, would you have considered him unable to

16  work, simply referring to the elbow condition,

17  not any other condition he was suffering from?

18          A.     That question wasn't posed to me at

19  that time.  I would have assumed that he could

20  be able to work, given the way his elbow

21  appeared on that date.

22          Q.     Okay.  And based on his condition

23  on that date, would you have considered him able

24  to work at full capacity?

Martin J. Luber, M.D.
May 24, 2010

Page 35

1    is related to what the patient tells me upon

2    arrival

3         Q.      Okay.  And that's information that

4    you take down, or someone else takes down?

5         A.      That I take down.

6         Q.      Okay.  And when you say past

7    several years, is that more than one year?

8         A.      It is certainly non-specific, but

9    it would be more than one year.

10        Q.      Is it more than two years?

11        A.      I don't know.  Several would

12   usually mean more than two.

13               MS. GAMACHE:  Okay.  I'm going to

14           take a minute and review any notes, Tom.

15               MR. JOYCE:  Sure.

16        Q.      (By Ms. Gamache)  Going back to

17   when you prepared your narrative report, you

18   indicated that you referred to what's been

19   marked as Exhibit 5, which were job

20   descriptions.  Did you assess any activity

21   versus rest period, as far as manual labor, and

22   how Mr. Crowther's job duties would have caused

23   or contributed to his degenerative condition?

24        A.      No.

Martin J. Luber, M.D.
May 24, 2010

1      Q.      So you didn't speak to him or

2  assess any percentage, if he's doing manual

3  work, this percentage of time versus resting it

4  percentage of the time?

5      A.      I did not.

6      Q.      Have you ever visited a job site

7  where individuals doing what Mr. Crowther did in

8  his work duties were doing?

9      A.      No.

10      Q.      Also looking at your report, on the

11  second page, in the second to last paragraph,

12  you indicate, "At this time, I believe that to a

13  reasonable degree of medical certainty that

14  Mr. Crowther's left elbow injury was exacerbated

15  and aggravated, and at least partially caused by

16  his work history at CSX Transportation."

17          What other causes, in your opinion

18  -- or I'm sorry, what else, other than his work,

19  caused his degenerative condition?

20      A.      Without certain knowledge, but

21  there is a suggestion in his original CT scan

22  that he might have had an old osteochondritis

23  dissecans lesion on his capitellum.

24      Q.      And can you tell, based -- I'm

Martin J. Luber, M.D.
May 24, 2010

Page 38

1          MS. GAMACHE:  Oh, it's in your

2      file.  We don't need to mark it as an

3      exhibit, then.

4      Q.     (By Ms. Gamache)  And the OCD that

5  you're referring to was visible on the CT scan,

6  correct?

7      A.     Correct.

8      Q.     Okay.

9      A.     Well, it can't be confirmed to be

10  an OCD lesion, but that is the most likely

11  diagnosis that would be associated with the

12  radiographic abnormalities seen on the CT scan.

13     Q.     And it's possible that the OCD

14  caused Mr. Crowther's degenerative condition?

15          MR. JOYCE:  Objection.

16          THE WITNESS:  It is possible that

17      the OCD lesion was a contributing factor

18      to his development of arthritis.

19     Q.     (By Ms. Gamache)  Is there any way

20  to determine whether one contributing factor,

21  whether it's the OCD or Mr. Crowther's job

22  duties, caused or contributed more to the

23  development of his degenerative condition?

24          MR. JOYCE:  Objection.

Beacon Hill Court Reporting, Inc.
617.569.8050

Martin J. Luber, M.D.
May 24, 2010

1           THE WITNESS:  I don't believe

2      that's possible.

3      Q.     (By Ms. Gamache)  I'm going to

4  refer you again to the CT scan.  What, in

5  addition to OCD, did the CT scan reveal?

6      A.        Again, degenerative spurring, and

7  multiple intra-articular loose bodies.

8      Q.        If you don't mind, explain briefly

9  what spurring is.

10      A.        In any joint that is undergoing

11  osteoarthritic change, and therefore, the loss

12  of cartilage on the end of the joint surfaces,

13  the most common response in the body is to make

14  osteophytes or bone spurs at the margins or

15  edges of those joints.  In the elbow, those bone

16  spurs often cause limited range of motion.

17      Q.        And then loose bodies?

18      A.        Loose bodies are found in a joint

19  for various reasons, but most commonly during

20  the development of degenerative arthritis,

21  pieces of cartilage are damaged or flaked off or

22  loosened, and they grow over time, much like a

23  pearl does, and get larger.

24      Q.        So this type of arthritic