# EXHIBIT "C"

Robert Scott Cowan, MD
December 16, 2008

Page 1

COURT OF COMMON PLEAS

PHILADELPHIA COUNTY - CIVIL DIVISION

DOCKET NO. 02389

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GEOFFREY CROWTHER,

    Plaintiff,

Vs.

CONSOLIDATED RAIL CORPORATION

and CSX TRANSPORTATION, INC.,

    Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF ROBERT SCOTT COWAN, M.D.

New England Orthopedic Surgeons

300 Birnie Avenue

Springfield, Massachusetts

December 16, 2008    5:20 p.m.

Jonathan P. Lodi

Court Reporter

# Robert Scott Cowah, MD
# December 16, 2008

### Page 6

1  went into an orthopedic residency program,
2  starting with a surgical internship, at the St.
3  Elizabeth's Hospital in Boston, and then the
4  orthopedic portion was the Boston University
5  affiliated hospitals. That ended in 1983.
6  Afterwards I did a fellowship in spinal surgery at
7  the New England Baptist Hospital.
8      Q. And how long have you been at this
9  practice?
10     A. Fourteen years.
11     Q. And are you board certified?
12     A. Yes.
13     Q. And what's your board in?
14     A. Orthopedic surgery.
15     Q. And when did you obtain certification?
16     A. 1996.
17     Q. Did you have to retake the test?
18     A. I recertified ten years later.
19     Q. And have you conducted any research in
20  the area of repetitive stress injuries or
21  cumulative trauma disorders?
22     A. No.
23     Q. And have you had a past experience as
24  an expert witness?

### Page 7

1      A. Yes.
2      Q. Can you tell me the type of cases that
3  you've served in as an expert?
4      A. Auto accident cases, medical
5  malpractice cases, and Workers' Compensation
6  cases.
7      Q. Have you ever — is this your first
8  railroad case?
9      A. Yes.
10     Q. And the auto accident cases, was that
11 primarily for your patient, or was that as a
12 defense medical expert?
13     A. Primarily for patients.
14     Q. And the medical malpractice, is that
15 for the defense?
16     A. Yes.
17     Q. And the Workers' Compensation would be
18 probably for your patients?
19     A. Yes.
20     Q. And have you ever testified live, in
21 court?
22     A. Yes.
23     Q. And where have you testified?
24     A. In Springfield.

### Page 8

1      Q. State court or Federal?
2      A. State.
3      Q. And do you recall the type of case
4  that was?
5      A. A woman fell off a porch.
6      Q. And do you recall what the outcome of
7  that case was?
8      A. They found for the plaintiff.
9      Q. Have you ever been excluded or not
10 permitted to give your full opinions in any court?
11     A. No.
12     Q. Do you have any connection with the
13 railroad industry?
14     A. I don't.
15     Q. Okay. So no friends, family, or any
16 other connection?
17     A. No.
18     Q. And, Doctor, it's my understanding
19 that you've authored a report in this case, dated
20 November 9th, 2008, which is marked as Exhibit 2,
21 is that correct?
22     A. Yes.
23     Q. And one of the things I noted was that
24 — or at least on the copy that I received — is

### Page 9

1  that it wasn't signed. Is your copy signed?
2      A. My copy is not signed.
3      Q. Is there anything — have you had a
4  chance to review the report in advance of your
5  deposition?
6      A. I did.
7      Q. And did you meet with Mr. Joyce today?
8      A. I did.
9      Q. I'm sorry?
10     A. I did.
11     Q. And what did you guys talk about?
12     A. We talked about this report. We
13 talked about what I might expect from this
14 deposition.
15     Q. And what were you told in that regard?
16     A. That we would discuss causality. That
17 we would discuss, possibly, statutes of
18 limitations. That we would discuss disability.
19     Q. And what was the discussion about
20 disability?
21     A. The extent of disability for this
22 patient.
23     Q. And how about the statute of
24 limitations?

3 (Pages 6 to 9)

Robert Scott Cowah, MD
December 16, 2008

### Page 10

1  A. Whether or not it had any bearing on
2  this case.
3  Q. And did it have any bearing in the
4  course of your conversations?
5  A. No.
6  Q. What were you specifically told about
7  the statute of limitations?
8  A. That there's a time period of two to
9  three years that a worker would have to file a
10 claim with respect to a given injury.
11 Q. Anything else?
12 A. No.
13 Q. Was there a discussion about whether
14 or not Mr. Crowther had met that criteria, that he
15 filed a common claim?
16 A. Yes, we did discuss that he had filed
17 a claim. And it was my opinion that that claim
18 was within the statute of limitations, based on
19 the knowledge I have of his injury.
20 Q. And have you reviewed any outside
21 medical records involving Mr. Crowther?
22 A. No.
23 Q. And what was the discussion about
24 causality?

### Page 11

1  A. It largely centered on an injury that
2  would occur as a result of cumulative trauma, as
3  opposed to a single event.
4  Q. And was there any other discussion
5  about any other topics?
6  A. No. Just, you know, what I've
7  discussed.
8  Q. And Exhibit 2, which is your report,
9  does it contain all of your opinions in this case?
10 A. Yes.
11 Q. Were there any opinions that were not
12 in the report, that were discussed between you and
13 Mr. Joyce?
14 A. No.
15 Q. And the fact that it's not signed, is
16 that signify to you, at all? I mean, do you stand
17 by what's written?
18 A. I stand by it.
19 Q. Even under the -- and maybe this is
20 peculiar to Massachusetts, but under the pains and
21 penalties of perjury?
22 A. Yes.
23 Q. And were you paid for the narrative
24 report?

### Page 12

1  A. Yes.
2  Q. How much were you paid?
3  A. For the narrative report, $500.
4  Q. And, excuse me, are there any other
5  drafts of this report?
6  A. I don't recall any other drafts.
7  Q. Did you receive any other
8  communications from Mr. Joyce after you did your
9  narrative report?
10 A. I don't recall any other
11 communications.
12 Q. Can you tell me what you did to
13 review, to come to your opinions and conclusions
14 that are set forth in your report?
15 A. I reviewed my office notes.
16 Q. Did you do anything else?
17 A. I reviewed the AMA guidelines to
18 permanent impairment.
19 Q. But you didn't review Mr. Crowther's
20 deposition or any of the other file materials
21 exchanged between the parties, is that accurate?
22 A. That's accurate.
23 Q. And you've not seen any other outside
24 medical records from any other provider, is that

### Page 13

1  true?
2  A. I have not.
3  Q. And in your report -- oh, and I'm
4  sorry. Let me back up. And you didn't do any
5  literature review?
6  A. I did not.
7  Q. And, sir, you'd agree that you're not
8  an ergonomist; would you agree with that?
9  A. I'd agree to that.
10 Q. And you're not an occupational
11 medicine doctor?
12 A. I am not.
13 Q. And occupation medicine doctor is a
14 field of specialty in which those types of doctors
15 focus on causality and work-related issues?
16 A. Yes.
17 Q. And would you agree that you're a
18 treating physician and that your day-to-day job is
19 to treat patients and conduct surgeries?
20 A. Correct.
21 Q. And that you don't do forensic
22 determinations on causation on a routine basis?
23 A. Not on a routine basis.
24 Q. So you don't hold yourself out as a

**CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, MA

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

# Robert Scott Cowah, MD
# December 16, 2008

**Page 14**

1 forensic causality expert, do you?
2    A. I don't.
3    Q. And you don't hold yourself out as a
4 specialist in the area of occupationally-related
5 injuries, is that true as well?
6    A. Well, I treat a lot of occupational
7 injuries. I have a sizable Worker's Comp. patient
8 population, and so I'm asked my opinion on
9 causality often. What constitutes an expert I
10 suppose is variable.
11    Q. Well, what percentage of your
12 practice, for instance, do you devote to doing
13 forensic determinations of causation?
14    A. Well, it would be quite small. That
15 would be, probably, five -- less than ten percent
16 of what I do, five or ten percent.
17    Q. Can you tell me what information, if
18 any, you received about Mr. Crowther's job and his
19 job duties at the Railroad?
20    A. Mr. Crowther discussed with me his job
21 duties as part of his intake history and physical
22 examination.
23    Q. And what did he tell you?
24    A. Well, essentially what I wrote in my

**Page 15**

1 letter, which is that he was employed for
2 thirty-one years as a track laborer; that he
3 stated his duties were heavy manual labor,
4 welding, repairing railroad tracks; and then
5 described repetitive strenuous motion, vibration,
6 awkward postures, heavy lifting, and loading.
7    Q. Okay. Is that what Mr. Crowther told
8 you; did he tell you, in his words, that he did
9 heavy manual labor and was exposed to repetitive
10 strenuous motion, vibration, awkward postures; I
11 mean, were those his words?
12    A. That was probably my interpretation of
13 what he was telling me.
14    Q. Did you lift any of the language from
15 -- and I mean that in the nature in which it's
16 intended. Did you borrow any of the language from
17 Mr. Joyce's letter? because it looks like that
18 very paragraph is --
19    A. Yes. So I'm sure I did.
20    Q. So the basic idea of the job duties
21 was taken from Mr. Crowther's lawyer --
22      MR. JOYCE: Objection.
23    Q. (By Mr. Hall) -- in his letter, is
24 that accurate?

**Page 16**

1    A. No.
2    Q. What, if anything, did you do to
3 confirm with Mr. Crowther that this was correct
4 information that was contained in Mr. Joyce's
5 letter?
6    A. Well, in the history obtained by Mr.
7 Crowther, I, once again, was described what he did
8 for work, which was important to my evaluation of
9 his case and his condition. And to the extent
10 that correlated with what doctor or -- I'm sorry
11 -- with what Mr. Joyce said, I put it in a letter.
12    Q. Which note would correlate or confirm
13 the information that's in Mr. Joyce's letter?
14    A. Well, it's not -- it's on an intake
15 form that I don't have with me.
16    Q. So there are file materials that are
17 out there, that haven't been brought?
18    A. Correct.
19    Q. Do you have access to those or --
20    A. Physically, no.
21    Q. And so do you -- on this intake form,
22 which I would ask to get a copy of, because we
23 sent out authorizations for the release of medical
24 records, to your practice, and I never got an

**Page 17**

1 intake form. I'm not sure why, but -- so it's
2 your understanding that on there there would be
3 information about his specific job duties?
4    A. It's been a long time since I've seen
5 it. But I think so.
6    Q. When was the last time you think you
7 saw it?
8    A. Probably at the time of his
9 evaluation. I'd have no reason to look at it
10 prior to. That would be January 27th, 2006.
11    Q. Well, can you tell me the specific
12 things that he did as a welder that exposed him to
13 repetitive strenuous motion?
14    A. As a welder?
15    Q. How about a heavy-duty manual -- I'm
16 sorry. How about as a track laborer? I
17 apologize.
18    A. As a track laborer?
19    Q. Yes. What were the specific job
20 duties that you believe exposed him to repetitive
21 strenuous motion or awkward postures or any of the
22 other things that are listed in the second
23 paragraph of your letter?
24    A. Well, I would think any type of track

5 (Pages 14 to 17)

Robert Scott Cowah, MD
December 16, 2008

Page 18

1  repair would be repetitive and strenuous.
2      Q.  Have you ever seen track repair being
3  done?
4      A.  No, I haven't.
5      Q.  And fair to say you haven't gone out
6  and looked at what Mr. Crowther did?
7      A.  No.
8      Q.  And you've never examined any of his
9  work conditions?
10     A.  No.
11     Q.  And Mr. Joyce hasn't provided you with
12 any videotape of a person repairing track?
13     A.  Correct.
14     Q.  And you've not seen any sort of
15 scientific analysis of the exposure he had on his
16 job, right?
17     A.  Correct.
18     Q.  And I think you previously stated that
19 the description of what he did for his work would
20 be important, and that you obtained that in your
21 history, and that it would be important to your
22 conclusion, is that correct, or your opinions?
23     A.  Correct.
24     Q.  And so if in fact Mr. Crowther's job

Page 19

1  turned out not to be as described in Mr. Joyce's
2  letter, would you agree that that would affect the
3  outcome of your opinion?
4      MR. JOYCE: Objection.
5      THE WITNESS: If Mr. Crowther's job
6  was considerably easier than described in
7  either this letter or by the patient, yes.
8      Q.  (By Mr. Hall) Okay. And so if Mr.
9  Crowther, for instance, worked at a safe and
10 comfortable pace, was able to take breaks, and was
11 not exposed to repetitive strenuous activity and
12 sustained awkward postures, then that could change
13 the outcome of your opinion, is that correct?
14     A.  It could be true, yes.
15     Q.  And you would agree that you don't
16 know how much time of the day he spent doing any
17 activity at work, is that correct?
18     A.  That's correct.
19     Q.  And you've never personally quantified
20 his exposure to any potential risk factors at
21 work, is that true?
22     A.  Correct.
23     Q.  And would you agree that someone who
24 evaluated his actual work tasks, or representative

Page 20

1  work tasks, would be in a better position to
2  determine causation?
3      MR. JOYCE: Objection.
4      THE WITNESS: Well, depending on who
5  that person is. I mean, are you talking
6  about a physician or --
7      Q.  (By Mr. Hall) How about a board
8  certified occupational medicine doctor; would that
9  person, after reviewing the job tasks, be in a
10 better position?
11     MR. JOYCE: As opposed to somebody
12 that's treated the patient and examined him?
13 Did you have somebody in mind or are
14 you just speaking generally?
15     MR. HALL: Do you have an objection?
16     MR. JOYCE: Yes, I have an objection.
17     MR. HALL: Okay. Then it's noted for
18 the record. You can answer.
19     THE WITNESS: Yes. I think that the
20 -- that it would depend on that doctor's
21 familiarity with the patients, in addition
22 to his familiarity with the job.
23     Q.  (By Mr. Hall) Well, would you agree
24 that a person who is board certified or trained in

Page 21

1  occupational medicine, who has reviewed videotape
2  of representative job tasks, and who has been to
3  railroad sites and has seen the work being done
4  personally would be in a better position to
5  determine whether or not those job duties caused
6  or contributed to the development of a person's
7  problems?
8      MR. JOYCE: Objection.
9      Q.  (By Mr. Hall) Would you agree with
10 that?
11     A.  If they'd examined the patient.
12     Q.  And is the examination of the patient
13 -- why is that critical; wouldn't it be reasonable
14 for a doctor to review -- to rely on your physical
15 examination and notes?
16     A.  Yes, that would be reasonable.
17     Q.  And so if a board certified
18 occupational medicine doctor reviewed your medical
19 notes and those of your partners and actually did
20 an analysis of the work duties that Mr. Crowther
21 had done, you would agree that that person would
22 be in a better position to determine causality?
23     MR. JOYCE: Objection.
24     THE WITNESS: Yes.

Robert Scott Cowah, MD
December 16, 2008

Page 22

1  Q.  (By Mr. Hall) Is there any other
2  information that you received or reviewed in
3  regards to Mr. Crowther's job?
4  A.  No.
5  Q.  Did you evaluate his avocational
6  activities in coming to your conclusions?
7  A.  No.
8  Q.  And you'd agree, sir, that you're not
9  familiar with railroad operations?
10  A.  Yes.
11  Q.  And you'd agree that in your letter,
12  in your narrative report, that you've not
13  suggested that there are any specific changes to
14  Mr. Crowther's job that has been scientifically
15  demonstrated or would otherwise be -- reasonably
16  anticipated to be preventive of his neck issues?
17      MR. JOYCE: Objection. That's not the
18  purpose of Dr. Cowan's participation in
19  Mr. Crowther's case.
20      THE WITNESS: I don't understand the
21  question.
22      MR. JOYCE: He's not our liability
23  expert, Steve, and you know that. He's a
24  medical doctor, treating physician, surgeon,

Page 23

1  expert medical witness. He's not a
2  liability witness. We have a different
3  liability witness to address that issue.
4      MR. HALL: Okay. Well, I'm just
5  asking him if he has an opinion.
6  Q.  (By Mr. Hall) Would you agree that
7  you've not given any opinions that there were any
8  specific changes to Mr. Crowther's job that could
9  have been done by the Railroad that would have
10  prevented his injury?
11  A.  Correct. I gave no such opinions.
12  Q.  And you hold no such opinion as you
13  sit here today?
14  A.  I hold no such opinion.
15  Q.  Okay. And, I'm sorry, I think we
16  covered you hadn't reviewed any of the literature
17  regarding the causes of Mr. Crowther's
18  degenerative disk disease, is that correct, in
19  preparation for your report?
20  A.  Correct.
21  Q.  And do you hold yourself out as an
22  expert in the area of causes of degenerative
23  diseases of the neck?
24  A.  Yes.

Page 24

1  Q.  And what are the risk factors for the
2  development of degenerative disk disease in the
3  neck?
4  A.  Genetic predisposition or neck-
5  strenuous manual labor.
6  A.  That's probably it.
7  Q.  How about age; is age a risk factor?
8  A.  Relative. Everybody develops
9  degenerative changes over time, so I suppose so.
10  Q.  Are there any other risk factors for
11  the development of degenerative disk disease or
12  arthritis?
13  A.  Deformity.
14  Q.  Deformity? Anything else?
15  A.  That would be the bulk of it.
16  Q.  And can you tell me which of the risk
17  factors you ruled out, if any?
18  A.  Deformity, trauma, genetics.
19  Q.  You didn't rule out age?
20  A.  No. He's at an age where, certainly,
21  they're fairly predominant.
22  Q.  Okay. I'm sorry. And I just want to
23  -- maybe I just didn't hear you, but he's at an
24  age where it's not unusual for him to have

Page 25

1  degenerative joint disease in his neck?
2  A.  Correct.
3  Q.  And so we can agree that his age
4  contributed at least in part to the development of
5  his degenerative disk disease, is that correct?
6  A.  Yes.
7  Q.  And if you take his job out of the
8  equation, he could have went on to develop the
9  exact same condition he had just -- back up.
10      If we take his job out of the
11  equation, isn't it true that he could have went on
12  to develop the same exact degenerative process in
13  his neck that resulted in his surgery?
14  A.  Yes.
15  Q.  And is there any way to attribute
16  whether or not his surgery was due to a function
17  of age more than a function of his job?
18      MR. JOYCE: Objection.
19      THE WITNESS: Based on chronology of
20  symptoms.
21  Q.  (By Mr. Hall) When did he begin to
22  develop signs or symptoms of degenerative disk
23  disease?
24  A.  His complaints of neck injury or arm

7 (Pages 22 to 25)

**Robert Scott Cowah, MD**
**December 16, 2008**

### Page 26

1 pain started just prior to evaluation by Dr.
2 Wenner for his thumb condition, which would have
3 been late in 2005.
4     Q. And so based on the fact that he began
5 to have neck pain, according to your file, in
6 2005, how is that significant? I'm sorry. Maybe
7 I'm not picking it up.
8     A. Well, there comes a point in the
9 patient's degenerative disk process where it
10 becomes symptomatic. And in this case, that was
11 2005. The patient was fifty-four years of age.
12 He had been working on the Railroad, at that
13 point, for thirty-odd years. And can I
14 differentiate exactly whether it was age-related
15 or job-related? No. But it was my opinion that
16 it would be a combination of the two.
17     Q. Okay. So fifty/fifty?
18     MR. JOYCE: Objection. There's no
19 reason for apportionment or allocation.
20 There's no requirement to do it. Note my
21 objection.
22     Q. (By Mr. Hall) Is it your opinion it
23 was fifty/fifty?
24     A. Sure.

### Page 27

1     Q. And is it unusual for someone in, say,
2 the fifth decade of life to have degenerative
3 changes in their neck as a result of age?
4     A. No. It's fairly common.
5     Q. It's fairly common? Is it, like,
6 fifty, sixty, seventy, eighty percent of the
7 population who have degenerative changes?
8     A. Sixty.
9     Q. Sixty percent, at the fifth decade of
10 life?
11     A. Yes.
12     Q. And I think you said -- when I asked
13 you about the personal risk factors, I think you
14 said -- and I'm trying to check my notes -- but
15 manual neck labor; is that -- and I apologize. I
16 had manual labor, neck, stress.
17     What is manual labor that involves
18 stressing of the neck; can you describe that for
19 me?
20     A. It would be anything done in a stooped
21 position. Anything requiring lifting from a
22 stooped position.
23     Q. And so -- and does it have to be
24 sustained a certain amount of time or does it have

### Page 28

1 to -- I'm just trying to imagine stooped.
2     Is that knees bent all the way down
3 and lifting from the ground up; is that what you
4 mean?
5     A. No. Stooped just means bent at the
6 waist.
7     Q. Just bent at the waist. Okay. And
8 it's not just being bent at the waist; it's
9 lifting?
10     A. Correct.
11     Q. And do you have any information about
12 how often Mr. Crowther would bend at his waist and
13 do lifting?
14     A. No.
15     Q. Are there any other things that fall
16 under the category of neck-strenuous manual labor?
17     A. Labor requiring repetitive rotation of
18 the neck.
19     Q. And what does that mean?
20     A. Repetitive rotations, rotating from
21 one side to the other, lateral rotation.
22     Q. Moving your neck left and right?
23     A. Yes.
24     Q. Up and down?

### Page 29

1     A. Up and down's more covered with the
2 first one, but --
3     Q. Okay. And does the rotation of neck
4 have to go to any certain degree in order to be
5 problematic or --
6     A. No, it just has to be sustained over
7 years.
8     Q. And when you say, "repetitive," I
9 mean, what's the cycle have to be in order for it
10 to be repetitive?
11     A. I'm not sure I understand the
12 question.
13     Q. Okay. For it to qualify -- I mean, I
14 can rotate my neck; I can look back and forth; but
15 what's the cycle time for it to be classified as
16 repetitive, in your opinion?
17     A. I would say if you're rotating back
18 and forth on a routine basis, four or five times a
19 minute, over the course of a workday.
20     Q. And do you have any specific
21 information about Mr. Crowther --
22     A. No.
23     Q. Okay. -- in that regard?
24     A. No.

8 (Pages 26 to 29)

Page 30

1  Q. Anything else that falls into the
2  category of repetitive manual neck labor?
3  A. Well, any actual lifting with the
4  neck, which I'm not sure he would encounter.
5  Q. So as far as you know, that's not a
6  personal risk factor for him because he didn't
7  have lifting with his neck?
8  A. He didn't describe any.
9  Q. Is that like putting water on your
10 head and walking with it?
11 A. You know who does that are guys who
12 put in the windshields because they have to push
13 with their head and their hands at the same time.
14 Q. There's none of that, that you know
15 of, in his railroad —
16 A. I don't know of any.
17 Q. Any other risk factors that we haven't
18 already talked about with regard to repetitive
19 neck or, I'm sorry, manual intensive neck, in that
20 area that we've been talking about?
21 A. Neck-strenuous labor.
22 Q. Neck-strenuous labor. Thank you.
23 A. No.
24 Q. And so to the extent that he was not

Page 31

1  exposed to neck-strenuous labor, that would be a
2  good thing, is that correct?
3  A. Correct.
4  Q. And if a qualified person like an
5  ergonomist went out to review the job and analyze
6  the type of activities that were done by someone
7  like Mr. Crowther and they came to the conclusion
8  that the job does not contain tasks that contain
9  neck-strenuous labor, would that alter your
10 opinion?
11     MR. JOYCE: Objection. Is it a
12     hypothetical; are you asking him to
13     speculate here?
14 Q. (By Mr. Hall) Would that change your
15 opinion?
16     MR. JOYCE: Note my objection.
17     THE WITNESS: It could.
18 Q. (By Mr. Hall) And so if in fact the
19 job did not contain a significant amount of
20 neck-strenuous labor, that would change your
21 opinion in fact, wouldn't it, sir?
22     MR. JOYCE: Objection.
23     THE WITNESS: It could.
24 Q. (By Mr. Hall) And how much

Page 32

1  neck-strenuous labor is required to produce
2  injury?
3  A. It varies from person to person.
4  Q. Is there any way to predict whether or
5  not someone who does neck-strenuous labor is going
6  to develop degenerative disk disease of the neck
7  because of that neck-strenuous labor?
8  A. No.
9  Q. Is there any way to prevent the
10 development of degenerative disk disease in the
11 neck, irrespective of work?
12     MR. JOYCE: Objection.
13     THE WITNESS: No.
14 Q. (By Mr. Hall) The aging process is
15 pretty hard on the body and on our disks and our
16 vertebrae, right?
17 A. It can be.
18 Q. It can be. And you'd agree, sir, that
19 you don't hold yourself out as an expert in the
20 work-related literature that deals with the
21 degenerative disk disease; would you agree with
22 that?
23     MR. JOYCE: Objection.
24     THE WITNESS: Work-related literature?

Page 33

1  Q. (By Mr. Hall) Yes. The literature
2  that — the scientific literature that deals with
3  work relatedness in the development of neck
4  issues. Would you agree that you don't hold
5  yourself out as an expert in that body of
6  literature?
7      MR. JOYCE: Objection.
8      THE WITNESS: Correct.
9  Q. (By Mr. Hall) Okay. And are you
10 aware of any valid studies that have been done
11 associating Mr. Crowther's work duties at the
12 Railroad with the development of degenerative disk
13 disease of the neck?
14 A. Say that again.
15 Q. Sure. Are you aware of any valid
16 studies that have been associating Mr. Crowther's
17 work duties with the development of degenerative
18 disk disease in the neck?
19 A. No.
20 Q. And we can agree, sir, that there is
21 no valid recognized dose response relationship
22 between neck-strenuous labor and the development
23 of degenerative disk disease in the neck, is that
24 true?

Robert Scott Cowah, MD
December 16, 2008

Page 34

1   A. Correct.
2   Q. And that's really what we're dealing
3   with in Mr. Crowther's case, is he had
4   degenerative disk disease in his neck, correct?
5   A. Right.
6   Q. And you would agree that, in coming to
7   a conclusion on causation, that it's important to
8   review as much information as you can; would you
9   agree with that?
10  A. Correct.
11  Q. And did you ask Mr. Crowther if he had
12  any issues in terms of trauma associated with his
13  neck?
14  A. Yes.
15  Q. And what did he tell you?
16  A. He did not.
17  Q. And can we agree that once somebody
18  develops degenerative disk disease of the neck --
19  my neck just cracked. Sorry.
20       Can we agree that once somebody has
21  degenerative disk disease in their neck and it
22  becomes symptomatic that, really, any use of the
23  neck or head can produce symptoms?
24  A. It can.

Page 35

1   Q. And it doesn't necessarily have to be
2   neck-strenuous labor in order to do that, right?
3   A. Correct.
4   Q. It could just be simply turning your
5   head could produce symptoms?
6   A. Yes.
7   Q. And can we agree, sir, that there's a
8   difference between the concept of activity-
9   exacerbating symptoms with the concept of an
10  actual increase in the disease process?
11  A. I'm sorry. Once more.
12  Q. Yes. I'm just trying to figure out,
13  can we agree that someone can be symptomatic,
14  maybe they turned their head and they turned their
15  neck and they produced the symptoms, that being
16  one concept; and would you agree that that doesn't
17  necessarily mean that the disease process is
18  changing?
19  A. I agree with that.
20  Q. So you can have symptoms without
21  necessarily increasing the disease process,
22  correct?
23  A. Correct.
24  Q. And in reading your report, I don't

Page 36

1   see that you came to any opinion that his job
2   duties accelerated or aggravated Mr. Crowther's
3   actual disease process, is that true?
4       MR. JOYCE: Are you asking him whether
5   his job aggravated or worsened the
6   degenerative disk disease; is that your
7   question?
8       MR. HALL: You can answer the
9   question.
10      THE WITNESS: I could not say whether
11  -- I could say that it rendered it more
12  symptomatic. Is that what you're asking?
13  I'm not sure what you're asking.
14  Q. (By Mr. Hall) Okay. As you sit here
15  today, you don't have an opinion, within a
16  reasonable degree of medical certainty, and under
17  the pains and penalties of perjury, as set forth
18  in your report, that his job actually increased
19  the disease process in his neck?
20      MR. JOYCE: Objection.
21      THE WITNESS: I did not render an
22  opinion there, correct.
23  Q. (By Mr. Hall) And you don't have such
24  an opinion within a reasonable degree of medical

Page 37

1   certainty and under the pains and penalties of
2   perjury?
3   A. Presently?
4   Q. Yes.
5   A. I do think his job duties aggravated
6   his underlying cervical degenerative disk disease,
7   yes.
8   Q. Aggravated his symptoms or actually
9   aggravated the underlying disease process; in
10  other words, do you have any objective scientific
11  evidence to show that his job duties at the
12  Railroad actually increased the disease process?
13      MR. JOYCE: He just said that's his
14  opinion.
15      THE WITNESS: That's my -- my opinion
16  is that it did. But do I have repetitive
17  MRIs showing a progression? No, I don't.
18  Q. (By Mr. Hall) Okay. Do you have any
19  diagnostic studies showing a comparison?
20  A. No.
21  Q. And do you have any objective
22  scientific evidence to make that conclusion?
23  A. I don't, no. It's my opinion.
24  Q. And what's the basis for that opinion?

10 (Pages 34 to 37)

Robert Scott Cowah, MD
December 16, 2008

Page 38

1  You've not seen his job. I mean, what is the
2  basis for that opinion?
3      A. I based that opinion, A, that he has a
4  degenerative disk disease process going on based
5  on MRIs that I was able to visualize; and, second,
6  that, in my opinion, the work that he described
7  were work duties that I considered to be
8  aggravating to a cervical degenerative disk
9  disease process.
10     Q. If that was true, then why didn't you
11 put that in your report?
12     A. I did. Mr. Crowther sustained
13 cumulative micro-trauma to his neck as a result of
14 strenuous labor on the Railroad over thirty years.
15     Q. When I read that, I saw that that was
16 your opinion, that his job duties caused the
17 underlying degenerative disk disease.
18     A. No.
19     Q. So that's not your opinion?
20     A. No.
21     Q. So we can agree that his job duties
22 did not cause the underlying degenerative disk
23 disease?
24        MR. JOYCE: Objection.

Page 39

1         THE WITNESS: That's correct.
2      Q. (By Mr. Hall) And so, what this
3  paragraph is saying is that -- if I understand
4  correctly, based on what you just told me -- is
5  that his job duties may have accelerated the
6  otherwise non-work-related degenerative disk
7  disease, is that correct?
8      A. Correct.
9      Q. So really, your opinion is based
10 solely on an aggravation of a pre-existing,
11 non-work-related injury of --
12        MR. JOYCE: Objection. I think his
13     report also talked about it being a
14     contributing factor, along with an
15     aggravation of the condition.
16        MR. HALL: You can answer the
17     question.
18        THE WITNESS: Can you restate it?
19        MR. HALL: Sure.
20     Q. (By Mr. Hall) Your opinion is that
21 his job duties at the Railroad aggravated or
22 worsened a pre-existing, non-work-related
23 condition, is that correct?
24     A. That's correct.

Page 40

1      Q. And the MRI that you took was February
2  of 2006, is that right? Do you have a copy of
3  that?
4      A. March. March 1, 2006. That's what I
5  have.
6      Q. I have an exam date of 2/8/06. And it
7  was signed -- can I see where you're getting the
8  date from? You only sent him out once, is that
9  right?
10     A. Correct.
11     Q. For an MRI?
12     A. Yes.
13     Q. And that was Dr. Deborah Green?
14     A. Yes.
15     Q. So the exam date was 2/8 of '06. Can
16 we agree on that?
17     A. Yes.
18     Q. And do you have that in front of you,
19 the MRI? Can I take a look at it? This is the
20 only copy I have.
21     A. I don't have a copy of it.
22     Q. Do you mind if I walk around and we
23 can look at it together?
24        MR. JOYCE: I have a copy, if you want

Page 41

1  it.
2         MR. HALL: You have a copy of it?
3         MR. JOYCE: Yes.
4      Q. (By Mr. Hall) Okay. And we're
5  referring, for the record, to the MRI Center
6  2/8/06 MRI done of Mr. Crowther's cervical spine,
7  done by Dr. Deborah Green, correct?
8      A. Correct.
9      Q. And can you go through the findings
10 for me?
11     A. Sure.
12     Q. And maybe put it into laymen's terms
13 for me, if that's possible?
14     A. Sure.
15     Q. Okay. Maybe starting with C2-3, which
16 is the first finding, is that correct?
17     A. Disk is of normal height, meaning that
18 he hadn't lost any height. It diminished signal
19 intensity, meaning that the disk was dry, no bulge
20 or herniation.
21     Q. Okay. And is diminished signal
22 intensity or dryness something that's typical of
23 age-related --
24     A. Yes.

11 (Pages 38 to 41)

CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, MA

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

# Robert Scott Cowah, MD
# December 16, 2008

### Page 66

1  Q. How did you assess Mr. Crowther's
2  surgery, in terms of what you did with the AMA?
3  A. Well, I assessed that he did well. He
4  didn't have persistent radicular findings,
5  weakness or numbness. But just based on the
6  surgery, that's how the AMA guideline worked for
7  that particular --
8  Q. And is this the best possible
9  impairment rating you can get, having neck
10 surgery?
11 A. Best in what sense?
12 Q. Best in terms of the least amount of
13 disability.
14     MR. JOYCE: Objection.
15 Q. (By Mr. Hall) I mean, is this the
16 best possible outcome he could have on the AMA
17 guidelines, based upon the fact that he had
18 surgery because of a radiculopathy?
19 A. I believe so. I think it's eighteen
20 to twenty-three percent.
21 Q. So this is the best possible outcome
22 for him, based on the AMA guidelines, is that
23 correct?
24 A. Correct.

### Page 67

1  Q. And people who have an eighteen-
2  percent, whole-body impairment rating can do
3  medium-type jobs?
4  A. Sure.
5  Q. Could they do heavy-type jobs?
6  A. Hypothetically, sure.
7  Q. Can you give me just a moment, and I
8  can review my notes?
9  A. Sure.
10 Q. Thank you. Do you have an opinion on
11 Mr. Crowther's long-term prognosis, in terms of
12 his neck?
13 A. He should do fine.
14 Q. When was the last time he went to see
15 you?
16 A. Last seen by me July the 6th, 2007, I
17 believe.
18 Q. And everything was satisfactory at
19 that point?
20 A. Yes.
21 Q. And you haven't seen him in almost two
22 years?
23 A. It'll be two years next July.
24 Q. Next January?

### Page 68

1  A. Next July.
2  Q. Oh, you saw him in July. I had -- I
3  apologize. So, like, a year and a half? Okay.
4      And in terms Mr. Crowther's other
5  orthopedic conditions, you would defer to the
6  other doctors who treated him in your practice, is
7  that right?
8  A. That's right.
9  Q. And that would also include the
10 disability ratings, as well?
11 A. Correct.
12 Q. And so is it your understanding that
13 he had excellent results or good results of those
14 issues, as well?
15 A. I actually don't have notations, in
16 regards to either his thumb or his knees, so I
17 can't really say how he's done with respect to
18 either of those.
19 Q. And you just defer to those doctors on
20 that?
21 A. I do.
22 Q. Okay. Your last exam -- I know we
23 talked a little bit about it being a good surgical
24 result. Did Mr. Crowther regain his full range of

### Page 69

1  motion?
2  A. Of --
3  Q. His neck. I'm sorry.
4  A. Typically, no. Most patients who have
5  a fusion lose some range of motion, but it's not
6  of any functional consequence.
7  Q. And is that consistent with -- I'm
8  sorry. Is that how Mr. Crowther's case turned out
9  to be?
10 A. Yes.
11 Q. So any limitation on how he can rotate
12 his neck has no functional consequence?
13 A. Correct.
14 Q. And one of the things I did want to
15 ask you about -- and I apologize to go back -- but
16 do you have any information about Mr. Crowther's
17 exposure to vibration to his neck?
18 A. I don't have any specifics on that,
19 no.
20 Q. I'm just trying to figure out -- do
21 you have any information to say that he was
22 exposed to vibration in his neck?
23 A. Only what's in Mr. Joyce's note here.
24 Q. And in order for a vibration to affect

18 (Pages 66 to 69)

**CATUOGNO COURT REPORTING & STEN-TEL TRANSCRIPTION**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, MA

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

# Robert Scott Cowah, MD
# December 16, 2008

Page 70

1  the neck, I mean, would you have to have direct
2  contact with some sort of vibrating source?
3      A.   Yes.
4      Q.   And would the contact have to be on
5  the spine itself?
6      A.   No. It could travel through the arms
7  or legs.
8      Q.   And have you made any assessment of
9  his vibration exposure at all?
10     A.   No.
11     Q.   And are you aware of the studies that
12 indicate that exposure to whole body vibration is
13 not causally related to the development of
14 musculoskeletal disorders of the neck?
15          MR. JOYCE: Objection.
16     Q.   (By Mr. Hall) Are you aware of that?
17     A.   I'm not aware of any study with
18 respect to that.
19     Q.   Is the National Institute of
20 Occupational Safety and Health an authoritative
21 body?
22     A.   Yes.
23     Q.   And if they indicated, in a
24 publication regarding work-relatedness, that

Page 71

1  whole-body vibration exposure has not been
2  causally related -- there's insufficient evidence
3  to formulate a caussal association between
4  whole-body vibration and the development of
5  musculoskeletal disorders of the neck and
6  shoulder -- would you agree with them and defer to
7  them?
8           MR. JOYCE: Objection.
9           THE WITNESS: Yes.
10     Q.   (By Mr. Hall) And you don't have any
11 independent scientific studies showing that
12 exposure to vibration causes degenerative disk
13 disease in the neck, do you?
14     A.   No.
15     Q.   Are you aware of any at all?
16     A.   No.
17     Q.   In terms of -- okay. Are there any
18 current medical restrictions on Mr. Crowther?
19     A.   No.
20     Q.   So as far as you're concerned, in
21 terms of his neck, he has no medical restrictions?
22          MR. JOYCE: Objection.
23          THE WITNESS: Well, I said he was
24     totally permanently disabled. I suppose

Page 72

1  that qualifies as a restriction that has
2  to do with all of his impairments; neck,
3  arm, knees. Was that what you were speaking
4  of?
5           MR. HALL: Well, any particular
6  medical restrictions with regard to his
7  neck, because I think we agreed before that
8  you would defer to -- the disability ratings
9  -- to the other doctors who treated him.
10          THE WITNESS: Well --
11     Q.   (By Mr. Hall) Is he disabled because
12 of his neck?
13          MR. JOYCE: He already answered that
14 question yes.
15          THE WITNESS: Yes, he's disabled with
16 regards to his neck. As I said, I think he
17 could go back to some work, but not his
18 previous line of work and duties.
19     Q.   (By Mr. Hall) Okay. And if we were
20 trying to figure out which job he could go and do,
21 are there any medical restrictions?
22     A.   Yes.
23     Q.   Could he, for instance, lift up to
24 twenty-five pounds or --

Page 73

1      A.   Yes.
2      Q.   -- fifty pounds?
3      A.   I would -- you know, once again, I
4  haven't seen him for a year and a half. And
5  probably the better way to judge this would be
6  something like a functional capacity evaluation.
7  But I would say he would have lifting
8  restrictions. He would be best not doing overhead
9  work. He would be best not working in a stooped
10 position, and best not lifting below his knees or
11 crawling into tight, cramped spaces.
12     Q.   But in order to really make an
13 assessment, you need a functional capacity exam?
14     A.   I think it's helpful.
15     Q.   And you're not aware of Mr. Crowther
16 having a functional capacity exam, is that
17 correct?
18     A.   I am not.
19     Q.   And you didn't do a functional
20 capacity exam before doing your percentage or
21 calculation on his impairment, is that correct?
22     A.   No. It wouldn't have figured in.
23          MR. HALL: Okay. I don't think I have
24     any other questions.

19 (Pages 70 to 73)

**Robert Scott Cowah, MD**
**December 16, 2008**

Page 74

1  MR. JOYCE: Just real briefly.
2      EXAMINATION
3  Q. (By Mr. Joyce) Dr. Cowan, in your
4  opinion, Geoff's job as a trackman at the Railroad
5  was a contributing factor in the development of
6  his degenerative disk disease in his neck?
7      MR. HALL: Objection.
8      THE WITNESS: Yes.
9  Q. (By Mr. Joyce) In your opinion,
10 Geoff's job as a trackman at the Railroad
11 aggravated and worsened his degenerative disk
12 disease in his neck?
13 A. Yes.
14     MR. HALL: Objection.
15 Q. (By Mr. Joyce) In your opinion, Geoff
16 is occupationally disabled from working as a
17 trackman at the Railroad as to his cervical
18 condition?
19     MR. HALL: Objection.
20     THE WITNESS: Yes.
21     MR. JOYCE: Those are all the
22 questions I have. Thank you.
23     EXAMINATION
24 Q. (By Mr. Hall) Let me ask you a

Page 75

1  follow-up, because you told me on the record that
2  the paragraph regarding your opinion was solely to
3  an aggravation.
4  A. Correct.
5  Q. Do you recall that testimony?
6  A. Yes.
7  Q. And so we can agree that his
8  degenerative disk disease was completely
9  non-work-related, correct?
10     MR. JOYCE: Objection.
11 Q. (By Mr. Hall) The development -- the
12 original development of his degenerative disk
13 disease was not related to his job --
14     MR. JOYCE: Objection.
15 Q. (By Mr. Hall) -- is that correct?
16     MR. JOYCE: I think that that --
17 Q. (By Mr. Hall) Is that correct?
18     MR. JOYCE: -- testimony speaks for
19 itself.
20 Q. (By Mr. Hall) You told me that it was
21 not caused by work, right?
22     MR. JOYCE: We're not -- there's a
23 distinction between "caused" and "a
24 contributing factor" here, Steve. He's not

Page 76

1  saying that the work caused the degenerative
2  disk disease. He's saying that the work was
3  a contributing factor. Is that what you're
4  getting at?
5      MR. HALL: No. You can answer my
6  question. Go ahead.
7      THE WITNESS: All right. I believe
8  that Mr. Crowther would have developed
9  degenerative disk disease to his neck
10 independent of work.
11 Q. (By Mr. Hall) All right. And so your
12 opinion is solely that there was an aggravation of
13 a pre-existing, non-work-related condition, is
14 that correct?
15 A. That's correct.
16 Q. And we talked about aggravation and
17 worsening and we agreed that there are two
18 concepts that are involved there, the worsening or
19 aggravation of symptoms versus aggravation and
20 worsening of the actual disease process, correct?
21 A. Correct.
22 Q. And from when you evaluated him in
23 March of '06, to when he had his surgery in
24 January of '07, you didn't see a worsening of the

Page 77

1  actual disease process, is that correct?
2  A. That is correct.
3  Q. And so in terms of his work from that
4  time period, from -- I believe it was March of '06
5  -- until he went off in January and had surgery,
6  his job didn't change his degenerative disk
7  disease, correct?
8  A. It did not appear to change his disk
9  disease, correct.
10 Q. And in terms of his symptoms, did you
11 note any increasing symptoms from his -- from the
12 time period of March of '06 until January of '07?
13 A. I did not.
14 Q. So in terms of his job duties creating
15 any problems, in your opinion, there wasn't any
16 problems created from at least March of '06, until
17 the time he had surgery in '07?
18 A. I didn't see any change, no.
19 Q. Okay. And you also agree that Mr.
20 Crowther could do some sort of light, medium, or
21 medium-duty work, correct, based on his current
22 condition right now?
23 A. No. Only based on his neck. In sum
24 total with his knees and his other issues, I will

20 (Pages 74 to 77)