UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | |
|---|---|
| GEOFFREY CROWTHER,<br>        Plaintiff,<br>        v.<br><br>CSX TRANSPORATION, INC. and<br>CONSOLIDATED RAIL CORP,<br>        Defendant<br><br>AND<br><br>GEOFFREY CROWTHER,<br>        Plaintiff,<br>        v.<br><br>CSX TRANSPORTATION, INC. | 3:09-cv-10334-MAP<br><br><br><br><br><br><br><br>3:09-cv-11467-MAP |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE
TO PRECLUDE ANY EVIDENCE RELATED TO BALLAST**</u>

Defendants CSX Transportation, Inc. ("CSXT") and Consolidated Rail Corporation

("Conrail") (hereinafter referred to collectively as "Defendants"), hereby submit the following

Memorandum of Law in support of their Motion in Limine to Preclude Any Evidence Related to

Ballast.  In support thereof, Defendants aver as follows:

## I.        **FACTUAL BACKGROUND**:

Defendants will not reiterate the facts of this case in their entirety here, instead

Defendants hereby incorporate by this reference their Omnibus Statement of Facts in Support of

Defendants' Motions in Limine and exhibits attached thereto.  Briefly, on January 24, 2008,

Defendants served Interrogatories on Plaintiff, and on April 10, 2008, Plaintiff provided Answers

to the Interrogatories.  (<u>See</u> Def.s' Interrogs. to Pl. dated January 24, 2008, a copy of which is

1

provided as Exhibit A; Pl.'s Ans. to Interrogs. dated April 10, 2008, a copy of which is attached as Exhibit B.)

At Interrogatory No. 2, Plaintiff was asked:

> 2.   State each and every injury, disease, or condition, which you allege was caused, in whole or in part, by [sic].  If you contend your injury is a "cumulative trauma" type of injury, please specify the specific "cumulative" activities you believed caused or contributed to the alleged injury.

(Ex. A at 2.)

In responding to this Interrogatory, Plaintiff identified two conditions that he contends caused or contributed to his bilateral knee arthritis: 1) kneeling for extended periods of time; and 2) excessive walking on uneven ballast.  (Ex. B at 2.)

On November 18, 2008 and January 22, 2010 Defendants conducted Plaintiff's discovery deposition.  (Dep. of Geoffrey Crowther dated November 18, 2008, relevant portions of which are attached as Exhibit C; Dep. of Geoffrey Crowther dated January 22, 2010, relevant portions of which are attached Exhibit D.) Plaintiff testified that he attributes his bilateral knee arthritis to walking on ballast during the course of his employment with Defendants.  (Ex. C at 131; Ex. D at 241.)

On January 29, 2010, Plaintiff disclosed his experts pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.   Regarding his alleged bilateral knee arthritis, Plaintiff disclosed his orthopedic surgeon, Andrew P. Lehman, M.D., to provide expert testimony regarding the cause of Plaintiff's bilateral knee arthritis.  See Report of Andrew P. Lehman, M.D., a copy of which is attached as Exhibit E.  In addition, Plaintiff disclosed Michael D. Shinnick as his ergonomic liability expert to proffer testimony regarding risk factors Plaintiff

was allegedly exposed to during the course of his employment with Defendants.  See Report of

Michael D. Shinnick, a copy of which is attached as Exhibit F.

> **1.    Dr. Andrew Lehman:**

Dr. Lehman provides no opinion whatsoever regarding Plaintiff's allegation that walking

on ballast, of any size, shape or condition, caused his bilateral knee arthritis.  Dr. Lehman

acknowledges that, during the course of his career, Plaintiff was exposed to heavy lifting and

repetitive strenuous motion, but does not opine to a reasonable degree of medical certainty that

walking on ballast caused, contributed to and/or aggravated his alleged bilateral knee condition

in any way.  In addition, Dr. Lehamn was deposed on November 15, 2008.  Dr. Lehamn offered

no testimony linking ballast to Plaintiff's bilateral knee arthritis.

> **2.    Dr. Michael D. Shinnick:**

Dr. Shinnick provides no opinion whatsoever regarding Plaintiff's allegation that he was

exposed to cumulative trauma and/or repetitive stress due to working in poor ground conditions

and/or walking on ballast.

Accordingly, Plaintiff has failed to present any evidence whatsoever that his bilateral

knee arthritis was medically caused ballast, or more specifically, by walking on ballast of any

kind.

## II.    DISCUSSION OF LAW:

**A.    This Court Should Preclude Any Evidence Related to Ballast on The Grounds That Plaintiff Has Failed to Present Any Evidence That Ballast Caused and/or Contributed to and/or Aggravated His Bilateral Knee Arthritis**

Based on Plaintiff's experts' reports, Plaintiff is unable to present any evidence that

walking on ballast, of any size, caused and/or contributed to and/or aggravated his bilateral knee

arthritis.  Indeed, Dr. Lehman, Plaintiff's only medical expert as to his bilateral knee arthritis, has

3

not offered any opinion whatsoever regarding ballast in his expert report.  In addition, Dr. Shinnick has not offered the opinion that Plaintiff was exposed to cumulative trauma and/or repetitive stress due to working in poor ground conditions and/or walking on ballast. Accordingly, any attempt to elicit such testimony from either expert should be stricken.

Absent any evidence of medical causation, any evidence related to Defendants' use or placement of ballast stone is not relevant to Plaintiff's claim whatsoever.  Further, if the Court finds this evidence to be relevant, in the absence of evidence of medical causation, it will confuse the issues, mislead the jury and create unfair prejudice.  Namely, admission of evidence related to ballast, without evidence that ballast caused or contributed to Plaintiff's bilateral knee arthritis, could allow the jury to reach a finding of liability based on Defendants' use of ballast, without first making a finding of one of the essential elements of an FELA negligence claim - medical causation.

Accordingly, Plaintiff has failed to present admissible evidence of a causative relationship between ballast stone and his hip injury, and any evidence related to ballast should be excluded from trial.

**B.     Assuming Arguendo That Plaintiff Has Presented Sufficient Expert Evidence That Ballast Caused and/or Aggravated His Bilateral Knee Arthritis, Which He Has Not, This Court Should Preclude His Claim Pursuant to Federal Law**

To the extent that Plaintiff alleges that walking on ballast caused and/or aggravated his bilateral knee condition, it is clear and free from doubt that this portion of his claim is precluded by federal law, as determined by the Sixth Circuit Court of Appeals, the highest court to have addressed the issue, in the case of <u>Nickels v. Grand Trunk W. R.R., Inc.</u> 560 F.3d 426 (6th Cir. 2009.)  In <u>Nickels</u>, Stanley Nickels and Donald Cooper brought an action against their former employers under the FELA alleging injuries caused by years of working on oversized track

ballast.  The Sixth Circuit Court of Appeals explained that the "gist of these claims is that railroads used large main line ballast in areas where smaller yard ballast would have sufficed- such as passing sidings, switch leads, and interior yard tracks."  <u>Id.</u> at 3.  The lower courts (specifically, the United States District Court for the Eastern District of Michigan) granted summary judgment in favor of the employers holding that a Federal Railway Safety Act regulation, 49 C.R.F. §213.10, covers the issue of ballast size, precluding the employees' negligence claims.  <u>Id.</u> at 1.  The employees appealed.  <u>Id.</u>  On appeal, the Sixth Circuit affirmed the lower courts' opinions holding that the size of the ballast used to support railroad track was governed by federal regulation 49 C.R.F. §213.103.  <u>Id.</u>

In holding that plaintiffs' claims were preempted, the court cited 49 CFR §213.103: Ballast; general**,** and held:

> **Rather than prescribing ballast sizes for certain types or classes of track, the regulation leaves the matter to the railroads' discretion so long as the ballast performs the enumerated support functions. In this way, the regulation substantially subsumes the issues of ballast size.**

<u>Id.</u>  (emphasis added).

Substantive issues concerning a claim under the FELA are determined by the interpretive decisions of federal courts construing the FELA.  <u>See</u> <u>N&W Ry. v. Liepelt</u>, 444 U.S. 490 (1980); <u>Chesapeake & O. Ry. Co. v. Kuhn</u>, 284 U.S. 44 (1931); and <u>McGraw v. Norfolk & Western Ry. Co.</u>, 500 S.E.2d 300 (W.Va. 1997).  Here, <u>Nickels</u> is directly on point, and, no other higher court has ruled on the issue at hand.

Defendants, like the defendant railroads in <u>Nickels</u>, also seek, as proscribed by federal law on the issue, preclusion of any evidence related to Defendants' use of ballast stone, to the extent that Plaintiff's case is based, in any way, on a claim that his bilateral knee arthritis was caused and/or aggravated by Defendants use of ballast.

\

There is absolutely no evidence that Defendants did not fully comply with the applicable federal regulation governing ballast, which was promulgated by the Federal Railroad Administration ("FRA") pursuant to the Federal Railroad Safety Act ("FRSA"). Accordingly, as discussed at length below, Plaintiff's ballast claim is precluded by federal regulations promulgated by the FRA pursuant to the FRSA.

    **1.**    <u>**Statutory and Regulatory Background**</u>

        **A.**        **The Federal Employers' Liability Act.**

FELA creates a federal cause of action for railroad employees who are injured as a result of their employer's negligence. The pertinent provision provides:

> Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. FELA neither prohibits nor requires specific conduct on the part of a railroad. Instead, FELA is "founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms." <u>Urie v. Thompson</u>, 337 U.S. 163, 182 (1949). Because the statute "does not define negligence, leaving that question to be determined . . . by the common law principles as established and applied in the federal courts" <u>Id</u>. at 174 (internal quotation marks omitted), claims brought under FELA are decided by juries on an *ad hoc* basis.).

**B.** **The Federal Railroad Safety Act of 1970.**

In 1969, the Secretary of Transportation established a Task Force on Railroad Safety comprising "representatives of the railroad industry, railroad labor organizations, and State regulatory commissions." See H.R. Rep. No. 91-1194 (1970) (Appendix F), *reprinted in* 1970 U.S.C.C.A.N. 4104, 4125–31. Its mandate was to "examine railroad safety and to advise the Secretary" accordingly. Id. at 4125.

Despite the "longstanding differences among the three groups represented on the task force" (Id. at 4128), the task force issued a unanimous final report specifically concluding that "legislation authorizing broad federal regulatory powers should be enacted." Id. at 4129. Dissatisfied with the inadequacy and inconsistency of existing state and federal regulations, the task force concluded that railroad safety required "a more comprehensive national approach[,]" (Id. at 4127), led by the Federal Railroad Administration ("FRA"), which, the task force determined, should "have authority to promulgate reasonable and necessary rules and regulations establishing safety standards in all areas of railroad safety." Id. at 4129.

Heeding the task force's recommendation for comprehensive and uniform federal railroad safety regulations, (see H. Rep. No. 91-1194 at 7, 1970 U.S.C.C.A.N. at 4104–05), Congress enacted the Federal Railroad Safety Act of 1970 ("FRSA"), now codified as amended at 49 U.S.C. § 20101 *et seq.* Consistent with the task force's recommendation, the FRSA directs the Secretary of Transportation to "prescribe regulations and issue orders for ***every area of railroad safety***" in an effort to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. §§ 20101, 20103(a) (emphasis added).[1]

---

[1] The Secretary of Transportation subsequently delegated this authority to the Federal Railroad Administrator. See 49 C.F.R. § 1.49(m).

Recognizing that the railroad industry has "a truly interstate character calling for a uniform body of regulation and enforcement[,]" (H.R. No. 91-1194 at 13, 1970 U.S.C.C.A.N. at 4110), Congress "declare[d] that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable." Pub. L. No. 91-458, 84 Stat. 972, § 205 (1970). As the House Report accompanying the FRSA concluded, "[t]he committee does not believe that safety in the Nation's railroads would be advanced sufficiently by subjecting the national rail system to a variety of enforcement in 50 different judicial and administrative systems." H.R. Rep. No. 91-1194 at 11, 1970 U.S.C.C.A.N. at 4109. "To subject a carrier to enforcement before a number of different State administrative and judicial systems in several areas of operation could well result in an undue burden on interstate commerce." Id. at 13, 1970 U.S.C.C.A.N. at 4110–11. Accordingly, "where the federal government has authority, with respect to rail safety, *it preempts the field.*" Id. at 11, 1970 U.S.C.C.A.N. at 4108 (emphasis added).

### C.        Regulations Promulgated by The FRA.

Soon after passage of the FRSA, the FRA promulgated initial Track Safety Standards, which "prescribe[d] initial minimum safety requirements for railroad track." 36 Fed. Reg. 20,336, 20,338 (Oct. 20, 1971). "[B]ased on the safety practices of the rail industry at that time, available track-related data, and public comments and testimony[,]" (44 Fed. Reg. 52,104, 52,107 (Sept. 6, 1979)), these initial standards were intended to operate as an evolving set of safety requirements that would "be continually reviewed and revised by FRA in light of technical innovation, the results of the FRA research and development program, and [regulatory] experience." 36 Fed. Reg. at 20,336. In fact, the FRA has revised and expanded the Track Safety Standards several times since their initial promulgation. See e.g., 71 Fed. Reg. 59,677

(Oct. 11, 2006); 66 Fed. Reg. 1894 (Jan. 10, 2001); 63 Fed. Reg. 33,992 (June 22, 1998); 47 Fed.

Reg. 39,398 (Sept. 7, 1982).

Divided into several interconnected subparts, the standards regulate, *inter alia*, train

speed, track alignment, track elevation, cross-ties, drainage, and vegetation control.  See 49

C.F.R. §§ 213.1–.369.  Ballast, one of the issues raised by Plaintiff in this case, is one of the

matters specifically regulated by the FRA.  Ballast is the material used to support the track

structure and provide drainage, and normally consists of crushed rock.  § 213.103 of the FRA's

Track Safety Standards establishes the minimum requirements for ballast as follows:

§ 213.103  Ballast; general.

Unless it is otherwise structurally supported, all track shall be supported by material which will –

(a)  Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;

(b)  Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;

(c)  Provide adequate drainage for the track; and

(d)  Maintain proper track crosslevel, surface and alinement.

49 C.F.R. § 213.103.

Ballast is considered "safe" under the Track Safety Standards if it transmits/distributes

the load of trains, restrains the track, drains the track, and "maintain[s]" proper track crosslevel,

surface and alinement."  49 C.F.R. § 213.103.  The FRA does not require any particular size of

ballast; and, thus, the FRA has decided to leave the choice of ballast in a particular location to

the railroad, which alone possesses the requisite local knowledge to ensure that the ballast

selected will, under the given conditions, fulfill the functional requirements set forth in exacting

detail in 49 C.F.R. §§ 213.33, 213.37, 213.55, 213.57, and 213.63.

Significantly, the ballast regulation was expressly reaffirmed by the FRA after a congressionally mandated safety review.  Congress—through the Rail Safety Enforcement and Review Act of 1992, Pub. L. No. 102-365, 106 Stat. 972 (1992), as amended by the Federal Railroad Safety Authorization Act of 1994, Pub. L. No. 103-440, 108 Stat. 4615 (1994)— ordered the FRA to review all of its "regulations related to track safety standards."  49 U.S.C. § 20142(a).  That review was specifically required to include, among other things, "employee safety."  49 U.S.C. § 20142(a)(3).  At the conclusion of the mandatory review, the FRA was required to "revise track safety standards, considering safety information presented during the review."  49 U.S.C. § 20142(b).  Pursuant to the congressional directive, the FRA convened a working group which--after having "systematically surveyed the existing regulations to identify those sections and subsections that needed updating[,]" (63 Fed. Reg. at 33,993)--unanimously recommended that the FRA ballast regulation set forth in 49 C.F.R. § 213.103, "remain as currently written."  63 Fed. Reg. at 34,006.  The FRA "agree[d] with the recommendation," adopted it as its own, and affirmatively decided to let 49 C.F.R. § 213.103 stand unchanged.  Id.

The FRA ballast regulation is just one part of "an integrated undertaking" that comprises "numerous elements."  Policy Statement, 43 Fed. Reg. 10,583, 10,585 (Mar. 14, 1978).  Given their interdependence, "[a]s a general rule, it is not possible to regulate an individual hazard without impacting on other, related working conditions, nor without impacting on the safe transportation of persons and property."  Id.  For that reason, "piecemeal regulation . . . would be disruptive and contrary to the public interest."  Id. at 10,586.  It is, therefore, "essential that the safety of railroad operations be the responsibility of a single agency and that that agency undertake new initiatives in an informed and deliberate fashion, weighing the impact of particular proposals on long-standing industry practices and pre-existing regulations."  Id. at

10,585.  The FRA is that agency.  The FRA has "special competence" in "traditional areas of railroad operations" and has "developed a special expertise which makes [it] uniquely qualified to play the primary role in the Federal Government's efforts to assure safe employment for railroad employees engaged in activities related to railroad operations."  Id.  Of particular relevance to this case, the agency's expertise includes the "walkways beside the tracks in yards or along the right-of-way."  Id. at 10587.  Indeed, walkways "are areas which are so much a part of the operating environment that they must be regulated by the agency with primary responsibility for railroad safety."  Id.

Lest "piecemeal regulation" interfere with the agency's "integrated undertaking," in 1998 the FRA promulgated a regulation underscoring the preemptive effect of its track safety standards, which of course include the ballast regulation.  See 49 C.F.R. § 213.2 (reiterating that "[u]nder 49 U.S.C. 20106, issuance of these regulations preempts any State law, regulation, or order covering the same subject matter" except under certain narrowly defined circumstances).  Although the regulation merely restates the FRSA preemption provision, the FRA felt compelled to "provide a statement of agency intent" that "promotes national uniformity of regulation in accordance with the statute."  Track Safety Standards, 62 Fed. Reg. 36,138, 36,146 (July 3, 1997).

### D.        Ballast

For good reason, the FRA ballast regulation does not require the use of a particular size of ballast.  Deciding which size of ballast is the most appropriate for a particular location—and the most likely to satisfy the functional requirements set forth in 49 C.F.R. § 213.103 (as well as, for example, the interconnected cross-level, surface, and alignment requirements set forth in 49 C.F.R. §§ 213.55, 213.57, and 213.63)—is a complex process that must be undertaken with detailed knowledge of the local conditions.

Based on Plaintiff's Complaint, his discovery responses and his experts' reports, it is entirely unclear on what grounds Plaintiff alleges that ballast in any way caused and/or aggravated his bilateral knee condition.  To the extent Plaintiff's theory of the case, even if only in part, is that Defendants were negligent in not providing smaller-sized ballast for him to walk on, his argument is misplaced.  Indeed, smaller-sized ballast provides less structural support for the tracks than mainline ballast, or larger-sized ballast.  See e.g., Norris v. Cent. of Ga. R.R. Co., 635 S.E.2d 179, 181–82 (Ga. Ct. App. 2006) (noting evidence that mainline ballast was necessary in yard to provide adequate support for switch).  Thus, use of walking ballast is more likely to result in swaying trains and derailments, each of which presents its own significant safety hazards to railroad workers.  Similarly, because it traps more dirt and other debris than mainline ballast, waking ballast tend to allow more mud to form and more vegetation to grow alongside the tracks, conditions that can both undermine the tracks' structural integrity and pose hazards to workers.  See e.g., Norris, 635 S.E.2d at 182 (noting testimony that mainline ballast was required "'[f]or the water drainage'").  Walking ballast may be sufficient in locations where trains move very slowly and precipitation is rare.  But even then, walking ballast may be inappropriate and mainline ballast necessary, for example where open cars are likely to spill materials, such as phosphate or coal, that can easily clog the voids between the ballast stones.  For these reasons, the FRA has decided to leave the choice of ballast in a particular location to the railroad, which alone possesses the requisite local knowledge to ensure that the ballast selected will, under the given conditions, fulfill the functional requirements set forth, in exacting detail, in 49 C.F.R. §§ 213.33, 213.37, 213.55, 213.57, and 213.63.  Of course, the FRA conducts inspections to ensure compliance with these requirements.  See Federal Railroad Administration

Track Safety Standards Compliance Manual (Apr. 1, 2007), *available at* http://www.fra.dot.gov/
us/content/460.

>    2.    **The FRSA and The FRA Regulations Promulgated Thereunder
>            Preclude Plaintiff's Ballast Claim.**

Congress has expressly provided that the standards relating to railroad safety "shall be
nationally uniform to the extent practicable."   49 U.S.C. § 20106(a)(1).   Responsibility for
developing such uniform safety standards has been vested in the FRA, the expert agency most
familiar with railroad operations.   See 49 C.F.R. § 1.49(m).   In the agency's expert judgment,
"piecemeal regulation" of matters falling within its purview "would be disruptive and contrary to
the public interest."  43 Fed. Reg. at 10,586.  Common-law litigation is the paradigmatic form of
piecemeal regulation.   It makes no difference whether such litigation arises under state or federal
law; each is equally disruptive of national uniformity in railroad safety standards.   Accordingly,
Section 20106(a)(1) requires that tort claims brought under FELA be precluded to the same
extent as tort claims brought under state law--namely, whenever the FRA has issued regulations
under the FRSA that cover the same subject matter as the tort claim.

It is well established that FRA regulations issued under the FRSA preempt any state-law
requirement with respect to the "subject matter" covered by the regulations, including any
requirement imposed through common-law tort actions.  49 U.S.C. § 20106(a)(2); see also 49
C.F.R. § 213.2.   In this case, Plaintiff apparently alleges that Defendants should have used a
particular size of ballast.   The FRA has, however, promulgated a regulation specifically
governing the use of ballast as part of the agency's "integrated" track safety requirements.  43
Fed. Reg. at 10,585.  Not only does the ballast regulation constitute an integral part of the
agency's broader regulatory scheme, but the FRA expressly decided to leave the regulation
unchanged after conducting a congressionally mandated review of the regulation's impact on

employee safety.   See 63 Fed. Reg. at 34,006.   Given its content, history, and structure, the ballast regulation covers the subject of, and therefore precludes, Plaintiff's ballast claim.

> **A.   Virtually Every Court That Has Considered The Issue Has Held That The FRSA Can Preclude FELA Claims.**

The vast majority of courts to have considered the issue, including the two circuits that have done so, have held that FRA regulations promulgated pursuant to the FRSA can preclude FELA claims to the same extent that such regulations preempt state-law claims.   As the Seventh Circuit Court of Appeals observed, "[t]o treat cases brought under federal law differently from cases brought under state law would defeat FRSA's goal of uniformity."   Waymire v. Norfolk & W. Ry. Co., 218 F.3d 773, 777 (7th Cir. 2000).

In Waymire, the Seventh Circuit considered whether a train conductor's FELA claims arising from a train/truck collision were precluded by the FRSA and certain regulations issued thereunder.   The plaintiff claimed that the train was traveling at an excessive speed and that the railroad had installed inadequate warning devices at the crossing where the accident took place. The train, however, was traveling within the federally prescribed speed limit, and the warning devices installed at the crossing complied with federal standards.   Id. at 776–77.   Recognizing that the Supreme Court had found comparable state law claims to be preempted by the FRSA in CSX Transp., Inc. v. Easterwood, 507 U.S. 658 (1993), and Norfolk S. Ry. Co. v. Shanklin, 529 U.S. 344, 354 (2000), the Seventh Circuit held that it "must strike the same result" in FELA cases "in order to uphold FRSA's goal of uniformity."   Waymire, 218 F.3d at 776.   Accordingly, the court held that both of the plaintiff's claims were precluded.   Id. at 777.   With reference to the plaintiff's inadequate warning devices claim, but in words equally applicable to the excessive speed claim, the court stated:   "Given that the federal agency empowered by Congress to establish uniform, comprehensive federal safety standards related to warning devices at grade

14

crossings has promulgated such regulations, federal common law and statutes on these issues are necessarily displaced." Id.

The Fifth Circuit Court of Appeals has joined the Seventh Circuit in holding that FELA claims are precluded by FRSA regulations covering the subject matter of those claims. See Lane v. R.A. Sims, Jr., Inc., 241 F.3d 439 (5th Cir. 2001). In Lane, a railroad employee sought damages under FELA for injuries he sustained in a railroad crossing collision. The plaintiff argued that the train was traveling at an unsafe speed at the time of the collision, even though it was going below the speed limit established by FRSA regulations. Id. at 441. The district court granted summary judgment to the railroad on preclusion grounds, and the plaintiff appealed. Recognizing "Congress' intent that railroad safety regulations be nationally uniform to the extent practicable" (id. at 443), the Fifth Circuit affirmed. It explained that "[d]issimilar treatment" of federal and state common-law claims "would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless: 'The railroad could at one time be in compliance with federal railroad safety standards with respect to certain classes of plaintiffs yet be found negligent under the FELA with respect to other classes of plaintiffs for the very same conduct.'" Id. (quoting Waymire v. Norfolk & W. Ry. Co., 65 F. Supp. 2d 951, 955 (S.D. Ind. 1999), aff'd, 218 F.3d 773 (7th Cir. 2000)). Moreover, the court observed:

> [A]llowing juries in FELA cases to find negligence based on excessive speed, even though it did not exceed that set by the FRSA regulations, would further undermine uniformity, because it would result in the establishment, through such verdicts, of varying, uncertain speed limits at different crossings, as well as different speed limits at the same crossing, depending on the time of day, traffic conditions, and other variables.

Id. at 443–44.

Waymire and Lane represent the near unanimous view among the federal courts to have considered the issue.[2]  With just one exception of which we are aware, every federal court presented with the question has held that FELA claims are precluded by FRSA regulations covering the same subject matter.  See e.g., Crabbe v. Consol. Rail Corp., 2007 WL 3227584, at *5 (E.D. Mich. Nov. 1, 2007) ("allowing Plaintiff to proceed with a FELA claim alleging that Defendant was negligent in its choice of ballast would undermine the FRSA's goal of national uniformity") (Duggan, J.); Ferra v. Canadian Nat'l/Ill. Cent. R.R., 2007 U.S. Dist. LEXIS 88457, at *15 (E.D. Mich. May 4, 2007) (noting "danger that Congress's strived-for uniformity would be undermined by 'allowing juries in FELA cases to find negligence based on' choice of ballast even though it complied with the requirements set forth in the FRSA regulations"); Dickerson v. Staten Trucking, Inc., 428 F. Supp. 2d 909, 913–14 (E.D. Ark. 2006) (noting that "courts have precluded FELA claims when the railroad's underlying conduct was in compliance with specific FRSA regulations" and holding FELA claim challenging crashworthiness of locomotive precluded by FRSA); Major v. CSX Transp., 278 F. Supp. 2d 597, 608–10 (D. Md. 2003) ("the district courts are agreed that a FELA claim may be preempted by the FRSA"); In re Amtrak "Sunset Limited" Train Crash, 188 F. Supp. 2d 1341, 1349 (S.D. Ala. 2000) ("Like common law negligence claims, FELA negligence claims may not be used to impose duties beyond those imposed by Congress or the FRA—that is, FELA claims may, indeed, be subject to pre-emption."); Rice v. Cincinnati, New Orleans & Pac. Ry. Co., 955 F. Supp. 739, 740 (E.D. Ky. 1997) ("[t]o the extent that they are inconsistent, the FRSA will supersede the FELA based on

---

[2] Grimes v. Norfolk S. Ry. Co., 116 F. Supp. 2d 995 (N.D. Ind. 2000), mistakenly states that "the Circuits that have considered the issue" of whether the FRSA precludes FELA claims "are split." Id. at 1003. Grimes cites Waymire, 218 F.3d at 776, in support of this assertion, but the conflict discussed in Waymire is among the various *district* courts.  As noted above, the two circuits to have considered the issue, the Fifth and the Seventh, have both concluded that FRSA regulations preclude FELA claims covering the same subject matter. See Waymire, 218 F.3d at 777; Lane, 241 F.3d 443.

the policy embodied in the FRSA to ensure uniformity in law pertaining to railway safety");

Thirkill v. J.B. Hunt Transp., Inc., 950 F. Supp. 1105, 1107 (N.D. Ala. 1996) (concluding that

FELA claim was precluded by FRSA regulations covering train speed); see also e.g., Herndon v.

Nat'l R.R. Passenger Corp., 814 A.2d 934, 936–37 (D.C. Ct. App. 2003) (finding differentiation

between state and FELA common-law claims in context of FRSA to be "a distinction without a

policy difference").

## B. The FRSA evidences Congress' intent to displace federal common law.

FELA is "founded on common-law concepts of negligence and injury," and because it

"does not define negligence" (Urie, 337 U.S. at 182), its application rests on "common law

principles as established and applied in the federal courts" (id. at 174, 182). It is well-established

that when enacting a statute that abrogates the common law, "Congress need not 'affirmatively

proscribe' the common-law doctrine at issue." United States v. Texas, 507 U.S. 529, 534

(1993).[3] See also Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991)

(abrogation of common law does not require a clear statement of congressional intent). Rather,

the relevant "inquiry is whether the statutory purpose evinces a congressional intent contrary to

the federal common law." Waymire, 65 F. Supp. 2d at 957.[4] In enacting the FRSA, Congress

---

[3] It is also well established that the inclusion of an express preemption provision in a statute does not foreclose the possibility that the statute will also impliedly preempt contrary laws even if such laws do not fall within the scope of the preemption provision. As the Supreme Court has stated, an express "pre-emption provision, by itself, does not foreclose (through negative implication) 'any possibility of implied [conflict] pre-emption.'" Geier v. Am. Honda Motor Co., 529 U.S. 861, 869 (2000) (quoting Freightliner Corp. v. Myrick, 514 U.S. 280, 288 (1995)). So too here: The mere fact that the FRSA expressly preempts, under certain circumstances, the application of state law does not foreclose the possibility that it also impliedly precludes, under equivalent circumstances, the application of federal law.

[4] Notably, less evidence of congressional intent is required to support the abrogation of federal common law than is required to support the preemption of state common law. Because federalism "concerns are not implicated in the same fashion when the question is whether federal statutory or federal common law governs, . . . the same sort of evidence of a clear and manifest purpose is not required." Milwaukee, 451 U.S. at 315–17.

clearly evidenced an intent contrary to the unbridled application of federal common law in FELA actions.

Permitting FELA negligence actions to proceed notwithstanding FRSA regulations that cover the same subject matter would undermine the statutory goal that railroad safety regulation "be nationally uniform to the extent practicable."  49 U.S.C. § 20106(a)(1).  FELA actions, like all common-law actions, are subject to case-by-case adjudication.  Thus, liability might be imposed in one case but not another even though the railroad's conduct in the two cases was identical.  Faced with inconsistent verdicts returned by different juries, railroads would not know what conduct is required of them.  Verdicts that are not merely inconsistent but outright contradictory pose an even greater threat.  For example, one jury, hearing a claim brought by a worker suffering AVN, might hold a railroad liable for using mainline ballast in a particular yard, while another jury, hearing a claim brought by a worker injured in a derailment, might hold that same railroad liable for not using mainline ballast in the very same yard.  The railroad would be in an impossible quandary, and Congress's goal of national uniformity in railroad safety regulation would be defeated "by piecemeal litigation."  R.40 Slip op. 7, JA411; see also Ferra, 2007 U.S. Dist. LEXIS 88457, at *15 (noting "danger that Congress's strived-for uniformity would be undermined" because "juries could reach different verdicts in similar employee negligence cases").  Accordingly, "[t]o the extent that they are inconsistent, the FRSA will supersede the FELA based on the policy embodied in the FRSA to ensure uniformity in law pertaining to railway safety."  Rice, 955 F. Supp. at 740.

Allowing FELA actions to proceed notwithstanding FRSA regulations that cover the same subject matter not only would defeat Congress's goal of national uniformity but also would undermine Congress's goal of "promot[ing] safety in every area of railroad operations."  49

U.S.C. § 20101. Each FRA regulation is part of "an integrated undertaking" that comprises "numerous elements." 43 Fed. Reg. at 10,585. Given their interdependence, "[a]s a general rule, it is not possible to regulate an individual hazard without impacting on other related working conditions, nor without impacting on the safe transportation of persons and property." *Id.* But the jury that is called upon to hear a particular FELA claim considers that claim in relative isolation without due regard for the myriad implications its decision might have on railroad operations.[5] Moreover, even if it did look beyond the plaintiff's narrow claim, a lay jury would lack the knowledge and expertise required to comprehend the far-reaching effects that imposition of a particular common-law standard would have on railroad operations. Precisely because such "piecemeal regulation . . . would be disruptive and contrary to the public interest," it is, in the FRA's view, "essential that the safety of railroad operations be the responsibility of a single agency and that that agency undertake new initiatives in an informed and deliberate fashion, weighing the impact of particular proposals on long-standing industry practices and pre-existing regulations." 43 Fed. Reg. at 10,585–86.[6] Because FELA tort actions are antithetical to that "informed and deliberate" process, they undermine Congress's goal of "promot[ing] safety in every area of railroad operations" and are therefore precluded to the extent FRA regulations cover the same subject matter.

---

[5] In a recent decision finding preemption in the medical device arena, the Supreme Court emphasized that "tort law[] applied by juries" produces distorted results because it fails to emulate the cost-benefit analysis that an expert agency would employ. Riegel v. Medtronic, Inc., 128 S. Ct. 999, 1008 (2008) ("A jury, on the other hand, sees only the cost of a more dangerous design, and is not concerned with its benefits; the patients who reaped those benefits are not represented in court.").

[6] The FRA's determination that "piecemeal regulation . . . would be disruptive" is entitled to deference. 43 Fed. Reg. at 10,586. Cf. Hillsborough County v. Auto. Med. Labs., Inc., 471 U.S. 707, 714–15 (1985) (when Congress has delegated authority to an expert federal agency to implement and enforce a federal regulatory scheme, the agency's determination that state law threatens to upset federal objectives "is dispositive . . . unless either the agency's position is inconsistent with clearly expressed congressional intent, . . . or subsequent developments reveal a change in that position") (citation omitted).

**3.     The FRSA Ballast Regulations Cover The Same Subject Matter As Plaintiff's Ballast Claim.**

It is well established that FRA regulations issued under the FRSA preempt any state law requirement with respect to the "subject matter" covered by the regulations, including any requirement imposed through common law tort actions.  49 U.S.C. § 20106(a)(2).  See also 49 C.F.R. § 213.2.  In this case, Plaintiff does not allege that Defendants violated the Track Safety Standards, but apparently alleges that they should have used a different size of ballast.  The FRA has, however, promulgated a regulation specifically governing the use of ballast as part of the agency's "integrated" track safety requirements.  43 Fed. Reg. at 10585.  Not only does the ballast regulation constitute an integral part of the agency's broader regulatory scheme, but the FRA expressly decided to leave the regulation unchanged after conducting a congressionally mandated review of the regulation's impact on employee safety.  See 63 Fed. Reg. at 34006.  Given its content, history, and structure, the ballast regulation covers the subject of, and therefore precludes, Plaintiff's FELA claim.

Plaintiff will likely argue that the FRA regulation governing ballast, 49 C.F.R. § 213.103, does not cover the subject matter of his claim, because the regulation does not require any particular size of ballast.  Such an argument rests on a fundamental misconception of the law.  As an initial matter, the fact that the ballast regulation does not require the use of a particular size ballast is immaterial.  As the Eighth Circuit Court of Appeals has observed, the FRSA's "regulatory framework need not impose bureaucratic micromanagement in order to substantially subsume a particular subject matter."  In re Derailment Cases, 416 F.3d 787, 794 (8th Cir. 2005); see also Black v. Baltimore & Ohio R.R. Co., 398 N.E.2d 1361, 1363 (Ind. Ct. App. 1980) (holding that FRSA track structure regulations collectively preempted public service commission

order addressing muddy yard conditions despite "absence of a specific regulation dealing with muddy conditions").

Furthermore, the ballast regulation may not be viewed in isolation.  On the contrary, when a court is deciding whether a regulation covers a particular subject matter, it must view the regulation in "the context of the overall structure of the regulations."  Easterwood, 507 U.S. at 674.  Thus, whether preclusion will be found "does not depend on a single federal regulation itself covering the subject matter."  Burlington N. & Santa Fe Ry. Co. v. Doyle, 186 F.3d 790, 795 (7th Cir. 1999).  Rather, preclusion will also be found when several regulations in conjunction together cover a given subject matter.  See e.g., CSX Transp., Inc. v. City of Plymouth, 283 F.3d 812, 817 (6th Cir. 2002) (holding that speed and brake regulations in combination covered subject of how long trains could permissibly block a crossing).

The FRA ballast regulation is part of "an integrated undertaking."  43 Fed. Reg. at 10,585.  For example, subpart (d) of the regulation requires that the ballast "[m]aintain proper track crosslevel, surface and alinement" (49 C.F.R. § 213.103(d)), three technical characteristics for which highly detailed requirements are in turn set forth in 49 C.F.R. §§ 213.57, 213.63, and 213.55 respectively.[7]  Similarly, the selection of ballast directly affects drainage and vegetation growth, which are themselves regulated by 49 C.F.R. §§ 213.33 and 213.37 respectively.  Given the intricate matrix of regulations of which the ballast regulation is one part, it is clear that a railroad cannot change the ballast it uses "without impacting on other related working conditions" and "without impacting on the safe transportation of persons and property."  43 Fed. Reg. at 10,585.  Indeed, it is precisely because ballast walkways "are so much a part of the

---

[7] The technical specifications established by the cross-level, surface, and alignment regulations are defined in fractions of inches.

operating environment" that the FRA believes that "they must be regulated by the agency with primary responsibility for railroad safety." Id. at 10,587.

In light of this dense regulatory structure, many courts have concluded that the FRA ballast regulation covers the subject of—and therefore precludes—ballast safety claims such as Plaintiff's. As noted previously, the highest court to address the issue precluded the plaintiffs' claims based on FRA preclusion is the Nickels court.

Indeed, every district court in the Sixth Circuit that has reached the issue has so held. See Crabbe, 2007 WL 3227584, at *4 ("to the extent that Plaintiff's FELA claim rests upon Defendant's use of improper or oversized ballast, such a claim is precluded"); Ferra, 2007 U.S. Dist. LEXIS 88457, at *18 (ballast claim was precluded because the ballast regulation "'covers' or 'substantially subsumes' the subject matter of ballast selection" "[e]ven though the regulations at issue do not dictate the size of the ballast"); cf. Norfolk & W. Ry. Co. v. Burns, 587 F. Supp. 161, 169–70 (E.D. Mich. 1984) (Guy, J.) (holding state law purporting to regulate railroad walkways preempted given "the relationship of the walkways to the railbed" and the fact that "the FRA has taken under its wing the area of the track, the track roadbed, and such related features as ballast, cross ties, switches, [and] frogs"). Courts in other jurisdictions have also concluded that claims such as Plaintiff's are precluded by the FRA's ballast regulation. See e.g., Norris, 635 S.E.2d at 182–83 ("[t]he fact that the regulation does not specify any size for the various purposes of the ballast does not alter the fact that the regulation nonetheless 'covers' or 'substantially subsumes' the subject matter").

In response to Defendant's Motion, Plaintiff will likely rely upon his interpretation of the case of Box v. Norfolk S., however Box does not apply to the facts of this case. Box, 556 F.3d 571 (7th Cir. 2009). The Box case dealt with a challenge to an Illinois law requiring certain rail

switching yards to include walkways parallel to each track, on the grounds that it conflicted with the federal objectives of the FRSA.  The Seventh Circuit Court of Appeals upheld the law, finding that 1) federal regulations governing roadbed construction and maintenance for rail lines did not "cover" the subject of adjacent walkways, and 2) Illinois law did not impermissibly conflict with federal objectives.  Id.

There is a very important distinction between the Box case and Plaintiff's case.  In the Box case, the court heard evidence related to the feasibility of placing walkways near railroad tracks, not related to which size ballast is safer to walk on.  The Seventh Circuit noted, "Illinois allows the railroads considerable discretion over the size, placement, and materials of the walkways.  They may be made from concrete, asphalt, wood, or gravel."  *In other words, the Illinois law did not attempt to cover the issue of ballast size*.  Plaintiff, through this lawsuit, would attempt to regulate ballast size, and unlike the Illinois legislation, his lawsuit will create a conflict with the Federal objectives of the FRSA.

Allowing ballast claims such as Plaintiff's to proceed would open a Pandora's box.  As noted previously, while Plaintiff apparently alleges that Defendants used ballast that was too large, the plaintiff in another case alleged that the railroad defendant used ballast that was too small.  Moreover, if Plaintiff can proceed with a claim based on the size of the ballast, nothing would stop other plaintiffs from basing claims on other aspects of the ballast.  For example, a plaintiff in another case might challenge the shape of the ballast used, contending that angular ballast is more difficult to walk on than smooth ballast, while another plaintiff in yet another case might challenge the material used as ballast, alleging that granite ballast is more taxing on the legs than limestone ballast.  But, as is true when deciding which size ballast to use in a particular location, railroad engineers must make complex calculations based on local conditions when

23

selecting the most appropriate shape and material to use.  Smooth ballast may be easier to walk on, but precisely because it is smooth it permits greater slippage than angular ballast, and is thus less able to satisfy the functional requirements imposed by the FRA track safety regulations. Similarly, limestone ballast may be softer underfoot, but precisely because it compacts more readily than granite, it provides less support for the tracks, and is thus also less capable of fulfilling the technical specifications set forth in the FRA regulations.  If ballast claims are not precluded, there could be an unending stream of such cases, each subject to *ad hoc* adjudication and each contrary to Congress' twin goals of national uniformity in railroad regulation and safety in every area of railroad operations.

It is clear and free from doubt that Plaintiff's claim in this case threatens the FRA's goal of national uniformity in its regulations; therefore, to the extent that Plaintiff's lawsuit is based upon allegations of improper ballast stone, that portion of his claim should be dismissed with prejudice.

## III.   <u>CONCLUSION</u>:

Based on the above-stated reasons, this Honorable Court should preclude any evidence related to ballast, and GRANT Defendants' Motion.

## IV.   <u>REQUEST FOR ORAL ARGUMENT</u>:

In accordance with Local Rule 7.1(D), Defendants believe that oral argument may assist the Court and wishes to be heard.  Defendants, therefore, request that the Court schedule a hearing on the instant Motion.

Respectfully submitted,
Defendants, CSX Transportation, Inc., and
Consolidated Rail Corporation,
By their attorneys,


 /s/ Heather M. Gamache_____
Michael B. Flynn, Esq., BBO# 559023
mbflynn@flynnwirkus.com
Lori A. Wirkus, Esq., BBO # 635525
lawirkus@flynnwirkus.com
Heather M. Gamache, BBO# 671898
hgamache@flynnwirkus.com
Flynn & Wirkus, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

DATED: November 8, 2010
G:\F & A\CASE FILES\CSX OCCUPATIONAL\Worn\Crowther - WORN - 61-123\Trial\Motions in Limine\MIL to Preclude Ballast\MOL re MIL to preclude ballast

## **CERTIFICATE OF SERVICE**

I, Heather M. Gamache, attorney for Defendants CSXT and Conrail hereby certify that I have served true and correct copies of the foregoing upon all counsel of record electronically via *CM/ECF* this 8th day of November, 2010.

/s/ Heather M. Gamache
Heather M. Gamache, Esq.