COURT OF COMMON PLEAS

PHILADELPHIA COUNTY - CIVIL DIVISION

DOCKET NO. 02389


*******************************

GEOFFREY CROWTHER,

      Plaintiff,

Vs.

CONSOLIDATED RAIL CORPORATION

and CSX TRANSPORTATION, INC.,

      Defendants.

*******************************


DEPOSITION OF ROBERT SCOTT COWAH, M.D.


New England Orthopedic Surgeons

300 Birnie Avenue

Springfield, Massachusetts


December 16, 2008     5:20 p.m.


Jonathan P. Lodi

Court Reporter

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 2

1  APPEARANCES:
2
3  Representing the Plaintiff:
4  LAW OFFICE OF THOMAS J. JOYCE, III
5  900 Centerton Road
6  Mount Laurel, New Jersey  08054
7  By:  Thomas J. Joyce, III, Esq.
8  856.914.0220
9
10  Representing the Defendants:
11  BURNS, WHITE & HICKTON, LLC
12  Four Northshore Center
13  106 Isabella Street
14  Pittsburgh, PA  15212
15  By:  Stephen A. Hall, Esq.
16  412.995.3000
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
2
3  WITNESS:  ROBERT SCOTT COWAH, M.D.
4  EXAMINATION BY:   PAGE:
5  Mr. Hall        4
6  Mr. Joyce        74
7  Mr. Hall        74
8
9  EXHIBITS:              PAGE:
10  1  Notice of deposition        4
11  2  Dr. Cowan's report and CV     4
12  3  A one-page medical record     4
13  4  Copy of x-ray report        4
14  5  Dr. Cowan's file          4
15  6  A letter dated 4/11/08 from Mr.  4
16    Joyce to Dr. Cowan
17
18
19
20
21
22
23
24

Page 4

ROBERT SCOTT COWAN, M.D., Deponent, having first
been duly sworn, deposes and states as follows:
        (Cowan Deposition Exhibits 1 - 6:
        Marked for identification.)
        EXAMINATION
    Q.   (By Mr. Hall)  Good evening, Doctor.
My name is Steve Hall, and I'm a lawyer.  I work
for the Railroad, in a piece of litigation filed
on behalf of Geoffrey Crowther, who's one of your
former patients.  And have you had your deposition
taken before?
    A.   Yes.
    Q.   So you know the basic ground rules?
    A.   I do.
    Q.   Okay.  I've marked, for the record,
the deposition notice, Exhibit 1.  I sent this to
you, care of Mr. Joyce, Mr. Crowther's lawyer,
just asking to bring a full copy of your file.
        Have you done that?
    A.   Yes.
    Q.   And we've marked your file as Exhibit
5, is that correct?
    A.   Yes.
    Q.   And before we had started, I had

Page 5

marked Exhibit 2 as your report.  Can you take a
look at Exhibit 2 and just let me know -- and
that's your report and your CV that was provided
to me.
    A.   Yes, that's accurate.
    Q.   And Exhibit 6 has been marked as a
letter and a job description that was sent to you
by Mr. Joyce.
        Is that a fair and accurate copy of
what you received from Mr. Joyce?
    A.   It is.
    Q.   Doctor, could you let me know where
you're licensed to practice?
    A.   Massachusetts.
    Q.   Have you ever been subject to
discipline at all?
    A.   No.
    Q.   And can you briefly go over your
professional education?
    A.   I went to Brown University, as an
undergrad; graduated in 1982; got a master's
degree at the University of Maryland, from '82 to
'84, in anatomy; started med school in 1984 at
Boston University, and finished up in 1988.  I

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 6

1  went into an orthopedic residency program,
2  starting with a surgical internship, at the St.
3  Elizabeth's Hospital in Boston, and then the
4  orthopedic portion was the Boston University
5  affiliated hospitals. That ended in 1983.
6  Afterwards I did a fellowship in spinal surgery at
7  the New England Baptist Hospital.
8      Q.   And how long have you been at this
9  practice?
10     A.   Fourteen years.
11     Q.   And are you board certified?
12     A.   Yes.
13     Q.   And what's your board in?
14     A.   Orthopedic surgery.
15     Q.   And when did you obtain certification?
16     A.   1996.
17     Q.   Did you have to retake the test?
18     A.   I recertified ten years later.
19     Q.   And have you conducted any research in
20  the area of repetitive stress injuries or
21  cumulative trauma disorders?
22     A.   No.
23     Q.   And have you had a past experience as
24  an expert witness?

Page 7

1      A.   Yes.
2      Q.   Can you tell me the type of cases that
3  you've served in as an expert?
4      A.   Auto accident cases, medical
5  malpractice cases, and Workers' Compensation
6  cases.
7      Q.   Have you ever -- is this your first
8  railroad case?
9      A.   Yes.
10     Q.   And the auto accident cases, was that
11  primarily for your patient, or was that as a
12  defense medical expert?
13     A.   Primarily for patients.
14     Q.   And the medical malpractice, is that
15  for the defense?
16     A.   Yes.
17     Q.   And the Workers' Compensation would be
18  probably for your patients?
19     A.   Yes.
20     Q.   And have you ever testified live, in
21  court?
22     A.   Yes.
23     Q.   And where have you testified?
24     A.   In Springfield.

Page 8

1      Q.   State court or Federal?
2      A.   State.
3      Q.   And do you recall the type of case
4  that was?
5      A.   A woman fell off a porch.
6      Q.   And do you recall what the outcome of
7  that case was?
8      A.   They found for the plaintiff.
9      Q.   Have you ever been excluded or not
10  permitted to give your full opinions in any court?
11     A.   No.
12     Q.   Do you have any connection with the
13  railroad industry?
14     A.   I don't.
15     Q.   Okay. So no friends, family, or any
16  other connection?
17     A.   No.
18     Q.   And, Doctor, it's my understanding
19  that you've authored a report in this case, dated
20  November 9th, 2008, which is marked as Exhibit 2,
21  is that correct?
22     A.   Yes.
23     Q.   And one of the things I noted was that
24  -- or at least on the copy that I received -- is

Page 9

1  that it wasn't signed. Is your copy signed?
2      A.   My copy is not signed.
3      Q.   Is there anything -- have you had a
4  chance to review the report in advance of your
5  deposition?
6      A.   I did.
7      Q.   And did you meet with Mr. Joyce today?
8      A.   I did.
9      Q.   I'm sorry?
10     A.   I did.
11     Q.   And what did you guys talk about?
12     A.   We talked about this report. We
13  talked about what I might expect from this
14  deposition.
15     Q.   And what were you told in that regard?
16     A.   That we would discuss causality. That
17  we would discuss, possibly, statutes of
18  limitations. That we would discuss disability.
19     Q.   And what was the discussion about
20  disability?
21     A.   The extent of disability for this
22  patient.
23     Q.   And how about the statute of
24  limitations?

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 10

1      A.   Whether or not it had any bearing on
this case.
2
3      Q.   And did it have any bearing in the
4  course of your conversations?
5      A.   No.
6      Q.   What were you specifically told about
7  the statute of limitations?
8      A.   That there's a time period of two to
9  three years that a worker would have to file a
10 claim with respect to a given injury.
11     Q.   Anything else?
12     A.   No.
13     Q.   Was there a discussion about whether
14 or not Mr. Crowther had met that criteria, that he
15 filed a common claim?
16     A.   Yes, we did discuss that he had filed
17 a claim.  And it was my opinion that that claim
18 was within the statute of limitations, based on
19 the knowledge I have of his injury.
20     Q.   And have you reviewed any outside
21 medical records involving Mr. Crowther?
22     A.   No.
23     Q.   And what was the discussion about
24 causality?

Page 11

1      A.   It largely centered on an injury that
2  would occur as a result of cumulative trauma, as
3  opposed to a single event.
4      Q.   And was there any other discussion
5  about any other topics?
6      A.   No.  Just, you know, what I've
7  discussed.
8      Q.   And Exhibit 2, which is your report,
9  does it contain all of your opinions in this case?
10     A.   Yes.
11     Q.   Were there any opinions that were not
12 in the report, that were discussed between you and
13 Mr. Joyce?
14     A.   No.
15     Q.   And the fact that it's not signed, is
16 that signify to you, at all?  I mean, do you stand
17 by what's written?
18     A.   I stand by it.
19     Q.   Even under the -- and maybe this is
20 peculiar to Massachusetts, but under the pains and
21 penalties of perjury?
22     A.   Yes.
23     Q.   And were you paid for the narrative
24 report?

Page 12

1      A.   Yes.
2      Q.   How much were you paid?
3      A.   For the narrative report, $500.
4      Q.   And, excuse me, are there any other
5  drafts of this report?
6      A.   I don't recall any other drafts.
7      Q.   Did you receive any other
8  communications from Mr. Joyce after you did your
9  narrative report?
10     A.   I don't recall any other
11 communications.
12     Q.   Can you tell me what you did to
13 review, to come to your opinions and conclusions
14 that are set forth in your report?
15     A.   I reviewed my office notes.
16     Q.   Did you do anything else?
17     A.   I reviewed the AMA guidelines to
18 permanent impairment.
19     Q.   But you didn't review Mr. Crowther's
20 deposition or any of the other file materials
21 exchanged between the parties, is that accurate?
22     A.   That's accurate.
23     Q.   And you've not seen any other outside
24 medical records from any other provider, is that

Page 13

1  true?
2      A.   I have not.
3      Q.   And in your report -- oh, and I'm
4  sorry.  Let me back up.  And you didn't do any
5  literature review?
6      A.   I did not.
7      Q.   And, sir, you'd agree that you're not
8  an ergonomist; would you agree with that?
9      A.   I'd agree to that.
10     Q.   And you're not an occupational
11 medicine doctor?
12     A.   I am not.
13     Q.   And occupation medicine doctor is a
14 field of specialty in which those types of doctors
15 focus on causality and work-related issues?
16     A.   Yes.
17     Q.   And would you agree that you're a
18 treating physician and that your day-to-day job is
19 to treat patients and conduct surgeries?
20     A.   Correct.
21     Q.   And that you don't do forensic
22 determinations on causation on a routine basis?
23     A.   Not on a routine basis.
24     Q.   So you don't hold yourself out as a

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 14

1   forensic causality expert, do you?
2       A.   I don't.
3       Q.   And you don't hold yourself out as a
4   specialist in the area of occupationally-related
5   injuries, is that true as well?
6       A.   Well, I treat a lot of occupational
7   injuries.  I have a sizable Worker's Comp. patient
8   population, and so I'm asked my opinion on
9   causality often.  What constitutes an expert I
10  suppose is variable.
11      Q.   Well, what percentage of your
12  practice, for instance, do you devote to doing
13  forensic determinations of causation?
14      A.   Well, it would be quite small.  That
15  would be, probably, five -- less than ten percent
16  of what I do, five or ten percent.
17      Q.   Can you tell me what information, if
18  any, you received about Mr. Crowther's job and his
19  job duties at the Railroad?
20      A.   Mr. Crowther discussed with me his job
21  duties as part of his intake history and physical
22  examination.
23      Q.   And what did he tell you?
24      A.   Well, essentially what I wrote in my

Page 15

1   letter, which is that he was employed for
2   thirty-one years as a track laborer; that he
3   stated his duties were heavy manual labor,
4   welding, repairing railroad tracks; and then
5   described repetitive strenuous motion, vibration,
6   awkward postures, heavy lifting, and loading.
7       Q.   Okay.  Is that what Mr. Crowther told
8   you; did he tell you, in his words, that he did
9   heavy manual labor and was exposed to repetitive
10  strenuous motion, vibration, awkward postures; I
11  mean, were those his words?
12      A.   That was probably my interpretation of
13  what he was telling me.
14      Q.   Did you lift any of the language from
15  -- and I mean that in the nature in which it's
16  intended.  Did you borrow any of the language from
17  Mr. Joyce's letter? because it looks like that
18  very paragraph is --
19      A.   Yes.  So I'm sure I did.
20      Q.   So the basic idea of the job duties
21  was taken from Mr. Crowther's lawyer --
22          MR. JOYCE:  Objection.
23      Q.   (By Mr. Hall)  -- in his letter, is
24  that accurate?

Page 16

1       A.   No.
2       Q.   What, if anything, did you do to
3   confirm with Mr. Crowther that this was correct
4   information that was contained in Mr. Joyce's
5   letter?
6       A.   Well, in the history obtained by Mr.
7   Crowther, I, once again, was described what he did
8   for work, which was important to my evaluation of
9   his case and his condition.  And to the extent
10  that correlated with what doctor or -- I'm sorry
11  -- with what Mr. Joyce said, I put it in a letter.
12      Q.   Which note would correlate or confirm
13  the information that's in Mr. Joyce's letter?
14      A.   Well, it's not -- it's on an intake
15  form that I don't have with me.
16      Q.   So there are file materials that are
17  out there, that haven't been brought?
18      A.   Correct.
19      Q.   Do you have access to those or --
20      A.   Physically, no.
21      Q.   And so do you -- on this intake form,
22  which I would ask to get a copy of, because we
23  sent out authorizations for the release of medical
24  records, to your practice, and I never got an

Page 17

1   intake form.  I'm not sure why, but -- so it's
2   your understanding that on there there would be
3   information about his specific job duties?
4       A.   It's been a long time since I've seen
5   it.  But I think so.
6       Q.   When was the last time you think you
7   saw it?
8       A.   Probably at the time of his
9   evaluation.  I'd have no reason to look at it
10  prior to.  That would be January 27th, 2006.
11      Q.   Well, can you tell me the specific
12  things that he did as a welder that exposed him to
13  repetitive strenuous motion?
14      A.   As a welder?
15      Q.   How about a heavy-duty manual -- I'm
16  sorry.  How about as a track laborer?  I
17  apologize.
18      A.   As a track laborer?
19      Q.   Yes.  What were the specific job
20  duties that you believe exposed him to repetitive
21  strenuous motion or awkward postures or any of the
22  other things that are listed in the second
23  paragraph of your letter?
24      A.   Well, I would think any type of track

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 18

1   repair would be repetitive and strenuous.
2       Q.   Have you ever seen track repair being
3   done?
4       A.   No, I haven't.
5       Q.   And fair to say you haven't gone out
6   and looked at what Mr. Crowther did?
7       A.   No.
8       Q.   And you've never examined any of his
9   work conditions?
10      A.   No.
11      Q.   And Mr. Joyce hasn't provided you with
12  any videotape of a person repairing track?
13      A.   Correct.
14      Q.   And you've not seen any sort of
15  scientific analysis of the exposure he had on his
16  job, right?
17      A.   Correct.
18      Q.   And I think you previously stated that
19  the description of what he did for his work would
20  be important, and that you obtained that in your
21  history, and that it would be important to your
22  conclusion, is that correct, or your opinions?
23      A.   Correct.
24      Q.   And so if in fact Mr. Crowther's job

Page 19

1   turned out not to be as described in Mr. Joyce's
2   letter, would you agree that that would affect the
3   outcome of your opinion?
4       MR. JOYCE:  Objection.
5       THE WITNESS:  If Mr. Crowther's job
6   was considerably easier than described in
7   either this letter or by the patient, yes.
8       Q.   (By Mr. Hall)  Okay.  And so if Mr.
9   Crowther, for instance, worked at a safe and
10  comfortable pace, was able to take breaks, and was
11  not exposed to repetitive strenuous activity and
12  sustained awkward postures, then that could change
13  the outcome of your opinion, is that correct?
14      A.   It could be true, yes.
15      Q.   And you would agree that you don't
16  know how much time of the day he spent doing any
17  activity at work, is that correct?
18      A.   That's correct.
19      Q.   And you've never personally quantified
20  his exposure to any potential risk factors at
21  work, is that true?
22      A.   Correct.
23      Q.   And would you agree that someone who
24  evaluated his actual work tasks, or representative

Page 20

1   work tasks, would be in a better position to
2   determine causation?
3       MR. JOYCE:  Objection.
4       THE WITNESS:  Well, depending on who
5   that person is.  I mean, are you talking
6   about a physician or --
7       Q.   (By Mr. Hall)  How about a board
8   certified occupational medicine doctor; would that
9   person, after reviewing the job tasks, be in a
10  better position?
11      MR. JOYCE:  As opposed to somebody
12  that's treated the patient and examined him?
13  Did you have somebody in mind or are
14  you just speaking generally?
15      MR. HALL:  Do you have an objection?
16      MR. JOYCE:  Yes, I have an objection.
17      MR. HALL:  Okay.  Then it's noted for
18  the record.  You can answer.
19      THE WITNESS:  Yes.  I think that the
20  -- that it would depend on that doctor's
21  familiarity with the patients, in addition
22  to his familiarity with the job.
23      Q.   (By Mr. Hall)  Well, would you agree
24  that a person who is board certified or trained in

Page 21

1   occupational medicine, who has reviewed videotape
2   of representative job tasks, and who has been to
3   railroad sites and has seen the work being done
4   personally would be in a better position to
5   determine whether or not those job duties caused
6   or contributed to the development of a person's
7   problems?
8       MR. JOYCE:  Objection.
9       Q.   (By Mr. Hall)  Would you agree with
10  that?
11      A.   If they'd examined the patient.
12      Q.   And is the examination of the patient
13  -- why is that critical; wouldn't it be reasonable
14  for a doctor to review -- to rely on your physical
15  examination and notes?
16      A.   Yes, that would be reasonable.
17      Q.   And so if a board certified
18  occupational medicine doctor reviewed your medical
19  notes and those of your partners and actually did
20  an analysis of the work duties that Mr. Crowther
21  had done, you would agree that that person would
22  be in a better position to determine causality?
23      MR. JOYCE:  Objection.
24      THE WITNESS:  Yes.

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 22

1    Q.   (By Mr. Hall)  Is there any other
2  information that you received or reviewed in
3  regards to Mr. Crowther's job?
4    A.   No.
5    Q.   Did you evaluate his avocational
6  activities in coming to your conclusions?
7    A.   No.
8    Q.   And you'd agree, sir, that you're not
9  familiar with railroad operations?
10    A.   Yes.
11    Q.   And you'd agree that in your letter,
12  in your narrative report, that you've not
13  suggested that there are any specific changes to
14  Mr. Crowther's job that has been scientifically
15  demonstrated or would otherwise be -- reasonably
16  anticipated to be preventive of his neck issues?
17    MR. JOYCE:  Objection.  That's not the
18  purpose of Dr. Cowan's participation in
19  Mr. Crowther's case.
20    THE WITNESS:  I don't understand the
21  question.
22    MR. JOYCE:  He's not our liability
23  expert, Steve, and you know that.  He's a
24  medical doctor, treating physician, surgeon,

Page 23

1  expert medical witness.  He's not a
2  liability witness.  We have a different
3  liability witness to address that issue.
4    MR. HALL:  Okay.  Well, I'm just
5  asking him if he has an opinion.
6    Q.   (By Mr. Hall)  Would you agree that
7  you've not given any opinions that there were any
8  specific changes to Mr. Crowther's job that could
9  have been done by the Railroad that would have
10  prevented his injury?
11    A.   Correct.  I gave no such opinions.
12    Q.   And you hold no such opinion as you
13  sit here today?
14    A.   I hold no such opinion.
15    Q.   Okay.  And, I'm sorry, I think we
16  covered you hadn't reviewed any of the literature
17  regarding the causes of Mr. Crowther's
18  degenerative disk disease, is that correct, in
19  preparation for your report?
20    A.   Correct.
21    Q.   And do you hold yourself out as an
22  expert in the area of causes of degenerative
23  diseases of the neck?
24    A.   Yes.

Page 24

1    Q.   And what are the risk factors for the
2  development of degenerative disk disease in the
3  neck?
4    A.   Genetic predisposition or neck-
5  strenuous manual labor.
6    A.   That's probably it.
7    Q.   How about age; is age a risk factor?
8    A.   Relative.  Everybody develops
9  degenerative changes over time, so I suppose so.
10    Q.   Are there any other risk factors for
11  the development of degenerative disk disease or
12  arthritis?
13    A.   Deformity.
14    Q.   Deformity?  Anything else?
15    A.   That would be the bulk of it.
16    Q.   And can you tell me which of the risk
17  factors you ruled out, if any?
18    A.   Deformity, trauma, genetics.
19    Q.   You didn't rule out age?
20    A.   No.  He's at an age where, certainly,
21  they're fairly predominant.
22    Q.   Okay.  I'm sorry.  And I just want to
23  -- maybe I just didn't hear you, but he's at an
24  age where it's not unusual for him to have

Page 25

1  degenerative joint disease in his neck?
2    A.   Correct.
3    Q.   And so we can agree that his age
4  contributed at least in part to the development of
5  his degenerative disk disease, is that correct?
6    A.   Yes.
7    Q.   And if you take his job out of the
8  equation, he could have went on to develop the
9  exact same condition he had just -- back up.
10    If we take his job out of the
11  equation, isn't it true that he could have went on
12  to develop the same exact degenerative process in
13  his neck that resulted in his surgery?
14    A.   Yes.
15    Q.   And is there any way to attribute
16  whether or not his surgery was due to a function
17  of age more than a function of his job?
18    MR. JOYCE:  Objection.
19    THE WITNESS:  Based on chronology of
20  symptoms.
21    Q.   (By Mr. Hall)  When did he begin to
22  develop signs or symptoms of degenerative disk
23  disease?
24    A.   His complaints of neck injury or arm

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 26

1   pain started just prior to evaluation by Dr.
2   Wenner for his thumb condition, which would have
3   been late in 2005.
4       Q.   And so based on the fact that he began
5   to have neck pain, according to your file, in
6   2005, how is that significant?  I'm sorry.  Maybe
7   I'm not picking it up.
8       A.   Well, there comes a point in the
9   patient's degenerative disk process where it
10  becomes symptomatic.  And in this case, that was
11  2005.  The patient was fifty-four years of age.
12  He had been working on the Railroad, at that
13  point, for thirty-odd years.  And can I
14  differentiate exactly whether it was age-related
15  or job-related?  No.  But it was my opinion that
16  it would be a combination of the two.
17      Q.   Okay.  So fifty/fifty?
18           MR. JOYCE:  Objection.  There's no
19      reason for apportionment or allocation.
20      There's no requirement to do it.  Note my
21      objection.
22      Q.   (By Mr. Hall)  Is it your opinion it
23  was fifty/fifty?
24      A.   Sure.

Page 27

1       Q.   And is it unusual for someone in, say,
2   the fifth decade of life to have degenerative
3   changes in their neck as a result of age?
4       A.   No.  It's fairly common.
5       Q.   It's fairly common?  Is it, like,
6   fifty, sixty, seventy, eighty percent of the
7   population who have degenerative changes?
8       A.   Sixty.
9       Q.   Sixty percent, at the fifth decade of
10  life?
11      A.   Yes.
12      Q.   And I think you said -- when I asked
13  you about the personal risk factors, I think you
14  said -- and I'm trying to check my notes -- but
15  manual neck labor; is that -- and I apologize.  I
16  had manual labor, neck, stress.
17           What is manual labor that involves
18  stressing of the neck; can you describe that for
19  me?
20      A.   It would be anything done in a stooped
21  position.  Anything requiring lifting from a
22  stooped position.
23      Q.   And so -- and does it have to be
24  sustained a certain amount of time or does it have

Page 28

1   to -- I'm just trying to imagine stooped.
2           Is that knees bent all the way down
3   and lifting from the ground up; is that what you
4   mean?
5       A.   No.  Stooped just means bent at the
6   waist.
7       Q.   Just bent at the waist.  Okay.  And
8   it's not just being bent at the waist; it's
9   lifting?
10      A.   Correct.
11      Q.   And do you have any information about
12  how often Mr. Crowther would bend at his waist and
13  do lifting?
14      A.   No.
15      Q.   Are there any other things that fall
16  under the category of neck-strenuous manual labor?
17      A.   Labor requiring repetitive rotation of
18  the neck.
19      Q.   And what does that mean?
20      A.   Repetitive rotations, rotating from
21  one side to the other, lateral rotation.
22      Q.   Moving your neck left and right?
23      A.   Yes.
24      Q.   Up and down?

Page 29

1       A.   Up and down's more covered with the
2   first one, but --
3       Q.   Okay.  And does the rotation of neck
4   have to go to any certain degree in order to be
5   problematic or --
6       A.   No, it just has to be sustained over
7   years.
8       Q.   And when you say, "repetitive," I
9   mean, what's the cycle have to be in order for it
10  to be repetitive?
11      A.   I'm not sure I understand the
12  question.
13      Q.   Okay.  For it to qualify -- I mean, I
14  can rotate my neck; I can look back and forth; but
15  what's the cycle time for it to be classified as
16  repetitive, in your opinion?
17      A.   I would say if you're rotating back
18  and forth on a routine basis, four or five times a
19  minute, over the course of a workday.
20      Q.   And do you have any specific
21  information about Mr. Crowther --
22      A.   No.
23      Q.   Okay.  -- in that regard?
24      A.   No.

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 30

1    Q.    Anything else that falls into the
2  category of repetitive manual neck labor?
3    A.    Well, any actual lifting with the
4  neck, which I'm not sure he would encounter.
5    Q.    So as far as you know, that's not a
6  personal risk factor for him because he didn't
7  have lifting with his neck?
8    A.    He didn't describe any.
9    Q.    Is that like putting water on your
10 head and walking with it?
11   A.    You know who does that are guys who
12 put in the windshields because they have to push
13 with their head and their hands at the same time.
14   Q.    There's none of that, that you know
15 of, in his railroad --
16   A.    I don't know of any.
17   Q.    Any other risk factors that we haven't
18 already talked about with regard to repetitive
19 neck or, I'm sorry, manual intensive neck, in that
20 area that we've been talking about?
21   A.    Neck-strenuous labor.
22   Q.    Neck-strenuous labor.  Thank you.
23   A.    No.
24   Q.    And so to the extent that he was not

Page 31

1  exposed to neck-strenuous labor, that would be a
2  good thing, is that correct?
3    A.    Correct.
4    Q.    And if a qualified person like an
5  ergonomist went out to review the job and analyze
6  the type of activities that were done by someone
7  like Mr. Crowther and they came to the conclusion
8  that the job does not contain tasks that contain
9  neck-strenuous labor, would that alter your
10 opinion?
11        MR. JOYCE:  Objection.  Is it a
12   hypothetical; are you asking him to
13   speculate here?
14   Q.    (By Mr. Hall)  Would that change your
15 opinion?
16        MR. JOYCE:  Note my objection.
17        THE WITNESS:  It could.
18   Q.    (By Mr. Hall)  And so if in fact the
19 job did not contain a significant amount of
20 neck-strenuous labor, that would change your
21 opinion in fact, wouldn't it, sir?
22        MR. JOYCE:  Objection.
23        THE WITNESS:  It could.
24   Q.    (By Mr. Hall)  And how much

Page 32

1  neck-strenuous labor is required to produce
2  injury?
3    A.    It varies from person to person.
4    Q.    Is there any way to predict whether or
5  not someone who does neck-strenuous labor is going
6  to develop degenerative disk disease of the neck
7  because of that neck-strenuous labor?
8    A.    No.
9    Q.    Is there any way to prevent the
10 development of degenerative disk disease in the
11 neck, irrespective of work?
12        MR. JOYCE:  Objection.
13        THE WITNESS:  No.
14   Q.    (By Mr. Hall)  The aging process is
15 pretty hard on the body and on our disks and our
16 vertebrae, right?
17   A.    It can be.
18   Q.    It can be.  And you'd agree, sir, that
19 you don't hold yourself out as an expert in the
20 work-related literature that deals with the
21 degenerative disk disease; would you agree with
22 that?
23        MR. JOYCE:  Objection.
24        THE WITNESS:  Work-related literature?

Page 33

1    Q.    (By Mr. Hall)  Yes.  The literature
2  that -- the scientific literature that deals with
3  work relatedness in the development of neck
4  issues.  Would you agree that you don't hold
5  yourself out as an expert in that body of
6  literature?
7        MR. JOYCE:  Objection.
8        THE WITNESS:  Correct.
9    Q.    (By Mr. Hall)  Okay.  And are you
10 aware of any valid studies that have been done
11 associating Mr. Crowther's work duties at the
12 Railroad with the development of degenerative disk
13 disease of the neck?
14   A.    Say that again.
15   Q.    Sure.  Are you aware of any valid
16 studies that have been associating Mr. Crowther's
17 work duties with the development of degenerative
18 disk disease in the neck?
19   A.    No.
20   Q.    And we can agree, sir, that there is
21 no valid recognized dose response relationship
22 between neck-strenuous labor and the development
23 of degenerative disk disease in the neck, is that
24 true?

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 34

1   A.   Correct.
2   Q.   And that's really what we're dealing
3   with in Mr. Crowther's case, is he had
4   degenerative disk disease in his neck, correct?
5   A.   Right.
6   Q.   And you would agree that, in coming to
7   a conclusion on causation, that it's important to
8   review as much information as you can; would you
9   agree with that?
10  A.   Correct.
11  Q.   And did you ask Mr. Crowther if he had
12  any issues in terms of trauma associated with his
13  neck?
14  A.   Yes.
15  Q.   And what did he tell you?
16  A.   He did not.
17  Q.   And can we agree that once somebody
18  develops degenerative disk disease of the neck --
19  my neck just cracked.  Sorry.
20      Can we agree that once somebody has
21  degenerative disk disease in their neck and it
22  becomes symptomatic that, really, any use of the
23  neck or head can produce symptoms?
24  A.   It can.

Page 35

1   Q.   And it doesn't necessarily have to be
2   neck-strenuous labor in order to do that, right?
3   A.   Correct.
4   Q.   It could just be simply turning your
5   head could produce symptoms?
6   A.   Yes.
7   Q.   And can we agree, sir, that there's a
8   difference between the concept of activity-
9   exacerbating symptoms with the concept of an
10  actual increase in the disease process?
11  A.   I'm sorry.  Once more.
12  Q.   Yes.  I'm just trying to figure out,
13  can we agree that someone can be symptomatic,
14  maybe they turned their head and they turned their
15  neck and they produced the symptoms, that being
16  one concept; and would you agree that that doesn't
17  necessarily mean that the disease process is
18  changing?
19  A.   I agree with that.
20  Q.   So you can have symptoms without
21  necessarily increasing the disease process,
22  correct?
23  A.   Correct.
24  Q.   And in reading your report, I don't

Page 36

1   see that you came to any opinion that his job
2   duties accelerated or aggravated Mr. Crowther's
3   actual disease process, is that true?
4      MR. JOYCE:  Are you asking him whether
5   his job aggravated or worsened the
6   degenerative disk disease; is that your
7   question?
8      MR. HALL:  You can answer the
9   question.
10     THE WITNESS:  I could not say whether
11  -- I could say that it rendered it more
12  symptomatic.  Is that what you're asking?
13  I'm not sure what you're asking.
14  Q.   (By Mr. Hall)  Okay.  As you sit here
15  today, you don't have an opinion, within a
16  reasonable degree of medical certainty, and under
17  the pains and penalties of perjury, as set forth
18  in your report, that his job actually increased
19  the disease process in his neck?
20     MR. JOYCE:  Objection.
21     THE WITNESS:  I did not render an
22  opinion there, correct.
23  Q.   (By Mr. Hall)  And you don't have such
24  an opinion within a reasonable degree of medical

Page 37

1   certainty and under the pains and penalties of
2   perjury?
3   A.   Presently?
4   Q.   Yes.
5   A.   I do think his job duties aggravated
6   his underlying cervical degenerative disk disease,
7   yes.
8   Q.   Aggravated his symptoms or actually
9   aggravated the underlying disease process; in
10  other words, do you have any objective scientific
11  evidence to show that his job duties at the
12  Railroad actually increased the disease process?
13     MR. JOYCE:  He just said that's his
14  opinion.
15     THE WITNESS:  That's my -- my opinion
16  is that it did.  But do I have repetitive
17  MRIs showing a progression?  No, I don't.
18  Q.   (By Mr. Hall)  Okay.  Do you have any
19  diagnostic studies showing a comparison?
20  A.   No.
21  Q.   And do you have any objective
22  scientific evidence to make that conclusion?
23  A.   I don't, no.  It's my opinion.
24  Q.   And what's the basis for that opinion?

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 38

1  You've not seen his job.  I mean, what is the
2  basis for that opinion?
3      A.  I based that opinion, A, that he has a
4  degenerative disk disease process going on based
5  on MRIs that I was able to visualize; and, second,
6  that, in my opinion, the work that he described
7  were work duties that I considered to be
8  aggravating to a cervical degenerative disk
9  disease process.
10     Q.  If that was true, then why didn't you
11 put that in your report?
12     A.  I did.  Mr. Crowther sustained
13 cumulative micro-trauma to his neck as a result of
14 strenuous labor on the Railroad over thirty years.
15     Q.  When I read that, I saw that that was
16 your opinion, that his job duties caused the
17 underlying degenerative disk disease.
18     A.  No.
19     Q.  So that's not your opinion?
20     A.  No.
21     Q.  So we can agree that his job duties
22 did not cause the underlying degenerative disk
23 disease?
24     MR. JOYCE:  Objection.

Page 39

1      THE WITNESS:  That's correct.
2      Q.  (By Mr. Hall)  And so, what this
3  paragraph is saying is that -- if I understand
4  correctly, based on what you just told me -- is
5  that his job duties may have accelerated the
6  otherwise non-work-related degenerative disk
7  disease, is that correct?
8      A.  Correct.
9      Q.  So really, your opinion is based
10 solely on an aggravation of a pre-existing,
11 non-work-related injury of --
12     MR. JOYCE:  Objection.  I think his
13     report also talked about it being a
14     contributing factor, along with an
15     aggravation of the condition.
16     MR. HALL:  You can answer the
17     question.
18     THE WITNESS:  Can you restate it?
19     MR. HALL:  Sure.
20     Q.  (By Mr. Hall)  Your opinion is that
21 his job duties at the Railroad aggravated or
22 worsened a pre-existing, non-work-related
23 condition, is that correct?
24     A.  That's correct.

Page 40

1      Q.  And the MRI that you took was February
2  of 2006, is that right?  Do you have a copy of
3  that?
4      A.  March.  March 1, 2006.  That's what I
5  have.
6      Q.  I have an exam date of 2/8/06.  And it
7  was signed -- can I see where you're getting the
8  date from?  You only sent him out once, is that
9  right?
10     A.  Correct.
11     Q.  For an MRI?
12     A.  Yes.
13     Q.  And that was Dr. Deborah Green?
14     A.  Yes.
15     Q.  So the exam date was 2/8 of '06.  Can
16 we agree on that?
17     A.  Yes.
18     Q.  And do you have that in front of you,
19 the MRI?  Can I take a look at it?  This is the
20 only copy I have.
21     A.  I don't have a copy of it.
22     Q.  Do you mind if I walk around and we
23 can look at it together?
24     MR. JOYCE:  I have a copy, if you want

Page 41

1  it.
2      MR. HALL:  You have a copy of it?
3      MR. JOYCE:  Yes.
4      Q.  (By Mr. Hall)  Okay.  And we're
5  referring, for the record, to the MRI Center
6  2/8/06 MRI done of Mr. Crowther's cervical spine,
7  done by Dr. Deborah Green, correct?
8      A.  Correct.
9      Q.  And can you go through the findings
10 for me?
11     A.  Sure.
12     Q.  And maybe put it into laymen's terms
13 for me, if that's possible?
14     A.  Sure.
15     Q.  Okay.  Maybe starting with C2-3, which
16 is the first finding, is that correct?
17     A.  Disk is of normal height, meaning that
18 he hadn't lost any height.  It diminished signal
19 intensity, meaning that the disk was dry, no bulge
20 or herniation.
21     Q.  Okay.  And is diminished signal
22 intensity or dryness something that's typical of
23 age-related --
24     A.  Yes.

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 42

1  Q.   -- degenerative disk disease?
2       So in terms of his C2-3, that would be
3  fully consistent with age-related-only --
4       MR. JOYCE:  Objection.
5  Q.   (By Mr. Hall)  -- degenerative disk
6  disease?
7  A.   Yes.
8  Q.   Okay.  And what about C3-4, which is
9  the next one down in the finding?
10 A.   C3-4 shows mild retrolisthesis,
11 meaning that the vertebrae didn't quite line up,
12 another degenerative finding.  The disk had lost
13 both height and signal intensity and had a bulge
14 in it on the right side, as well as some bone
15 spurs.
16 Q.   And is that fully consistent with
17 age-related degenerative changes?
18 A.   Yes.
19 Q.   And what was the next part?  There was
20 flattening of the dural sac.
21 A.   Correct.
22 Q.   And what does that mean?
23 A.   That means the bulge pushed in on the
24 sac housing the spinal cord, containing the spinal

Page 43

1  cord.
2  Q.   And there's moderate, right-lateral
3  recessed stenosis?
4  A.   Right.  That's narrowing of the nerve
5  tunnels.
6  Q.   And bilateral, foraminal stenosis,
7  with proximal encroachment on C4-5 nerve roots?
8  A.   Same thing.
9  Q.   Same thing?  And is that all
10 consistent with age-related, degenerative disk
11 disease?
12      MR. JOYCE:  Objection.
13      THE WITNESS:  Yes.
14 Q.   (By Mr. Hall)  And how about C4-5?
15 A.   Same sort of findings.
16 Q.   All completely consistent with
17 age-related changes?
18      MR. JOYCE:  Objection.
19      THE WITNESS:  Yes.
20 Q.   (By Mr. Hall)  And how about C5-6?
21 A.   Similar to C3-4.  Once again, disk
22 bulging, narrowing of the spinal canal, narrowing
23 of the nerve tunnels.
24 Q.   Okay.  All consistent with age-related

Page 44

changes?
A.   Yes.
     MR. JOYCE:  Objection.
Q.   (By Mr. Hall)  And how about C6-7?
A.   A little worse with the spur formation
actually causing mild impression on the spinal
cord itself and tighter nerve tunnel impingement.
Q.   Okay.  But consistent with age?
     MR. JOYCE:  Objection.
     THE WITNESS:  Yes.
Q.   (By Mr. Hall)  And C7-T1?
A.   That's a normal disk.
Q.   Normal disk.  So no problems there?
A.   Correct.
Q.   And what is the last paragraph there?
There's right retrolisthesis at C3-4, C5-6 and
C6-7?
A.   That was all mentioned in the body of
the report above.
Q.   And what is this mild endplate
degenerative changes; what does that mean?
A.   That's an arthritic finding.
Q.   Is that completely consistent with
age-related degenerative changes?

Page 45

A.   Yes.
Q.   And there was no problem with the
cord, is that correct, the spinal cord?
A.   The spinal cord didn't show any signal
change abnormalities, looked okay.
Q.   And the other structures were also
normal?
A.   Yes.
Q.   And so this entire MRI that was done
by you is completely consistent with age-related
changes, is that fair to say?
     MR. JOYCE:  Objection.
     THE WITNESS:  Correct.
Q.   (By Mr. Hall)  There's not anything on
here showing any specific trauma or any specific
micro-trauma, would you agree with that?
A.   There is no traumatic findings.
Micro-trauma refers to more, actually, arthritic-
type changes.
Q.   Okay.  Let me ask you this, because
there were a couple notations I think you said at
C6-7 and C5-6, if I'm not mistaken, that showed
that there was a narrowing of where the nerves
went through or something was touching the nerves.

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 46

1    A.   Yes.
2    Q.   Is that right?
3    A.   That's correct.
4    Q.   And whenever that happens in the neck,
5  in this area of the neck, based on my laymen's
6  understanding of the dermatome charts, it produces
7  a single or sensation in the left hand, is that
8  right?
9    A.   It could.
10    Q.   Well, let me ask you this:  If there's
11  a touching or if there's encroachment of the
12  nerve, is it physiologically possible not to
13  produce a symptom in the hand?
14    A.   Yes.
15    Q.   And how does it happen that when some
16  encroachment turns into a neurological -- creates
17  a neurological finding?
18    A.   It's usually a matter of degree of
19  encroachment.
20    Q.   And when it's described in MRI or
21  x-ray reports or diagnostic studies, is there a
22  difference between, you know, small-, medium- or
23  large-type of impingement or encroachment, or does
24  "impingement" mean that it's being fully touched

Page 47

1  or compromised; can you, in your experience, tell
2  me how that's read?
3    A.   Usually the way it's described is
4  there is impingement, and it's graded either mild,
5  moderate, or severe.
6    Q.   And can you have radiculopathy in your
7  left hand or your left arm as a result of minor or
8  minimal neuroforaminal impingement?
9    A.   That's possible.
10    Q.   And is that something that once it's
11  impinged, once it's -- once something is hitting
12  it, whether or not it's a bone spur, or if there's
13  some narrowing or some arthritic changes in the
14  area where the nerve runs -- that it -- can their
15  symptoms go away and come back --
16    A.   Yes.
17    Q.   -- or do they stay?
18    A.   They can go away and come back.
19    Q.   Okay.  I'm going to show you what's
20  been marked as Exhibits 3 and 4.  And Exhibit 4 --
21  and, I'm sorry, this is the only copy I have.
22  It's got some hole punches on it.
23    MR. JOYCE:  Can I take a look at that?
24    MR. HALL:  Sure.  It's the 2002 x-ray

Page 48

1  that was taken of his neck.
2    Q.   (By Mr. Hall)  Doctor, could you take
3  a look at this with me?  And I apologize.  This is
4  the only copy that I have.  And I can make the
5  representation to you that I didn't put any of
6  this writing on here, okay?  But if we're looking
7  at the -- because it was at an x-ray done of the
8  right shoulder and the cervical spine.  Can we
9  agree on that?
10    A.   Yes.
11    Q.   And the date of the x-ray was
12  10/8/2002?
13    A.   Yes.
14    Q.   Okay.  And I can show you what's been
15  marked as Exhibit 3.
16    MR. JOYCE:  Can I take a look at that,
17  please?
18    MR. HALL:  Sure.  That's from Dr.
19  Baustin's records.
20    Q.   (By Mr. Hall)  Okay.  And it looks to
21  me from -- and this is Exhibit -- Exhibit 3 is
22  from Dr. Baustin's records.  And it looks to me
23  that at that point, Mr. Crowther was fifty-one
24  years old and was having pain for weeks and months

Page 49

1  involving his right shoulder, right arm and neck.
2  And he was experiencing tingling sensations in his
3  fingertips but no necessarily numbness or
4  weakness, okay?  And it looks like, to me, that
5  Dr. Baustin, in his assessment on this particular
6  date, says that Mr. Crowther's story suggests to
7  him there was possible nerve root irritation at
8  the most likely source, is that correct?
9    A.   As the most likely source.
10    Q.   As the most likely source.  I'm sorry.
11  I'm reading sideways.  And that he was sending him
12  out for an x-ray, is that right?
13    A.   Yes.
14    Q.   And this x-ray is taken four days
15  after that visit.  So I'm assuming that this is a
16  -- it's probably reasonable to assume that that is
17  the x-ray that he -- was sent out from Dr.
18  Baustin.
19    A.   Yes.
20    Q.   And there were degenerative changes in
21  -- noted in Mr. Crowther's spine at that time, is
22  that correct?
23    A.   Correct.
24    Q.   And looking at the impressions that

13  (Pages 46 to 49)

Page 50

1   were given from this particular x-ray, they're
2   extraordinarily similar to the MRI findings that
3   were done with you a few years later, is that
4   correct?
5       MR. JOYCE:  Objection.
6       THE WITNESS:  I wouldn't call them
7   extraordinarily similar.  He's got some
8   degenerative disk changes on his x-ray.  His
9   MRI is consistent with that, as well.
10      Q.   (By Mr. Hall)  Okay.  So these
11  degenerative changes are consistent in both the
12  MRI you had done, as well as this x-ray, is that
13  correct?
14      A.   Correct.
15      Q.   And in looking at these, can you see
16  if they're -- if there's any worsening of the
17  disease process?
18      MR. JOYCE:  Objection.
19      THE WITNESS:  No.  It's impossible to
20  say.
21      Q.   (By Mr. Hall)  Okay.  Can we agree
22  that this particular x-ray that was done and sent
23  to Dr. Baustin indicated that there was
24  degenerative disk disease at C3-4, C5-6, C6-7, and

Page 51

1   some neuroforaminal impingement suggested,
2   particularly at C5-6 on the left?
3       A.   That's what it says.
4       Q.   Okay.  And that would -- and then it
5   says there's a statement that says, This does not
6   clearly account for his -- for the right-sided
7   symptoms, is that right?
8       A.   Correct.
9       Q.   And so is the impression that that
10  neuroforaminal impingement and the degenerative
11  disk disease that was there explain the left-sided
12  symptoms; is that a fair assessment?
13      MR. JOYCE:  Objection.
14      THE WITNESS:  I don't know if he had
15  any left-sided symptoms.
16      Q.   (By Mr. Hall)  Based on the note that
17  was done by Dr. Baustin, he was noting that he
18  had --
19      A.   Right arm, shoulder, neck.
20      Q.   -- along his right arm and neck, that
21  he was having pain in his neck.
22      A.   Um-hum.
23      Q.   And that -- I'm sorry.  It's hard for
24  me to read sideways.  I apologize.  And that

Page 52

1   sometimes he gets tingling sensation in his
2   fingertips.
3       A.   Um-hum.
4       Q.   Would that account for the left-sided
5   numbness or weakness or tingling in the
6   fingertips?
7       A.   I don't know if he has any left-sided
8   tingling.  I don't think he does.
9       Q.   Well, let me ask you this:  Based on
10  just looking at the x-ray, would it surprise you
11  if someone had left-sided numbness or tingling
12  sensations in their hands, based upon the
13  degenerative changes and the foraminal impingement
14  that was suggested in this x-ray?
15      MR. JOYCE:  Objection.
16      THE WITNESS:  Would it surprise me,
17  no, if in fact somebody did.
18      Q.   (By Mr. Hall)  Okay.  And it's my
19  understanding that you've never seen these records
20  before?
21      A.   I've never seen those records before.
22      Q.   And had you seen these whenever you
23  were evaluating -- let me ask you this:  Do these
24  records change your opinion as to the onset of his

Page 53

1   problems with his neck?
2       MR. JOYCE:  Objection.  He wasn't
3   symptomatic in 2003, on the left side.
4       THE WITNESS:  No.  I would expect him
5   to have some degenerative changes in the
6   neck.
7       Q.   (By Mr. Hall)  Okay.  Let me ask you
8   this:  If you sent out a patient for this x-ray,
9   would you tell them that it looks like there might
10  be some neck impingement that might be causing
11  left-sided neurological changes?
12      MR. JOYCE:  Objection.
13      THE WITNESS:  In a hypothetical, sure.
14      Q.   (By Mr. Hall)  Yes, in a hypothetical,
15  you know, because based on your years of practice,
16  you know that if there's some impingement of the
17  nerve at these particular areas that it could
18  produce symptoms in the left side, correct?
19      A.   Correct.
20      MR. JOYCE:  Objection.
21      Q.   (By Mr. Hall)  And that would be
22  reasonable for you to tell your patient; and in
23  fact, you would likely tell your patient that,
24  correct?

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 54

1   MR. JOYCE: Objection. Is this all
2   hypothetical?
3   MR. HALL: It's a hypothetical
4   situation, yes.
5   THE WITNESS: Yes.
6   Q.   (By Mr. Hall) If this patient came in
7   to see you --
8   A.   Hypothetically, yes.
9   Q.   And it's my understanding, in looking
10  at your medical notes, that Mr. Crowther at one
11  point -- you recommended that he have surgery and
12  that he declined. Does that ring a bell?
13  A.   I think so.
14  Q.   And do you know why he declined?
15  A.   Let's look.
16  Q.   I think on page -- and I'm looking at
17  Page 2 of your report. It says, "He had work-
18  related financial constraints and deferred at that
19  time."
20  A.   Okay.
21  Q.   Did he tell you anything specific
22  about what those financial constraints were?
23  A.   I don't recall anything specific, no.
24  Q.   And let me ask you this:  If he

Page 55

1   continued to work after that time -- do you know
2   when that was, by the way? I apologize. Off the
3   top of your head, do you know when you recommended
4   surgery and he declined?
5   A.   Let's see. I believe I offered it in
6   March and he declined in March.
7   Q.   Of, I'm sorry, which year?
8   A.   Of '06.
9   Q.   And he ended up having it in January
10  of '07?
11  A.   Yes.
12  Q.   And if you assume that he continued to
13  go to work -- well, let's put it this way:  In
14  March of '06, did you put him on a work
15  restriction?
16  A.   There's no mention of a work
17  restriction here.
18  Q.   Okay. And did you tell Mr. Crowther
19  that if he went back to work doing his job at the
20  Railroad, that he would likely increase his
21  injury?
22  A.   No, I don't believe I did.
23  Q.   Why not?
24  A.   Well, I don't think he would,

Page 56

necessarily.
Q.   Okay. And so --
A.   He already had it.
Q.   He already had it. But my
understanding was you were concerned about it
being aggravated or increased, correct?
A.   That's certainly a possibility, yes.
Q.   And despite it being a possibility,
you have no record of informing him of that?
A.   I don't.
Q.   And I assume you don't have any
written correspondence to the Railroad informing
him of his degenerative disk disease in his neck
and the potential for an exaggeration of that
pre-existing injury?
A.   I don't believe I do.
Q.   And at that point, you didn't tell Mr.
Crowther to do anything differently, is that
correct?
A.   I don't believe so.
Q.   And do you have any evidence in your
file that -- him working from March of '06, until
he had his surgery in January of -- was it January
of '07?

Page 57

A.   The operation was -- yes, January of
'07.
Q.   Do you have anything in your file or
do you have an opinion as to whether or not he
actually had an increase in the disease process in
that time period?
A.   No. Basically it stayed the same, as
best I could tell.
Q.   So as best you could tell, from March
of 2006, until he had surgery in January of 2007,
his job didn't produce any further injury, is that
correct?
A.   Correct.
Q.   And going before March of 2006, do you
have any evidence to determine whether or not his
job actually aggravated or increased the disease
process --
MR. JOYCE: Objection.
Q.   (By Mr. Hall) -- from 2002 until
2006?
MR. JOYCE: Objection.
THE WITNESS: Yes.
Q.   (By Mr. Hall) What objective evidence
do you have?

Page 58

1    A.   The development of the left arm
2  symptoms.
3    Q.   And could Mr. Crowther have developed
4  left arm symptoms for reasons other than work?
5    A.   Yes.
6    Q.   And couldn't it be a natural function
7  of age that could explain for his left-sided
8  neurological change?
9        MR. JOYCE:  Objection.
10       THE WITNESS:  It is possible.
11   Q.   (By Mr. Hall)  And can we agree that
12  at least in part, if not fifty/fifty I think is
13  what you said before, that age would have played a
14  significant role in the potential for the
15  development of neurological symptoms in the left
16  arm?
17       MR. JOYCE:  Objection.
18       THE WITNESS:  Age plays a significant
19       role as well.
20   Q.   (By Mr. Hall)  Okay.  And do we know
21  which particular level and which particular
22  degenerative change resulted in the development of
23  left arm problems?
24   A.   In my opinion, the distribution of his

Page 59

1  symptoms were most consistent with a C5-6 and a
2  C6-7 lesion.
3    Q.   Which I think we can agree could be
4  completely as a result of age-related changes?
5        MR. JOYCE:  Objection.
6        THE WITNESS:  It could be age-related
7        changes.
8    Q.   (By Mr. Hall)  I'm sorry.  My question
9  was:  That could be -- age could completely
10  explain the symptoms, correct?
11       MR. JOYCE:  Objection.
12       THE WITNESS:  Age could completely
13       explain the symptoms, yes.
14   Q.   (By Mr. Hall)  And there's no
15  predisposing occupation for the development of
16  degenerative disk disease in the neck, would you
17  agree with that?
18   A.   No.  I think certain people have a
19  risk for developing cervical degenerative problems
20  that result in more aggressive care.  Certain
21  occupations are predisposing.
22   Q.   And this being your first railroad
23  case, does that involve any occupation at the
24  Railroad?

Page 60

1    A.   Well, the activities described as
2  Mr. Crowther's job duties, in my opinion, would
3  put him at risk.
4    Q.   And it's my understanding that Mr.
5  Crowther, when he underwent the operation, that he
6  had an uneventful post-operative care, is that
7  correct?
8    A.   Correct.
9    Q.   And that he had excellent results in
10  terms of his neck surgery?
11   A.   He did well.
12   Q.   And isn't it true that the literature
13  says that ninety-plus percent of people who have
14  the type of surgery that Mr. Crowther had return
15  to full functional capacity within one year?
16   A.   I'm not aware of that finding.
17   Q.   Are you aware of a finding that
18  ninety-plus percent of people who have the type of
19  surgery that Mr. Crowther had have positive or
20  good results?
21   A.   Yes.
22   Q.   Okay.  And so you may not agree with
23  the one-year, but you might -- could it be longer
24  than one year?

Page 61

1    A.   Well, I just haven't seen data,
2  return-to-work data, on people who have two levels
3  of degenerative disk disease and subsequent
4  surgeries, so it's hard to speculate.
5    Q.   Have you returned patients back to
6  work after a two-level fusion?
7    A.   Sure.
8    Q.   Okay.  In the past?
9    A.   Yes.
10   Q.   And did you recommend that Mr.
11  Crowther go back to work?
12   A.   Let me just look.  I didn't recommend
13  he go back to work because he had too many
14  concurrent issues.
15   Q.   Well, let me ask you this:  If you
16  just take the neck alone, was that keeping him out
17  of work?
18   A.   The neck alone, in my opinion, would
19  not keep him out of any and all work.  It
20  certainly would not render him totally disabled.
21   Q.   So we can agree that -- could we agree
22  that Mr. Crowther could return to his work at the
23  Railroad after his operation?
24       MR. JOYCE:  Objection.  Are you

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 62

1  talking about all work or railroad work?
2      MR. HALL:  Railroad work.  If you just
3  look at his neck --
4      THE WITNESS:  No.  I understand the
5  question.
6      MR. HALL:  Okay.  I'm sorry.  I
7  apologize.  I didn't mean to interrupt you.
8      THE WITNESS:  With regards to his
9  neck, in conjunction with his age and based
10  on my knowledge of his job duties, I felt he
11  could not return to his previous job just
12  with his neck.
13      **Q.   (By Mr. Hall)  Okay.  Is that stated**
14  **anywhere in your report?**
15      A.   Well, it's rendered moot by the fact
16  that he had the other -- the issue with his knees,
17  and I didn't think he could do anything.
18      **Q.   Okay.  Well -- and that's Dr. Lehman's**
19  **territory, right?**
20      A.   That is correct.
21      **Q.   And you would defer to Dr. Lehman,**
22  **correct?**
23      A.   On the specific issues with his knees,
24  yes.

Page 63

1      **Q.   And so we can agree that Mr. Crowther,**
2  **based just on his neck, could perform at least a**
3  **light or sedentary-type job?**
4      A.   Yes.
5      **Q.   And maybe even medium-duty work?**
6      MR. JOYCE:  Objection.
7      THE WITNESS:  Yes.
8      **Q.   (By Mr. Hall)  And do you encourage**
9  **your patients to do that, to return to work?**
10      A.   I do.
11      **Q.   Because one of the things I noted was**
12  **that six weeks post surgery, in one of your notes,**
13  **you had him as being returned to work.  Do you**
14  **recall that?**
15      A.   If I can look at it.
16      MR. JOYCE:  That's incorrect.  He did
17  not return to work.
18      MR. HALL:  I just said he had him down
19  as being returned to work.
20      MR. JOYCE:  You know that, Steve.  He
21  didn't go back to work after his surgery.
22  There is a follow-up note that says he
23  doesn't go back to work.
24      MR. HALL:  I'm asking him about it.

Page 64

1      MR. JOYCE:  I think that is
2  misleading, though, because you know he
3  never went back to work after that.
4      MR. HALL:  Well, if you listened to
5  the question --
6      MR. JOYCE:  I listened to the
7  question.
8      **Q.   (By Mr. Hall)  Okay.  Is that a**
9  **mistake?**
10      A.   What note?
11      **Q.   February 28th, 2007, Cowan/PAL.  Right**
12  **there.**
13      A.   Okay.  That must have been my mistake.
14  If he didn't go back -- I thought he said he did,
15  so that's what I wrote.
16      **Q.   Okay.  When is the soonest you would**
17  **put somebody back, back to work, after a fusion**
18  **like Mr. Crowther had?**
19      A.   If it's a sedentary-duty job, they can
20  go back whenever they want.
21      **Q.   Like, the next few days?**
22      A.   Well, a week, two weeks.
23      **Q.   Okay.  And how about, like, say, a**
24  **medium-duty job; how long would the recovery**

Page 65

1  period need to be, in order for someone to be
2  returned to a medium-duty-type job?
3      A.   It's more like six.
4      **Q.   Six weeks?**
5      A.   Six weeks.
6      **Q.   And so if you thought he did a**
7  **medium-duty job and he was six weeks post surgery,**
8  **like in this note, that would be a reasonable**
9  **return-to-work schedule?**
10      A.   It's within the realm of possibility.
11      **Q.   And based on the AMA guidelines, can**
12  **you tell me how you did that?**
13      A.   There's a chart in a book.
14      **Q.   And are there subjective things you**
15  **have to make, in order to figure out how to be on**
16  **the chart?**
17      A.   Not a lot.  It basically states, for
18  that category, if patients had surgery for a
19  radiculopathy, that they fall into that particular
20  DRE and that particular impairment rating.
21      **Q.   And does the success of the particular**
22  **surgery play a role in how it's evaluated on the**
23  **AMA?**
24      A.   It can.

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 66

```
 1        Q.   How did you assess Mr. Crowther's
 2   surgery, in terms of what you did with the AMA?
 3        A.   Well, I assessed that he did well.  He
 4   didn't have persistent radicular findings,
 5   weakness or numbness.  But just based on the
 6   surgery, that's how the AMA guideline worked for
 7   that particular --
 8        Q.   And is this the best possible
 9   impairment rating you can get, having neck
10   surgery?
11        A.   Best in what sense?
12        Q.   Best in terms of the least amount of
13   disability.
14        MR. JOYCE:  Objection.
15        Q.   (By Mr. Hall)  I mean, is this the
16   best possible outcome he could have on the AMA
17   guidelines, based upon the fact that he had
18   surgery because of a radiculopathy?
19        A.   I believe so.  I think it's eighteen
20   to twenty-three percent.
21        Q.   So this is the best possible outcome
22   for him, based on the AMA guidelines, is that
23   correct?
24        A.   Correct.
```

Page 67

```
 1        Q.   And people who have an eighteen-
 2   percent, whole-body impairment rating can do
 3   medium-type jobs?
 4        A.   Sure.
 5        Q.   Could they do heavy-type jobs?
 6        A.   Hypothetically, sure.
 7        Q.   Can you give me just a moment, and I
 8   can review my notes?
 9        A.   Sure.
10        Q.   Thank you.  Do you have an opinion on
11   Mr. Crowther's long-term prognosis, in terms of
12   his neck?
13        A.   He should do fine.
14        Q.   When was the last time he went to see
15   you?
16        A.   Last seen by me July the 6th, 2007, I
17   believe.
18        Q.   And everything was satisfactory at
19   that point?
20        A.   Yes.
21        Q.   And you haven't seen him in almost two
22   years?
23        A.   It'll be two years next July.
24        Q.   Next January?
```

Page 68

```
 1        A.   Next July.
 2        Q.   Oh, you saw him in July.  I had -- I
 3   apologize.  So, like, a year and a half?  Okay.
 4        And in terms Mr. Crowther's other
 5   orthopedic conditions, you would defer to the
 6   other doctors who treated him in your practice, is
 7   that right?
 8        A.   That's right.
 9        Q.   And that would also include the
10   disability ratings, as well?
11        A.   Correct.
12        Q.   And so is it your understanding that
13   he had excellent results or good results of those
14   issues, as well?
15        A.   I actually don't have notations, in
16   regards to either his thumb or his knees, so I
17   can't really say how he's done with respect to
18   either of those.
19        Q.   And you just defer to those doctors on
20   that?
21        A.   I do.
22        Q.   Okay.  Your last exam -- I know we
23   talked a little bit about it being a good surgical
24   result.  Did Mr. Crowther regain his full range of
```

Page 69

```
     motion?
 1        A.   Of --
 2        Q.   His neck.  I'm sorry.
 3        A.   Typically, no.  Most patients who have
 4   a fusion lose some range of motion, but it's not
 5   of any functional consequence.
 6        Q.   And is that consistent with -- I'm
 7   sorry.  Is that how Mr. Crowther's case turned out
 8   to be?
 9        A.   Yes.
10        Q.   So any limitation on how he can rotate
11   his neck has no functional consequence?
12        A.   Correct.
13        Q.   And one of the things I did want to
14   ask you about -- and I apologize to go back -- but
15   do you have any information about Mr. Crowther's
16   exposure to vibration to his neck?
17        A.   I don't have any specifics on that,
     no.
18        Q.   I'm just trying to figure out -- do
19   you have any information to say that he was
20   exposed to vibration in his neck?
21        A.   Only what's in Mr. Joyce's note here.
22        Q.   And in order for a vibration to affect
```

Page 70

1  the neck, I mean, would you have to have direct
2  contact with some sort of vibrating source?
3      A.   Yes.
4      Q.   And would the contact have to be on
5  the spine itself?
6      A.   No.  It could travel through the arms
7  or legs.
8      Q.   And have you made any assessment of
9  his vibration exposure at all?
10     A.   No.
11     Q.   And are you aware of the studies that
12  indicate that exposure to whole body vibration is
13  not causally related to the development of
14  musculoskeletal disorders of the neck?
15         MR. JOYCE:  Objection.
16     Q.   (By Mr. Hall)  Are you aware of that?
17     A.   I'm not aware of any study with
18  respect to that.
19     Q.   Is the National Institute of
20  Occupational Safety and Health an authoritative
21  body?
22     A.   Yes.
23     Q.   And if they indicated, in a
24  publication regarding work-relatedness, that

Page 71

1  whole-body vibration exposure has not been
2  causally related -- there's insufficient evidence
3  to formulate a caussal association between
4  whole-body vibration and the development of
5  musculoskeletal disorders of the neck and
6  shoulder -- would you agree with them and defer to
7  them?
8          MR. JOYCE:  Objection.
9          THE WITNESS:  Yes.
10     Q.   (By Mr. Hall)  And you don't have any
11  independent scientific studies showing that
12  exposure to vibration causes degenerative disk
13  disease in the neck, do you?
14     A.   No.
15     Q.   Are you aware of any at all?
16     A.   No.
17     Q.   In terms of -- okay.  Are there any
18  current medical restrictions on Mr. Crowther?
19     A.   No.
20     Q.   So as far as you're concerned, in
21  terms of his neck, he has no medical restrictions?
22         MR. JOYCE:  Objection.
23         THE WITNESS:  Well, I said he was
24  totally permanently disabled.  I suppose

Page 72

1  that qualifies as a restriction that has
2  to do with all of his impairments; neck,
3  arm, knees.  Was that what you were speaking
4  of?
5          MR. HALL:  Well, any particular
6  medical restrictions with regard to his
7  neck, because I think we agreed before that
8  you would defer to -- the disability ratings
9  -- to the other doctors who treated him.
10         THE WITNESS:  Well --
11     Q.   (By Mr. Hall)  Is he disabled because
12  of his neck?
13         MR. JOYCE:  He already answered that
14  question yes.
15         THE WITNESS:  Yes, he's disabled with
16  regards to his neck.  As I said, I think he
17  could go back to some work, but not his
18  previous line of work and duties.
19     Q.   (By Mr. Hall)  Okay.  And if we were
20  trying to figure out which job he could go and do,
21  are there any medical restrictions?
22     A.   Yes.
23     Q.   Could he, for instance, lift up to
24  twenty-five pounds or --

Page 73

1      A.   Yes.
2      Q.   -- fifty pounds?
3      A.   I would -- you know, once again, I
4  haven't seen him for a year and a half.  And
5  probably the better way to judge this would be
6  something like a functional capacity evaluation.
7  But I would say he would have lifting
8  restrictions.  He would be best not doing overhead
9  work.  He would be best not working in a stooped
10  position, and best not lifting below his knees or
11  crawling into tight, cramped spaces.
12     Q.   But in order to really make an
13  assessment, you need a functional capacity exam?
14     A.   I think it's helpful.
15     Q.   And you're not aware of Mr. Crowther
16  having a functional capacity exam, is that
17  correct?
18     A.   I am not.
19     Q.   And you didn't do a functional
20  capacity exam before doing your percentage or
21  calculation on his impairment, is that correct?
22     A.   No.  It wouldn't have figured in.
23         MR. HALL:  Okay.  I don't think I have
24  any other questions.

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 74

1    MR. JOYCE:  Just real briefly.
2    EXAMINATION
3    Q.   (By Mr. Joyce)  Dr. Cowan, in your
4    opinion, Geoff's job as a trackman at the Railroad
5    was a contributing factor in the development of
6    his degenerative disk disease in his neck?
7    MR. HALL:  Objection.
8    THE WITNESS:  Yes.
9    Q.   (By Mr. Joyce)  In your opinion,
10   Geoff's job as a trackman at the Railroad
11   aggravated and worsened his degenerative disk
12   disease in his neck?
13   A.   Yes.
14   MR. HALL:  Objection.
15   Q.   (By Mr. Joyce)  In your opinion, Geoff
16   is occupationally disabled from working as a
17   trackman at the Railroad as to his cervical
18   condition?
19   MR. HALL:  Objection.
20   THE WITNESS:  Yes.
21   MR. JOYCE:  Those are all the
22   questions I have.  Thank you.
23   EXAMINATION
24   Q.   (By Mr. Hall)  Let me ask you a

Page 75

1    follow-up, because you told me on the record that
2    the paragraph regarding your opinion was solely to
3    an aggravation.
4    A.   Correct.
5    Q.   Do you recall that testimony?
6    A.   Yes.
7    Q.   And so we can agree that his
8    degenerative disk disease was completely
9    non-work-related, correct?
10   MR. JOYCE:  Objection.
11   Q.   (By Mr. Hall  The development -- the
12   original development of his degenerative disk
13   disease was not related to his job --
14   MR. JOYCE:  Objection.
15   Q.   (By Mr. Hall)  -- is that correct?
16   MR. JOYCE:  I think that that --
17   Q.   (By Mr. Hall)  Is that correct?
18   MR. JOYCE:  -- testimony speaks for
19   itself.
20   Q.   (By Mr. Hall)  You told me that it was
21   not caused by work, right?
22   MR. JOYCE:  We're not -- there's a
23   distinction between "caused" and "a
24   contributing factor" here, Steve.  He's not

Page 76

1    saying that the work caused the degenerative
2    disk disease.  He's saying that the work was
3    a contributing factor.  Is that what you're
4    getting at?
5    MR. HALL:  No.  You can answer my
6    question.  Go ahead.
7    THE WITNESS:  All right.  I believe
8    that Mr. Crowther would have developed
9    degenerative disk disease to his neck
10   independent of work.
11   Q.   (By Mr. Hall)  All right.  And so your
12   opinion is solely that there was an aggravation of
13   a pre-existing, non-work-related condition, is
14   that correct?
15   A.   That's correct.
16   Q.   And we talked about aggravation and
17   worsening and we agreed that there are two
18   concepts that are involved there, the worsening or
19   aggravation of symptoms versus aggravation and
20   worsening of the actual disease process, correct?
21   A.   Correct.
22   Q.   And from when you evaluated him in
23   March of '06, to when he had his surgery in
24   January of '07, you didn't see a worsening of the

Page 77

1    actual disease process, is that correct?
2    A.   That is correct.
3    Q.   And so in terms of his work from that
4    time period, from -- I believe it was March of '06
5    -- until he went off in January and had surgery,
6    his job didn't change his degenerative disk
7    disease, correct?
8    A.   It did not appear to change his disk
9    disease, correct.
10   Q.   And in terms of his symptoms, did you
11   note any increasing symptoms from his -- from the
12   time period of March of '06 until January of '07?
13   A.   I did not.
14   Q.   So in terms of his job duties creating
15   any problems, in your opinion, there wasn't any
16   problems created from at least March of '06, until
17   the time he had surgery in '07?
18   A.   I didn't see any change, no.
19   Q.   Okay.  And you also agree that Mr.
20   Crowther could do some sort of light, medium, or
21   medium-duty work, correct, based on his current
22   condition right now?
23   A.   No.  Only based on his neck.  In sum
24   total with his knees and his other issues, I will

dc0b73ff-8352-4ff1-995f-dfec308d8c6b

Page 78

1  stand by that he's totally disabled.
2      **Q.   Okay.  So you're saying that because**
3  **he had neck surgery and he had thumb surgery and**
4  **knee surgery, that he can never work any type of**
5  **job ever again, for the rest of his life; is that**
6  **what you're saying?**
7      A.   At the time I last evaluated him I
8  thought he was totally disabled.
9      **Q.   So to the extent your partners have**
10 **indicated that he could return to a light or**
11 **sedentary-type job, you would disagree with them?**
12         MR. JOYCE:  Objection.
13         MR. HALL:  I'll represent to you that
14     both the other doctors that have been
15     deposed have indicated that he could perform
16     some type of work.
17         MR. JOYCE:  Light duty.  They didn't
18     say anything about medium duty, Steve.  If
19     you're going to go there -- you didn't ask
20     either one of those doctors yesterday about
21     medium duty.  You asked them whether or not
22     they thought he could perform --
23         THE WITNESS:  I would defer to them.
24     **Q.   (By Mr. Hall)  You will defer to them?**

Page 79

1      A.   Yes.
2      **Q.   And so would that change your opinion;**
3  **if you found out that your partners indicated that**
4  **Mr. Crowther could do at least light-duty work,**
5  **would that change your opinion?**
6      MR. JOYCE:  Objection.
7         THE WITNESS:  Of what?
8         MR. HALL:  Of your belief that he
9     might not be able to perform any type of
10    job.
11         THE WITNESS:  Yes, since my opinion is
12    based not only on his neck condition, but on
13    his other conditions.
14     **Q.   (By Mr. Hall)  So if they would have**
15 **released him at least to light-duty work or a**
16 **sedentary-type job, that changes your opinion,**
17 **then?**
18     A.   Yes.  I would say, then, if there --
19 if I've already said that his neck would not
20 totally disable him, then I would have to agree
21 that if the other conditions would not totally
22 disable him, then he could go back to a sedentary
23 position.  Yes, that would be fine.
24     **Q.   And you would defer to them on their**

Page 80

1  stuff?
2      A.   Correct.
3         MR. HALL:  Okay.  That's all the
4  questions I have.
5         MR. JOYCE:  Thank you, Dr. Cowan.
6         (Deposition concluded at 6:50 p.m.)

Page 81

CERTIFICATE OF REPORTER

I, Jonathan P. Lodi, a Notary Public in and for
the Commonwealth of Massachusetts, do hereby
certify that ROBERT SCOTT COWAN, M.D., came before
me on December 16, 2008, at New England Orthopedic
Surgeons, 300 Birnie Avenue, Springfield,
Massachusetts, and was by me duly sworn to testify
to the truth and nothing but the truth as to his
knowledge touching and concerning the matters in
controversy in this cause; that he was thereupon
examined upon his oath and said examination
reduced to writing by me; and that the statement
is a true record of the testimony given by the
witness, to the best of my knowledge and ability?
I further certify that I am not a relative or
employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.
WITNESS MY HAND this   day of        , 2008.

Jonathan P. Lodi          My Commission Expires:
Notary Public          8/8/14

21  (Pages 78 to 81)

dc0b73ff-8352-4ff1-995f-dfec308d8c6b