IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

GEOFFREY CROWTHER                 :       Civil Action No.  09-10334-MAP and
                                  :                          09-11467-MAP
            Plaintiff             :
                                  :
v.                                :
                                  :
CSX TRANSPORTATION, INC.          :       ORAL ARGUMENT REQUESTED
and                               :
CONSOLIDATED RAIL CORP.           :
                                  :
            Defendants            :
_____

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO
PRECLUDE ANDREW P. LEHMAN, M.D.

COMES NOW the Plaintiff, Geoffrey Crowther, by and through his attorneys, Thomas J.

Joyce, III, and Michael J. McDevitt, and hereby responds in Opposition to Defendants' Motion in

Limine to Preclude Andrew P. Lehman, M.D. (Document 57), as follows:

I.     INTRODUCTION:

        This is an occupational injury action brought pursuant to an Act of Congress known as

the Federal Employers' Liability Act (FELA), 45 U.S.C. Section 51, et seq.  Plaintiff, Geoffrey

Crowther, claims occupational neck, bilateral knee, left elbow, and left thumb injuries, which

were caused and/or contributed to and/or aggravated, worsened and exacerbated, in whole or in

part, by exposure to occupational risk factors for cumulative-trauma injuries, including

repetition, force, vibration and/or awkward postures, in his employment as a track laborer, track

welder, track foreman, and track inspector (trackman) with Defendants, CSX Transportation, Inc.

(CSX) and Consolidated Rail Corp. (Conrail).

Defendants have filed a Motion in Limine to Preclude Andrew P. Lehman, M.D., arguing that there is allegedly no basis for his opinions with regard to the medical causation of his own patient's injuries which he treated.  For the reasons stated herein, Defendants' Motion in Limine to Preclude Andrew P. Lehman, M.D. should be denied.

II.   FACTS:

Plaintiff, Geoffrey Crowther, is presently age 59.  Geoffrey Crowther worked as a track laborer, track welder, track foreman, and track inspector (trackman) for the railroad from 1975 through December 2006, when he became disabled (at age 55).  As a trackman, Geoffrey Crowther's work tasks required an extreme amount of heavy repetitive work, utilizing certain track tools and equipment such as torches, electric and gas welding equipment, grinders, chipping guns, track chisels, sledge hammers, claw bars, spiking mauls, needle guns, air impact hammers and saws.  He was also required to lift and carry heavy objects, and was exposed to excessive and harmful vibration.  Geoffrey Crowther's job duties further required prolonged use of his arms in awkward and extended positions, and working in poor ground conditions and walking on improper and poorly maintained ballast.  Many times he was required to perform his tasks without adequate tools and equipment and/or adequate manpower.

On February 28, 2007, Geoffrey Crowther consulted Dr. Andrew P. Lehman of New England Orthopedic Surgeons, with complaints of bilateral knee pain.  X-rays of both knees demonstrated severe tricompartmental osteoarthritis of the bilateral knees.  Despite conservative treatment for his bilateral knee injuries, Geoffrey Crowther eventually underwent bilateral total knee arthroplasty surgery performed by Dr. Lehman on April 17, 2007.  (Please see Medical Records of New England Orthopedic Surgeons, attached as Exhibit 1).

Geoffrey Crowther has disclosed his treating physician and surgeon, Andrew P. Lehman, M.D., as Plaintiff's medical expert with regard to his bilateral knee injuries in this matter.  Dr. Lehman is a highly qualified medical professional with expertise and knowledge as to orthopedic surgery who regularly treats patients with knee injuries including bilateral knee osteoarthritis. (Please see CV of Dr. Andrew P. Lehman, attached as Exhibit 2).  Dr. Lehman will be called to testify on behalf of Geoffrey Crowther as to the history, physical examinations, diagnostic tests, diagnosis, treatment, surgery, cause and disability of Plaintiff's bilateral knee injuries.

On or about November 24, 2008, Dr. Lehman authored a narrative medical report regarding his patient, Geoffrey Crowther.  In his detailed narrative medical report, Dr. Lehman states, in pertinent part:

> As you know, he is claiming that his work as a track laborer, welder, foreman and inspector has contributed to the development of the osteoarthritis in both of his knees.
>  …
> I understand that he has done a lot of heavy lifting and repetitive strenuous motion in regards to his knees.  I also understand that he was exposed to a lot of vibratory stress and overall hard work in his 30 years working on the railroad.
>  …
> Thus, it is my medical opinion that it is more likely than not that his work conditions have aggravated the symptoms of his osteoarthritis, but his osteoarthritis was caused by his original injuries back in the early 1970s.

(Please see Medical Report of Dr. Lehman, attached as Exhibit 3).

On December 15, 2008, Dr. Andrew P. Lehman was deposed by Defendants.  Dr. Lehman testified in his discovery deposition, in pertinent part, as follows:

Q.  And your specialty here is knees?

A.  Hip and knee reconstruction.
…

Q.  What's your board certification?

A.  Orthopedic surgery.

…

Q.  And have you conducted any research?

A.  We do have a database here, at New England Orthopedics, where we do clinical research.

…

Q.  And have you ever been deposed before sir?

A.  Yes.

Q.  And was that in relationship to lawsuits involving your patients or former patients?

A.  Yes.

…

Q.  And how may Workers' Compensation cases have you been involved with?

A.  I don't know.  A lot.  Dozens.

(Please see Deposition of Dr. Lehman, attached as Exhibit 4, at page 7-10).

Dr. Andrew Lehman further testified:

Q.  Have you ever reviewed the scientific literature in regard to causation or the development of musculoskeletal disorders or degenerative joint disease - -

A.  Certainly.

Q.  - - in the spine or, I'm sorry - - in the knees?

A.  Certainly.

Q.  And did any of that have any relationship or impact on your narrative report?

A.  Well, I always use my education and my knowledge to formulate opinions.  None of this is black and white.  There's many shades of gray.  And without using your best judgment and education, it's, you know, would be difficult to formulate an opinion.  So yes.

Q.  Okay.  And I apologize, because I -- I'll just, you know, be up front.  And I'm just a lawyer; you're the doctor, and so -- but what I've gleaned from reading your report is that – and just correct me, if I'm wrong -- that, in April of '07 Mr. Crowther, had a bilateral knee arthroplasty.

A.   That's correct.

Q.   And that was a result of osteoarthritis in both of his knees, is that right?

A.   That is correct, yes.

Q.   Okay.  So it was the osteoarthritis that caused him to have to have surgery, correct?

A.   Well, it was the pain from the osteoarthritis which caused him to have a surgery.  We don't treat the x-rays.  We treat the patient.  And the patient was having pain, secondary to his osteoarthritis, and that was refractory to other treatments.  So the ultimate treatment for arthritis of the knee or pain, secondary to osteoarthritis of the knee, is a knee replacement.

Q.   And my understanding is that your opinion is that his old injuries or old surgeries caused the osteoarthritis, is that correct?

A.   They contributed.  I think the cause of osteoarthritis is multi-factorial.

Q.   Well, in your multi-factorial analysis, you said it was more likely than not that his work conditions may have aggravated his symptoms, but that his osteoarthritis was caused by his original injuries to the back in the early 1970s, right?

A.   Yes.

Q.   And so we can agree that his osteoarthritis was caused, in your opinion, within a reasonable degree of medical certainty, was linked back to his original injuries in the early '70s, right?

MR. JOYCE:  Objection.  You can answer.

THE WITNESS:  I mean, that's a slippery slope you have there.  I mean, I think literature would show you that following removal of the meniscus, which he had, greater than ninety percent of the individuals will develop osteoarthritis after twenty years or so.  Whether that arthritis is symptomatic or not is a separate issue.

Q.   (By Mr. Hall)  Okay.  But the onset of the disease is osteoarthritis, correct?

A.   I think one of the major contributing factors to his osteoarthritis is his original injuries back in the early 1970s.

Q.   Okay.  Well, and you excluded his work as being a cause of his osteoarthritis, isn't that correct?

A.   No, that's not correct.

Q.   Well, it's not reflected in your report that his osteoarthritis was caused by his work conditions, isn't that correct?

A.   It's not reflected in the report that the osteoarthritis he had was caused by his work, but it's -- I perhaps didn't elaborate enough in the report.  However, I think that it's safe to say that, radiographically, his osteoarthritis was probably initiated and caused by his original injuries, although I think other factors also caused the arthritis, whether that be working on the railroad or genetic factors.  I mean, there's a lot of things involved in the development of arthritis and the symptoms of it, as well.

…

Q.   Okay.  And the report that you gave, after being asked to do that, was that his original injuries caused his osteoarthritis, is that correct?

A.   Well, if you look at the third paragraph in my report, he had a work-related injury and tore his left ACL.

Q.   In 1986?

A.   Yes.

Q.   Okay.

A.   And that I also said, May have contributed to a certain extent to this gentleman's development of osteoarthritis.

Q.   Okay.  So it was either his -- I'm sorry.  So it was either his injuries in 1986 or his injuries in the '70s which -- I think one was a sports-related injury five years before he started at the railroad -- that those were the things that were causing his osteoarthritis?

A.   Those are the things that led to the development of osteoarthritis.  You do not develop arthritis immediately after such an injury.  It takes twenty years or so to develop those types of changes.  And I think those are the things that -- I think that's the majority of what we're talking about here, those things, yes.

Q.   Okay.  And so, when you were just talking about work being a contributor, you were talking about that 1986 accident –

MR. JOYCE:  Objection.

Q.   (By Mr. Hall)  -- is that correct?

A.   That's not correct, no.  I think that the repetitive stress of being at the railroad exacerbated his pre-existing condition of arthritis.

Q.   And when you say, "exacerbated his condition," you mean his symptoms got worse?

A.   Yes.

Q.   You're not saying, within a reasonable degree of medical certainty, that his job at the Railroad caused or contributed to an actual acceleration of the disease process, are you?

MR. JOYCE:  Objection.

THE WITNESS:  Well, I think it's unclear whether that is the case or not. …

Q.   (By Mr. Hall)  I'm sorry.  That's unclear?

A.   It's unclear.  I mean, I think, with a reasonable degree of medical certainty, if someone's lifting fifty pounds a day, I think that would accelerate the amount of osteoarthritis you have.  I don't think it necessarily initiated the osteoarthritis, but it certainly accelerated it.

…

Q.   Okay.  So - - and you've never reviewed his job duties, have you?

A.   Well, I think it did mention that, in Attorney Joyce's note, that he had - - as a track laborer, track welder, track foreman, track inspector, and welder foreman, that his tasks included operating all types of equipment such as hand and power tools including torches, electric and gas welding equipment, grinders, chipping guns, track chisels, sledge hammers, claw bars, spiking mauls, needle guns, air impact hammers and saws.  His tasks required him to stoop, bend, and kneel while welding and repairing railroad track.  These tasks also exposed him to an extreme amount of repetitive strenuous motion, vibration, force and awkward postures, heavy lifting and carrying along with excessive walking on uneven ballast.  So that's the job description that I was privy to.

Q.   Okay.  So the job description that - - did you rely on anything else in coming up with the idea that his work may have played a role in his problem, other than what you were provided by Mr. Joyce?

A.   Common sense.

Q.   Okay.  Well let me ask you this: Did you ask Mr. Crowther about his job?

A.   When I last saw him yes, probably in April, April of 2007, I believe.  Or was it February?

Q.   And what did he tell you then?

A.   He said he worked on the railroad for upwards of thirty years and did a lot of heavy work for it.  I didn't get the actual job description at that time because I did not believe he was filing this under Workers' Compensation.

…

Q.   And would you agree you don't have a firm, factual foundation of Mr. Crowther's actual job duties –

A.   No.

Q.   -- and exposure?

MR. JOYCE:  Objection.

THE WITNESS:  I think it says pretty clearly what he does here, and it seems like it's pretty heavy work.  I think I have a fair judgment of what he's doing.

Q.   (By Mr. Hall)  Okay.  And would you agree that the description of any causality, with regard to any specific work duties, is not contained in your report?

A.   Well, I mentioned that he's done a lot of heavy lifting and repetitive strenuous motion.

Q.   And can you define that for me, in terms of Mr. Crowther's actual work history?

A.   I'm sorry.  I don't understand the question.

Q.   Well, you know, what vibratory stress or what heavy lifting or repetitive strenuous motions did he have to do with regard to his knees?

A.   He was using air impact hammers and chipping guns, grinders, welding equipment. These are very heavy instruments.

…

Q.   Okay.  Without having ever seen the job or seeing videotape of the job, do you believe that you have a scientific basis to make that conclusion, that he had, you know, exposure to heavy lifting, repetitive strenuous motion, and vibratory stress?

A.   I have no reason to doubt it.

(Please see Deposition of Dr. Lehman, attached as Exhibit 4, at page 16-29).

Dr. Andrew Lehman further testified:

Q.   And without belaboring it, but what are the other risk factors; if you didn't rule

anything else out, what else could possibly be playing a role?

A.   Other injuries.  Like you mentioned, genetic predisposition.  There are lots of things that can cause damage to the bones.  Autoimmune diseases.  Osteonecrosis of the bone.  It can be caused by a number of things.  But these items were irrelevant at the time of me treating him.  In my opinion, his risk factors were his injuries and previous surgeries and his job.

Q.   Okay.  And his job played the smallest role, correct?

MR. JOYCE:  Objection.

THE WITNESS:  It's difficult to quantify.  It played a role.

Q.   (By Mr. Hall)  And we can agree, and I'm not trying to belabor the point, that that's outside the confines of your report?

MR. JOYCE:  Objection.  It's not outside the confines of his report.

THE WITNESS:  What's the --

MR. HALL:  That his work played a role in the development of his osteoarthritis.

THE WITNESS:  No.  I mentioned it in two different places, I believe.

Q.   (By Mr. Hall)  Okay.  You said that it made him more symptomatic?

A.   Yes.  We treated his symptoms of knee replacement.

Q.   Okay.  And --

A.   We didn't treat his x-rays.  We treated his symptoms.
Q.   Okay.  And I --

A.   If he didn't have symptoms, I wouldn't have had to operate on him.
…

Q.   You said that you can't say whether or not he would have become symptomatic either way, right?

MR. JOYCE:  He's already testified that the job aggravated and worsened his symptoms.

MR. HALL:  Please.  Please.

MR. JOYCE:  Don't change the testimony, Steve.  You're --

MR. HALL:  I'm not changing it.

MR. JOYCE:  You know what?  Note my objection.  That's all.

THE WITNESS:  I mean, I think -- I believe his work exacerbated his previous condition of osteoarthritis.  That's my testimony.

Q.   (By Mr. Hall)  And are you relying on any particular literature for that conclusion?

A.   I don't have a study, off the top of my head.  But certainly, heavy lifting and repetitive motions can certainly exacerbate the symptoms of arthritis.

(Please see Deposition of Dr. Lehman, attached as Exhibit 4, at page 41-44).

Dr. Andrew Lehman further testified:

Q.   And so you don't have an opinion that the railroad could have done some specific change that would have resulted in him not having degenerative joint disease in his knee; would you agree?

MR. JOYCE:  Objection.  That's not Dr. Lehman's role in this case.  He's not our liability expert.  He's not our ergonomic expert.

THE WITNESS:  I think job modifications may have alleviated symptoms related to his osteoarthritis, but not necessarily changes his - - the fact that he had osteoarthritis.
…

Q.   Do you think it would have been helpful for you to see some of his job duties?

A.   Well, I took Mr. Joyce's letter as being truthful and - - you know - - but things that would elaborate on these things may have been more helpful, sure.

Q.   And to the extent that Mr. Joyce is wrong - -

MR. JOYCE:  Objection.

Q.   (By Mr. Hall) - - would you agree that that would impact on the strength of your opinion?

A.   Well, if a guy sat at a desk all day, instead of doing what Mr. Joyce mentioned in his letter to me, then certainly it would change it.  But for all intents and purposes, I think that the description here is likely accurate.
…

Q.   If an ergonomist reviewed the job and said that it does not contain risk factors that the scientific literature has shown to be problematic, would that alter your opinion?

MR. JOYCE:  Objection.
…
THE WITNESS:  Not problematic for causing symptoms or causing arthritis?  Because there's two different things here.

MR. HALL:  For causing degenerative joint disease.

THE WITNESS:  I don't think that would have altered my opinion, no.
…

Q.  Okay.  So my understanding is that you'll take the word of a lawyer, in a letter, who you've never met, over an ergonomist who studied the work - -

MR. JOYCE:  Objection.

Q.  (By Mr. Hall) - - is that correct?

A.  Well, I think the job description should not be variable, no matter if an ergonomist, or lawyer or the patient told me.  I don't know what the difference is.  If someone tells me the description, as long as it's accurate, it shouldn't make a difference.

(Please see Deposition of Dr. Lehman, attached as Exhibit 4, at page 52- 63).

Dr. Andrew Lehman further testified:

Q.  (By Mr. Joyce)  Dr. Lehman, what I gathered from your opinion is that, in your opinion, Geoff's job as a track laborer and foreman aggravated and worsened his pre-existing osteoarthritis, is that correct?

A.  That's correct.
…

Q.  And in your opinion, Geoff is disabled from working as a trackman based upon what you - - your understanding of what he does at the railroad?

A.  If his description of his job is accurate, then yes.

(Please see Deposition of Dr. Lehman, attached as Exhibit 4, at page 63-64).

(Please see CSX Job Description for Trackman, attached as Exhibit 5).

The National Institute for Occupational Safety and Health (NIOSH) / Centers for Disease

Control (CDC), published *Musculoskeletal Disorders and Workplace Factors, A Critical Review*

*of Epidemiologic Evidence for Work-Related Musculoskeletal Disorders of the Neck, Upper*

*Extremity, and Low Back,* in July 1997.  Thus, the federal government, through NIOSH, as far

back as 1997, determined what the occupational risk factors were for work related

musculoskeletal disorders (WMSDs).

This Honorable Court should note that the parties took Dr. Lehman's videotape

deposition on November 29, 2010, which is not yet available for inclusion in Plaintiff's Response

in Opposition to Defendants' Motion in Limine as of this date of filing.   Plaintiff respectfully

requests the opportunity to submit the *entire* videotape deposition testimony of Dr. Lehman to

the Court for the Court's consideration before the Court makes a ruling on Defendants' Motion in

Limine to Preclude Andrew P. Lehman, M.D. when the transcript becomes available.

III.   ARGUMENT:

This occupation injury action was brought pursuant to an Act of Congress known as the

Federal Employers' Liability Act (FELA), 45 U.S.C. Sec. 51 et seq.  Specifically, the FELA

states, in pertinent part:

> Every common carrier by railroad while engaging in commerce between any of
> the states and territories, or between the District of Columbia and any of the states
> or territories and any foreign nation or nations, shall be liable in damages to any
> person suffering injury while he is employed by such carrier, in such commerce,
> or in case of death of such employee, to his or her personal representative for the
> benefit of the surviving widow or husband and children of such employee; and, if
> none, then of such employee's parents; and, if none, then of the next of kin
> dependent upon such employee for such injury or death resulting in whole or in
> part from the negligence of any of the officers, agents, or employees of such
> carrier, or by reason of any defect or insufficiency due to its negligence in its cars,
> engines, appliances, machinery, track, road bed, works, boats, wharves, or other
> equipment.
>
> Any employee of a carrier, any part of whose duties as such employee shall be in
> the furtherance of interstate commerce; or shall, in any way, directly or closely
> and substantially, affect such commerce as above set forth shall, for the purposes
> of this Act be considered as being employed by such carrier, in such commerce,
> and shall be considered as entitled to the benefits of this Act and of an Act entitled

"An Act related to the liability of common carriers by railroad to their employees in certain cases".  (App'd April 22, 1908) [45 U.S.C. Secs. 51 et seq.] as the same has been or may hereafter be amended (emphasis added).

45 U.S.C. Sec. 51.

The FELA was enacted by the United States Congress in 1908.  Congress and the United States Supreme Court have, over the years, consistently stated the purpose of the FELA is to protect and benefit railroad employees injured on the job.  The FELA is to be liberally construed to allow railroad employees, such as Geoffrey Crowther, injured in the scope of their employment to recover from the railroad even where the railroad's negligence is minimal. *Rodriguez v. Deloroy Connecting Railroad Company,* 473 F. 2d 819 (6th Cir. 1973).

This duty to provide a safe place to work was non-delegable and could not be passed on by the railroad to any person, firm or corporation.  *Bailey v. Central Vermont Railway Company,* 319 U.S. 350 (1943).  Not only is this duty to provide a safe place to work a non-delegable one, but it is also an affirmative one.  This means that Defendants CSX and Conrail had a positive obligation to provide Geoffrey Crowther with a safe place to work, including finding any defect or hazard which would normally be revealed within the work place.  *Williams v. Atlantic Coastline Railroad Company,* 190 F. 2d 744 (5th Cir. 1951).

It has long been accepted doctrine that "the question of evidence required to establish liability in an FELA case is much less than an ordinary negligence action."  *Harbin v. Burlington Northern Railroad Company,* 921 F. 2d 129 (7th Cir. 1990).  In *Hines v. Conrail*, 926 F. 2d 262 (3rd Cir. 1991), the Third Circuit reversed the grant of summary judgment in a toxic tort case which was predicated on the exclusion of plaintiff's expert witness.  The Court held that *the FELA relaxed standard of causation also relaxes the threshold of admissibility for the reception of expert testimony*.  Further, in an FELA case, the railroad employee is to be given every doubt

before the Court.  *Ratigan v. New York Central Railroad Company*, 291 F. 2d 548 (2nd Cir.

1961), citing *Harris v. Pennsylvania Railroad*, 361 U.S. 15 (1959), *Moore v. Terminal Railroad*

*Association,* 358 U.S. 31 (1958).

The test of a jury case, under the FELA, is simply whether the proofs justify with reason

the conclusion that employer negligence played any part, even the slightest, in producing injury

for which damages are sought.  *Rogers v. Missouri P.R.Co.,* 352 U.S. 500, 1 L.Ed 2D 493, 77

S.Ct. 443 (1957).  Under the FELA, if a defendant railroad negligently causes further injury or

aggravation to plaintiff's pre-existing injury or condition, the plaintiff is entitled to compensation

for all of his damages caused by the railroad's negligence, including further injury or

aggravation.  *Stevens v. Bangor and Aroostook R. Co.,* 97 F. 3d 594, 601 (C.A.1 (Me.), 1996).

In the instant matter before this Honorable Court, Defendants have moved to preclude the

medical causation opinions of Plaintiff's treating physician and surgeon, Andrew P. Lehman,

M.D.  Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education may testify thereto
> in the form of an opinion or otherwise.

F.R.E. 702.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), for expert

testimony to be admitted, the proposed testimony must be supported by appropriate validation

based on what is known.  The trial judge must make a preliminary assessment of whether the

reasoning or methodology underlying the testimony is scientifically valid, and of whether that

reasoning or methodology properly can be applied to the facts in issue.  *Daubert* at 593.

Andrew P. Lehman, M.D., is a Board Certified Orthopedic Surgeon who has been

practicing medicine for years.  Dr. Lehman is familiar with the medical literature and the risk

factors for bilateral knee osteoarthritis, both work related and non-work related.  Dr. Lehman is

very familiar with occupational knee injuries.  It is important to note that Defendants do not

challenge Dr. Lehman's qualifications as a medical expert generally.  Rather, Defendants, in

their Motion, challenge only Dr. Lehman's ability to provide a medical *causation* opinion

concerning his own patient, Geoffrey Crowther.

So what is the methodology underlying Dr. Andrew P. Lehman's conclusions and

opinions?  What does a treating physician do to determine the cause of his patient's injury?

Differential diagnosis is a standard generally accepted methodology utilized by physicians to

assess medical causation.  Using his experience and expertise, Dr. Lehman utilized a differential

diagnosis methodology to assess causation with regard to Geoffrey Crowther as all physicians do

with their patients.  Dr. Lehman examined his patient Geoffrey Crowther.  Dr. Lehman took his

patient's history, including personal and work history, and reviewed his medical records.  Dr.

Lehman conducted physical examinations, reviewed diagnostic tests, made diagnoses and

recommended treatment and surgery.  Dr. Lehman also reviewed additional information on

Geoffrey Crowther's work including the CSX and Conrail trackman job descriptions that were

provided by Plaintiff's counsel.  As an orthopedic specialist, Dr. Lehman is obviously familiar

with the medical literature and the risk factors for bilateral knee osteoarthritis, both work related

and non-work related.  As Plaintiff's treating physician and surgeon, plainly aware of such things

as Plaintiff's age, weight and his other medical conditions, Dr. Lehman has opined that Geoffrey

Crowther's bilateral knee osteoarthritis was aggravated, worsened and exacerbated by Geoffrey

Crowther's work as a trackman for the railroad.  It is important to note that Dr. Lehman did not

opine that the sole or primary cause of Geoffrey Crowther's bilateral knee injuries was his work

as a trackman.  That is not what the FELA requires for purposes of proving causation.  Rather, a

contributing factor or aggravation and worsening are sufficient to prove causation under the FELA. *Rogers v. Missouri P.R.Co.,* 352 U.S. 500, 1 L.Ed 2D 493, 77 S.Ct. 443 (1957); *Stevens v. Bangor and Aroostook R. Co.,* 97 F. 3d 594, 601 (C.A.1 (Me.), 1996).

In the case of *Hardyman v. Norfolk & Western Railway Company*, 243 F. 3d 255 (6th Cir. 2001), the Sixth Circuit considered an FELA carpal tunnel syndrome action in which the trial court precluded the plaintiff from offering expert causation testimony and erred in granting the railroad's motion for summary judgment on the ground that plaintiff failed to show that a genuine issue of fact exists as to whether the railroad's negligence was, in whole or in part, a cause or contributing factor of plaintiff's carpal tunnel syndrome. In *Hardyman*, the Sixth Circuit stated:

> (T)he district court held that unless the plaintiff could offer a scientific or epidemiological study specifically concerning carpal tunnel syndrome and railroad brakemen, the only way plaintiff could establish causation would be with the proffer of a known "dose/response relationship" or "threshold phenomenon". Not only does such a requirement ignore the alternative method of establishing causation through differential diagnosis, but it is contrary to the testimony of plaintiff's experts, i.e., that one simply could not quantify the level or dose of risk factors causative of CTS in a manner consistent with dose/response relationship or threshold level.
> …
> After careful review of the entire record, we are firmly convinced that the rationale of the district court did not justify exclusion of plaintiff's expert testimony.

*Hardyman* at 262, 267.

Dr. Lehman is Plaintiff's treating physician and surgeon, and is not a hired gun medical expert who never cared for Geoffrey Crowther. It is to be expected that a treating physician will customarily opine about his patient's history, diagnosis and causation of injuries, treatment, and prognosis.

In the case of *Fielden v. CSX Transportation, Inc.,* 482 F.3d 866 (6th Cir. 2007), the Sixth

Circuit stated:

> The (Advisory Committee) Note to Rule 26 states that "[a] treating
> physician …can be deposed or called to testify at trial without any requirement
> for a written report." Fed.R.Civ.P. 26(a), cmt. 1993 Amendments, subdivision (a),
> para. (2). Under a straightforward reading of the rule and its advisory note,
> Fielden did not need to file an expert report from Dr. Fischer.
> This conclusion is supported by the obvious fact that doctors may need to
> determine the cause of an injury in order to treat it. Determining causation may
> therefore be an integral part of "treating" a patient. As a thoughtful U.S.
> Magistrate Judge reasoned in permitting causation testimony without a prior
> expert's report,
> It is within the normal range of duties for a health care provider to develop
> opinions regarding causation and prognosis during the ordinary course of an
> examination.  To assume otherwise is a limiting perspective, which narrows the
> role of a treating physician. Instead, to properly treat and diagnose a patient, the
> doctor needs to understand the cause of a patient's injuries. See *McCloughan [v.
> City of Springfield]*, 208 F.R.D. [236'] 242 [(C.D.Ill.2002)] ("doctors do not
> operate in a vacuum … Thus the [c]ourt believes causation, diagnosis, and
> prognosis would be based on the treating physician's personal knowledge …").

*Fielden* at 869, 870.

Defendants challenge only Dr. Lehman's ability to provide a medical *causation* opinion

concerning his own patient, Geoffrey Crowther, and *interestingly raise no challenge to Dr.*

*Lehman's ability to provide opinions as to the diagnosis, treatment and prognosis of Geoffrey*

*Crowther.*  In reality, Defendants' issues with Dr. Lehman's causation opinions go not to their

admissibility, but rather go to the *weight of the evidence.*  Dr. Lehman's differential diagnosis is

a standard generally acceptable methodology utilized by treating physicians to assess causation.

It should be up to the jury to determine what weight to give his expert testimony.

In *Primiano v. Yan Cook, et al.*, United States Court of Appeals for the Ninth Circuit, 06-

15563 (March 2010), the Ninth Circuit recently considered the admissibility of medical

testimony under *Daubert*.  The District Court had excluded the testimony of a highly qualified

expert because he could not say precisely why a product had failed, and because there was no

peer-reviewed literature supporting his testimony.  The Ninth Circuit held that his methodology

was adequate, and the testimony relevant, and reversed the trial court.  In *Primiano*, the Ninth

Circuit stated:

> The question before us is whether excluding Primiano's expert's testimony was an abuse of discretion.
>
> …
>
> The district court granted defendants' motion to exclude Dr. Weiss's testimony as not meeting the *Daubert* standard and granted summary judgment. The court concluded that Dr. Weiss's testimony would not be helpful to the jury.
>
> …
>
> Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.
>
> …
>
> Under *Daubert*, the district judge is a "gatekeeper, not a fact finder." When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony. Testimony by physicians may or may not be scientific evidence like the epidemiologic testimony at issue in *Daubert*.
>
> …
>
> '[M]edicine is not a science but a learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit.' 'Evidence-based medicine' is 'the conscientious, explicit and judicious use of current best evidence in making decisions about the care of individual patients.' 'Despite the importance of evidence-based medicine, much of medical decision-making relies on judgment – a process that is difficult to quantify or even to assess quantitatively.'
>
> …
>
> 'A trial court should admit medical expert testimony if physicians would accept it as useful and reliable,' but it need not be conclusive because 'medical knowledge is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof.' Where the foundation is sufficient, the litigant is 'entitled to have the jury decide upon [the experts'] credibility, rather than the judge.'
>
> …
>
> Other circuits have taken similar approaches focusing especially on experience. The Sixth Circuit held that a district court abused its discretion by excluding a physician's testimony based upon extensive, relevant experience even though he had not cited medical literature supporting his view. *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004). Likewise, the Third Circuit pointed out that a doctor's experience might be good reason to admit his testimony. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 406-07 (3rd Cir. 2003).
>
> …

> Given that the judge is 'a gatekeeper, not a fact-finder,' the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it.

*Primiano v. Yan Cook, et al.*, United States Court of Appeals for the Ninth Circuit, 06-15563 (March 2010), page 3805-3817.

Defendants' assertions that there is no scientific basis to Dr. Lehman's opinions with regard to the medical causation of his own patient's injuries are misleading. Dr. Lehman should not be required to go to a job site and actually observe an employee work before he can offer a causation opinion. If that were the case, then no doctor could ever provide any causation opinion in any traumatic injury case when the doctor had not witnessed the actual accident when it occurred. That is absurd. Geoffrey Crowther's history and job description suffice. A plaintiff's history is generally what a medical doctor relies upon for the foundation of his causation opinion in any FELA trauma or cumulative-trauma injury case.

Dr. Lehman's medical causation opinions should not be excluded. It should be up to the jury to determine what weight to give his expert testimony. The jury should decide if Geoffrey Crowther's bilateral knee injuries were contributed to and/or aggravated, worsened and exacerbated, in whole or in part, by his work for Defendants, CSX and Conrail. FELA cases are supposed to be determined by the jury.

IV.   <u>CONCLUSION</u>:

Defendants CSX and Conrail do not challenge Dr. Lehman's qualifications as an orthopedic surgeon and knee specialist. Andrew P. Lehman, M.D., is a qualified medical expert who employs the same methodology in diagnosing every one of his patients and determining the cause of their conditions. Using his experience and expertise, Dr. Lehman reviewed his patient Geoffrey Crowther's history, including his personal and work history, as well as his records,

examinations, diagnostic tests and surgery reports.  Dr. Lehman's methodology is sound and

scientifically valid, and his opinions are supported by ample evidence.  Dr. Lehman's opinions

are obviously not "mere speculation".  Dr. Lehman's testimony will most certainly properly

assist the jury to understand critical evidence in this FELA occupational injury action.  As such,

Defendants' arguments are without merit.

WHEREFORE, Plaintiff respectfully requests Defendants' Motion in Limine to Preclude

Andrew P. Lehman, M.D. be Denied, and that Andrew P. Lehman, M.D. be permitted to testify

as Plaintiff's medical expert at trial in this matter.

Respectfully submitted,

*/s/Thomas J. Joyce, III*
THOMAS J. JOYCE, III
Law Office of Thomas J. Joyce, III
801 Centerton Road
Mount Laurel, NJ 08054
(856) 914-0220
Attorney for Plaintiff

*/s/Michael J. McDevitt*
MICHAEL J. McDEVITT
Lawson & Weitzen
88 Black Falcon Avenue, Suite 345
Boston, MA 02110
(617) 439-4990
Attorney for Plaintiff

DATED: December 3, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

GEOFFREY CROWTHER                  :      Civil Action No. 09-10334-MAP and
                                   :                        09-11467-MAP
            Plaintiff              :
                                   :
v.                                 :
                                   :
CSX TRANSPORTATION, INC.           :
and                                :
CONSOLIDATED RAIL CORP.            :
                                   :
            Defendants             :

_____

CERTIFICATE OF SERVICE

I, THOMAS J. JOYCE, III, hereby certify that on December 3, 2010, I electronically

filed: Plaintiff's Response and Memorandum of Law in Opposition to Defendants' Motion in

Limine to Preclude Andrew P. Lehman, M.D.; Plaintiff's Exhibits; and Plaintiff's Proposed

Order, with the Clerk of Court using the CM/ECF system, which will send notification of such

filing to the following counsel of record for the Defendants:

Heather M. Gamache, Esquire
Flynn & Wirkus
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

                                   /s/Thomas J. Joyce, III
                                   Thomas J. Joyce, III