Page 1

COURT OF COMMON PLEAS

PHILADELPHIA COUNTY - CIVIL DIVISION

DOCKET NO. 02389


*******************************

GEOFFREY CROWTHER,

      Plaintiff,

Vs.

CONSOLIDATED RAIL CORPORATION

and CSX TRANSPORTATION, INC.,

      Defendants.

*******************************


DEPOSITION OF ANDREW P. LEHMAN, M.D.


New England Orthopedic Surgeons

300 Birnie Avenue

Springfield, Massachusetts


December 15, 2008      4:20 p.m.


Jonathan P. Lodi

Court Reporter

Page 2

APPEARANCES:

Representing the Plaintiff:
LAW OFFICE OF THOMAS J. JOYCE, III
900 Centerton Road
Mount Laurel, New Jersey  08054
By:  Thomas J. Joyce, III, Esq.
856.914.0220

Representing the Defendants:
BURNS, WHITE & HICKTON, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA  15212
By:  Stephen A. Hall, Esq.
412.995.3000

Page 3

I N D E X

WITNESS:  ANDREW P. LEHMAN, M.D.
EXAMINATION BY:   PAGE:

Mr. Hall       4
Mr. Joyce        63

EXHIBITS:                      PAGE:
1  Notice of deposition            4
2  Dr. Lehman's report and CV        4
3  Medical records pertaining to     4
   Mr. Crowther
4  Further medical records pertaining to  4
   Mr. Crowther
5  Letter dated 4/11/08 from Mr. Joyce   4
   to Dr. Lehman

Page 4

ANDREW P. LEHMAN, M.D., Deponent, having first
been duly sworn, deposes and states as follows:
        (Lehman Deposition Exhibits 1 - 5:
        Marked for identification.)
        EXAMINATION
    Q.    (By Mr. Hall)  Good afternoon, Doctor.
My name is Stephen Hall, and I represent the
Railroad in a piece of litigation involving one of
your former patients, Geoffrey Crowther.  And
before we began, we talked a little bit about the
exhibits, and I just want to make sure that we go
through them on the record, quickly.
        Exhibit 1 is marked as the notice of
deposition, which has got the legalese, but asking
for -- I'm not sure if you saw this or not -- but
it was sent to Mr. Joyce, care of -- to you --
care of Mr. Joyce, but it asked that you bring the
whole file relating to Mr. Crowther.  And it's my
understanding that Exhibits 3 and 4 constitute the
records that relate to your treatment, is that
correct?
    A.    Yes, as far as I know.  I didn't see
the --
    Q.    Sure.  And you're more than welcome to

Page 5

take a look through those.  You gave me a --
    A.    Yes.  These are the -- this is pretty
redundant.  This has got -- this stuff has got
that in there, but --
    Q.    Okay.  There was some additional
material in --
    A.    This is --
    Q.    And Exhibit 4 is what you reviewed in
advance of the deposition?
    A.    Yes.
    Q.    And Exhibit 2 is your report that you
were asked to draft in this case and a copy of
your CV, is that correct?
    A.    Yes.  And that is also in 4, as well;
My CV, not; but the report is.
    Q.    I just want to make sure.  Is that a
true and accurate copy?
    A.    It appears to be.
    Q.    Okay.  And you signed that?
    A.    Yes.  This is an older CV.  This is
not quite accurate.
    Q.    Okay.  We can append it afterwards.
    A.    Okay.
    Q.    Is there anything -- as you're looking

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 6

1 at it, is there anything that pops out, in your
2 mind, that's significant, in terms of what --
3     A.   Well, I would just -- my e-mail
4 address, home address and phone number are all
5 different.  And I am no longer licensed in New
6 York and Illinois, so I don't work there.  I have
7 also passed Part II of the exam, of the American
8 boards, so --
9     Q.   All right.  And Exhibit 5 is a copy of
10 a letter dated April 11th, from the Law Office of
11 Tom Joyce.  And is this the letter that you
12 received from Attorney Joyce, asking for the
13 narrative report?
14     A.   Yes.  It appears to be, yes.
15     Q.   And, Doctor, can you tell me the
16 states in which you're licensed to practice
17 medicine?
18     A.   Massachusetts.
19     Q.   And have you had any discipline or
20 anything like that, in terms of your license in
21 Massachusetts?
22     A.   No.
23     Q.   And can you quickly go through your
24 educational background, please?

Page 7

1     A.   I went to medical school in
2 Philadelphia, at Jefferson Medical College;
3 graduated there in '98, with honors.  I
4 subsequently did my surgical internship at the
5 University of Illinois at Chicago, for one year;
6 and then, my orthopedic residency at the
7 University of Illinois at Chicago, from 1999, to
8 2003; after which I did a subspecialty fellowship
9 in hip and knee reconstruction at the Hospital for
10 Special Surgery, in New York, which I completed in
11 August of 2004.  And I've been here, at New
12 England Orthopedics, for the last four years and
13 three months, four years and four months I guess.
14     Q.   And your specialty here is knees?
15     A.   Hip and knee reconstruction.
16     Q.   Hip and knee?  Okay.
17     A.   I do that exclusively.
18     Q.   And I apologize.  Are you board
19 certified?
20     A.   Yes.
21     Q.   And in which -- hip and knee or --
22     A.   There is no --
23         (Multiple speakers.)
24     Q.   (By Mr. Hall)  What's your board

Page 8

1 certification?
2     A.   Orthopedic surgery.
3     Q.   And, I'm sorry, when did you complete
4 the boards?
5     A.   Step I, I believe, was in 2003.  Part
6 II was following twenty-six months of practice,
7 which was in August of 2006.
8     Q.   And have you conducted any research?
9     A.   We do have a database here, at New
10 England Orthopedics, where we do clinical
11 research.
12     Q.   Have you done any research in the area
13 of repetitive stress injuries?
14     A.   No.
15     Q.   Cumulative trauma disorders?
16     A.   No.
17     Q.   Or anything involving railroad work?
18     A.   No.
19     Q.   Have you published any findings with
20 regard to the cause of degenerative conditions in
21 the hip or knees?
22     A.   No.
23     Q.   And have you ever been deposed before,
24 sir?

Page 9

1     A.   Yes.
2     Q.   Okay.  And was that in relationship to
3 lawsuits involving your patients or former
4 patients?
5     A.   Yes.
6     Q.   And have you ever served as an expert
7 witness before?
8     A.   No.
9     Q.   So this is your first time being an
10 expert?
11     A.   It is.  First time being deposed as an
12 expert witness, yes.
13     Q.   And what type of cases were you
14 involved in before, where you were deposed?
15     A.   Hip and knee reconstructive cases.
16     Q.   And were those personal injury
17 lawsuits?
18     A.   It was one time.  And yes.
19     Q.   And what court was that in; do you
20 know?
21     A.   It was in New York.  I don't remember
22 which one.
23     Q.   And were the other cases Workers'
24 Compensation cases or --

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 10

1    A.   Personal injury.
2    Q.   Okay.  And, I'm sorry, how many times
3  do you think you've been deposed?
4    A.   Once.
5    Q.   Okay.  One time.  And have you been
6  involved in any Workers' Compensation cases?
7    A.   Yes.
8    Q.   And how many Workers' Compensation
9  cases have you been involved with?
10   A.   I don't know.  A lot.  Dozens.
11   Q.   And have you ever been a party to a
12 lawsuit; have you ever been a plaintiff or a
13 defendant yourself?
14   A.   Yes.
15   Q.   And which one?
16   A.   Defendant.
17   Q.   And can you tell me a little bit --
18 well, how many times have you been sued as a
19 defendant?
20   A.   Once.
21   Q.   Okay.  And not to delve too much into
22 your private area, but can you tell me the
23 circumstances of that?
24   A.   I was in training.  I was present in a

Page 11

1  room where there was an alleged malpractice.  Five
2  years later, the case has not been settled yet.
3    Q.   And did that involve a surgical
4  intervention?
5    A.   Yes.
6    Q.   But you weren't performing that?
7    A.   No.
8    Q.   And has that lawsuit been filed in
9  Massachusetts?
10   A.   New York.
11   Q.   New York.  And which county is that
12 pending in?
13   A.   It's on Long Island somewhere.  I'm
14 not sure if Suffield County sounds right or --
15 it's something that sounds similar to that.  I
16 didn't realize that was going to be a part of
17 this.
18   Q.   No.  I'm sorry.  I'm just asking some
19 general background questions.  And I'm not trying
20 to impune your -- I'm just trying to figure out
21 what your experience was prior to this case.
22       MR. JOYCE:  It's not part of this
23 case.
24       MR. HALL:  No.  Yeah.  I promise you.

Page 12

1    Q.   (By Mr. Hall)  Have you ever testified
2  in court?
3    A.   No.
4    Q.   And to your knowledge, have you ever
5  -- you never testified and this is the first time
6  you've been an expert, right, so -- okay.
7        Do you have any connection with the
8  railroad industry at all; friends, family --
9    A.   No.
10   Q.   -- any other kind of connection?
11       Okay.  And it's my understanding that
12 you have authored a report which has been marked
13 as Lehman -- am I pronouncing your name correctly,
14 by the way?
15   A.   Lay-man.
16   Q.   Lay-man?  I'm sorry.
17   A.   Although in New York it's Lee-man.
18   Q.   You know what?  As soon as I get it in
19 my mind, that's it.
20       This has been marked as Exhibit 2.
21 And some questions about your report.
22   A.   Certainly.
23   Q.   And, I'm sorry, that report --
24   A.   Do you mind if I refer to it?

Page 13

1    Q.   Oh, no.  You may.  Please do.  It's
2  dated November 24th, 2008, is that correct?
3    A.   Yes.
4    Q.   Okay.  And it's my understanding that
5  you were contacted by Attorney Joyce, via the
6  letter that's Exhibit Number 5, in April of 2008,
7  is that correct?
8    A.   That is incorrect.  No.
9    Q.   Okay.  When did you --
10   A.   I did not receive this letter in
11 April.
12   Q.   I'm sorry.  What is it dated?
13   A.   It is dated April.  But I received it
14 -- I don't know when I received it, to be honest.
15 It must have been at least September or October.
16   Q.   And were you paid to provide the
17 narrative report?
18   A.   Yes, our standard office fee.
19   Q.   And what's that fee?
20   A.   $550.
21   Q.   And approximately how long did you
22 work on it?
23   A.   Well, the chart review and the
24 deposition took me probably between an hour and an

Page 14

1  hour and a half.
2       Q.   And prior to today, had you talked to
3  Mr. Joyce --
4       A.   No.
5       Q.   -- or any representatives from his
6  office?
7       A.   I personally did not, no.
8       Q.   And did you speak with Mr. Joyce
9  today, before your deposition?
10      A.   I did.
11      Q.   And how long did you speak with
12 Mr. Joyce?
13      A.   Approximately five minutes.
14      Q.   And what did you guys talk about?
15      A.   We just talked about the case,
16 preparation of the case, details of the case.
17      Q.   Did he talk to you about the FELA?
18      A.   No.
19      Q.   Do you know what the FELA is?
20      A.   No, I do not.
21      Q.   Okay.  And it's my understanding that,
22 in looking at your report -- and please correct
23 me, if I'm wrong -- on Page 2 of your report,
24 third paragraph from the bottom -- your main

Page 15

1  opinion, I guess, is that it's more likely than
2  not that Mr. Crowther's work conditions have
3  aggravated the symptoms of his osteoarthritis, but
4  his osteoarthritis was caused by his original
5  injuries back in the early 1970s, is that
6  accurate?
7       A.   Yes.
8       Q.   And do you hold any opinions outside
9  of your narrative report?
10      A.   No.
11      Q.   And did you review any of the
12 litigation materials, or can you tell me what
13 materials, if any, are reviewed, in advance of
14 drafting a report?
15      A.   I reviewed the patient's history, the
16 patient's chart, my office notes.  I also referred
17 to the American Medical Association Guide to
18 Permanent Impairment to establish his impairment
19 rating.
20      Q.   Okay.  Anything else?
21      A.   No.
22      Q.   Did you review any particular
23 literature, any scientific literature?
24      A.   No.

Page 16

1       Q.   Have you ever reviewed the scientific
2  literature in regard to causation or the
3  development of musculoskeletal disorders or
4  degenerative joint disease --
5       A.   Certainly.
6       Q.   -- in the spine or, I'm sorry -- the
7  spine -- in the knees?
8       A.   Certainly.
9       Q.   And did any of that have any
10 relationship or any impact on your narrative
11 report?
12      A.   Well, I always use my education and my
13 knowledge to formulate opinions.  None of this is
14 black and white.  There's many shades of gray.
15 And without using your best judgment and
16 education, it's, you know, would be difficult to
17 formulate an opinion.  So yes.
18      Q.   Okay.  And I apologize, because I --
19 I'll just, you know, be up front.  I'm just a
20 lawyer; you're the doctor, and so -- but what I've
21 gleaned from reading your report is that -- and
22 just correct me, if I'm wrong -- that, in April of
23 '07 Mr. Crowther, had a bilateral knee
24 arthroplasty.

Page 17

1       A.   That's correct.
2       Q.   And that was a result of
3  osteoarthritis in both of his knees, is that
4  right?
5       A.   That is correct, yes.
6       Q.   Okay.  So it was the osteoarthritis
7  that caused him to have to have surgery, correct?
8       A.   Well, it was the pain from the
9  osteoarthritis which caused him to have a surgery.
10 We don't treat the x-rays.  We treat the patient.
11 And the patient was having pain, secondary to his
12 osteoarthritis, and that was refractory to other
13 treatments.  So the ultimate treatment for
14 arthritis of the knee or pain, secondary to
15 osteoarthritis of the knee, is a knee replacement.
16      Q.   And my understanding is that your
17 opinion is that his old injuries or old surgeries
18 caused the osteoarthritis, is that correct?
19      A.   They contributed.  I think the cause
20 of osteoarthritis is multi-factorial.
21      Q.   Well, in your multi-factorial
22 analysis, you said it was more likely than not
23 that his work conditions may have aggravated his
24 symptoms, but that his osteoarthritis was caused

Page 18

1 by his original injuries to the back in the early
2 1970s, right?
3    A.   Yes.
4    Q.   And so we can agree that his
5 osteoarthritis was caused, in your opinion, within
6 a reasonable degree of medical certainty, was
7 linked back to his original injuries in the early
8 '70s, right?
9        MR. JOYCE: Objection. You can
10       answer.
11       THE WITNESS: I mean, that's a
12       slippery slope you have there. I mean, I
13       think literature would show you that
14       following removal of the meniscus, which he
15       had, greater than ninety percent of the
16       individuals will develop osteoarthritis
17       after twenty years or so. Whether that
18       arthritis is symptomatic or not is a
19       separate issue.
20   Q.   (By Mr. Hall) Okay. But the onset of
21 the disease is osteoarthritis, correct?
22    A.   I think one of the major contributing
23 factors to his osteoarthritis is his original
24 injuries back in the early 1970s.

Page 19

1    Q.   Okay. Well, and you excluded his work
2 as being a cause of his osteoarthritis, isn't that
3 correct?
4    A.   No, that's not correct.
5    Q.   Well, it's not reflected in your
6 report that his osteoarthritis was caused by his
7 work conditions, isn't that correct?
8    A.   It's not reflected in the report that
9 the osteoarthritis he had was caused by his work,
10 but it's -- I perhaps didn't elaborate enough in
11 the report. However, I think that it's safe to
12 say that, radiographically, his osteoarthritis was
13 probably initiated and caused by his original
14 injuries, although I think other factors also
15 caused the arthritis, whether that be working on
16 the railroad or genetic factors. I mean, there's
17 a lot of things involved in the development of
18 arthritis and the symptoms of it, as well.
19   Q.   Okay. Well, let's back up. It's
20 pretty clear that when you drafted this letter, it
21 was your opinion, within a reasonable degree of
22 medical certainty and I think subject to being
23 sworn under the pains and penalties of perjury,
24 that it was his -- his osteoarthritis was caused

Page 20

1 by his original injuries and there isn't anything
2 else mentioned, is that correct?
3    A.   That's correct.
4    Q.   And when you received this letter
5 marked as Exhibit 5, Mr. Joyce asked you, in your
6 opinion, were Geoffrey Crowther's knee injuries
7 and subsequent knee surgeries, in whole or in
8 part, caused, contributed to, or aggravated by his
9 work at the railroad, isn't that right?
10    A.   Let me see. Yes, it is.
11    Q.   Okay. And the report that you gave,
12 after being asked to do that, was that his
13 original injuries caused his osteoarthritis, is
14 that correct?
15    A.   Well, if you look at the third
16 paragraph in my report, he had a work-related
17 injury and tore his left ACL.
18    Q.   In 1986?
19    A.   Yes.
20    Q.   Okay.
21    A.   And that I also said, May have
22 contributed to a certain extent to this
23 gentleman's development of osteoarthritis.
24    Q.   Okay. So it was either his -- I'm

Page 21

1 sorry. So it was either his injuries in 1986 or
2 his injuries in the '70s which -- I think one was
3 a sports-related injury five years before he
4 started at the railroad -- that those were the
5 things that were causing his osteoarthritis?
6    A.   Those are the things that led to the
7 development of osteoarthritis. You do not develop
8 arthritis immediately after such an injury. It
9 takes twenty years or so to develop those types of
10 changes. And I think those are the things that --
11 I think that's the majority of what we're talking
12 about here, those things, yes.
13    Q.   Okay. And so, when you were just
14 talking about work being a contributor, you were
15 talking about that 1986 accident --
16       MR. JOYCE: Objection.
17    Q.   (By Mr. Hall) -- is that correct?
18    A.   That's not correct, no. I think that
19 the repetitive stress of being at the railroad
20 exacerbated his pre-existing condition of
21 arthritis.
22    Q.   And when you say, "exacerbated his
23 condition," you mean his symptoms got worse?
24    A.   Yes.

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 22

1    Q.   You're not saying, within a reasonable
2  degree of medical certainty, that his job at the
3  Railroad caused or contributed to an actual
4  acceleration of the disease process, are you?
5       MR. JOYCE:  Objection.
6       THE WITNESS:  Well, I think it's
7  unclear whether that is the case or not.  I
8  mean, there's no --
9    Q.   (By Mr. Hall) I'm sorry.  That's
10 unclear?
11   A.   It's unclear.  I mean, I think, with a
12 reasonable degree of medical certainty, if
13 someone's lifting fifty pounds a day, I think that
14 would accelerate the amount of osteoarthritis you
15 have.  I don't think it necessarily initiated the
16 osteoarthritis, but it certainly accelerated it.
17   Q.   Well, do you have any objective
18 scientific evidence to support that his job duties
19 at the Railroad caused or contributed to --
20   A.   No.
21   Q.   -- an actual acceleration?
22   A.   Absolutely not.
23   Q.   Okay.  So -- and you've never reviewed
24 his job duties, have you?

Page 23

1    A.   Well, I think it did mention that, in
2  Attorney Joyce's note, that he had -- "As a track
3  laborer, track welder, track foreman, track
4  inspector and welder foreman," that "his tasks
5  included operating all types of equipment such as
6  hand and power tools including torches, electric
7  and gas welding equipment, grinders, chipping
8  guns, track chisels, sledge hammers, claw bars,
9  spiking mauls, needle guns, air impact hammers and
10 saws.  His tasks required him to stoop, bend, and
11 kneel while welding and repairing railroad track.
12 These tasks also exposed him to an extreme amount
13 of repetitive strenuous motion, vibration force
14 and awkward postures, heavy lifting and carrying
15 along with excessive walking on uneven ballast."
16      So that's the job description that I
17 was privy to.
18   Q.   Okay.  So the job description that --
19 did you rely on anything else in coming up with
20 the idea that his work may have played a role in
21 his problem, other than what you were provided by
22 Mr. Joyce?
23   A.   Common sense.
24   Q.   Okay.  Well, let me ask you this:  Did

Page 24

you ask Mr. Crowther about his job?
1    A.   When I last saw him, yes, probably in
2  April, April of 2007, I believe.  Or was it
3  February?
4    Q.   And what did he tell you he did then?
5    A.   He said he worked on the railroad for
6  upwards of thirty years and did a lot of heavy
7  work for it.  I didn't get the actual job
8  description at that time because I did not believe
9  he was filing this under Workers' Compensation.
10   Q.   Did you take down any notes as to the
11 frequency, the amount of bending, stooping,
12 lifting, or his use of tools; did you try to look
13 at the frequency or anything, or any details about
14 that in your file at all?
15   A.   No.
16   Q.   Have you ever went out and looked at
17 the type of work that Mr. Crowther did?
18   A.   No.
19   Q.   Have you ever seen any videotape of
20 the type of work that Mr. Crowther did?
21   A.   No.
22   Q.   Do you have any familiarity with the
23 types of things he actually did, other than --

Page 25

1    A.   Just from what I'm reading in this
2  report.  That's it.
3    Q.   And you would understand that that was
4  given to you by the plaintiff's lawyer, right?
5    A.   Yes.
6    Q.   And did you read that with any
7  skepticism?
8       MR. JOYCE:  Objection.
9       THE WITNESS:  No, I did not.
10   Q.   (By Mr. Hall) Okay.  And I suppose
11 you didn't perform any scientific analysis on the
12 exposure he had at the Railroad, did you?
13   A.   No.
14   Q.   And not only didn't you quantify his
15 exposure, but you also didn't quantify any rest
16 period or down-time that he may have had on the
17 job as well, is that correct?
18   A.   That's correct.
19   Q.   And did you talk to Mr. Crowther about
20 his past work history?
21   A.   I'm sorry?
22   Q.   His past work history.
23   A.   No, I did not.  I was more interested
24 in treating his knees, replacing his knees.

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 26

1    Q.   And you're not an occupational
2  medicine doctor, are you?
3    A.   No.
4    Q.   And you know that there's a specialty
5  in occupational medicine?
6    A.   I do.
7    Q.   And those folks deal specifically with
8  work-related conditions, is that right?
9    A.   As far as I know, yes.
10   Q.   And fair to say that's not what you do
11 on a day-to-day basis?
12   A.   That's correct.
13   Q.   And you're a treating doctor and a
14 surgeon, right?
15   A.   Yes.
16   Q.   And you don't routinely examine
17 workers to determine whether or not their work
18 caused or contributed to a problem they're having,
19 right?
20   A.   That's correct.
21   Q.   And you'd agree with me, sir, that it
22 would be important, if you were making a work-
23 related opinion, to have some sound basis of what
24 the actual work was, would you agree with that?

Page 27

1    A.   That is correct.
2    Q.   And would you agree you don't have a
3  firm, factual foundation of Mr. Crowther's actual
4  job duties --
5    A.   No.
6    Q.   -- and exposure?
7    MR. JOYCE:  Objection.
8    THE WITNESS:  I think it says pretty
9    clearly what he does here, and it seems like
10   it's pretty heavy work.  I think I have a
11   fair judgment of what he's doing.
12   Q.   (By Mr. Hall)  Okay.  And would you
13 agree that the description of any causality, with
14 regard to any specific work duties, is not
15 contained in your report?
16   A.   Well, I mentioned that he's done a lot
17 of heavy lifting and repetitive strenuous motion.
18   Q.   And can you define that for me, in
19 terms of Mr. Crowther's actual work history?
20   A.   I'm sorry.  I don't understand the
21 question.
22   Q.   Well, you know, what vibratory stress
23 or what heavy lifting or repetitive strenuous
24 motions did he have to do with regard to his

Page 28

knees?
   A.   He was using air impact hammers and
chipping guns, grinders, welding equipment.  These
are very heavy instruments.
   Q.   Okay.  And what's your basis for
determining whether or not they're heavy?
   A.   Mr. Joyce's letter.  Mr. Joyce's
letter.  I mean, I think they sound pretty heavy
to me.
   Q.   Okay.  Well, what vibratory stress was
involved, in regard to his knees?
   A.   I suppose I was using Attorney Joyce's
letter, where he mentioned he was exposed to "an
extreme amount of repetitive strenuous motion,
vibration, force and awkward postures, heavy
lifting and carrying along with excessive walking
on uneven" ground.  I think I was utilizing that
paragraph as my basis for my analysis.
   Q.   Okay.  Without having ever seen the
job or seeing videotape of the job, do you believe
that you have a scientific basis to make that
conclusion, that he had, you know, exposure to
heavy lifting, repetitive strenuous motion, and
vibratory stress?

Page 29

   A.   I have no reason to doubt it.
   Q.   Do you have any sound scientific data
upon which to rely upon?
   A.   No.
   Q.   Have you ever seen an ergonomic
assessment of the type of work that Mr. Crowther
did?
   A.   No.
   Q.   And would you agree with me that you
don't have a scientific basis for those
conclusions?
   MR. JOYCE:  Objection.
   THE WITNESS:  I think if --
   Q.   (By Mr. Hall)  You were given those
conclusions by a lawyer, right?
   A.   Yes.
   Q.   And that's not scientific, correct?
   MR. JOYCE:  Objection.
   THE WITNESS:  Aren't you a lawyer?
   MR. HALL:  Yes, I'm a lawyer, so --
   Q.   (By Mr. Hall)  But you'd agree with me
that you were given information by a lawyer?
   A.   I was given information.  And I take
information, as given to me, as truth, so --

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 30

1    Q.   But you weren't enclosed -- you
2  weren't given an ergonomic assessment by
3  Mr. Joyce, were you?
4    A.   No.
5    Q.   And you didn't review or rely upon an
6  ergonomic assessment, is that correct?
7    A.   That's correct.
8    Q.   And so really, other than Mr. Joyce's
9  conclusory statements, you have no scientific
10 information to support those conclusions, is that
11 right?
12   A.   That's correct.
13   Q.   And in fact, I believe Mr. Crowther
14 began -- presented to you in February of '07, is
15 that right?
16   A.   Yes.
17   Q.   And at that time, you indicated that
18 he was having severe pain and disability in regard
19 to both his knees, is that right?
20   A.   Yes.
21   Q.   Okay.  And how long was his symptoms
22 -- how long had he been symptomatic at the point
23 he saw you in February of '07, do you recall?
24   A.   He said to me two years.

Page 31

1    Q.   Two years?  So February 28 of 2005?
2    A.   I'm sure he was approximating.  But
3  certainly, that's -- I mean, my history said, Pain
4  in the last two years.
5    Q.   Okay.  And I presume you weren't
6  provided any records outside of what's in your --
7  of what's in Exhibits 3 and 4, right?
8    A.   This is all I have to go on.
9    Q.   Were you aware that, for instance,
10 with regard to Mr. Crowther's right knee, that he
11 had an x-ray from 4/24 of 1986 that indicated that
12 he had an extreme, severe degree of osteoarthritic
13 changes in the medial and lateral aspects of the
14 joint?
15   A.   I never saw that.
16   Q.   And he had osteophytes in the superior
17 aspect of the patella and the anterior portion of
18 the femur; were you aware of that?
19   A.   No, I was not.
20   Q.   And were you aware that in 1998, in
21 the medical record, he was complaining that his
22 knees were bothersome; were you aware of that?
23   A.   No.
24   Q.   And with that type of history, in

Page 32

terms of even severe arthritic changes in his
right knee back in 1986, would you expect someone
like Mr. Crowther to be symptomatic prior to
February of 2005?
     MR. JOYCE:  Objection.
     THE WITNESS:  I'm sorry.  "Would" --
     Q.   (By Mr. Hall)  Would you expect
someone like Mr. Crowther to be symptomatic prior
to 2005?
     A.   Not necessarily, no.
     Q.   And you actually went in and did the
surgery, is that right?
     A.   Yes.
     Q.   And when you went in, can you tell me
what you saw; I mean, did you see evidence of the
prior surgeries when you did your surgery?
     A.   I have the operative note here.  I
mean, the patient did have previous incisions.
So, I mean, that was the first evidence that I
saw.  He had two previous incisions on the left
knee, one previous incision on the right knee.
     Q.   So he had two surgeries on his left
knee, and he had one surgery on his right knee,
based on what you saw?

Page 33

     A.   That was my understanding, my history.
I do not have the records to support that.
     Q.   And did you see any other evidence of
surgery, prior surgery?
     A.   I do not think so.
     Q.   And the good news is that Mr. Crowther
did extraordinarily well, in terms of his knee
replacement, is that right?
     A.   That is correct.
     Q.   And he basically, as of April 14th,
2008 -- was that the last time you saw him, by the
way?
     A.   That he saw one of my assistants, yes.
     Q.   And that was his last visit with you?
     A.   Yes.
     Q.   And at that point, he basically was
returning to normal activities, without
restriction, is that right?
     MR. JOYCE:  Objection.
     THE WITNESS:  Just give me a moment to
read this note again, please.
     MR. HALL:  Sure.  It's also -- and I'm
looking at your report, on the first page.
And I'm not sure I want to dissuade you from

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 34

1    looking at the note, if you want, but --
2        THE WITNESS:  He was having some
3    irritability in the left knee; but in
4    general, after knee replacement, was doing
5    very well.
6        Q.   (By Mr. Hall)  And he essentially was
7    back to normal activities, without restriction,
8    right?
9        A.   Depends on what those activities --
10   what you define "normal" as, I guess.
11       Q.   Well, those were your words, right?
12       A.   Where is that?
13       Q.   I'm sorry.  It's the first page, third
14   paragraph, last sentence, quote, He was
15   "essentially" --
16       A.   That's correct, yes.
17       Q.   That's correct?
18       A.   Yes.
19       Q.   And what was the mild discomfort he
20   was having in his left knee?
21       A.   He described it as a mild soreness.
22       Q.   Do you recall if, during the course of
23   his recuperation from his knee surgeries, whether
24   or not he had an incident with his left knee; does

Page 35

1    that ring a bell?
2        A.   One moment, please.
3        Q.   Sure.
4        A.   Yes.
5        Q.   And what was that incident?
6        A.   Approximately -- it says here, after
7    three -- three months -- three-month post-op
8    visit, July 17th, 2007, he had a hyperextension
9    injury to the knee, with some swelling.
10       Q.   And what's a hyperextension injury;
11   what does that mean?
12       A.   Essentially, bending the wrong way;
13   essentially.
14       Q.   And do you know how that happened?
15       A.   It does not elaborate on that, no.  He
16   saw one of my assistants for that visit, not
17   myself.
18       Q.   Is there any more detail than that?
19       A.   No.
20       Q.   Is that something that usually happens
21   during the course of, you know, recuperation from
22   knee surgery?
23       A.   It's not infrequent, no.
24       Q.   And could that -- and he wasn't

Page 36

1    working at that time, when that hyperextension
2    injury occurred, was he?
3        A.   I do not know that, the answer to
4    that.
5        Q.   And, I'm sorry, what was the date of
6    that injury?
7        A.   July 17th, 2007 was when we -- he
8    reported the injury to us.  I don't -- it doesn't
9    say when he had that.  I'm assuming not too far
10   prior to that, or he would have come in sooner.
11       Q.   And could that account for the
12   residual difficulties that he's having?
13       MR. JOYCE:  Objection.
14       THE WITNESS:  There's no way to know,
15   without discussing with Mr. Crowther exactly
16   what that injury was and how serious it was.
17       Q.   (By Mr. Hall)  And did you do that?
18       A.   No.
19       Q.   And did you take that into account in
20   your -- in coming to your conclusions in your
21   report -- that --
22       A.   I didn't think it was relevant.
23       Q.   And why not?
24       A.   Because it seemed to be very mild and

Page 37

1    he still did very well despite -- if it was a
2    serious injury, he probably would have required
3    intervention and no intervention was required and
4    x-rays remained normal.
5        Q.   But in terms of your -- in your
6    opinion, his left knee had an extraordinarily good
7    outcome, as well?
8        A.   Yes.
9        Q.   And would you agree with me, sir, that
10   age is a risk factor for the development of
11   osteoarthritis in the knees?
12       A.   I think genetics are the risk factor.
13   Age -- certainly it's more -- it's more common in
14   older people, yeah.  I don't know if age is an
15   independent variable or not.
16       Q.   Okay.  Well, is it unusual for a
17   person of Mr. Crowther's age to have
18   osteoarthritis in his knees, irrespective of his
19   oc -- his or her occupation?
20       A.   No, it's not unusual.
21       Q.   Not unusual.  It's pretty common,
22   correct?
23       A.   More than one half of the knee
24   replacements I do are in people under sixty, so --

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 38

1    Q.    And we can agree that, at least in
2    part, age may have played a role in the
3    development of his osteoarthritis in his knees;
4    can we agree on that?
5        A.    No.
6        Q.    And why not?
7        A.    He's too young to have age as being a
8    factor.
9        Q.    At what age do you need to be --
10        A.    Typically, osteoarthritis is not seen,
11    if it were not for some other type of insult to
12    the knee or genetic predisposition, until the
13    patient's seventies.
14        Q.    And did you ever determine whether or
15    not he had a genetic predisposition?
16        A.    I don't think there's any way to do
17    that.
18        Q.    Did you ask him if he had a history of
19    traumas or falling on his knees or anything like
20    that?
21        A.    He had a history of an ACL injury at
22    work in 1986.  And he also had two sports-related
23    injuries, one or two.  It's unclear, via his
24    history.  But he had his meniscus out, in both

Page 39

1    knees, back in the 1970s, subsequent ACL injury.
2    I think that both those injuries are enough to --
3        Q.    To cause osteoarthritis?
4        A.    At this age, yes.
5        Q.    And so we can agree that prior trauma
6    is an independent risk factor for the development
7    of --
8        A.    Oh, absolutely.
9        Q.    And that it certainly played a great
10    role in the development of Mr. Crowther's
11    problems, correct?
12        A.    It played a very big role, yes.
13        Q.    And can we agree that weight also
14    plays a role in the development of degenerative
15    conditions in the knees?
16        A.    Yes.
17        Q.    And can we agree that Mr. Crowther's
18    weight may have contributed?
19        A.    No.
20        Q.    And why not?
21        A.    He's not -- in my opinion, being six-
22    foot-one, 212 pounds -- and if I recall correctly,
23    he's in pretty decent shape -- he's not an obese
24    individual.

Page 40

1        Q.    And in fact, surgery is also -- is an
2    independent risk factor for the development of
3    arthritis, correct?
4        A.    No.  It depends on what type of
5    surgery it is.
6        Q.    Okay.  The type of surgeries that Mr.
7    Crowther had, with regard to his knees.
8        A.    Yes.
9        Q.    They are risk factors for the
10    development of osteoarthritis down the road,
11    correct?
12        A.    Yes.
13        Q.    And we can agree that -- certainly --
14    that Mr. Crowther's surgeries and prior injuries
15    played a significant role in the development of
16    his problems; correct?
17        A.    Yes.
18        Q.    Are there any other risk factors for
19    the development of osteoarthritis that we haven't
20    discussed?
21        A.    Not that Mr. Crowther has, no.
22        Q.    And did you rule out any other risk
23    factors?
24        A.    No.

Page 41

1        Q.    And without belaboring it, but what
2    are the other risk factors; if you didn't rule
3    anything else out, what else could possibly be
4    playing a role?
5        A.    Other injuries.  Like you mentioned,
6    genetic predisposition.  There are lots of things
7    that can cause damage to the bones.  Autoimmune
8    diseases.  Osteonecrosis of the bone.  It can be
9    caused by a number of things.  But these items
10    were irrelevant at the time of me treating him.
11            In my opinion, his risk factors were
12    his injuries and previous surgeries and his job.
13        Q.    Okay.  And his job played the smallest
14    role, correct?
15        MR. JOYCE:  Objection.
16        THE WITNESS:  It's difficult to
17    quantify.  It played a role.
18        Q.    (By Mr. Hall)  And we can agree, and
19    I'm not trying to belabor the point, that that's
20    outside the confines of your report?
21        MR. JOYCE:  Objection.  It's not
22    outside the confines of his report.
23        THE WITNESS:  What's the --
24        MR. HALL:  That his work played a role

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 42

1    in the development of his osteoarthritis.
2        THE WITNESS:  No.  I mentioned it in
3    two different places, I believe.
4        Q.   (By Mr. Hall)  Okay.  You said that it
5    made him more symptomatic?
6        A.   Yes.  We treated his symptoms of knee
7    replacement.
8        Q.   OKay.  And --
9        A.   We didn't treat his x-rays.  We
10   treated his symptoms.
11       Q.   Okay.  And I --
12       A.   If he didn't have symptoms, I wouldn't
13   have had to operate on him.
14       Q.   But in terms of causing the disease
15   that produced the symptoms, you did not link work
16   to the cause --
17       (Multiple speakers.)
18       THE WITNESS:  Can you repeat that
19   again, please?
20       MR. HALL:  Sure.
21       Q.   (By Mr. Hall)  You said that his job
22   duties may have made him more symptomatic, right?
23       A.   Yes.
24       Q.   And you did not say that his work

Page 43

1    produced the underlying disease, is that correct?
2    I mean, that's what your report states.
3        A.   That's correct, other than the ACL
4    injury --
5        Q.   In 1986.
6        A.   -- in 1986, which, from my
7    understanding, was also a work-related injury.
8        Q.   Okay.  That was a trauma that occurred
9    at work?
10       A.   I believe that also caused the
11   arthritis in his left knee, in addition to the
12   cartilage procedures he had in the early '70s,
13   which are not work-related.  I think he would have
14   developed arthritis, irrespective of his job, with
15   the aforementioned operations on his knees.
16       Q.   Okay.
17       A.   However, I do not know if he would
18   have become symptomatic from his arthritis, had it
19   not been for his job.  It's impossible to say.
20       Q.   And so you can't say, within a
21   reasonable degree of medical certainty, either
22   way?
23       MR. JOYCE:  Objection.
24       THE WITNESS:  Either way what?

Page 44

1        MR. HALL:  Whether he would not --
2    whether he would have developed symptoms,
3    irrespective --
4        MR. JOYCE:  Objection.  He's already
5    testified to that.
6        Q.   (By Mr. Hall)  So the answer is --
7        A.   I don't --
8        Q.   You said that you can't say whether or
9    not he would have become symptomatic either way,
10   right?
11       MR. JOYCE:  He's already testified
12   that the job aggravated and worsened his
13   symptoms.
14       MR. HALL:  Please.  Please.
15       MR. JOYCE:  Don't change the
16   testimony, Steve.  You're --
17       MR. HALL:  I'm not changing it.
18       MR. JOYCE:  You know what?  Note my
19   objection.  That's all.
20       THE WITNESS:  I mean, I think -- I
21   believe his work exacerbated his previous
22   condition of osteoarthritis.  That's my
23   testimony.
24       Q.   (By Mr. Hall)  And are you relying on

Page 45

1    any particular literature for that conclusion?
2        A.   I don't have a study, off the top of
3    my head.  But certainly, heavy lifting and
4    repetitive motions can certainly exacerbate the
5    symptoms of arthritis.
6        Q.   How about motions in lifting, outside
7    of work; could that also exacerbate --
8        A.   Sure.
9        Q.   -- or increase the amount of symptoms?
10       A.   Certainly.
11       Q.   And is there any way to differentiate
12   between the amount of activity that would be
13   required to produce symptoms?
14       A.   No.
15       Q.   And so you would agree with me, then,
16   that, you know, walking up the steps at home could
17   produce symptoms?
18       A.   It could produce symptoms.
19       Q.   Walking on a path or hiking could also
20   do the same thing, right?
21       A.   Yes.
22       Q.   Or riding a bicycle, is that correct?
23       A.   Riding a bicycle is not impact.
24   That's unusual, would be unusual.

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 46

1    Q.   Okay.  How about things like, you
2  know, cleaning the house?
3    A.   That's a pretty generic activity.  I
4  mean, it depends on what he's cleaning.  I mean, I
5  think it has to do with vigorous activity.  I
6  mean, certainly, minor activities would cause some
7  symptoms, whereas vigorous activities would cause
8  more significant symptoms.
9    Q.   Okay.  So we can agree that you don't
10  have to have a particularly demanding physical
11  activity to exacerbate symptoms, once you have
12  arthritis or degenerative joint disease; can we
13  agree on that?
14    A.   Well, I think it's -- depending on the
15  activity, I think the symptoms would probably be
16  -- would correlate to the degree of activity.
17    Q.   And did you place any medical
18  restrictions on Mr. Crowther when he left your
19  care --
20    A.   I don't recall.
21    Q.   -- because I didn't see anything in
22  the medical file.
23    A.   I don't remember having a work release
24  note.  I didn't see one in the file.  But

Page 47

1  typically we do.
2    Q.   And I saw that you gave him a knee
3  brochure.  Do you have that, by chance?  I mean,
4  we don't have to do it now.  We can get it
5  appended to the record.
6    A.   Sure.
7    Q.   Is that something you typically send
8  out?
9    A.   Yes.  I give it to all my patients
10  pre-operatively.
11    Q.   But in terms of his restrictions, does
12  he have restrictions today?
13    A.   Yes.
14    Q.   And what are those restrictions?
15    A.   The restrictions would be no lifting
16  frequently, greater than twenty-five pounds; no
17  lifting occasionally, greater than fifty pounds;
18  no kneeling or squatting; and no ladders.
19    Q.   And for whatever reason, that official
20  work restriction was never placed into his file,
21  is that right?
22    A.   It may have been given to him, but it
23  was not in the file, that I saw.  I don't know if
24  he was going back to work or if he never went back

Page 48

to work and didn't need it.  It's unclear to me
why he didn't get one.  I usually don't give it to
someone unless they request it.
    Q.   And someone who has these restrictions
can work a lighter or sedentary-type job, would
you agree?
    A.   Absolutely.
    Q.   And would you agree that Mr. Crowther
could work a light or sedentary-type job, based on
the results -- his surgical results?
    A.   Based on his knees, yes.  I can't
comment about the rest of his disabilities.
    Q.   So we can agree that he could -- in
terms of his knees -- he could certainly do some
type of physical work?
    A.   Physical work or sedentary work?
    Q.   Well, lighter, sedentary-type work.
    A.   Sedentary work, yes.  Light physical
work, whatever you define that as, because I'd
have to see the description.
    Q.   But certainly he could work in an
office setting, or he could work a, you know, a
supervisory position in a warehouse or something
like that?

Page 49

    A.   People do it all the time.
    Q.   Okay.  And that's even with an
impairment rating of sixty percent on the lower
extremity?
    A.   Oh, yeah.
    Q.   And that was the AMA guideline that
you had talked about?
    A.   That is correct.
    Q.   And one of the things I wanted to ask
you to do is to explain how you came up with the
impairment rating.  Can you explain that to me?
    A.   Yes.  There's a chart.  I think I
refer to the page number.  I don't have the book
with me here.  But it discusses the recovery of
knee replacement.  And for different physical
findings and history from the patient, you obtain
a value out of a hundred.  And he happened -- I
don't remember what his exact value is.  It
doesn't say.  In my note here, however, it
correlated to a good result following knee
replacement.  And a good result or an excellent
result or a perfect result after knee replacement
gives you fifteen percent whole body disability
and thirty-seven percent lower extremity

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 50

1  disability on that particular knee.  He happened
2  to have both knees.  There's a combined values
3  chart at the back of the book which combines the
4  two.
5      Q.   Okay.  So he got the best disability
6  rating possible?
7      A.   Yes.
8      Q.   So other than not having a problem, he
9  got the best rating, under the AMA guideline
10 anyway?
11     A.   I'm sorry?
12     Q.   Other than not having a disability at
13 all, he got the best rating after knee
14 replacement?
15     A.   This is the best possible disability
16 rating following knee replacement; yes; following
17 bilateral knee replacement.
18     Q.   And how is Mr. Crowther's prognosis;
19 is it good?
20     A.   Yes.  I think he's reached maximum
21 medical improvement.  Usually maximum medical
22 improvement is achieved at twelve, occasionally
23 eighteen months, post-operatively, and that time
24 has passed, so he has reached maximum medical

Page 51

1  improvement.  I expect him to continue doing well
2  for a number of years.
3      Q.   And do you know of any valid studies
4  that have been done, that associate Mr. Crowther's
5  work duties with the development of degenerative
6  joint disease in the knees?
7      A.   Say that again, please.
8      Q.   Are you aware of any valid scientific
9  studies that associate the type of work duties
10 that Mr. Crowther did with the development of
11 degenerative joint disease?
12     A.   No.
13     Q.   Are you aware of any valid studies
14 that -- or any scientific literature -- that
15 indicates that there are any specific,
16 scientifically-accepted measures that are
17 preventative for degenerative joint disease of the
18 knees?
19     A.   Could you please repeat that again?
20     Q.   Sure.  Is there anything in the
21 scientific literature that shows that a specific
22 change can be made to a job process that would
23 prevent the development of degenerative joint
24 disease in a person like Mr. Crowther?

Page 52

1      A.   There is no such study that I'm aware
2  of.  But there may be instances -- no, there's no
3  such study that I'm aware of.
4      Q.   Okay.  And so you don't have an
5  opinion that the Railroad could have done some
6  specific change that would have resulted in him
7  not having degenerative joint disease in his knee;
8  would you agree?
9          MR. JOYCE:  Objection.  That's not Dr.
10 Lehman's role in this case.  He's not our
11 liability expert.  He's not our ergonomic
12 expert.
13         THE WITNESS:  I think job
14 modifications may have alleviated symptoms
15 related to his osteoarthritis, but not
16 necessarily changed his -- the fact that he
17 had osteoarthritis.
18     Q.   (By Mr. Hall)  So you're unaware of
19 any specific scientific literature that indicates
20 a specific change to be made to his job that would
21 prevent him to have symptoms, is that correct?
22     A.   I don't think a scientific study could
23 ever be done in that regard.
24     Q.   Are you aware of any specific changes

Page 53

1  that could have been done to Mr. Crowther's job
2  that would have changed the outcome with regard to
3  his knees?
4      A.   I think if he was more sedentary, he
5  would have less symptoms.
6      Q.   Other than that, that's it?
7      A.   Right.
8      Q.   And it's impossible to prevent
9  degenerative joint disease in the knees, correct?
10         MR. JOYCE:  Objection.
11     Q.   (By Mr. Hall)  Is there any way to
12 prevent it?
13     A.   Just sitting on a couch for your
14 entire life, you'd never develop it.
15     Q.   Okay.
16     A.   It's a matter of wear and tear.  The
17 more wear, the more tear.
18     Q.   And did you take into consideration
19 Mr. Crowther's avocational activities?
20     A.   No.  Do you mean activities outside of
21 work?
22     Q.   Yes.
23     A.   No.
24     Q.   And activities of daily living are all

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 54

1  contributing to the, quote, "wear and tear" that
2  you just talked about, correct?
3      A.   That's correct.
4      Q.   And sports and all kinds of other
5  things, right?
6      A.   Yes, sir.
7      Q.   And so you haven't made any
8  consideration for that?
9      A.   No.
10      Q.   And that would be part of a
11  differential diagnosis, right, to exclude things
12  and include things?
13      A.   My job as a physician is not to --
14  when I see a patient -- is not to determine why,
15  necessarily, they have it but, as a surgeon, is to
16  fix what they have.  And that's what I did.  And,
17  you know, I didn't have to ask the guy, you know,
18  how many times he walked his dog a day to
19  determine whether or not he needs a knee
20  replacement.
21      Q.   Okay.  Point taken.  Are you aware of
22  any dose response relationship that's been
23  established between the type of job duties that
24  Mr. Crowther had with the development of

Page 55

1  degenerative joint disease in the knees?
2      A.   No.
3      Q.   Are you aware -- basically, you'd
4  agree, sir, that we don't know how much activity
5  is too much?
6      A.   Excuse me?
7           A VOICE:  Dr. Wenner's leaving.
8           THE WITNESS:  I'm sorry?
9           (Off-the-record discussion.)
10      Q.   (By Mr. Hall)  Fair to say we don't
11  know how much activity is too much?
12      A.   No, we do not.
13      Q.   And that goes for -- the same for
14  developing symptoms, is that correct?
15      A.   That's correct.  It's all a judgment.
16      Q.   And did you review any other expert
17  reports in this case?
18      A.   No.
19      Q.   Can you give me just a minute to look
20  over my notes, and then --
21      A.   Certainly.
22      Q.   Would you agree with me, Doctor, that
23  more information is better than less information
24  in making causal determinations?

Page 56

1      A.   Yes.
2      Q.   And other than what has been provided
3  by you, in terms of the letter from Mr. Joyce,
4  it's my understanding you've not reviewed any of
5  the case materials; depositions --
6      A.   Such as --
7      Q.   -- Mr. Crowther's deposition --
8      A.   No, I have not.
9      Q.   -- or any of the discovery that's been
10  exchanged between the parties?
11      A.   No, I did not.
12      Q.   And you didn't review his railroad
13  medical file, did you?
14      A.   No, I did not.
15      Q.   Or any of the medical records from Dr.
16  Baustin or any of his other physicians?
17      A.   No.  I did request it.
18      Q.   And, I'm sorry, who did you make that
19  request to?
20      A.   I think my secretary made the request
21  either to Mr. Crowther or to Attorney Joyce for
22  the records related to his ACL injury, as well as
23  his original sports injuries back in the early
24  1970s.

Page 57

1      Q.   And were those records provided to
2  you?
3      A.   No.
4      Q.   And do you know why not?
5      A.   I was told they were not available.
6      Q.   And when did you make that inquiry?
7      A.   Prior to doing my narrative.
8      Q.   And is there any documentation, in
9  terms of the narrative -- the request for the
10  narrative -- other than Mr. Joyce's letter?
11      A.   Not that I'm aware of, no.
12      Q.   Is this the full and complete file, as
13  far as you're concerned?
14      A.   The full and complete file for his
15  knees.
16      Q.   Okay.
17      A.   But, I mean, this is --
18      Q.   All right.  In terms of -- but there
19  isn't anything else that you've touched or seen or
20  looked at, other than what's here and has been
21  marked as an exhibit?
22      A.   That is correct.
23      Q.   And was there anything else that you
24  wanted to see, that you weren't provided with?

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 58

1    A.   No.
2        Q.   Do you think it would have been
3    helpful for you to see some of his job duties?
4        A.   Well, I took Mr. Joyce's letter as
5    being truthful and -- you know.  But things that
6    would elaborate on these things may have been more
7    helpful, sure.
8        Q.   And to the extent that Mr. Joyce is
9    wrong --
10       MR. JOYCE:  Objection.
11       Q.   (By Mr. Hall) -- would you agree that
12   that would impact on the strength of your opinion?
13       A.   Well, if a guy sat at a desk all day,
14   instead of doing what Mr. Joyce mentioned in his
15   letter to me, then certainly it would change it.
16   But for all intents and purposes, I think that the
17   description here is likely accurate.
18       Q.   Well, what if he was able to work at a
19   safe and comfortable pace; would that impact your
20   ability -- or would that impact, in your
21   estimation, the strength of your opinions?
22       A.   I'm not sure I understand.
23       Q.   If Mr. Crowther was able to work at a
24   safe and comfortable pace by --

Page 59

1        A.   Doing what?
2        Q.   Doing his job.  Would that have any --
3        A.   Doing his current job?  As long as --
4        Q.   Would that have any --
5        A.   As long as he followed the
6    restrictions that I outlined for you earlier --
7        Q.   Okay.
8        A.   -- and was comfortable.  Not everybody
9    can.
10       Q.   Okay.  Well, what I was asking you is
11   that, if, over the course of his career, Mr.
12   Crowther was able to work at a safe and
13   comfortable pace, would that have an impact on
14   your opinion?
15       A.   No.
16       Q.   If Mr. Crowther used appropriate
17   lifting techniques during the course of his career
18   and had assistance from others, et cetera, would
19   that have an impact on your opinion?
20       A.   Having assistance from others during
21   heavy lifting certainly would be helpful.
22   However, I don't think whether he bent his knees
23   while picking up something heavy, you know, doing
24   a proper lifting technique, you know, over a

Page 60

1    period of thirty years, is going to make a
2    difference if he's doing a lot of heavy lifting.
3        Q.   And how about, you know, bending and
4    twisting or squatting; if the ergonomic analysis
5    shows that there were punitive risk factors for
6    the development of musculoskeletal disorders,
7    would that impact your opinion?
8        A.   I don't understand.  Please rephrase.
9        Q.   If an ergonomist reviewed the job and
10   said that it does not contain risk factors that
11   the scientific literature has shown to be
12   problematic, would that alter your opinion?
13       MR. JOYCE:  Objection.
14       THE WITNESS:  Not problematic in what
15   regard?
16       MR. HALL:  Not problematic for --
17       THE WITNESS:  Not problematic for
18   causing symptoms or causing arthritis?
19   because there's two different things here.
20       MR. HALL:  For causing degenerative
21   joint disease.
22       THE WITNESS:  I don't think that would
23   have altered my opinion, no.
24       Q.   (By Mr. Hall)  Okay.  So if an

Page 61

1    ergonomic assessment of the job was shown to be --
2        A.   So a nonmedical engineer came and
3    assessed his job?
4        Q.   Do you understand what an ergonomist
5    is?
6        A.   Is it a medical doctor?
7        Q.   Well, an ergonomist could be a medical
8    doctor.  But an ergonomist could be someone who
9    studies jobs and the relationship --
10       A.   All right.
11       Q.   -- of how fitting the worker --
12       A.   So if a -- so if a non-medical
13   personnel evaluated his job and made a
14   recommendation regarding his development of a
15   medical issue, I should take that for gospel?
16       Q.   You're asking me?
17       A.   It's not your deposition, I
18   understand.  But I'm trying to understand why I
19   would change my medical opinion if a non-medical
20   individual gave me medical advice regarding a
21   patient.  If a non-medical individual gave me an
22   assessment, then I'm not going to necessarily take
23   that for medical gospel.
24       Q.   Okay.  But you'll take a lawyer's word

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 62

1   for it --
2       MR. JOYCE:  Objection.
3       Q.   (By Mr. Hall)  -- is that correct?
4       A.   I'm hoping the lawyer's letter got
5   this information from the patient --
6       Q.   Did you --
7       A.   -- or the client in this case.
8       Q.   Did you check on that?
9       A.   No.
10      Q.   Did you confirm any of this with Mr.
11  Crowther?
12      A.   But I'm sure we could.
13      Q.   I'm asking if you did.
14      A.   No.
15      Q.   Okay.  So my understanding is that
16  you'll take the word of a lawyer, in a letter, who
17  you've never met, over an ergonomist who studied
18  the work --
19      MR. JOYCE:  Objection.
20      Q.   (By Mr. Hall)  -- is that correct?
21      A.   Well, I think the job description
22  should not be variable, no matter if an ergonomist
23  or a lawyer or the patient told me.  I don't know
24  what the difference is.  If someone tells me the

Page 63

1   description, as long as it's accurate, it
2   shouldn't make a difference.
3       Q.   Okay.  And you'd agree that if it's
4   not accurate --
5       A.   If it's not accurate, then yes, it
6   wouldn't make a difference.
7       Q.   And in fact, it could invalidate your
8   opinion?
9       A.   Yes.  I was -- I would, you know,
10  probably like to re-evaluate it, if it's not
11  accurate and --
12      Q.   Okay.
13      A.   -- you know, it may or may not change
14  my opinion, depending on how inaccurate it may be.
15      Q.   And as far as you sit here today,
16  you've never done -- you've not done anything to confirm
17  whether or not the description that you were given
18  was accurate, correct?
19      A.   That's correct.
20      MR. HALL:  Okay.  I don't have any
21  further questions.
22      MR. JOYCE:  Just real briefly.
23      EXAMINATION
24      Q.   (By Mr. Joyce)  Dr. Lehman, what I

Page 64

1   gathered from your opinion is that, in your
2   opinion, Geoff's job as a track laborer and
3   foreman aggravated and worsened his pre-existing
4   osteoarthritis, is that correct?
5       A.   That's correct.
6       Q.   You're not here telling us that his
7   job as a trackman caused the osteoarthritis,
8   correct?
9       A.   That's correct.
10      Q.   And in your opinion, is Geoff disabled
11  from working as a trackman, based upon what you --
12  your understanding of what he does at the
13  Railroad?
14      A.   If his description of his job is
15  accurate, then yes.
16      MR. JOYCE:  Okay.  That's all the
17  questions I have.
18      MR. HALL:  You have the ability to
19  read the transcript and make any corrections
20  that might be necessary.
21      THE WITNESS:  Okay.
22      MR. HALL:  Or you can waive that
23  right and basically believe that the court
24  reporter has accurately taken down what

Page 65

you've said.
        THE WITNESS:  Since I have a history
of speaking way too fast, maybe it would be
a good idea if I take a look at it.
        MR. HALL:  Okay.  And just so you
know, when the transcript is sent to you,
you have thirty days to read it and make any
changes; and you'll be given an errata sheet
to do that, okay?  And, Tom, do you want to
do that?
        MR. JOYCE:  Yes.  If you would, just
send it to me and I'll send it to Dr.
Lehman.
        MR. HALL:  Okay.  We're more than
happy to do that, so --
        MR. JOYCE:  That's fine.
        (Deposition concluded at 5:22 p.m.)

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0

Page 66

CERTIFICATE OF REPORTER

1
2
3    I, Jonathan P. Lodi, a Notary Public in and for
4    the Commonwealth of Massachusetts, do hereby
5    certify that ANDREW P. LEHMAN, M.D., came before
6    me on December 15, 2008, at New England Orthopedic
7    Surgeons, 300 Birnie Avenue, Springfield,
8    Massachusetts, and was by me duly sworn to testify
9    to the truth and nothing but the truth as to his
10   knowledge touching and concerning the matters in
11   controversy in this cause; that he was thereupon
12   examined upon his oath and said examination
13   reduced to writing by me; and that the statement
14   is a true record of the testimony given by the
15   witness, to the best of my knowledge and ability?
16   I further certify that I am not a relative or
17   employee of counsel/attorney for any of the
18   parties, nor a relative or employee of such
19   parties, nor am I financially interested in the
20   outcome of the action.
21      WITNESS MY HAND this   day of        , 2008.
22
23   Jonathan P. Lodi         My Commission Expires:
24   Notary Public            8/8/14

Page 68

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY - CIVIL DIVISION
DOCKET NO. 02389

**********************************
GEOFFREY CROWTHER,
           Plaintiff,
Vs.
CONSOLIDATED RAIL CORPORATION
and CSX TRANSPORTATION, INC.,
           Defendants.
**********************************

   I, ANDREW P. LEHMAN, M.D., do hereby certify,
under the pains and penalties of perjury, that the
foregoing testimony is true and accurate, to the
best of my knowledge and belief.
   WITNESS MY HAND, this   day of        ,
2008/2009.

                    _____
                    ANDREW P. LEHMAN, M.D.

JPL

Page 67

1    Today's date:      December 19, 2008
2    To:         Thomas J. Joyce, Esq.
3    Copied to:       Stephen A. Hall, Esq.
4    From:        Jonathan P. Lodi
5    Deposition of:    Andrew P. Lehman, M.D.
6    Taken:        December 15, 2008
7    Action:        Crowther  Vs.  Consolidated
8
9
10
11
12
13
14   Enclosed is a copy of the deposition transcript
15   of Andrew P. Lehman, M.D.  Pursuant to the Rules
16   of Civil Procedure, Dr. Lehman has thirty days to
17   sign the deposition from today's date.
18   Please have Dr. Lehman sign the enclosed
19   signature page.  If there are any errors, please
20   have him mark the page, line and error on the
21   enclosed correction sheet.  He should not mark the
22   transcript itself.  This addendum should be
23   forwarded to all interested parties.
24   Thank you for your cooperation in this matter.

Page 69

CORRECTION SHEET
WITNESS:  ANDREW P. LEHMAN, M.D.
ACTION:  CROWTHER  Vs. CONSOLIDATED
TAKEN:   DECEMBER 15, 2008
PAGE LINE          CORRECTION OR CHANGE
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

4a2ae25d-d8ea-4abe-ae57-b1dcb5257fa0