IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GEOFFREY CROWTHER | : | Civil Action No.  09-10334-MAP and |
| | : |                          09-11467-MAP |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| CSX TRANSPORTATION, INC. | : | ORAL ARGUMENT REQUESTED |
| and | : | |
| CONSOLIDATED RAIL CORP. | : | |
| | : | |
| Defendants | : | |

PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO
PRECLUDE MARTIN J. LUBER, M.D.

COMES NOW the Plaintiff, Geoffrey Crowther, by and through his attorneys, Thomas J. Joyce, III, and Michael J. McDevitt, and hereby responds in Opposition to Defendants' Motion in Limine to Preclude Martin J. Luber, M.D. (Document 61), as follows:

I.  INTRODUCTION:

This is an occupational injury action brought pursuant to an Act of Congress known as the Federal Employers' Liability Act (FELA), 45 U.S.C. Section 51, et seq.  Plaintiff, Geoffrey Crowther, claims occupational neck, bilateral knee, left elbow, and left thumb injuries, which were caused and/or contributed to and/or aggravated, worsened and exacerbated, in whole or in part, by exposure to occupational risk factors for cumulative-trauma injuries, including repetition, force, vibration and/or awkward postures, in his employment as a track laborer, track welder, track foreman, and track inspector (trackman) with Defendants, CSX Transportation, Inc. (CSX) and Consolidated Rail Corp. (Conrail).

Defendants have filed a Motion in Limine to Preclude Martin J. Luber, M.D., arguing that there is allegedly no basis for his opinions with regard to the medical causation of his own patient's injuries which he treated. For the reasons stated herein, Defendants' Motion in Limine to Preclude Martin J. Luber, M.D. should be denied.

## II.   FACTS:

Plaintiff, Geoffrey Crowther, is presently age 59. Geoffrey Crowther worked as a track laborer, track welder, track foreman, and track inspector (trackman) for the railroad from 1975 through December 2006, when he became disabled (at age 55). As a trackman, Geoffrey Crowther's work tasks required an extreme amount of heavy repetitive work, utilizing certain track tools and equipment such as torches, electric and gas welding equipment, grinders, chipping guns, track chisels, sledge hammers, claw bars, spiking mauls, needle guns, air impact hammers and saws. He was also required to lift and carry heavy objects, and was exposed to excessive and harmful vibration. Geoffrey Crowther's job duties further required prolonged use of his arms in awkward and extended positions, and working in poor ground conditions and walking on improper and poorly maintained ballast. Many times he was required to perform his tasks without adequate tools and equipment and/or adequate manpower.

On February 26, 2007, Geoffrey Crowther consulted Dr. Martin J. Luber of New England Orthopedic Surgeons, with complaints of left elbow pain. X-rays of the left elbow demonstrated some early olecranon spur formation posteriorly and a large loose body in the anterior lateral chamber. Despite conservative treatment for his left elbow injuries, Geoffrey Crowther eventually underwent left elbow arthroscopy and loose body, olecranon and coronoid spur removal surgery performed by Dr. Luber on February 27, 2009. (Please see Medical Records of New England Orthopedic Surgeons, attached as Exhibit 1).

Geoffrey Crowther has disclosed his treating physician and surgeon, Martin J. Luber, M.D., as Plaintiff's medical expert with regard to his left elbow injuries in this matter. Dr. Luber is a highly qualified medical professional with expertise and knowledge as to orthopedic surgery who regularly treats patients with elbow injuries including left elbow degenerative osteoarthropathy. (Please see CV of Dr. Martin J. Luber, attached as Exhibit 2). Dr. Luber will be called to testify on behalf of Geoffrey Crowther as to the history, physical examinations, diagnostic tests, diagnosis, treatment, surgery, cause and prognosis of Plaintiff's left elbow injuries.

On or about April 26, 2010, Dr. Luber authored a narrative medical report regarding his patient, Geoffrey Crowther. In his detailed narrative medical report, Dr. Luber states, in pertinent part:

> I have had the opportunity to review the work requirements of Mr. Crowther's job at CSX. I believe that Mr. Crowther's repetitive use of his left upper extremity including lifting, carrying, hammering, etc., is in fact a direct cause if not an exacerbating feature of the development of left elbow degenerative osteoarthropathy. To a reasonable degree of medical certainty, I believe that Mr. Crowther's work habits as described to me, and available from description by CSX Industries, would in fact increase the likelihood that Mr. Crowther would develop degenerative osteoarthopathy of his left elbow and result in mechanical symptoms associated with loose bodies.
> …
> At this time, I believe that to a reasonable degree of medical certainty that Mr. Crowther's left elbow injury was exacerbated and aggravated, and at least partially caused by his work history at CSX Transportation.

(Please see Medical Report of Dr. Luber, attached as Exhibit 3).

On May 24, 2010, Dr. Martin J. Luber was deposed by Defendants. Dr. Luber testified in his discovery deposition, in pertinent part, as follows:

Q. And we were just talking about your board certification. And you're board certified in Sport's Medicine, and you received that in 2007, correct?

     A. Correct.

     Q. Are you board certified in any other areas?

     A. Orthopedic Surgery.

     Q. When did you receive your board certification in orthopedic surgery?

     A. 2003.

…

     Q. Have you authored any papers or conducted any research?

     A. I have. They are listed in my CV.

…

     Q. But you said you've given prior depositions?

     A. Yes.

…

     Q. Were those personal injury cases, or medical malpractice cases, if you know?

     A. Personal injury cases.

(Please see Deposition of Dr. Luber, attached as Exhibit 4, at page 8-10).

     Dr. Martin Luber further testified:

     Q. Did you review any documents related to Mr. Crowther's job duties at the railroad?

     A. I did.

     Q. What documents did you review?

     A. I had a listing of the job description that he provided for or while on the job at the railroad.

…

     Q. So you don't recall discussing his job with him while you were treating him?

     A. We did in terms of his abilities to return to work after the fact. I don't recall any specific other descriptions or conversations regarding his job duties, and how they would pertain to his left elbow.

Q. When you say after the fact, are you referring to after the surgery, his left elbow surgery?

A. No. When we first treated him, when I first treated him in 2007, we did describe how his left elbow pain was associated with, or at least brought upon by his working, i.e. when he worked, he would have elbow pain. And after his elbow surgery, we did discuss how it might impact his ability to return to work.

…

Q. Did you rely on any literature in reaching your opinion that's in the narrative report?

A. In my - - the literature I reviewed for my general education and how I provide orthopedic services, but not specifically an article directly related to Mr. Crowther's elbow.

Q. Thank you. I just want to refer to your report a minute. I'm going to ask you some specific questions about your opinion. On the second page, the first or second paragraph, you say you have had the opportunity to review the work requirements of Mr. Crowther's job at CSX. "I believe that Mr. Crowther's repetitive use of his left upper extremity, including lifting, carrying, hammering, etc., is in fact a direct cause if not an exacerbating feature of the development of left elbow degenerative osteoarthropathy." Did I say that correctly?

A. Yes.

Q. If you want to take a look at these again, what specifically are you referring to when you say work requirements? I mean, you have etc. on there, so lifting, carrying, hammering, etc. What would be the etc.?

A. Well, I mean, the description of his job that includes drilling holes through rails, inserting and tightening loose bolts. There's also a description of manual labor. There was a description of swinging a hammer, using tie bars. I'm not sure where I remember that from. If I can just review this.

Q. Sure. Take a moment.

A. (Doctor looks over document.) I mean, it's repetitive use of his left upper extremity often with very heavy loads, and again, the repetitive nature, that's the most important.

Q. The repetitive nature of using any specific tool or?

A. Any specific tool can lead to degenerative change, but it's the heavy unloading, loading, track materials, cutting rails, aligning tie plates, repairing and adjusting track switches, you know, cutting the brush from the vegetation for the right of way.

>   I mean, all that involves repetitive, and my understanding, heavy work, manual labor.
>
> …
>
> Q.  Is it your opinion that Mr. Crowther's work, his normal every day work on the railroad could cause or contribute to the degenerative changes that he was suffering from in his left elbow?
>
> A.  It is.
>
> …
>
> Q.  So you have not given an opinion regarding whether CSX could have done something differently to prevent M. Crowther from developing a degenerative condition?
>
> MR. JOYCE:  Dr. Luber is not our liability expert, he's simply a medical causation expert, so we're not offering an unsafe workplace, if that's what you mean.
>
> MS. GAMACHE:  I understand.  I'm just confirming that he's not providing an opinion, he's simply saying the repetitive activity at work caused or at least contributed to the degenerative changes.
>
> MR. JOYCE:  Okay.
>
> MS. GAMACHE:  Is that correct?
>
> THE WITNESS:  Correct.
>
> Q.  Would you agree that there are other activities can cause degenerative changes in the elbow?
>
> A.  Overhead throwing for many years is a prime cause of degenerative change. Frankly, any repetitive use of a limb can lead to degenerative arthritis.
>
> Q.  Is age a factor?
>
> A.  Age is not the sole cause of the degenerative change, but as we age, the likelihood of seeing arthritis increases.
>
> …
>
> Q.  You've also given an opinion that Mr. Crowther's employment or employment activities exacerbated his degenerative changes.  What do you mean by exacerbated?
>
> A.  I mean, likely led to an acceleration of degenerative arthritis developing.
>
> ...

> Q. Would you agree that any activity can exacerbate degenerative changes, any repetitive activity with your arm?
>
> A. Any repetitive activity, particularly heavy activity, can increase and accelerate it, yes.
>
> Q. But any activity, it doesn't necessarily have to be heavy?
>
> A. While not statistically proven, there does appear to be an increased rate of the development of arthritis in heavier activity as opposed to lighter activities done repetitively, such as clerical work.

(Please see Deposition of Dr. Luber, attached as Exhibit ___, at page 11-21).

> Dr. Martin Luber further testified:
>
> Q. Is the degenerative condition that Mr. Crowther suffers from in his left elbow, is that a common condition?
>
> A. Elbow arthritis is relatively uncommon.
>
> Q. Do you treat other railroad workers, in general?
>
> A. I have seen other railroad workers. I don't have a large percentage of them in my practice.

(Please see Deposition of Dr. Luber, attached as Exhibit 4, at page 25- 26).

> Q. Also looking at your report, on the second page, in the second to last paragraph, you indicate, At this time, I believe that to a reasonable degree of medical certainty that Mr. Crowther's left elbow injury was exacerbated and aggravated, and at least partially caused by his work history at CSX Transportation. What other causes, in your opinion - - or I'm sorry, what else, other than his work, caused his degenerative condition?
>
> A. Without certain knowledge, but there is a suggestion in his original CT scan that he might have had an old osteochondritis dissecans lesion on his capitellum.
> …
>
> Q. Based on the CT scan, is it possible to determine how long it had been there?
>
> A. No, but they generally develop in adolescence.
> …
>
> Q. … Is it your opinion that any - - that there is another potential cause of the condition

>       in his elbow?
>
> A.    I believe that his osteochondritis dissecans was a contributing factor that was exacerbated by the repetitive use of his arm, in activities, particularly the work activities that I was provided with.

(Please see Deposition of Dr. Luber, attached as Exhibit 4, at page 36-41).

(Please see CSX Job Description for Trackman, attached as Exhibit 5).

---

The National Institute for Occupational Safety and Health (NIOSH) / Centers for Disease Control (CDC), published *Musculoskeletal Disorders and Workplace Factors, A Critical Review of Epidemiologic Evidence for Work-Related Musculoskeletal Disorders of the Neck, Upper Extremity, and Low Back,* in July 1997. Thus, the federal government, through NIOSH, as far back as 1997, determined what the occupational risk factors were for work related musculoskeletal disorders (WMSDs).

This Honorable Court should note that the parties took Dr. Luber's videotape deposition on December 1, 2010, which is not yet available for inclusion in Plaintiff's Response in Opposition to Defendants' Motion in Limine as of this date of filing. Plaintiff respectfully requests the opportunity to submit the *entire* videotape deposition testimony of Dr. Luber to the Court for the Court's consideration before the Court makes a ruling on Defendants' Motion in Limine to Preclude Martin J. Luber, M.D. when the transcript becomes available.

III.   ARGUMENT:

---

This occupation injury action was brought pursuant to an Act of Congress known as the Federal Employers' Liability Act (FELA), 45 U.S.C. Sec. 51 et seq. Specifically, the FELA states, in pertinent part:

> Every common carrier by railroad while engaging in commerce between any of the states and territories, or between the District of Columbia and any of the states or territories and any foreign nation or nations, shall be liable in damages to any

> person suffering injury while he is employed by such carrier, in such commerce, or in case of death of such employee, to his or her personal representative for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, road bed, works, boats, wharves, or other equipment.
>
> Any employee of a carrier, any part of whose duties as such employee shall be in the furtherance of interstate commerce; or shall, in any way, directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this Act be considered as being employed by such carrier, in such commerce, and shall be considered as entitled to the benefits of this Act and of an Act entitled "An Act related to the liability of common carriers by railroad to their employees in certain cases". (App'd April 22, 1908) [45 U.S.C. Secs. 51 et seq.] as the same has been or may hereafter be amended (emphasis added).

45 U.S.C. Sec. 51.

The FELA was enacted by the United States Congress in 1908. Congress and the United States Supreme Court have, over the years, consistently stated the purpose of the FELA is to protect and benefit railroad employees injured on the job. The FELA is to be liberally construed to allow railroad employees, such as Geoffrey Crowther, injured in the scope of their employment to recover from the railroad even where the railroad's negligence is minimal. *Rodriguez v. Deloroy Connecting Railroad Company,* 473 F. 2d 819 (6th Cir. 1973).

This duty to provide a safe place to work was non-delegable and could not be passed on by the railroad to any person, firm or corporation. *Bailey v. Central Vermont Railway Company,* 319 U.S. 350 (1943). Not only is this duty to provide a safe place to work a non-delegable one, but it is also an affirmative one. This means that Defendants CSX and Conrail had a positive obligation to provide Geoffrey Crowther with a safe place to work, including finding any defect or hazard which would normally be revealed within the work place. *Williams v. Atlantic Coastline Railroad Company,* 190 F. 2d 744 (5th Cir. 1951).

It has long been accepted doctrine that "the question of evidence required to establish liability in an FELA case is much less than an ordinary negligence action." *Harbin v. Burlington Northern Railroad Company,* 921 F. 2d 129 (7th Cir. 1990). In *Hines v. Conrail*, 926 F. 2d 262 (3rd Cir. 1991), the Third Circuit reversed the grant of summary judgment in a toxic tort case which was predicated on the exclusion of plaintiff's expert witness. The Court held that *the FELA relaxed standard of causation also relaxes the threshold of admissibility for the reception of expert testimony*. Further, in an FELA case, the railroad employee is to be given every doubt before the Court. *Ratigan v. New York Central Railroad Company*, 291 F. 2d 548 (2nd Cir. 1961), citing *Harris v. Pennsylvania Railroad*, 361 U.S. 15 (1959), *Moore v. Terminal Railroad Association,* 358 U.S. 31 (1958).

The test of a jury case, under the FELA, is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing injury for which damages are sought. *Rogers v. Missouri P.R.Co.,* 352 U.S. 500, 1 L.Ed 2D 493, 77 S.Ct. 443 (1957). Under the FELA, if a defendant railroad negligently causes further injury or aggravation to plaintiff's pre-existing injury or condition, the plaintiff is entitled to compensation for all of his damages caused by the railroad's negligence, including further injury or aggravation. *Stevens v. Bangor and Aroostook R. Co.,* 97 F. 3d 594, 601 (C.A.1 (Me.), 1996).

In the instant matter before this Honorable Court, Defendants have moved to preclude the medical causation opinions of Plaintiff's treating physician and surgeon, Martin J. Luber, M.D. Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

F.R.E. 702.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), for expert testimony to be admitted, the proposed testimony must be supported by appropriate validation based on what is known. The trial judge must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid, and of whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert* at 593.

Martin J. Luber, M.D., is a Board Certified Orthopedic Surgeon who has been practicing medicine for over nine years. Dr. Luber is familiar with the medical literature and the risk factors for degenerative osteoarthropathy of the elbow, both work related and non-work related. Dr. Luber is very familiar with occupational elbow injuries. It is important to note that Defendants do not challenge Dr. Luber's qualifications as a medical expert generally. Rather, Defendants, in their Motion, challenge only Dr. Luber's ability to provide a medical *causation* opinion concerning his own patient, Geoffrey Crowther.

So what is the methodology underlying Dr. Martin J. Luber's conclusions and opinions? What does a treating physician do to determine the cause of his patient's injury? Differential diagnosis is a standard generally accepted methodology utilized by physicians to assess medical causation. Using his experience and expertise, Dr. Luber utilized a differential diagnosis methodology to assess causation with regard to Geoffrey Crowther as all physicians do with their patients. Dr. Luber examined his patient Geoffrey Crowther. Dr. Luber took his patient's history, including personal and work history, and reviewed his medical records. Dr. Luber conducted physical examinations, reviewed diagnostic tests, made diagnoses and recommended treatment and surgery. Dr. Luber also reviewed additional information on Geoffrey Crowther's work including the CSX trackman and welder job descriptions that were provided by Plaintiff's counsel. As an orthopedic specialist, Dr. Luber is obviously familiar with the medical literature

and the risk factors for left elbow degenerative osteoarthropathy, both work related and non-work related. As Plaintiff's treating physician and surgeon, plainly aware of such things as Plaintiff's age, weight and his other medical conditions, Dr. Luber has opined that the development of Geoffrey Crowther's left elbow degenerative osteoarthropathy was caused and/or contributed to by Geoffrey Crowther's work as a trackman for the railroad. Dr. Luber has further opined that Geoffrey Crowther's left elbow degenerative osteoarthropathy was aggravated, worsened and exacerbated by Geoffrey Crowther's work as a trackman for the railroad. It is important to note that Dr. Luber did not opine that the sole or primary cause of Geoffrey Crowther's left elbow injuries was his work as a trackman. That is not what the FELA requires for purposes of proving causation. Rather, a contributing factor or aggravation and worsening are sufficient to prove causation under the FELA. *Rogers v. Missouri P.R.Co.,* 352 U.S. 500, 1 L.Ed 2D 493, 77 S.Ct. 443 (1957); *Stevens v. Bangor and Aroostook R. Co.,* 97 F. 3d 594, 601 (C.A.1 (Me.), 1996).

In the case of *Hardyman v. Norfolk & Western Railway Company*, 243 F. 3d 255 (6th Cir. 2001), the Sixth Circuit considered an FELA carpal tunnel syndrome action in which the trial court precluded the plaintiff from offering expert causation testimony and erred in granting the railroad's motion for summary judgment on the ground that plaintiff failed to show that a genuine issue of fact exists as to whether the railroad's negligence was, in whole or in part, a cause or contributing factor of plaintiff's carpal tunnel syndrome. In *Hardyman*, the Sixth Circuit stated:

> (T)he district court held that unless the plaintiff could offer a scientific or epidemiological study specifically concerning carpal tunnel syndrome and railroad brakemen, the only way plaintiff could establish causation would be with the proffer of a known "dose/response relationship" or "threshold phenomenon". Not only does such a requirement ignore the alternative method of establishing causation through differential diagnosis, but it is contrary to the testimony of

>plaintiff's experts, i.e., that one simply could not quantify the level or dose of risk factors causative of CTS in a manner consistent with dose/response relationship or threshold level.
>
>…
>
>After careful review of the entire record, we are firmly convinced that the rationale of the district court did not justify exclusion of plaintiff's expert testimony.

*Hardyman* at 262, 267.

Dr. Luber is Plaintiff's treating physician and surgeon, and is not a hired gun medical expert who never cared for Geoffrey Crowther. It is to be expected that a treating physician will customarily opine about his patient's history, diagnosis and causation of injuries, treatment, and prognosis.

In the case of *Fielden v. CSX Transportation, Inc.,* 482 F.3d 866 (6th Cir. 2007), the Sixth Circuit stated:

>The (Advisory Committee) Note to Rule 26 states that "[a] treating physician …can be deposed or called to testify at trial without any requirement for a written report." Fed.R.Civ.P. 26(a), cmt. 1993 Amendments, subdivision (a), para. (2). Under a straightforward reading of the rule and its advisory note, Fielden did not need to file an expert report from Dr. Fischer.
>This conclusion is supported by the obvious fact that doctors may need to determine the cause of an injury in order to treat it. Determining causation may therefore be an integral part of "treating" a patient. As a thoughtful U.S. Magistrate Judge reasoned in permitting causation testimony without a prior expert's report,
>It is within the normal range of duties for a health care provider to develop opinions regarding causation and prognosis during the ordinary course of an examination. To assume otherwise is a limiting perspective, which narrows the role of a treating physician. Instead, to properly treat and diagnose a patient, the doctor needs to understand the cause of a patient's injuries. See *McCloughan [v. City of Springfield*], 208 F.R.D. [236'] 242 [(C.D.Ill.2002)] ("doctors do not operate in a vacuum … Thus the [c]ourt believes causation, diagnosis, and prognosis would be based on the treating physician's personal knowledge …").

*Fielden* at 869, 870.

Defendants challenge only Dr. Luber's ability to provide a medical *causation* opinion concerning his own patient, Geoffrey Crowther, and *interestingly raise no challenge to Dr.*

*Luber's ability to provide opinions as to the diagnosis, treatment and prognosis of Geoffrey Crowther*.  In reality, Defendants' issues with Dr. Luber's causation opinions go not to their admissibility, but rather go to the *weight of the evidence*.  Dr. Luber's differential diagnosis is a standard generally acceptable methodology utilized by treating physicians to assess causation.  It should be up to the jury to determine what weight to give his expert testimony.

In *Primiano v. Yan Cook, et al.*, United States Court of Appeals for the Ninth Circuit, 06-15563 (March 2010), the Ninth Circuit recently considered the admissibility of medical testimony under *Daubert*.  The District Court had excluded the testimony of a highly qualified expert because he could not say precisely why a product had failed, and because there was no peer-reviewed literature supporting his testimony.  The Ninth Circuit held that his methodology was adequate, and the testimony relevant, and reversed the trial court.  In *Primiano*, the Ninth Circuit stated:

> The question before us is whether excluding Primiano's expert's testimony was an abuse of discretion.
> …
> The district court granted defendants' motion to exclude Dr. Weiss's testimony as not meeting the *Daubert* standard and granted summary judgment. The court concluded that Dr. Weiss's testimony would not be helpful to the jury.
> …
> Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.
> …
> Under *Daubert*, the district judge is a "gatekeeper, not a fact finder." When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony. Testimony by physicians may or may not be scientific evidence like the epidemiologic testimony at issue in *Daubert*.
> …
> '[M]edicine is not a science but a learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit.' 'Evidence-based medicine' is 'the conscientious, explicit and judicious use of current best evidence in making decisions about the care of individual patients.' 'Despite the importance of evidence-based medicine, much of medical decision-

> making relies on judgment – a process that is difficult to quantify or even to assess quantitatively.'
>
> …
>
> 'A trial court should admit medical expert testimony if physicians would accept it as useful and reliable,' but it need not be conclusive because 'medical knowledge is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof.' Where the foundation is sufficient, the litigant is 'entitled to have the jury decide upon [the experts'] credibility, rather than the judge.'
>
> …
>
> Other circuits have taken similar approaches focusing especially on experience. The Sixth Circuit held that a district court abused its discretion by excluding a physician's testimony based upon extensive, relevant experience even though he had not cited medical literature supporting his view. *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004). Likewise, the Third Circuit pointed out that a doctor's experience might be good reason to admit his testimony. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 406-07 (3rd Cir. 2003).
>
> …
>
> Given that the judge is 'a gatekeeper, not a fact-finder,' the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it.

*Primiano v. Yan Cook, et al.*, United States Court of Appeals for the Ninth Circuit, 06-15563 (March 2010), page 3805-3817.

Defendants' assertions that there is no scientific basis to Dr. Luber's opinions with regard to the medical causation of his own patient's injuries are misleading. Dr. Luber should not be required to go to a job site and actually observe an employee work before he can offer a causation opinion. If that were the case, then no doctor could ever provide any causation opinion in any traumatic injury case when the doctor had not witnessed the actual accident when it occurred. That is absurd. Geoffrey Crowther's history and job description suffice. A plaintiff's history is generally what a medical doctor relies upon for the foundation of his causation opinion in any FELA trauma or cumulative-trauma injury case.

Dr. Luber's medical causation opinions should not be excluded. It should be up to the jury to determine what weight to give his expert testimony. The jury should decide if Geoffrey

Crowther's left elbow injuries were caused and/or contributed to and/or aggravated, worsened and exacerbated, in whole or in part, by his work for Defendants, CSX and Conrail. FELA cases are supposed to be determined by the jury.

IV.     CONCLUSION:

Defendants CSX and Conrail do not challenge Dr. Luber's qualifications as an orthopedic surgeon and elbow specialist. Martin J. Luber, M.D., is a qualified medical expert who employs the same methodology in diagnosing every one of his patients and determining the cause of their conditions. Using his experience and expertise, Dr. Luber reviewed his patient Geoffrey Crowther's history, including his personal and work history, as well as his records, examinations, diagnostic tests and surgery reports. Dr. Luber's methodology is sound and scientifically valid, and his opinions are supported by ample evidence. Dr. Luber's opinions are obviously not "mere speculation". Dr. Luber's testimony will most certainly properly assist the jury to understand critical evidence in this FELA occupational injury action. As such, Defendants' arguments are without merit.

WHEREFORE, Plaintiff respectfully requests Defendants' Motion in Limine to Preclude Martin J. Luber, M.D. be Denied, and that Martin J. Luber, M.D. be permitted to testify as Plaintiff's medical expert at trial in this matter.

Respectfully submitted,

*/s/Thomas J. Joyce, III*
THOMAS J. JOYCE, III
Law Office of Thomas J. Joyce, III
801 Centerton Road
Mount Laurel, NJ 08054
(856) 914-0220
Attorney for Plaintiff

               */s/Michael J. McDevitt*
               MICHAEL J. McDEVITT
               Lawson & Weitzen
               88 Black Falcon Avenue, Suite 345
               Boston, MA 02110
               (617) 439-4990
               Attorney for Plaintiff

DATED: December 3, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GEOFFREY CROWTHER | : | Civil Action No. 09-10334-MAP and |
| | : | 09-11467-MAP |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| CSX TRANSPORTATION, INC. | : | |
| and | | |
| CONSOLIDATED RAIL CORP. | : | |
| | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I, THOMAS J. JOYCE, III, hereby certify that on December 3, 2010, I electronically filed: Plaintiff's Response and Memorandum of Law in Opposition to Defendants' Motion in Limine to Preclude Martin J. Luber, M.D.; Plaintiff's Exhibits; and Plaintiff's Proposed Order, with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record for the Defendants:

Heather M. Gamache, Esquire
Flynn & Wirkus
400 Crown Colony Drive, Suite 200
Quincy, MA 02169

                                                          */s/Thomas J. Joyce, III*
                                                          Thomas J. Joyce, III