UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

SPRINGFIELD DIVISION

3:09-CV-10334-PBS

* * * * * * * * * * * * * *

GEOFFREY CROWTHER,              *

          Plaintiff   *

V.                              *

CSX TRANSPORTATION, INC.,       *

and CONSOLIDATED RAIL CORP.,    *

          Defendants  *

* * * * * * * * * * * * * *

DEPOSITION OF:  DR. MARTIN J. LUBER

OFFICES OF NEW ENGLAND ORTHOPEDIC SURGEONS

300 Birnie Avenue

Springfield, Massachusetts  01107

May 24, 2010, 5:30 p.m.

Michele L. Mariani

Certified Shorthand Reporter

BEACON HILL COURT REPORTING, INC.

44 Bayswater Street

Boston, Massachusetts  02128

617.569.8050

```
 1  APPEARANCES:
 2
 3
 4  Representing the Plaintiff:
 5     LAW OFFICE OF THOMAS J. JOYCE, III
 6     900 Centerton Road
 7     Mount Laurel, NJ  08054
 8     BY:  THOMAS J. JOYCE, III, ESQ.
 9     856.914.0220  FAX 856.914.0429
10     EMAIL: tjoyce@tjoycelaw.com
11
12
13  Representing the Defendants:
14     FLYNN & WIRKUS, P.C.
15     400 Crown Colony Drive, Suite 200
16     Quincy, MA  02169
17     BY:  HEATHER M. GAMACHE, ESQ.
18     617.773.5500  FAX 617.773.5510
19     EMAIL: hgamache@flynnwirkus.com
20
21
22
23
24
                                    Page 2
```

```
 1           I N D E X
 2
 3
 4  DEPONENT:    DR. MARTIN J. LUBER
 5
 6
 7  EXAMINATION BY:             PAGE:
 8  MS. GAMACHE                   4
 9
10
11  EXHIBITS:                   PAGE:
12  Exhibit 1, File ......................6
13  Exhibit 2, Notice of Deposition ......6
14  Exhibit 3, CV of Dr. Luber ...........6
15  Exhibit 4, Narrative Report, 4/26/10 ..6
16  Exhibit 5, CSX Job Description, 2 pgs. ..12
17  Exhibit 6, Office Note, 2/26/07 ......28
18  Exhibit 7, Office Note, 3/19/07 ......30
19
20  (Exhibit 1 retained by Dr. Luber.)
21
22
23
24
                                    Page 3
```

```
 1     (Deposition commenced at 5:26 p.m.)
 2
 3     DR. MARTIN LUBER, Deponent, Having first
 4  been duly identified and sworn, testifies and
 5  states as follows:
 6
 7
 8     EXAMINATION BY MS. GAMACHE:
 9
10     Q.   Good -- I guess it's afternoon --
11  good afternoon, Dr. Luber.  My name is Heather
12  Gamache.  We met briefly before going on the
13  record.  Have you been deposed before?
14     A.   I have.
15     Q.   So you're familiar with the
16  procedure, questions back and forth.  Wait until
17  I finish the question before answering, and I'll
18  do the same for you.  If you need a break at any
19  time, just let me know, that's fine.  If at any
20  time you don't understand a question I'm asking,
21  just ask that I rephrase it, and I'd be happy to
22  do so.  If you answer a question, I'm going to
23  presume that you knew or understood the question
24  that was being asked.
                                    Page 4
```

```
 1     A.   Understood.
 2     Q.   Are you on any medications today
 3  that would compromise your ability to answer?
 4     A.   I am not.
 5     Q.   Okay.  Did you bring your file with
 6  you today?
 7     A.   I have files from our office, yes.
 8     Q.   Okay.  Is that something that --
 9  you can keep it, but something I'm going to mark
10  just the entire thing as an exhibit, and then
11  not alter it in any way from this point forward.
12     A.   Okay, please.
13     Q.   You can just mark the first page as
14  Exhibit 1, and then you can keep it in front of
15  you, and then just after the deposition, don't
16  make any changes to it, just keep it as is.
17     A.   Understood.
18     Q.   In your possession in the event
19  that this case goes to trial.
20     A.   All right.
21          MS. GAMACHE:  So we'll mark that as
22  Exhibit 1.
23     Q.   (By Ms. Gamache)  And also, you
24  received a notice of deposition, or Tom may have
                                    Page 5
```

2 (Pages 2 to 5)

### Page 6

1  received a notice of deposition.
2  A.  I did.
3  MS. GAMACHE:  I'm going to mark
4  that as Exhibit 2, and mark these up to
5  4.
6
7  (Exhibit 1, File, Marked.)
8
9  (Exhibit 2, Notice of Deposition,
10  Marked.)
11
12  (Exhibit 3, CV of Dr. Luber,
13  Marked.)
14
15  (Exhibit 4, Narrative Report,
16  4/26/10, Marked.)
17
18  Q.  (By Ms. Gamache)  Dr. Luber, I'm
19  going to hand you what has been marked as
20  Exhibit 3.  It's your CV.  If you can just take
21  a look at that and confirm whether it's an up to
22  date copy.
23  A.  (Doctor looks over document.)  It
24  is not completely up to date.  There's an

### Page 7

1  additional board certification.
2  Q.  What board certification is that?
3  A.  I'm board certified in Sport's
4  Medicine, and that was in 2007.
5  Q.  If you could provide Mr. Joyce with
6  an updated copy of your CV, then he can get that
7  to me, that would be great.
8  A.  I can do that.
9  Q.  And what's been marked as Exhibit
10  4 is the narrative report you prepared?
11  A.  In April of this year, yes.
12  Q.  And that's an accurate copy of the
13  report you prepared?
14  A.  Yes.
15  Q.  Okay.  Dr. Luber, what is your date
16  of birth?
17  A.  March 16th, 1968.
18  Q.  And what is -- the address here is?
19  A.  300 Birnie Avenue, Springfield.
20  Q.  And that's the location of your
21  office, correct?
22  A.  Correct.
23  Q.  Where did you attend college?
24  A.  Loyola University in Chicago.

### Page 8

1  Q.  What year did you graduate?
2  A.  1990.
3  Q.  And where did you attend medical
4  school?
5  A.  SUNY Upstate in Syracuse.
6  Q.  And what year did you graduate?
7  A.  1994.
8  Q.  And we were just talking about your
9  board certification.  And you're board certified
10  in Sport's Medicine, and you received that in
11  2007, correct?
12  A.  Correct.
13  Q.  Are you board certified in any
14  other areas?
15  A.  Orthopedic Surgery.
16  Q.  When did you receive your board
17  certification in Orthopedic Surgery?
18  A.  2003.
19  Q.  And both certifications are up to
20  date?
21  A.  They are.
22  Q.  Have you ever been suspended --
23  have your certifications ever been suspended in
24  any way?

### Page 9

1  A.  No.
2  Q.  Altered?
3  A.  No.
4  Q.  Has any disciplinary action ever
5  been taken against you?
6  A.  No.
7  Q.  Okay.  Have you authored any
8  papers or conducted any research?
9  A.  I have.  They're listed in my CV.
10  Q.  Are any of them related to
11  repetitive stress injuries?
12  A.  They are not.
13  Q.  Is it your understanding that
14  you've been retained as an expert by Mr. Joyce
15  in this case?
16  A.  I don't believe that I have been.
17  I believe I've been retained as a witness of
18  fact for the services I provided for
19  Mr. Crowther.
20  Q.  Okay.  So were you paid for your
21  narrative report?
22  A.  I believe that I was, yes.
23  Q.  Have you served as an expert
24  witness in the past?

1    A.   I have not.
2    Q.   Have you testified in court before?
3    A.   No.
4    Q.   But you said you've given prior
5  depositions?
6    A.   Yes.
7    Q.   What were those in connection
8  with?
9    A.   Care rendered to patients.
10   Q.   On a fact witness basis?
11   A.   Yes.
12   Q.   Were they personal injury cases, or
13 medical malpractice cases, if you know?
14   A.   Personal injury cases.
15   Q.   Okay.  Do you have any connection
16 to the railroad industry?
17   A.   I do not.
18   Q.   And referring back your report or
19 your narrative report, does your narrative
20 report contain all of your opinions with regard
21 to Mr. Crowther's condition?
22   A.   It contains my opinion regarding
23 the injury that I treated him for regarding his
24 left elbow.

Page 10

1    Q.   Okay.  And what did you review to
2  prepare your report?
3    A.   Mr. Crowther's office notes from
4  New England Orthopedics, his x-rays, his CT
5  scan, and my operative reports from his
6  subsequent surgery.
7    Q.   When you say his New England
8  Orthopedic Surgeons, is that correct?
9    A.   Correct, Surgeons.
10   Q.   Office notes, those are his entire
11 record from the office, including the other
12 treating physicians?
13   A.   I reviewed the records regarding
14 his left elbow.  He was originally seen by
15 Dr. Wenner, subsequently, I believe, by
16 Dr. Adler, and then referred on to myself for
17 final treatment of his left elbow.
18   Q.   So the records related to the left
19 elbow, but not necessarily the records related
20 to his other conditions?
21   A.   I am aware of his other surgeries
22 and services provided here, but I did not study
23 them.
24   Q.   Okay.  Did you review any documents

Page 11

1  related to Mr. Crowther's job duties at the
2  railroad?
3    A.   I did.
4    Q.   What documents did you review?
5    A.   I had a listing of the job
6  description that he provided for or while on the
7  job at the railroad.
8    Q.   Do you have a copy of that?
9    A.   I don't currently in my possession.
10        MR. JOYCE:  I do.  Do you want what
11 I sent to him, Heather?
12        MS. GAMACHE:  Yes, that would be
13 great.
14        MR. JOYCE:  I sent two.  I sent him
15 the actual trackman.
16        MS. GAMACHE:  Yeah, I'm going to
17 mark them as exhibits.  We can mark them
18 as Exhibit 5.
19
20        (Exhibit 5, CSX Job Description,
21        2 pgs., Marked.)
22
23   Q.   (By Ms. Gamache)  Take a look at
24 those, and let me know if those are the

Page 12

1  documents you reviewed.
2    A.   (Doctor looks over documents.)
3  Yes, these are what I reviewed when preparing
4  his narrative report.
5    Q.   Do you mind if I take a look at
6  them real quick.
7        Other than the medical records from
8  your office, the entire NEOS office, did you
9  review any outside medical records?
10   A.   No.
11   Q.   And other than the two documents
12 provided to you by Mr. Joyce, the CSX Position
13 Information document, did you review any other
14 documents related to Mr. Crowther's job duties?
15   A.   No.
16   Q.   Did you have any conversations with
17 Mr. Crowther regarding his job duties?
18   A.   Not that I recall.
19   Q.   So you don't recall discussing his
20 job with him while you were treating him?
21   A.   We did in terms of his abilities to
22 return to work after the fact.  I don't recall
23 any specific other descriptions or conversations
24 regarding his job duties, and how they would

Page 13

4 (Pages 10 to 13)

**Page 14**

1  pertain to his left elbow.
2  Q.  When you say after the fact, are
3  you referring to after the surgery, his left
4  elbow surgery?
5  A.  No.  When we first treated him,
6  when I first treated him in 2007, we did
7  describe how his left elbow pain was associated
8  with, or at least brought upon by his working,
9  i.e., when he worked, he would have elbow pain.
10 And after his elbow surgery, we did discuss how
11 it might impact his ability to return to work.
12 Q.  Okay.  And so am I correct that you
13 don't recall having any conversations with him
14 regarding tools that he used, or the way in
15 which he held the tools, or anything of that
16 nature?
17 A.  I don't recall.
18 Q.  Okay.  Did you rely on any
19 literature in reaching your opinion that's in
20 the narrative report?
21 A.  In my -- the literature I reviewed
22 for my general education and how I provide
23 orthopedic services, but not specifically an
24 article directly related to Mr. Crowther's

**Page 15**

1  elbow.
2  Q.  Thank you.  I just want to refer to
3  your report a minute.  I'm going to ask you some
4  specific questions about your opinion.
5      On the second page, the first or
6  second paragraph, you say you have had the
7  opportunity to review the work requirements of
8  Mr. Crowther's job at CSX.  "I believe that
9  Mr. Crowther's repetitive use of his left upper
10 extremity, including lifting, carrying,
11 hammering, etc., is in fact a direct cause if
12 not an exacerbating feature of the development
13 of left elbow degenerative osteoarthropathy."
14 Did I say that correctly?
15 A.  Yes.
16 Q.  If you want to take a look at these
17 again, what specifically are you referring to
18 when you say work requirements?  I mean, you
19 have etc. on there, so lifting, carrying,
20 hammering, etc.  What would be the etc.?
21 A.  Well, I mean, the description of
22 his job that includes drilling holes through
23 rails, inserting and tightening loose bolts.
24 There's also a description of manual labor.

**Page 16**

1  There was a description of swinging a hammer,
2  using tie bars.  I'm not sure where I remember
3  that from.  If I can just review this.
4  Q.  Sure.  Take a moment.
5  A.  (Doctor looks over document.)
6  I mean, it's repetitive use of his left upper
7  extremity often with very heavy loads, and
8  again, the repetitive nature, that's the most
9  important.
10 Q.  The repetitive nature of using any
11 specific tool or?
12 A.  Any specific tool can lead to
13 degenerative change, but it's the heavy
14 unloading, loading, track materials, cutting
15 rails, aligning tie plates, repairing and
16 adjusting track switches, you know, cutting the
17 brush from the vegetation for the right of way.
18 I mean, all that involves repetitive, and my
19 understanding, heavy work, manual labor.
20 Q.  And further down in the same
21 paragraph, you say -- you indicate, "To a
22 reasonable degree of medical certainty, I
23 believe that Mr. Crowther's work habits as
24 described to me, and available from description

**Page 17**

1  by CSX Industries, would in fact increase the
2  likelihood that Mr. Crowther would develop
3  degenerative osteoarthropathy of his left elbow
4  and result in mechanical symptoms associated
5  with loose bodies."
6      When you refer to work habits, what
7  are you referring to, that is different from his
8  work requirements?  How is habit different than
9  requirement?
10 A.  I don't believe that they are.
11 Different choice of words.
12 Q.  So you're using habit and
13 requirement synonymously?
14 A.  Yes.
15 Q.  Okay.  And you testified earlier
16 that you did not speak, or you don't recall a
17 specific conversation with Mr. Crowther
18 regarding work habits?
19 A.  I don't recall a specific
20 conversation, no.
21 Q.  Okay.  So in preparing your
22 narrative, you didn't speak to Mr. Crowther
23 beforehand in preparation to prepare the
24 narrative?

### Page 18

1  A.  No.
2  Q.  Is it your opinion that
3  Mr. Crowther's work, his normal every day work
4  on the railroad could cause or contribute to the
5  degenerative changes that he was suffering from
6  in his left elbow?
7  A.  It is.
8  Q.  You have not given an opinion, am I
9  correct, whether or not anything separate and
10  aside from those daily work habits -- I'm sorry,
11  let me rephrase that.
12      Would you agree that any activity
13  could, any repetitive activity at work could
14  cause the degenerative condition that he was
15  suffering from?
16  A.  I think any repetitive work could
17  increase the likelihood of developing arthritis,
18  yes.
19  Q.  So you have not provided an opinion
20  regarding whether there was something -- whether
21  the position, he was holding something, or the
22  specific work that he was doing, whether there
23  was anything wrong with it, just simply that he
24  was doing it?

### Page 19

1  A.  Correct.
2  Q.  So you have not given an opinion
3  regarding whether CSX could have done something
4  differently to prevent Mr. Crowther from
5  developing a degenerative condition?
6      MR. JOYCE:  Dr. Luber is not our
7  liability expert, he's simply a medical
8  causation expert, so we're not offering an
9  unsafe work place, if that's what you
10  mean.
11      MS. GAMACHE:  I understand.  I'm
12  just confirming that he's not providing an
13  opinion, he's simply saying the repetitive
14  activity at work caused or at least
15  contributed to the degenerative changes.
16      MR. JOYCE:  Okay.
17      MS. GAMACHE:  Is that correct?
18      THE WITNESS:  Correct.
19  Q.  (By Ms. Gamache)  Would you agree
20  that there are other activities can cause
21  degenerative changes in the elbow?
22  A.  Yes.
23  Q.  What types of activities can cause
24  degenerative changes?

### Page 20

1  A.  Overhead throwing for many years is
2  a prime cause of degenerative change.  Frankly,
3  any repetitive use of a limb can lead to
4  degenerative arthritis.
5  Q.  Is age a factor?
6  A.  Age is not the sole cause of
7  degenerative change, but as we age, the
8  likelihood of seeing arthritis increases.
9  Q.  Okay.  Genetics, is that ever a
10  factor?
11  A.  It appears to be.  Not yet proven.
12  Q.  You've also given an opinion that
13  Mr. Crowther's employment or employment
14  activities exacerbated his degenerative changes.
15  What do you mean by exacerbated?
16  A.  I mean, likely led to an
17  acceleration of degenerative arthritis
18  developing.
19  Q.  Is it your opinion that
20  Mr. Crowther's condition would have developed
21  more quickly if he continued to work beyond the
22  date that he stopped working?
23  A.  If he were continuing to engage in
24  repetitive behaviors as described in the CSX

### Page 21

1  documents I reviewed, I would have expected his
2  arthritis to have increased after the period of
3  time he stopped working.
4  Q.  Would you agree that any activity
5  can exacerbate degenerative changes, any
6  repetitive activity with your arm?
7  A.  Any repetitive activity,
8  particularly heavy activity, can increase and
9  accelerate it, yes.
10  Q.  But any activity, it doesn't
11  necessarily have to be heavy?
12  A.  While not statistically proven,
13  there does appear to be an increased rate of the
14  development of arthritis in heavier activity as
15  opposed to lighter activities done repetitively,
16  such as clerical work.
17  Q.  What about activities that are not
18  related to work, such as leisure activities?
19  A.  As I mentioned, yes, baseball
20  players seem to have an increased risk of
21  degenerative elbow conditions.
22  Q.  Would activities such as swimming
23  increase the chance of degenerative -- or
24  exacerbate degenerative changes in the elbow?

6 (Pages 18 to 21)

```
 1    A.    I have not seen that personally or
 2  described in the literature.
 3    Q.    How about fly fishing?
 4    A.    Fly fishing is in some degree
 5  repetitive with casting.  It would depend upon
 6  which arm, I guess, you casted with.
 7    Q.    And I'm not sure if it's in your
 8  record -- it's probably somewhere in your
 9  records that Mr. Crowther is right hand
10  dominant, correct?
11    A.    I'd have to review my records.  If
12  that is accurate, I don't know that.
13    Q.    I can represent to you that he's
14  right hand dominant.
15    A.    Fine.
16    Q.    And this injury was his left
17  elbow, correct?
18    A.    Correct.
19    Q.    Is there -- do you have any
20  objective scientific evidence that
21  Mr. Crowther's work activities were exacerbated
22  by -- oh, I'm sorry, Mr. Crowther's elbow
23  disease process was exacerbated by his work
24  activities?
                                        Page 22
```

```
 1        MR. JOYCE:  Objection.  You can
 2    answer.
 3        THE WITNESS:  Not necessarily,
 4    because those are tendonopathies, which
 5    are different from mechanical locking
 6    episodes associated with arthritis, which
 7    is what I treated him for.
 8    Q.    (By Ms. Gamache)  Is it possible
 9  that he was experiencing degenerative changes in
10  2002 and suffering pain from them at the same
11  time he was presenting -- I mean, he was
12  presenting for pain in 2002, and ultimately
13  diagnosed with the conditions I just spoke
14  about.  Is it possible that he was also
15  suffering from degenerative changes in 2002?
16        MR. JOYCE:  Objection.
17        THE WITNESS:  It is possible, but I
18    did not treat him for it, nor did I exam
19    him, so I can't speak to accuracy of the
20    physician who made that diagnosis in 2002.
21    Q.    (By Ms. Gamache)  Okay.  Is medial
22  epicondylitis in any way indicative of
23  degenerative changes?
24    A.    No.
                                        Page 24
```

```
 1    A.    No.
 2    Q.    Do you have an opinion regarding
 3  when Mr. Crowther became symptomatic, when his
 4  left elbow became symptomatic?
 5    A.    He first complaint of it to
 6  Dr. Wenner, who was treating him for or seeing
 7  him for his hand, I believe in 2006 or 2007.
 8  He was referred to me in 2007.  That was the
 9  first knowledge I had of his complaints.
10    Q.    In general, in your opinion, when
11  does a patient become symptomatic?
12    A.    Well, I mean, I would relate being
13  symptomatic to having enough complaints to seek
14  out medical care for.
15    Q.    Were you aware of Mr. Crowther
16  seeking out medical attention prior to 2006?
17    A.    I am not.
18    Q.    If I represent to you that
19  Mr. Crowther sought medical attention in 2002
20  for elbow pain, and was diagnosed with bilateral
21  medial epicondylitis, as well as tennis elbow
22  and cubital tunnel, would that change when you
23  believe he became symptomatic for the disease
24  process in his left elbow?
                                        Page 23
```

```
 1    Q.    Is Cubital Tunnel Syndrome in any
 2  way indicative of degenerative changes?
 3    A.    Not necessarily.
 4    Q.    In what way would it be indicative
 5  of degenerative changes?
 6    A.    There is a condition called Tardy
 7  Ulnar Nerve Palsy, which is Cubital Tunnel
 8  Syndrome, which develops years after a
 9  fracture.  It usually is associated with
10  significant loss of motion.  But those are
11  different than Mr. Crowther's elbow, which had
12  range of motion with mechanical locking
13  episodes, so different disease process.
14    Q.    Have you treated other railroad
15  workers with a similar condition?
16    A.    I have not.
17    Q.    Is the degenerative condition that
18  Mr. Crowther suffers from in his left elbow, is
19  that a common condition?
20    A.    Elbow arthritis is relatively
21  uncommon.
22    Q.    Do you treat other railroad
23  workers, in general?
24    A.    I have seen other railroad
                                        Page 25
```

```
 1  workers. I don't have a large percentage of
 2  them in my practice.
 3      Q.   The ones that you have seen, do you
 4  know whether they have the same position or type
 5  of position that Mr. Crowther had?
 6      A.   I do not know that for a fact.
 7      Q.   Okay. Is there any way to
 8  determine the actual cause of the degenerative
 9  condition?
10      A.   No, not to my knowledge. Could I
11  rephrase that?
12      Q.   Sure.
13      A.   It is more likely that you will
14  develop degenerative change after an
15  intra-articular fracture. So if we have a
16  fracture in the knee, it's more likely to
17  develop degenerative change later, but it's a
18  different condition, so.
19      Q.   Are you aware of Mr. Crowther
20  suffering from any intra-articular fracture in
21  any way?
22      A.   Not that I'm aware of.
23      Q.   So to diagnose a degenerative
24  condition, you would assess symptoms, and then
                                              Page 26
```

```
 1  conduct tests, and make a diagnosis; is that
 2  generally --
 3      A.   Yes.
 4      Q.   I'm going to refer to a couple
 5  medical records, they're probably in your
 6  notes. You indicated that you first saw
 7  Mr. Crowther -- or actually, I'm not sure if we
 8  covered exactly when you saw him. You said in
 9  2007, if I'm correct. Do you recall that being
10  when you initially saw Mr. Crowther?
11      A.   I believe that was the first
12  referral to me. I actually do not have that
13  office note in front of me.
14      Q.   Okay. I can give you one.
15          MR. JOYCE: This is February 26th,
16      2007?
17          MS. GAMACHE: Yes. You can ignore
18      my highlighting.
19      Q.   (By Ms. Gamache) Take a moment
20  and look at the note.
21      A.   Thank you.
22      Q.   That's not included in the packet
23  you have?
24      A.   It's not included in the packet
                                              Page 27
```

```
 1  that I have in front of me.
 2          MS. GAMACHE: Then we'll that as an
 3      exhibit, as well.
 4
 5          (Exhibit 6, Office Note, 2/26/07,
 6          Marked.)
 7
 8      Q.   (By Ms. Gamache) Now, referring
 9  back to what was marked as Exhibit 6, is that
10  your office note dated February 26th, 2007?
11      A.   It is.
12      Q.   In your office note, it indicates
13  in the first paragraph, "Since he has been
14  relatively inactive, his left elbow has become
15  relatively asymptomatic for him;" is that
16  correct?
17      A.   Yes.
18      Q.   So at the time you saw him -- at
19  the time that you saw Mr. Crowther, was he --
20  what were his symptoms, if you've written
21  relatively asymptomatic?
22      A.   He was really having little or no
23  symptoms, because, again, recent surgery with
24  Dr. Cowan and separately with Dr. Wenner, he
                                              Page 28
```

```
 1  hadn't been using his arm very much.
 2      Q.   And that, based on the records, was
 3  the first time that you saw --
 4      A.   That was the first time I was asked
 5  to see him, yes.
 6      Q.   Okay. Do you recall, at any point
 7  after seeing Mr. Crowther for the first time on
 8  February 26th, 2007, his condition worsening,
 9  his left elbow condition?
10      A.   Not until he returned to me in, I
11  believe it was 2009, when he was experiencing
12  more mechanical episodes in his left elbow.
13      Q.   Would you consider that to be an
14  aggravation or exacerbation of his condition
15  from when you saw him on February 26th, 2007?
16      A.   Yes. As I outlined in that
17  original note, the reason to do surgery would be
18  based upon whether or not he was having
19  mechanical locking episodes.
20      Q.   I'm going to refer you to a note
21  dated March 19th, 2007.
22      A.   I don't have that, as well.
23      Q.   Okay. That's fine.
24      A.   (Doctor looks over document.)
                                              Page 29
```

**Page 30**

1  MS. GAMACHE: That will be
2  Exhibit 7.
3
4  (Exhibit 7, Office Note, 3/19/07,
5  Marked.)
6
7  Q. (By Ms. Gamache) And again, in
8  this note, March 19th, 2007, you indicate,
9  "Today, he has relatively few symptoms because,
10 again, his work habits have changed," correct?
11 A. Yes.
12 Q. Would you agree that similar to
13 February 26, 2007, at the time you saw him on
14 March 19th, 2007, he was asymptomatic?
15 A. Yes. The main reason for his visit
16 was to follow-up on his CT scan that I had
17 ordered. Could I clarify an error I see in my
18 note?
19 Q. Sure.
20 A. In the "Impression," I list left
21 knee loose bodies, and left knee capitellar, and
22 that should be elbow.
23 Q. Okay. I was going to ask you that,
24 actually. Thank you.

**Page 31**

1  MR. JOYCE: You didn't treat him
2  for his left knee, right, Doctor?
3  THE WITNESS: I did not. That was
4  an error.
5  Q. (By Ms. Gamache) And now I'm going
6  to refer you to a note dated January 19th, 2009,
7  which I believe, based on the records, is the
8  next visit you had with Mr. Crowther, which is
9  22 months later.
10 A. Yes. And again, I said knee, it is
11 elbow. I apologize for that.
12 Q. Okay. In both places? It's also
13 in the second paragraph?
14 A. Yes. It is always his elbow.
15 Q. So if, in the records, it says
16 Dr. Luber and relates to the knee, is it safe to
17 presume that you're referring to the elbow?
18 A. I am sorry to admit this, that it
19 is safe to assume that I spoke in error.
20 Q. In this record, you indicate, "He
21 has been having ongoing mechanical symptoms and
22 discomfort as he is recovering from bilateral
23 total -- which says knee, but should be elbow --
24 A. No, I'm sorry. So he has recently

**Page 32**

1  had bilateral total knee arthroplasty with
2  Dr. Laymen. I never treated him for his knee.
3  Q. Okay. Although that's in one
4  sentence, when you say he has been having
5  ongoing mechanical symptoms and discomfort, are
6  you referring, then, to his knee or his elbow?
7  A. To his elbow.
8  Q. And I believe you testified earlier
9  that that would be -- that based on the times
10 you saw him in February of 2007 and March of
11 2007, that in January of 2009, he is no longer
12 asymptomatic, and is now --
13 A. Having symptoms.
14 Q. -- having symptoms?
15 A. That has brought him back to seek
16 care, yes.
17 Q. And I believe you testified that
18 that was an aggravation of his condition?
19 A. At least his symptoms were enough
20 that he cycled back to seek care again regarding
21 his left elbow.
22 Q. If I represent to you that
23 Mr. Crowther did not work at all between when
24 you saw saw him in 2007 to 2009, is it safe to

**Page 33**

1  state that conditions, other than his work, were
2  aggravating his condition?
3  MR. JOYCE: Objection.
4  THE WITNESS: I'm answering?
5  MR. JOYCE: Yes.
6  THE WITNESS: Other things may have
7  exacerbated his elbow at that time, yes.
8  Q. (By Ms. Gamache) I'm going to
9  refer you back to the February 26th, 2007
10 record.
11 A. Yes.
12 Q. That was the first day that you
13 that treated Mr. Crowther. On that date, based
14 on the elbow -- based on the condition of the
15 elbow, would you have considered him unable to
16 work, simply referring to the elbow condition,
17 not any other condition he was suffering from?
18 A. That question wasn't posed to me at
19 that time. I would have assumed that he could
20 be able to work, given the way his elbow
21 appeared on that date.
22 Q. Okay. And based on his condition
23 on that date, would you have considered him able
24 to work at full capacity?

9 (Pages 30 to 33)

**Page 34**

   A.   Well, that's difficult to determine, because I don't know how symptomatic he would have been were he working at full capacity; meaning, that in an inactive state, he was not complaining of elbow pain, but if he were at work full duty, would his elbow have been worse?  I don't have that answer.

   Q.   At any point, when you were treating Mr. Crowther, did you give him an opinion regarding whether or not he could work based on the condition of his elbow?

   A.   I don't recall doing so.  I don't know if there are records to indicate a work note regarding his left elbow during my course of treatment with him.

   Q.   Okay.  I'm going to refer to, again, back to the February 26th, 2007 record. On the second sentence, it states, "He has had complaints of left elbow pain and some mechanical symptoms for the past several years." Would Mr. Crowther have provided that information to you?

   A.   That would be the likely source of that, if it's in that section of the note, which

**Page 35**

is related to what the patient tells me upon arrival

   Q.   Okay.  And that's information that you take down, or someone else takes down?

   A.   That I take down.

   Q.   Okay.  And when you say past several years, is that more than one year?

   A.   It is certainly non-specific, but it would be more than one year.

   Q.   Is it more than two years?

   A.   I don't know.  Several would usually mean more than two.

      MS. GAMACHE:  Okay.  I'm going to take a minute and review any notes, Tom.

      MR. JOYCE:  Sure.

   Q.   (By Ms. Gamache)  Going back to when you prepared your narrative report, you indicated that you referred to what's been marked as Exhibit 5, which were job descriptions.  Did you assess any activity versus rest period, as far as manual labor, and how Mr. Crowther's job duties would have caused or contributed to his degenerative condition?

   A.   No.

**Page 36**

   Q.   So you didn't speak to him or assess any percentage, if he's doing manual work, this percentage of time versus resting it percentage of the time?

   A.   I did not.

   Q.   Have you ever visited a job site where individuals doing what Mr. Crowther did in his work duties were doing?

   A.   No.

   Q.   Also looking at your report, on the second page, in the second to last paragraph, you indicate, "At this time, I believe that to a reasonable degree of medical certainty that Mr. Crowther's left elbow injury was exacerbated and aggravated, and at least partially caused by his work history at CSX Transportation."

      What other causes, in your opinion -- or I'm sorry, what else, other than his work, caused his degenerative condition?

   A.   Without certain knowledge, but there is a suggestion in his original CT scan that he might have had an old osteochondritis dissecans lesion on his capitellum.

   Q.   And can you tell, based -- I'm

**Page 37**

sorry, you said it was a CT scan, correct?

   A.   Correct.

   Q.   Based on the CT scan, is it possible to determine how long it had been there?

   A.   No, but they generally develop in adolescence.

   Q.   And what is it, if you can say it again?

   A.   Osteochondritis Dissecans.

   Q.   OCD is how it is commonly referred to?

   A.   Correct.

   Q.   And what is OCD?

   A.   It is a poorly understood injury to the blood supply of a growth plate that leads to a disruption of that blood supply, and then a resulting injury to the underlying bone that supports the cartilage.

   Q.   I'm going to refer you to the CT of the left elbow dated March 8th, 2007.

      MS. GAMACHE:  We can mark that as exhibit --

      THE WITNESS:  It's in my file.

**Page 38**

1   MS. GAMACHE: Oh, it's in your
2   file. We don't need to mark it as an
3   exhibit, then.
4   Q. (By Ms. Gamache) And the OCD that
5   you're referring to was visible on the CT scan,
6   correct?
7   A. Correct.
8   Q. Okay.
9   A. Well, it can't be confirmed to be
10  an OCD lesion, but that is the most likely
11  diagnosis that would be associated with the
12  radiographic abnormalities seen on the CT scan.
13  Q. And it's possible that the OCD
14  caused Mr. Crowther's degenerative condition?
15  MR. JOYCE: Objection.
16  THE WITNESS: It is possible that
17  the OCD lesion was a contributing factor
18  to his development of arthritis.
19  Q. (By Ms. Gamache) Is there any way
20  to determine whether one contributing factor,
21  whether it's the OCD or Mr. Crowther's job
22  duties, caused or contributed more to the
23  development of his degenerative condition?
24  MR. JOYCE: Objection.

**Page 39**

1   THE WITNESS: I don't believe
2   that's possible.
3   Q. (By Ms. Gamache) I'm going to
4   refer you again to the CT scan. What, in
5   addition to OCD, did the CT scan reveal?
6   A. Again, degenerative spurring, and
7   multiple intra-articular loose bodies.
8   Q. If you don't mind, explain briefly
9   what spurring is.
10  A. In any joint that is undergoing
11  osteoarthritic change, and therefore, the loss
12  of cartilage on the end of the joint surfaces,
13  the most common response in the body is to make
14  osteophytes or bone spurs at the margins or
15  edges of those joints. In the elbow, those bone
16  spurs often cause limited range of motion.
17  Q. And then loose bodies?
18  A. Loose bodies are found in a joint
19  for various reasons, but most commonly during
20  the development of degenerative arthritis,
21  pieces of cartilage are damaged or flaked off or
22  loosened, and they grow over time, much like a
23  pearl does, and get larger.
24  Q. So this type of arthritic

**Page 40**

1   condition, it develops over time?
2   A. Correct.
3   Q. Is there any way to determine,
4   based on the CT or any other type of test, how
5   long those loose bodies or spurs were present in
6   Mr. Crowther's elbow?
7   A. No, other than following serial
8   radiographs.
9   Q. Did you have any other scans, other
10  than this one, which was taken on March 8th,
11  2007?
12  A. No. Dr. Wenner, I believe,
13  obtained the original elbow x-rays, which led to
14  his referral the year before that, or at some
15  point prior to that 2007 CT scan.
16  Q. And would the x-ray provide the
17  same information that the CT scan would?
18  A. Yes, but in less detail.
19  Q. Other than the OCD, are there any
20  other factors which could have caused or
21  contributed to Mr. Crowther's degenerative
22  condition?
23  A. I don't understand the question.
24  Q. In your opinion, you've opined in

**Page 41**

1   your narrative report that Mr. Crowther's work
2   activities contributed or caused his
3   degenerative condition, and you've also just
4   testified that the OCD could have caused or
5   contributed to his condition in his left elbow.
6   Is it your opinion that any -- that
7   there is another potential cause of the
8   condition in his elbow?
9   A. I believe that his osteochondritis
10  dissecans was a contributing factor that was
11  exacerbated by the repetitive use of his arm,
12  inactivities, particularly the work activities
13  that I was provided with.
14  Q. Could Mr. Crowther have developed
15  this type of degenerative condition without
16  having performed manual labor?
17  A. Possibly.
18  Q. Is there any way to determine --
19  strike that.
20  Is it possible for the OCD lesion
21  to have caused Mr. Crowther pain over the course
22  of its development?
23  A. They are often asymptomatic, and
24  they're only brought to our attention

11 (Pages 38 to 41)

```
 1  theoretically years after they've develop, but
 2  they do occasionally cause symptoms early on in
 3  their development.
 4      Q.   And what type of symptoms would
 5  show up?
 6      A.   They can cause pain, they can cause
 7  swelling.  If they are generating loose pieces,
 8  they can cause mechanical locking episodes.
 9      Q.   So the OCD could also have caused
10  the loose bodies?
11           MR. JOYCE:  Objection.
12           THE WITNESS:  It's possible.
13      Q.   (By Ms. Gamache)  Could the OCD
14  lesion have caused the spurring?
15      A.   Again, an OCD lesion is an injury
16  to the bone and cartilage.  The end result of
17  that can be arthritis, and the spurs develop in
18  response to that arthritis.
19      Q.   And am I correct that there's no
20  way to determine whether the OCD or
21  Mr. Crowther's job duties actually caused his
22  degenerative condition?
23           MR. JOYCE:  Objection.
24           THE WITNESS:  There's no way to say
                                           Page 42
```

```
 1      Q.   Okay.  He could return to the job
 2  duties that he was performing prior to the
 3  surgery, or prior to stopping work?
 4      A.   That's what I would have attempted.
 5  Now, after returning to that job, would he have
 6  had symptoms enough to come back and have new
 7  complaints, I don't know the answer to that, but
 8  I would have tried to return him to his previous
 9  job.
10      Q.   Okay.  So in your opinion,
11  Mr. Crowther's surgery was successful?
12      A.   I believe so.
13      Q.   Have you treated Mr. Crowther since
14  then?
15      A.   I have.
16      Q.   For his elbow?
17      A.   No.
18      Q.   Okay.  Do you know if Mr. Crowther
19  has sought any treatment for his elbow following
20  your surgery?
21      A.   I don't know the answer.  He has
22  never asked me about it, or complained to me
23  about his elbow.
24      Q.   Okay.  Referring again to your
                                           Page 44
```

```
 1  for absolute certainty.
 2      Q.   (By Ms. Gamache)  And given that
 3  Mr. Crowther had an OCD lesion, or an OCD lesion
 4  was on the CT scan, it's possible that
 5  Mr. Crowther could have developed this
 6  degenerative condition having never done any
 7  manual labor; is that correct?
 8      A.   He could have.  It appears that
 9  these types of injuries are made worse or
10  accelerated by repetitive use.
11      Q.   But he could have developed the
12  arthritic condition in his elbow having not done
13  the job duties that he did with the railroad?
14      A.   It is possible.
15      Q.   Okay.  In your opinion, based
16  simply on Mr. Crowther's elbow condition, could
17  he have returned to work after the surgery in
18  2009?
19      A.   In large, it could have been
20  dependent upon what type of job he was returning
21  to.  Based upon his outcome from the surgery,
22  and those job descriptions, I believe he could
23  have returned to work based upon his elbow
24  alone.
                                           Page 43
```

```
 1  record dated January 19th, 2009.
 2      A.   Yes.
 3      Q.   In the "Impression" section of that
 4  note, you indicate, "We discussed whether or not
 5  we could manage his symptoms with an
 6  intra-articular injection, which may be
 7  temporary, but might be helpful."
 8      A.   Yes.
 9      Q.   In your opinion, could he have
10  obtained the same results having not undergone
11  surgery?
12      A.   No.
13      Q.   What results may he have obtained
14  without undergoing surgery?
15      A.   Well, asociated with his arthritis,
16  there's often swelling and discomfort, and an
17  intra-articular injection can temporarily
18  relieve those symptoms.  It would not have
19  eliminated any mechanical symptoms associated
20  with the loose bodies, or eliminated those to
21  remove them.
22      Q.   And if you can, is it your
23  understanding that the mechanical symptoms or
24  the discomfort, if one or the other was more the
                                           Page 45
```

12 (Pages 42 to 45)

```
 1  issue for Mr. Crowther?
 2      A.  I believe that the mechanical
 3  symptoms were the bigger complaint for him.
 4      Q.  And the mechanical symptoms were a
 5  result of the loose bodies?
 6      A.  Yes.
 7      Q.  And the loose bodies, is that also
 8  a degenerative condition?
 9      A.  Loose bodies are not always present
10  in degenerative arthritis, but they are often a
11  component of it, yes.
12      Q.  Is it possible to have loose
13  bodies and not have a degenerative condition?
14      A.  Theoretically, I don't know whether
15  I've ever seen one without the other.
16      Q.  And other than non-use, is there
17  any way to prevent degenerative conditions?
18      A.  No.
19      Q.  So it's possible that anyone can
20  develop a degenerative condition in their elbow?
21      A.  It is possible.  Again, elbow
22  arthritis is relatively uncommon.
23          MS. GAMACHE:  I think that's all I
24  have.
                                          Page 46
```

```
 1          MR. JOYCE:  That's it, Dr. Luber,
 2  you're all done.
 3          MS. GAMACHE:  Thank you,
 4  Dr. Luber.
 5
 6  (Deposition concluded at 6:25 p.m.)
 7
 ...
24
                                          Page 47
```

```
 1  CERTIFICATE OF COURT REPORTER
 2      I, Michele L. Mariani, Certified Shorthand
 3  Reporter, do certify that the deposition of
 4  DR. MARTIN J. LUBER, in the matter of CROWTHER
 5  V. CSX TRANSPORTATION, ET AL., on the 24th day
 6  of May, 2010, was stenographically recorded by
 7  me; that the witness provided satisfactory
 8  evidence of identification, as prescribed by
 9  Executive Order 455 (03-13) issued by the
10  Governor of the Commonwealth of Massachusetts,
11  before being sworn by me, a Notary Public in and
12  for the Commonwealth of Massachusetts; that the
13  transcript produced by me is a true and accurate
14  record of the proceedings to the best of my
15  ability; that I am neither counsel for, related
16  to, nor employed by any of the parties to the
17  above action; and further, that I am not a
18  relative or employee of any attorney or counsel
19  employed by the parties thereto, nor financially
20  or otherwise interested in the outcome of the
21  action.
22
23  MAY 26, 2010 _____
24          Michele L. Mariani, CSR
                                          Page 48
```