IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GEOFFREY CROWTHER | : | Civil Action No. 09-10334-MAP and |
| | : | 09-11467-MAP |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| CSX TRANSPORTATION, INC. | : | <u>ORAL ARGUMENT REQUESTED</u> |
| and | : | |
| CONSOLIDATED RAIL CORP. | : | |
| | : | |
| Defendants | : | |

<u>PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO
PRECLUDE STEVEN M. WENNER, M.D.</u>

COMES NOW the Plaintiff, Geoffrey Crowther, by and through his attorneys, Thomas J. Joyce, III, and Michael J. McDevitt, and hereby responds in Opposition to Defendants' Motion in Limine to Preclude Steven M. Wenner, M.D. (Document 59), as follows:

I. <u>INTRODUCTION</u>:

This is an occupational injury action brought pursuant to an Act of Congress known as the Federal Employers' Liability Act (FELA), 45 U.S.C. Section 51, et seq. Plaintiff, Geoffrey Crowther, claims occupational neck, bilateral knee, left elbow, and left thumb injuries, which were caused and/or contributed to and/or aggravated, worsened and exacerbated, in whole or in part, by exposure to occupational risk factors for cumulative-trauma injuries, including repetition, force, vibration and/or awkward postures, in his employment as a track laborer, track welder, track foreman, and track inspector (trackman) with Defendants, CSX Transportation, Inc. (CSX) and Consolidated Rail Corp. (Conrail).

Defendants have filed a Motion in Limine to Preclude Steven M. Wenner, M.D., arguing that there is allegedly no basis for his opinions with regard to the medical causation of his own patient's injuries which he treated. For the reasons stated herein, Defendants' Motion in Limine to Preclude Steven M. Wenner, M.D. should be denied.

II.   FACTS:

Plaintiff, Geoffrey Crowther, is presently age 59. Geoffrey Crowther worked as a track laborer, track welder, track foreman, and track inspector (trackman) for the railroad from 1975 through December 2006, when he became disabled (at age 55). As a trackman, Geoffrey Crowther's work tasks required an extreme amount of heavy repetitive work, utilizing certain track tools and equipment such as torches, electric and gas welding equipment, grinders, chipping guns, track chisels, sledge hammers, claw bars, spiking mauls, needle guns, air impact hammers and saws. He was also required to lift and carry heavy objects, and was exposed to excessive and harmful vibration. Geoffrey Crowther's job duties further required prolonged use of his arms in awkward and extended positions, and working in poor ground conditions and walking on improper and poorly maintained ballast. Many times he was required to perform his tasks without adequate tools and equipment and/or adequate manpower.

On September 26, 2005, Geoffrey Crowther consulted Dr. Steven M. Wenner of New England Orthopedic Surgeons, with complaints of left thumb pain. X-rays of the left thumb demonstrated left thumb arthritis of the metacarpophalangeal joint. Despite conservative treatment for his left thumb injuries, Geoffrey Crowther eventually underwent left thumb arthrodesis metacarpal joint surgery, performed by Dr. Wenner on February 14, 2007. (Please see Medical Records of New England Orthopedic Surgeons, attached as Exhibit 1).

Geoffrey Crowther has disclosed his treating physician and surgeon, Steven M. Wenner, M.D., as Plaintiff's medical expert with regard to his left thumb injuries in this matter. Dr. Wenner is a highly qualified medical professional with expertise and knowledge as to orthopedic surgery who regularly treats patients with hand and thumb injuries including left thumb arthritis of the metacarpophalangeal joint. (Please see CV of Dr. Steven M. Wenner, attached as Exhibit 2). Dr. Wenner will be called to testify on behalf of Geoffrey Crowther as to the history, physical examinations, diagnostic tests, diagnosis, treatment, surgery, cause and prognosis of Plaintiff's left thumb injuries.

On or about November 11, 2008, Dr. Wenner authored a narrative medical report regarding his patient, Geoffrey Crowther. In his detailed narrative medical report, Dr. Wenner states, in pertinent part:

> I initially saw Mr. Crowther in the office on September 26, 2005. This man, aged in his middle 50s, is employed doing heavy work for the railroad company.
> …
> He understood that the alternatives for surgical treatment for the MP joint of the thumb were arthrodesis vs. arthroplasty, and since he still did quite a lot of heavy work with this hand, arthrodesis was the better choice.

(Please see Medical Reports of Dr. Wenner, attached as Exhibit 3).

On November 30, 2008, Dr. Wenner authored an addendum to his narrative medical report, which states, in pertinent part:

> On his job, Mr. Crowther performs heavy use of his hands as a railroad worker. He aggravated the arthritis of the metacarpophalangeal joint of his left thumb in using it for his work related duties.

(Please see Medical Reports of Dr. Wenner, attached as Exhibit 3).

On December 15, 2008, Dr. Steven M. Wenner was deposed by Defendants. Dr. Wenner testified in his discovery deposition, in pertinent part, as follows:

Q.  And do you have a specialty or - - well, can you give me a brief overview of your

        education background?

A.     Yes. I went to Yale College for my undergraduate degree. I graduated from Jefferson Medical College in Philadelphia in 1974. I trained for two years in general surgery, three years in orthopedic surgery, and one year in surgery of the hand. About ten or twelve years later, I limited myself only to surgery of the hand, and have continued to do that since that time.

Q.     And are you board certified?

A.     I am.

Q.     And is that in orthopedic surgery?

A.     It's in orthopedic surgery. And I have what's called a certificate of added qualifications in hand surgery.

Q.     And have you conducted any research or written any papers?

A.     I have.

…

Q.     And have you been an expert witness in the past, sir?

A.     I have.

Q.     And can you tell me the types of cases?

A.     All upper limb; elbow, wrist, hand.

Q.     And were those personal injuries?

A.     They were - - yes, I think so.

…

Q.     And have you ever testified in court?

A.     I have.

(Please see Deposition of Dr. Wenner, attached as Exhibit 4, at page 7-9).

        Dr. Steven Wenner further testified:

Q.     And it's my understanding that you basically, on the second page or, I'm sorry, on the third page of your November 11th letter / report - -

A. Yes.

Q. - - it indicates, with respect to your questions about whether or not his left thumb problem is attributable to a specific injury: I do not believe that it is; with respect to the question whether his left thumb arthritis is a result of what he does at work: I cannot state whether it is or it isn't. Basically, my understanding is that you don't have an opinion, within a reasonable degree of medical certainty, as to whether or not his job duties caused his left thumb arthritis, is that correct?

A. Caused as the primary event; you don't mean aggravated?

Q. No. I mean caused as a primary event.

A. I can't say for sure.

…

Q. And that addendum essentially is that -- well, let me ask you this: When you say that he aggravated the arthritis of the metacarpal phalangeal joint of his left thumb, what does that mean?

A. Made it biologically worse and made it more symptomatic. Both.

…

Q. And have you relied on any particular literature in coming to your opinion that there was a biological worsening?

A. Well, you know, if you're asking have I relied on a specific article that says that this -- if you do this -- then here's the outcome of it, no. If you're referring to am I familiar with literature that describes the natural biological processes and disease states, their typical evolution, what factors may aggravate them, contribute to their worsening, et cetera, there's a whole body of medical literature about that. You know, that's what we learn in school and in residencies.

…

Q. And were you aware of the type of job duties that Mr. Crowther was doing when he presented to you for the first time I think in September of 2005?

A. I was aware of them. And it was 2005.

…

Q. Okay. Do you know any specific jobs that he was doing at that time that - -

A. Well, I had it - - my understanding was that he was working on the railroad and repairing track; repairing, laying, et cetera, track.

Q. And is that the sum and substance of your knowledge of his job duties?

    A.       Well, that's the sum and substance of what it is now.  I've taken care of some number of railroad workers over the years, and I've listened to what they describe as that type of work, so I have a little bit of a sense of it.

    Q.       Okay.  How many - -

    A.       Jackhammers and sledgehammers and all that.

    Q.       Okay.  How many railroad workers do you think you've seen?

…

    A.       Half a dozen maybe.

    Q.       In what craft?

    A.       Track workers.

    Q.       And what problems did they present with?

    A.       They presented with a variety of complaints referable to their hands.

…

    Q.       And have you reviewed any information about his job, other than what he told you?

    A.       I don't think so.

(Please see Deposition of Dr. Wenner, attached as Exhibit 4, at page 12-20).

    Dr. Steven Wenner further testified:

    Q.       What are the risk factors for the development of arthritis in the metacarpal phalangeal joint of the left thumb?

    A.       Injury to the ligaments that stabilize the joint.  If you injure the ligaments, then there's a chance that you will make the joint mechanically unsound.  And it may become arthritic as a consequence of that.  A direct injury to the cartilage of that joint, such as might occur from -- the conventional term would be jamming it, but it's more severe than just a jamming injury, of course.  A fracture of that joint could make it become arthritic.  And it could be arthritic as a result of a disease state throughout the body, if you had an arthritic disease that was affecting multiple parts of the body.

    Q.       Okay.  How about just age?

A. Age contributes to it. But again, this tends not to be the joint of the thumb that's affected with arthritis just as a consequence of age.

…

Q. Have you ruled out each of these risk factors with regard to Mr. Crowther?

A. Well, he had some evidence of having had a chronic ligament injury to the thumb, so that's not ruled out; that's probably ruled in. That was the first one I gave you. I do not think that he had any evidence of having had a fracture of it. I imagine, in my own mind, that repetitive heavy use of it, using sledgehammers and jackhammers and, you know, carrying heavy railroad ties, all of which I imagined that he did for many years, using heavy tools, would probably result, like it does for most people who are doing heavy mechanical work, in a number of dings to the joints of their hands. Workers get that all the time, workers in a variety of pursuits. So when I say, "dings," I mean jamming-type injuries, but bad jamming injuries. And I don't think he had an arthritic disease throughout his entire body.

Q. Well, he is polyarthritic. You're aware of that?

A. Well, he's polyarthritic, but I don't think it's an inflammatory arthropathy.

…

Q. And would you agree, sir, that you're a treating physician; that means that you basically see patients, spend your days with patients and perform surgery, is that correct?

A. That's correct.

Q. And that you don't routinely examine workers to determine if their work caused a problem they might be having, would you agree?

A. I'm not sure I understood the question.

Q. That you don't routinely examine workers to determine if their work may have caused a particular problem they were having?

A. I'm not sure I would agree with that entirely. I examine people who are injured on the job, a variety of jobs, regularly. And I examine - - and I'm frequently asked the question: Did the particular job that they did cause or result in a problem that they have.

Q. And in your practice, do you ordinarily go out and review the job or get more information about jobs?

A. I never go out and review the job. And I frequently get written reports about what they do on their job.

…

Q. I'm sorry. Is it your normal practice to try to learn as much as you can about a job before you make an opinion within a reasonable degree of scientific certainty?

A. If what you mean by that is do I study reports about what somebody does in their jobs, I do it some of the time; I don't do it routinely.

(Please see Deposition of Dr. Wenner, attached as Exhibit 4, at page 21-26).

Dr. Steven Wenner further testified:

Q. And do you know what type of – I apologize. I think I already asked you that. Would you agree with me -- I think that you -- part of your opinion anyway – was that -- on the addendum anyway -- was that, in terms of this aggravation of the arthritis in his left thumb -- that would you agree that non-work-related hand activity would also aggravate the problem he was having in his left thumb?

A. Well, non-related-work -- non-related-work activity did you say?

Q. Non-related -- I'm sorry. Non-work-related.

A. Non-work-related. That's what you said. Non-work-related activity might make it hurt, but it's -- I believe -- would be much less likely to truly aggravate the underlying problem than heavy use of it. So if his non-work-related activity was doing heavy construction around his home, for example, then I would expect that would not only make it hurt, but also aggravate the basic problem. And if the non-work-related activity was jogging or reading or something like that, then I would expect that it would not aggravate the basic problem.

(Please see Deposition of Dr. Wenner, attached as Exhibit 4, at page 43-44).

Dr. Steven Wenner further testified:

Q. What was it specifically about his job that aggravated his thumb?

A. Well, the nature of gripping large heavy objects is you have to wrap your thumb around it. And so if you haven't -- and that joint, his arthritic metacarpal phalangeal joint, will make contact with any large handle. That's how you're – that's how your hand grips something. It always makes contact there. So a large handle, for example, would be the handle of a sledgehammer, that he would make contact with, and that might be a problematic thing for him to do. A large handle might be the handle on a big pair of pliers, or maybe large wrenches.

Q. And it's those things that you think aggravated his pre-existing condition?

A.   I think so.

Q.   And was there anything the railroad could have done to prevent him from aggravating it; I mean, what could they have done, I your estimation?

MR. JOYCE:  Objection.  He's not here as our ergonomic expert; he's here as a medical expert, so I think that opinion is outside the scope of his testimony.  It's a negligence question.

Q.   Are there any specific changes that the railroad could have made in his job, that could have prevented him from having an aggravation, as you've described it?

A.   I guess not having him used those tools.

Q.   So anything that would have him touching a tool or gripping a tool would be problematic for him?

A.   I'm not sure "anything."  But repetitive use of - - pounding with heavy tools with big handles that he would need to use would tend to aggravate it.

(Please see Deposition of Dr. Wenner, attached as Exhibit 4, at page 48-50).

Dr. Steven Wenner further testified:

Q.   (By Mr. Joyce)  Dr. Wenner, do you have your April 13, 2007 note?

A.   I think I do, yes.
…

Q.   It looks like you did have some sort of discussion about his ability to return to work.  I'm looking at that third paragraph.  It looks like you had a discussion about what he did?

A.   Yes.

Q.   And it looks like at least there was some sort of a conversation.  Maybe you can read to me what you told him about his return to work?

A.   My note says, "he has previously undergone an anterior cervical arthrodesis" - - two levels is what that means - - "arthrodesis of the left thumb MPJ and is soon to have a TKR," meaning total knee replacement.  "It seems to me that he's had too much orthopedic breakdown, multiple bone and joint problems, to make it sensible for him to return to such heavy labor.  I would be inclined not to permit it.  I told him that today."
…

> Q. So your discussion with Geoff was not focused on his thumb; it was really his total orthopedic picture with regard to his neck and his knees as well?
>
> A. Yes, his total orthopedic status. …
>
> Q. Okay. And just lastly, am I correct that your opinion is that Geoff's job as a trackman aggravated and worsened his thumb arthritis?
>
> A. That's correct.

(Please see Deposition of Dr. Wenner, attached as Exhibit 4, at page 55-56).

(Please see CSX Job Description for Trackman, attached as Exhibit 5).

---

The National Institute for Occupational Safety and Health (NIOSH) / Centers for Disease Control (CDC), published *Musculoskeletal Disorders and Workplace Factors, A Critical Review of Epidemiologic Evidence for Work-Related Musculoskeletal Disorders of the Neck, Upper Extremity, and Low Back,* in July 1997. Thus, the federal government, through NIOSH, as far back as 1997, determined what the occupational risk factors were for work related musculoskeletal disorders (WMSDs).

This Honorable Court should note that the parties have scheduled to take Dr. Wenner's videotape deposition on December 22, 2010, which is not yet available for inclusion in Plaintiff's Response in Opposition to Defendants' Motion in Limine as of this date of filing. Plaintiff respectfully requests the opportunity to submit the *entire* videotape deposition testimony of Dr. Wenner to the Court for the Court's consideration before the Court makes a ruling on Defendants' Motion in Limine to Preclude Steven M. Wenner, M.D. when the transcript becomes available.

III.  ARGUMENT:

---

This occupation injury action was brought pursuant to an Act of Congress known as the Federal Employers' Liability Act (FELA), 45 U.S.C. Sec. 51 et seq. Specifically, the FELA states, in pertinent part:

> Every common carrier by railroad while engaging in commerce between any of the states and territories, or between the District of Columbia and any of the states or territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier, in such commerce, or in case of death of such employee, to his or her personal representative for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, road bed, works, boats, wharves, or other equipment.
>
> Any employee of a carrier, any part of whose duties as such employee shall be in the furtherance of interstate commerce; or shall, in any way, directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this Act be considered as being employed by such carrier, in such commerce, and shall be considered as entitled to the benefits of this Act and of an Act entitled "An Act related to the liability of common carriers by railroad to their employees in certain cases".  (App'd April 22, 1908) [45 U.S.C. Secs. 51 et seq.] as the same has been or may hereafter be amended (emphasis added).

45 U.S.C. Sec. 51.

The FELA was enacted by the United States Congress in 1908.  Congress and the United States Supreme Court have, over the years, consistently stated the purpose of the FELA is to protect and benefit railroad employees injured on the job.  The FELA is to be liberally construed to allow railroad employees, such as Geoffrey Crowther, injured in the scope of their employment to recover from the railroad even where the railroad's negligence is minimal. *Rodriguez v. Deloroy Connecting Railroad Company,* 473 F. 2d 819 (6th Cir. 1973).

This duty to provide a safe place to work was non-delegable and could not be passed on by the railroad to any person, firm or corporation.  *Bailey v. Central Vermont Railway Company,* 319 U.S. 350 (1943).  Not only is this duty to provide a safe place to work a non-delegable one, but it is also an affirmative one.  This means that Defendants CSX and Conrail had a positive obligation to provide Geoffrey Crowther with a safe place to work, including finding any defect

or hazard which would normally be revealed within the work place. *Williams v. Atlantic Coastline Railroad Company,* 190 F. 2d 744 (5th Cir. 1951).

It has long been accepted doctrine that "the question of evidence required to establish liability in an FELA case is much less than an ordinary negligence action." *Harbin v. Burlington Northern Railroad Company,* 921 F. 2d 129 (7th Cir. 1990). In *Hines v. Conrail*, 926 F. 2d 262 (3rd Cir. 1991), the Third Circuit reversed the grant of summary judgment in a toxic tort case which was predicated on the exclusion of plaintiff's expert witness. The Court held that *the FELA relaxed standard of causation also relaxes the threshold of admissibility for the reception of expert testimony*. Further, in an FELA case, the railroad employee is to be given every doubt before the Court. *Ratigan v. New York Central Railroad Company*, 291 F. 2d 548 (2nd Cir. 1961), citing *Harris v. Pennsylvania Railroad*, 361 U.S. 15 (1959), *Moore v. Terminal Railroad Association,* 358 U.S. 31 (1958).

The test of a jury case, under the FELA, is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing injury for which damages are sought. *Rogers v. Missouri P.R.Co.,* 352 U.S. 500, 1 L.Ed 2D 493, 77 S.Ct. 443 (1957). Under the FELA, if a defendant railroad negligently causes further injury or aggravation to plaintiff's pre-existing injury or condition, the plaintiff is entitled to compensation for all of his damages caused by the railroad's negligence, including further injury or aggravation. *Stevens v. Bangor and Aroostook R. Co.,* 97 F. 3d 594, 601 (C.A.1 (Me.), 1996).

In the instant matter before this Honorable Court, Defendants have moved to preclude the medical causation opinions of Plaintiff's treating physician and surgeon, Steven M. Wenner, M.D. Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

>expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

F.R.E. 702.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), for expert testimony to be admitted, the proposed testimony must be supported by appropriate validation based on what is known. The trial judge must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid, and of whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert* at 593.

Steven M. Wenner, M.D., is a Board Certified Orthopedic Surgeon who has been practicing medicine for over thirty years. Dr. Wenner is familiar with the medical literature and the risk factors for left thumb arthritis of the metacarpophalangeal joint, both work related and non-work related. Dr. Wenner is very familiar with occupational thumb injuries. It is important to note that Defendants do not challenge Dr. Wenner's qualifications as a medical expert generally. Rather, Defendants, in their Motion, challenge only Dr. Wenner's ability to provide a medical *causation* opinion concerning his own patient, Geoffrey Crowther.

So what is the methodology underlying Dr. Steven M. Wenner's conclusions and opinions? What does a treating physician do to determine the cause of his patient's injury? Differential diagnosis is a standard generally accepted methodology utilized by physicians to assess medical causation. Using his experience and expertise, Dr. Wenner utilized a differential diagnosis methodology to assess causation with regard to Geoffrey Crowther as all physicians do with their patients. Dr. Wenner examined his patient Geoffrey Crowther. Dr. Wenner took his patient's history, including personal and work history, and reviewed his medical records. Dr. Wenner conducted physical examinations, reviewed diagnostic tests, made diagnoses and recommended treatment and surgery. Dr. Wenner also reviewed additional information on

Geoffrey Crowther's work including the CSX and Conrail trackman job descriptions that were provided by Plaintiff's counsel. As an orthopedic specialist, Dr. Wenner is obviously familiar with the medical literature and the risk factors for left thumb arthritis of the metacarpophalangeal joint, both work related and non-work related. As Plaintiff's treating physician and surgeon, plainly aware of such things as Plaintiff's age, weight and his other medical conditions, Dr. Wenner has opined that Geoffrey Crowther's left thumb arthritis of the metacarpophalangeal joint was aggravated, worsened and exacerbated by Geoffrey Crowther's work as a trackman for the railroad. It is important to note that Dr. Wenner did not opine that the sole or primary cause of Geoffrey Crowther's left thumb injuries was his work as a trackman. That is not what the FELA requires for purposes of proving causation. Rather, a contributing factor or aggravation and worsening are sufficient to prove causation under the FELA. *Rogers v. Missouri P.R.Co.,* 352 U.S. 500, 1 L.Ed 2D 493, 77 S.Ct. 443 (1957); *Stevens v. Bangor and Aroostook R. Co.,* 97 F. 3d 594, 601 (C.A.1 (Me.), 1996).

In the case of *Hardyman v. Norfolk & Western Railway Company*, 243 F. 3d 255 (6th Cir. 2001), the Sixth Circuit considered an FELA carpal tunnel syndrome action in which the trial court precluded the plaintiff from offering expert causation testimony and erred in granting the railroad's motion for summary judgment on the ground that plaintiff failed to show that a genuine issue of fact exists as to whether the railroad's negligence was, in whole or in part, a cause or contributing factor of plaintiff's carpal tunnel syndrome. In *Hardyman*, the Sixth Circuit stated:

> (T)he district court held that unless the plaintiff could offer a scientific or epidemiological study specifically concerning carpal tunnel syndrome and railroad brakemen, the only way plaintiff could establish causation would be with the proffer of a known "dose/response relationship" or "threshold phenomenon". Not only does such a requirement ignore the alternative method of establishing causation through differential diagnosis, but it is contrary to the testimony of

>plaintiff's experts, i.e., that one simply could not quantify the level or dose of risk factors causative of CTS in a manner consistent with dose/response relationship or threshold level.
>…
>After careful review of the entire record, we are firmly convinced that the rationale of the district court did not justify exclusion of plaintiff's expert testimony.

*Hardyman* at 262, 267.

Dr. Wenner is Plaintiff's treating physician and surgeon, and is not a hired gun medical expert who never cared for Geoffrey Crowther. It is to be expected that a treating physician will customarily opine about his patient's history, diagnosis and causation of injuries, treatment, and prognosis.

In the case of *Fielden v. CSX Transportation, Inc.,* 482 F.3d 866 (6th Cir. 2007), the Sixth Circuit stated:

>The (Advisory Committee) Note to Rule 26 states that "[a] treating physician …can be deposed or called to testify at trial without any requirement for a written report." Fed.R.Civ.P. 26(a), cmt. 1993 Amendments, subdivision (a), para. (2). Under a straightforward reading of the rule and its advisory note, Fielden did not need to file an expert report from Dr. Fischer.
>This conclusion is supported by the obvious fact that doctors may need to determine the cause of an injury in order to treat it. Determining causation may therefore be an integral part of "treating" a patient. As a thoughtful U.S. Magistrate Judge reasoned in permitting causation testimony without a prior expert's report,
>It is within the normal range of duties for a health care provider to develop opinions regarding causation and prognosis during the ordinary course of an examination. To assume otherwise is a limiting perspective, which narrows the role of a treating physician. Instead, to properly treat and diagnose a patient, the doctor needs to understand the cause of a patient's injuries. See *McCloughan [v. City of Springfield]*, 208 F.R.D. [236'] 242 [(C.D.Ill.2002)] ("doctors do not operate in a vacuum … Thus the [c]ourt believes causation, diagnosis, and prognosis would be based on the treating physician's personal knowledge …").

*Fielden* at 869, 870.

Defendants challenge only Dr. Wenner's ability to provide a medical *causation* opinion concerning his own patient, Geoffrey Crowther, and *interestingly raise no challenge to Dr.*

*Wenner's ability to provide opinions as to the diagnosis, treatment and prognosis of Geoffrey Crowther.*  In reality, Defendants' issues with Dr. Wenner's causation opinions go not to their admissibility, but rather go to the *weight of the evidence*.  Dr. Wenner's differential diagnosis is a standard generally acceptable methodology utilized by treating physicians to assess causation.  It should be up to the jury to determine what weight to give his expert testimony.

In *Primiano v. Yan Cook, et al.*, United States Court of Appeals for the Ninth Circuit, 06-15563 (March 2010), the Ninth Circuit recently considered the admissibility of medical testimony under *Daubert*.  The District Court had excluded the testimony of a highly qualified expert because he could not say precisely why a product had failed, and because there was no peer-reviewed literature supporting his testimony.  The Ninth Circuit held that his methodology was adequate, and the testimony relevant, and reversed the trial court.  In *Primiano*, the Ninth Circuit stated:

> The question before us is whether excluding Primiano's expert's testimony was an abuse of discretion.
> …
> The district court granted defendants' motion to exclude Dr. Weiss's testimony as not meeting the *Daubert* standard and granted summary judgment. The court concluded that Dr. Weiss's testimony would not be helpful to the jury.
> …
> Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.
> …
> Under *Daubert*, the district judge is a "gatekeeper, not a fact finder." When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony. Testimony by physicians may or may not be scientific evidence like the epidemiologic testimony at issue in *Daubert*.
> …
> '[M]edicine is not a science but a learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit.' 'Evidence-based medicine' is 'the conscientious, explicit and judicious use of current best evidence in making decisions about the care of individual patients.' 'Despite the importance of evidence-based medicine, much of medical decision-

> making relies on judgment – a process that is difficult to quantify or even to assess quantitatively.'
>
> …
>
> 'A trial court should admit medical expert testimony if physicians would accept it as useful and reliable,' but it need not be conclusive because 'medical knowledge is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof.' Where the foundation is sufficient, the litigant is 'entitled to have the jury decide upon [the experts'] credibility, rather than the judge.'
>
> …
>
> Other circuits have taken similar approaches focusing especially on experience. The Sixth Circuit held that a district court abused its discretion by excluding a physician's testimony based upon extensive, relevant experience even though he had not cited medical literature supporting his view. *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004). Likewise, the Third Circuit pointed out that a doctor's experience might be good reason to admit his testimony. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 406-07 (3rd Cir. 2003).
>
> …
>
> Given that the judge is 'a gatekeeper, not a fact-finder,' the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it.

*Primiano v. Yan Cook, et al.*, United States Court of Appeals for the Ninth Circuit, 06-15563 (March 2010), page 3805-3817.

Defendants' assertions that there is no scientific basis to Dr. Wenner's opinions with regard to the medical causation of his own patient's injuries are misleading. Dr. Wenner should not be required to go to a job site and actually observe an employee work before he can offer a causation opinion. If that were the case, then no doctor could ever provide any causation opinion in any traumatic injury case when the doctor had not witnessed the actual accident when it occurred. That is absurd. Geoffrey Crowther's history and job description suffice. A plaintiff's history is generally what a medical doctor relies upon for the foundation of his causation opinion in any FELA trauma or cumulative-trauma injury case.

Dr. Wenner's medical causation opinions should not be excluded. It should be up to the jury to determine what weight to give his expert testimony. The jury should decide if Geoffrey

Crowther's left thumb injuries were aggravated, worsened and exacerbated, in whole or in part, by his work for Defendants, CSX and Conrail. FELA cases are supposed to be determined by the jury.

IV. <u>CONCLUSION</u>:

Defendants CSX and Conrail do not challenge Dr. Wenner's qualifications as an orthopedic surgeon and hand specialist. Steven M. Wenner, M.D., is a qualified medical expert who employs the same methodology in diagnosing every one of his patients and determining the cause of their conditions. Using his experience and expertise, Dr. Wenner reviewed his patient Geoffrey Crowther's history, including his personal and work history, as well as his records, examinations, diagnostic tests and surgery reports. Dr. Wenner's methodology is sound and scientifically valid, and his opinions are supported by ample evidence. Dr. Wenner's opinions are obviously not "mere speculation". Dr. Wenner's testimony will most certainly properly assist the jury to understand critical evidence in this FELA occupational injury action. As such, Defendants' arguments are without merit.

WHEREFORE, Plaintiff respectfully requests Defendants' Motion in Limine to Preclude Steven M. Wenner, M.D. be Denied, and that Steven M. Wenner, M.D. be permitted to testify as Plaintiff's medical expert at trial in this matter.

Respectfully submitted,

*/s/Thomas J. Joyce, III*
THOMAS J. JOYCE, III
Law Office of Thomas J. Joyce, III
801 Centerton Road
Mount Laurel, NJ 08054
(856) 914-0220
Attorney for Plaintiff

*/s/Michael J. McDevitt*
MICHAEL J. McDEVITT
Lawson & Weitzen
88 Black Falcon Avenue, Suite 345
Boston, MA 02110
(617) 439-4990
Attorney for Plaintiff

DATED: December 3, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| GEOFFREY CROWTHER | : | Civil Action No. 09-10334-MAP and |
| | : | 09-11467-MAP |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| CSX TRANSPORTATION, INC. | : | |
| and | | |
| CONSOLIDATED RAIL CORP. | : | |
| | : | |
| Defendants | : | |

_____

### CERTIFICATE OF SERVICE

I, THOMAS J. JOYCE, III, hereby certify that on December 3, 2010, I electronically filed: Plaintiff's Response and Memorandum of Law in Opposition to Defendants' Motion in Limine to Preclude Steven M. Wenner, M.D.; Plaintiff's Exhibits; and Plaintiff's Proposed Order, with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record for the Defendants:

---

Heather M. Gamache, Esquire
Flynn & Wirkus
400 Crown Colony Drive, Suite 200
Quincy, MA 02169


　　　　　　　　　　　　　　　　　　　　　　　　*/s/Thomas J. Joyce, III*
　　　　　　　　　　　　　　　　　　　　　　　　Thomas J. Joyce, III