COURT OF COMMON PLEAS

PHILADELPHIA COUNTY - CIVIL DIVISION

DOCKET NO. 02389


*******************************

GEOFFREY CROWTHER,

      Plaintiff,

Vs.

CONSOLIDATED RAIL CORPORATION

and CSX TRANSPORTATION, INC.,

      Defendants.

*******************************


DEPOSITION OF STEVEN M. WENNER, M.D.


New England Orthopedic Surgeons

300 Birnie Avenue

Springfield, Massachusetts


December 15, 2008      5:25 p.m.


Jonathan P. Lodi

Court Reporter

Page 2

APPEARANCES:

Representing the Plaintiff:
LAW OFFICE OF THOMAS J. JOYCE, III
900 Centerton Road
Mount Laurel, New Jersey  08054
By:  Thomas J. Joyce, III, Esq.
856.914.0220

Representing the Defendants:
BURNS, WHITE & HICKTON, LLC
Four Northshore Center
106 Isabella Street
Pittsburgh, PA  15212
By:  Stephen A. Hall, Esq.
412.995.3000

Page 3

I N D E X

WITNESS:  STEVEN M. WENNER, M.D.
EXAMINATION BY:   PAGE:
Mr. Hall          4
Mr. Joyce        55
Mr. Hall         56

EXHIBITS:                     PAGE:
1 Notice of deposition             4
2 Dr. Wenner's report and CV       4
3 Addendum report dated 11/30/08   5
4 Letter dated 4/11/08 from Mr. Joyce  14
  to Dr. Wenner

Page 4

STEVEN M. WENNER, M.D., Deponent, having first
been duly sworn, deposes and states as follows:
        (Wenner Deposition Exhibits 1 and 2:
        Marked for identification.)
        EXAMINATION
    Q.   (By Mr. Hall)  Hi, Dr. Wenner.  My
name is Steve Hall, and I represent the Railroad
in a piece of litigation involving a former
patient of yours, Geoffrey Crowther.  And I've
marked, as Exhibit 1, your deposition notice.  And
I sent this through to Mr. Joyce, because he
designated you as an expert in this case, okay?
    A.   Okay.
    Q.   And I'd asked that you bring in all
your file materials with you, with regard to Mr.
Crowther.  Have you done that?
    A.   I think I have.
    Q.   And is that the stack of papers that
you have in front of you?
    A.   Yes.
    Q.   And are these the electronic records
that are kept by New England?
    A.   Yes, they are.
    Q.   And is it okay if I mark these as an

Page 5

exhibit?
    A.   Yes.  Actually, one of them is a paper
that you gave me, because I didn't have that last
copy there, that paper.
        (Wenner Deposition Exhibit 3:  Marked
        for identification.)
    Q.   (By Mr. Hall)  Okay.  And the paper
that you're referring to was the addendum report
dated November 30th, 2008, is that correct?
    A.   Correct.
    Q.   And I've also marked as Exhibit 2,
before you got here, a copy of your report, which
actually includes that addendum as well.  And it
also has your CV that I have.
        Could you look at that; and is that a
fair and accurate copy of your report, the
addendum, as well as your CV?
    A.   It is a fair and accurate copy of
that.  It looks correct to me.
    Q.   Okay.  And one of things I noticed is
that your report and your addendum weren't signed.
        Do you have a signed copy or --
    A.   I don't, myself, have a signed copy,
no.

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 6

1    **Q.   Do you know if a signed copy exists?**
2         A.   I might have sent a signed copy to
3    Attorney Joyce, if you're the person who asked me
4    for this.  But I don't recall, myself.
5              MR. JOYCE:  And I don't think I've
6    seen a signed copy.  Maybe we could have you
7    sign one right here, because that's
8    something we want to do.
9              THE WITNESS:  That's fine with me.
10             MR. HALL:  Okay.  And I'm not trying
11   to be difficult.  I was just -- because one
12   of the things that was consistent with Dr.
13   Lehman's report is that, you know, you're
14   signing and swearing to it under the pains
15   and penalties of perjury.
16             THE WITNESS:  Yes.
17        **Q.   (By Mr. Hall)  I mean, is that the**
18   **nature in which you -- when you drafted your**
19   **report, that was your intention, to sign it and**
20   **execute it?**
21        A.   It was my intent to dictate a report
22   that was honest and accurate.
23        **Q.   So are there any changes to your**
24   **report or to your addendum?**

Page 7

1         A.   No.
2         **Q.   So you're okay with it as it's**
3    **written?**
4         A.   I am.  Well, there are a couple of
5    typos.  But other than that, there's nothing
6    important.
7         **Q.   Okay.  And in looking at that -- well,**
8    **let me back up.**
9              **Can you tell me a little bit about**
10   **your background?  Where are you licensed to**
11   **practice medicine?**
12        A.   Massachusetts.
13        **Q.   Any other states?**
14        A.   No, none active.
15        **Q.   And have you been subject to**
16   **discipline at any time?**
17        A.   I have not.
18        **Q.   And do you have a specialty or --**
19   **well, can you give me a brief overview of your**
20   **educational background?**
21        A.   Yes.  I went to Yale College for my
22   undergraduate degree.  I graduated from Jefferson
23   Medical College in Philadelphia in 1974.  I
24   trained for two years in general surgery, three

Page 8

1    years in orthopedic surgery, and one year in
2    surgery of the hand.  I entered practice in July
3    of 1980 doing orthopedic surgery and surgery of
4    the hand.  About ten or twelve years later, I
5    limited myself only to surgery of the hand,
6    exclusively to surgery of the hand, and have
7    continued to do that since that time.
8         **Q.   And are you board certified?**
9         A.   I am.
10        **Q.   And is that in orthopedic surgery?**
11        A.   It's in orthopedic surgery.  And I
12   have what's called a certificate of added
13   qualifications in hand surgery.
14        **Q.   And have you conducted any research or**
15   **written any papers?**
16        A.   I have.
17        **Q.   And do any of those relate to**
18   **repetitive stress injuries?**
19        A.   They do not.
20        **Q.   Anything that deals with railroad**
21   **work?**
22        A.   No.
23        **Q.   And have you been an expert witness in**
24   **the past, sir?**

Page 9

1         A.   I have.
2         **Q.   And can you tell me the types of**
3    **cases?**
4         A.   All upper limb; elbow, wrist, hand.
5         **Q.   And were those personal injuries?**
6         A.   They were -- yes, I think so.
7         **Q.   And were you hired or retained by the**
8    **plaintiff or by the defendant?**
9         A.   I was hired by the defendant, I think,
10   in all of the cases.  But there may be one
11   exception to that.
12        **Q.   And have you been retained by a**
13   **particular defendant or by a variety of different**
14   **defendants or --**
15        A.   No.  I don't think any defendant has
16   hired me, retained me repeatedly.
17        **Q.   And were these Workers' Compensation**
18   **cases or --**
19        A.   I think they were largely medical
20   malpractice cases.
21        **Q.   And have you ever testified in court?**
22        A.   I have.
23        **Q.   And where have you testified?**
24        A.   In Springfield.

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 10

1    Q.   And in state court or Federal court?
2    A.   I don't know.
3    Q.   And was that in a medical malpractice
4    case?
5    A.   I think that they -- I don't think
6    they were medical malpractice cases.  I think once
7    or twice, for personal injuries, as an expert.
8    Q.   And do you recall the outcome of the
9    cases in which you testified?
10   A.   I don't.
11   Q.   Do you have any connection with the
12   railroad industry?
13   A.   I don't.
14   Q.   Family, friends, anyone else?
15   A.   I took the train to New York last
16   Friday.  Other than that, that's it.
17   Q.   And it's my understanding that you
18   authored a report dated November 11th and an
19   addendum dated November 30th?
20   A.   Correct.
21   Q.   And were you paid by Mr. Joyce's
22   office in that record?
23   A.   I believe I was.
24   Q.   And one of the things that I saw with

Page 11

1    Dr. Lehman was a letter from Attorney Joyce.
2         Did you receive a similar letter?
3    A.   Well, I don't know what Dr. Lehman
4    received, so I can't tell you.
5    Q.   Okay.  I can show you what has been
6    marked as Lehman Exhibit 5, which is a letter from
7    Mr. Joyce's office asking for a narrative.
8    A.   I don't remember if I received a
9    letter that was just like this or not.  Normally
10   we don't dictate reports unless we have a letter
11   and a payment.
12   Q.   And how much is that payment; is that
13   the $550?
14   A.   I think it was.
15   Q.   And do you --
16   MR. JOYCE:  Do you want a copy of the
17   letter, Steve?
18   MR. HALL:  Please.  That would be
19   great.  Thanks.  And we'll mark this as an
20   exhibit.  We can mark it at the end.
21   Q.   (By Mr. Hall)  And your report and
22   your addendum, do they contain all of your
23   opinions?
24   A.   I think so.

Page 12

1    Q.   Can you tell me what you reviewed to
2    come to your opinions that are contained in your
3    report; can you tell me the things that you might
4    have reviewed?
5    A.   I would have reviewed my own office
6    notes about my care of Mr. Crowther and notes of
7    our physician assistants that pertained to his
8    care.
9    Q.   Was there anything else that you might
10   have reviewed?
11   A.   I don't think so.
12   Q.   And did you rely on any particular
13   literature in coming to your opinions?
14   A.   No.
15   Q.   And it's my understanding that you
16   basically, on the second page or, I'm sorry, on
17   the third page of your November 11th letter/
18   report --
19   A.   Yes.
20   Q.   -- it indicates, with respect to your
21   questions about whether or not his left thumb
22   problem is attributable to a specific injury, "I
23   do not believe that it is"; with respect to the
24   question whether his left thumb arthritis is a

Page 13

1    result of what he does at work, "I cannot state
2    whether it is or isn't."
3         Basically, my understanding is that
4    you don't have an opinion, within a reasonable
5    degree of medical certainty, as to whether or not
6    his job duties caused his left thumb arthritis, is
7    that correct?
8    A.   Caused as the primary event; you don't
9    mean aggravated?
10   Q.   No.  I mean caused as a primary event.
11   A.   I can't say for sure.
12   Q.   And you can't say within a reasonable
13   degree of medical certainty, correct?
14   A.   Yes.
15   Q.   And in the addendum report -- well,
16   let me ask you this:  Did you send off this letter
17   to Mr. Joyce's office?
18   A.   I did.
19   Q.   And then were you contacted later to
20   write an addendum report?
21   A.   Well, I was asked if I was willing to.
22   Q.   Okay.  And what do you mean by that?
23   A.   Well, I wasn't told to write one.
24   Q.   Oh, I'm sorry.  You're right.

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 14

1      A.   I was asked if, in my opinion -- I
2  guess I would have to see what I was asked in the
3  letter, and then see if that would help me to know
4  how to answer your question.
5        MR. HALL:  Okay.  And I guess we'll
6  mark it now as Wenner Exhibit 4.
7        (Wenner Deposition Exhibit 4:  Marked
8        for identification.)
9        MR. HALL:  I hand you a copy of what
10 has been marked as Exhibit 4 and is Mr.
11 Joyce's letter to you.
12       THE WITNESS:  Yes.
13     Q.   (By Mr. Hall)  And can you explain to
14 me how you came to come to the addendum report
15 dated November 30th, 2008 after reviewing that
16 letter?
17     A.   Well, I can't tell based upon this
18 letter.
19     Q.   Do you recall whether or not you saw
20 or received another communication from Mr. Joyce's
21 office about an addendum?
22     A.   I think that I did.
23     Q.   And do you have a copy of that letter
24 or was it a phone call or --

Page 15

1      A.   No.  I don't think it would have been
2  a phone call, because I normally wouldn't respond
3  to that.  I assume it was a letter.  I don't have
4  a copy of it here.
5        MR. HALL:  Tom, do you have a copy of
6  another letter?
7        MR. JOYCE:  I think we just re-sent
8  that.  I thought we just re-sent the letter,
9  Doctor.  I'm not aware of another follow-up
10 letter, although that's possible.
11       MR. HALL:  To the extent one exists,
12 can you produce it?
13       MR. JOYCE:  Yes.  I'll send it to you.
14 I'm pretty sure we -- that our follow-up
15 question was:  Thank you for your report;
16 and your -- we have another follow-up
17 question as to whether or not his job
18 aggravated or worsened his osteoarthritis of
19 his thumb.
20       THE WITNESS:  And as -- if it's of
21 consequence, as I read this, in the last
22 paragraph on the first page of Mr. Joyce's
23 letter, it asks, Left thumb injury and
24 subsequent left thumb surgery in part

Page 16

1  caused, contributed to, and aggravated by
2  his work at the Railroad.  And my -- Page 3,
3  last paragraph of my initial report, I don't
4  refer to aggravated, I don't believe.
5        MR. HALL:  Okay.
6        THE WITNESS:  So I assume that I was
7  referring to that in the addendum.
8      Q.   (By Mr. Hall)  Okay.  And -- but you
9  recall there being a subsequent communication
10 after --
11     A.   Yes.  I would not have just sent that
12 on my own.
13     Q.   And that addendum essentially is that
14 -- well, let me ask you this:  When you saw that
15 he aggravated the arthritis of the metacarpal
16 phalangeal joint of his left thumb, what does that
17 mean?
18     A.   Made it biologically worse and made it
19 more symptomatic.  Both.
20     Q.   And do you have any objective
21 scientific evidence that shows that Mr. Crowther's
22 left thumb joint, that the disease process that
23 existed there was actually made worse by his job
24 duties?

Page 17

1      A.   I don't.
2      Q.   And have you relied on any particular
3  literature in coming to your opinion that there
4  was a biological worsening?
5      A.   Well, you know, if you're asking have
6  I relied on a specific article that says that this
7  -- if you do this -- then here's the outcome of
8  it, no.  If you're referring to am I familiar with
9  literature that describes the natural biological
10 processes and disease states, their typical
11 evolution, what factors may aggravate them,
12 contribute to their worsening, et cetera, there's
13 a whole body of medical literature about that.
14 You know, that's what we learn in school and in
15 residencies.
16     Q.   Is there a leading article that you're
17 aware of?
18     A.   If there is, I couldn't quote it to
19 you.  Sorry.
20     Q.   And fair to say that there's no
21 articles listed in your report, right?
22     A.   Correct.
23     Q.   And I didn't see any reference that
24 you looked at any particular book, journal, or

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 18

1    anything like that, correct?
2        A.    That's correct.
3        Q.    And as you sit here today, you can't
4    name any of those studies, is that right?
5        A.    That's correct.
6        Q.    And were you aware of the type of job
7    duties that Mr. Crowther was doing when he
8    presented to you for the first time I think in
9    September of 2005?
10       A.    I was aware of them.  And it was 2005.
11       Q.    Okay.
12       A.    And it looks like it was September.
13       Q.    Okay.  Do you know any specific jobs
14   that he was doing at that time that --
15       A.    Well, I had it -- my understanding was
16   that he was working on the Railroad and repairing
17   track; repairing, laying, et cetera, track.
18       Q.    And is that the sum and substance of
19   your knowledge of his job duties?
20       A.    Well, that's the sum and substance of
21   what it is now.  I've taken care of some number of
22   railroad workers over the years, and I've listened
23   to what they describe as that type of work, so I
24   have a little bit of a sense of it.

Page 19

1        Q.    Okay.  How many --
2        A.    Jackhammers and sledgehammers and all
3    that.
4        Q.    Okay.  How many railroad workers do
5    you think you've seen?
6        A.    Over the years?
7        Q.    Yes.
8        A.    Half a dozen maybe.
9        Q.    In what craft?
10       A.    Track workers.
11       Q.    And what problems did they present
12   with?
13       A.    They presented with a variety of
14   complaints referable to their hands.
15       Q.    Any similar to Mr. Crowther's?
16       A.    I don't recall.
17       Q.    Is arthritis in the thumb or the joint
18   of the thumb, is that a pretty common occurrence?
19       A.    Well, the joint where he has the
20   arthritis is not the commonest occurrence.  There
21   is one joint in the thumb that's commonly
22   afflicted with arthritis, but it's not this joint,
23   not the joint that was involved for him.
24       Q.    And have you reviewed any information

Page 20

1    about his job, other than what he told you?
2        A.    I don't think so.
3        Q.    So fair to say you didn't go out and
4    see the type of work that Mr. Crowther did?
5        A.    I did not.
6        Q.    And you've not seen the videotape of
7    the type of job he did?
8        A.    I have not.
9        Q.    And I assume that you've not seen any
10   ergonomic assessments of the work he did?
11       A.    I have not.
12       Q.    And you've not performed any type of
13   scientific analysis of exposure he had on the job,
14   correct?
15       A.    Correct.
16       Q.    And I guess the same would go for not
17   having done any analysis on the type of rest
18   periods and things like that, or non-work
19   exposures he had?
20       A.    Correct.
21       Q.    And fair to say you wouldn't know how
22   much time during a given shift that Mr. Crowther
23   might use his hands?
24       A.    Correct.

Page 21

1        Q.    Or the way in which he would
2    manipulate tools or use tools, correct?
3        A.    Correct.
4        Q.    Or on the duration of the use of
5    tools?
6        A.    Correct.
7        Q.    Or the rest time in between tool
8    usage?
9        A.    Correct.
10       Q.    And did you consider any of
11   Mr. Crowther's avocational activities in coming to
12   your determination that he had an aggravation of
13   his pre-existing arthritis in his metacarpal
14   phalangeal joint of his left thumb?
15       A.    I did not.
16       Q.    What are the risk factors for the
17   development of arthritis in the metacarpal
18   phalangeal joint of the left thumb?
19       A.    Injury to the ligaments that stabilize
20   the joint.  If you injure the ligaments, then
21   there's a chance that you will make the joint
22   mechanically unsound.  And it may become arthritic
23   as a consequence of that.  A direct injury to the
24   cartilage of that joint, such as might occur from

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 22

1  -- the conventional term would be jamming it, but
2  it's more severe than just a jamming injury, of
3  course.  A fracture of that joint could make it
4  become arthritic.  And it could be arthritic as a
5  result of a disease state throughout the body, if
6  you had an arthritic disease that was affecting
7  multiple parts of the body.
8       Q.   Okay.  How about just age?
9       A.   Age contributes to it.  But again,
10 this tends not to be the joint of the thumb that's
11 affected with arthritis just as a consequence of
12 age.
13      Q.   Any other risk factors?  Smoking,
14 tobacco use, anything like that?
15      A.   I don't think so.
16      Q.   Have you ruled out each of these risk
17 factors with regard to Mr. Crowther?
18      A.   Well, he had some evidence of having
19 had a chronic ligament injury to the thumb, so
20 that's not ruled out; that's probably ruled in.
21 That was the first one I gave you.  I do not think
22 that he had any evidence of having had a fracture
23 of it.  I imagine, in my own mind, that repetitive
24 heavy use of it, using sledgehammers and

Page 23

1  jackhammers and, you know, carrying heavy railroad
2  tie, all of which I imagined that he did for many
3  years, using heavy tools, would probably result,
4  like it does for most people who are doing heavy
5  mechanical work, in a number of dings to the
6  joints of their hands.  Workers get that all the
7  time, workers in a variety of pursuits.  So when I
8  say, "dings," I mean jamming-type injuries, but
9  bad jamming injuries.  And I don't think he had an
10 arthritic disease throughout his entire body.
11      Q.   Well, he is polyarthritic.  You're
12 aware of that?
13      A.   Well, he's polyarthritic, but I don't
14 think it's an inflammatory arthropathy.
15      Q.   Did you do anything to rule that out?
16      A.   No.
17      Q.   And it's my understanding that you
18 stated in that paragraph that, with respect to
19 your question as to whether or not his thumb
20 problem is attributable to his specific injury, "I
21 don't believe that it is."  And would that also
22 include the chronic ligament injury to his thumb?
23      A.   Well, a chronic ligament injury won't
24 cause arthritis right at that day.  It results

Page 24

1  over a period of years from sustained heavy use of
2  it in the face of that.
3       Q.   But it's still your opinion that you
4  can't say whether or not work caused that?
5       A.   A ligament -- whether it caused a
6  ligament injury?
7       Q.   Or the arthritis.
8       A.   Correct.
9       Q.   And you'd agree with me that you're
10 not an occupational medicine doctor, are you?
11      A.   I am not.
12      Q.   And you're aware of that specialty?
13      A.   I am.
14      Q.   And you would agree, sir, that you're
15 a treating physician; that means that you
16 basically see patients, spend your days with
17 patients and perform surgery, is that correct?
18      A.   That's correct.
19      Q.   And that you don't routinely examine
20 workers to determine if their work caused a
21 problem they might be having, would you agree?
22      A.   I'm not sure I understood the
23 question.
24      Q.   That you don't routinely examine

Page 25

1  workers to determine if their work may have caused
2  a particular problem they were having?
3       A.   I'm not sure I would agree with that
4  entirely.  I examine people who are injured on the
5  job, a variety of jobs, regularly.  And I examine
6  -- and I'm frequently asked the question: Did the
7  particular job that they did cause or result in a
8  problem that they have.
9       Q.   And in your practice, do you
10 ordinarily go out and review the job or get more
11 information about jobs?
12      A.   I never go out and review the job.
13 And I frequently get written reports about what
14 they do on their job.
15      Q.   And did you get a written report of
16 what Mr. Crowther did on his job?
17      A.   I don't recall having gotten one.
18      Q.   Okay.  And it certainly isn't part of
19 your file, is that correct?
20      A.   Correct.
21      Q.   And so at least in this case, in that
22 minor instance you deviated from your normal
23 practice, would you agree?
24      A.   No.  I didn't say that was my normal

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 26

1  practice.
2      Q.   I'm sorry.  Is it your normal practice
3  to try to learn as much as you can about a job
4  before you make an opinion within a reasonable
5  degree of scientific certainty?
6      A.   If what you mean by that is do I study
7  reports about what somebody does in their job, I
8  do it some of the time; I don't do it routinely.
9      Q.   Okay.  You would agree with me that
10  more information is better, correct?
11      A.   I would agree that more information is
12  better, correct.
13      Q.   And that if you're evaluating the
14  value of a conclusion or opinion, that might be a
15  factor to take into account, would you agree?
16      A.   I agree.
17      Q.   And it's my understanding that, in
18  looking at the file that you had provided me, that
19  you hadn't reviewed any of Mr. Crowther's outside
20  medical records, is that correct?
21      A.   I think that's correct.
22      Q.   So you haven't seen his railroad
23  medical file or his railroad personnel file?
24      A.   I believe that's correct.

Page 27

1      Q.   Or his deposition?
2      A.   I don't think I saw any deposition.
3      Q.   Or any documents that had been
4  exchanged between the parties, correct?
5      A.   Correct.
6      Q.   Okay.  And, I'm sorry, you said that
7  you didn't see an ergonomic assessment of his job?
8      A.   I don't recall having seen one.
9      Q.   And when he presented with problems in
10  his thumb in September -- on September 26th of
11  2005 -- and I see that you had written a letter on
12  that date to Dr. Baustin.  Does that ring a bell
13  to you?
14      A.   I have a copy of it here.
15      Q.   Okay.  And in looking at the letter,
16  it's my understanding that you told Dr. Baustin,
17  in September of 2005, that Mr. Crowther was
18  complaining of pain at the ulnar border of his
19  left wrist, pain in the left thumb, intermittent
20  episodes of numbness and tingling in the hands,
21  with radiation of pain up to the forearms,
22  "symptoms have gone on for several years and are
23  gradually worsening," is that correct?
24      A.   Yes.

Page 28

1      Q.   And when he told -- and is that
2  information -- is that -- that's based on what Mr.
3  Crowther told you?
4      A.   That's correct.
5      Q.   And so fair to say that when you wrote
6  this in September of 2006, that it appeared that
7  Mr. Crowther was complaining of a chronic problem?
8      A.   Yes.
9      Q.   And that would include chronic pain in
10  his left thumb?
11      A.   Yes.
12      Q.   And so it would be fair to say that,
13  when it says that "symptoms have gone on for
14  several years," that would be at least more than
15  two years?
16      A.   Yes, probably.
17      Q.   So at least it went back to September
18  of 2003 --
19          MR. JOYCE:  Objection.
20      Q.   (By Mr. Hall)  -- based on what he
21  told you?
22      A.   I guess so.  You know, I don't know
23  what -- I said, "several."  I didn't ask him the
24  specific number apparently.

Page 29

1      Q.   Certainly more than a year, though,
2  right?
3      A.   Yes, I think so.  If I said,
4  "several," yes.
5      Q.   And at that time, he was doing some
6  supervision, as well as some heavy work.  Is that
7  what he told you?
8      A.   If that's what I wrote, it's probably
9  based on his telling me that.
10      Q.   And when he presented with you at that
11  time, what was the status of the joint in the
12  thumb that was problematic for him?
13      A.   It had limited movement.  It was
14  tender.  And there was x-ray evidence of arthritis
15  of it.
16      Q.   And, I'm sorry, I didn't hear the last
17  part of it.
18      A.   There was x-ray evidence of it.
19      Q.   And in looking at that x-ray, can you
20  tell how long that arthritis was there?
21      A.   I don't think you could tell from the
22  x-ray.
23      Q.   Was it advanced arthritis?
24      A.   My note indicates that it was fairly

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 30

advanced.

Q.   And if it's fairly advanced, does that mean that it's probably been in existence for some time?

A.   Sure.

Q.   And would that be consistent with having symptoms for several years before he presented?

A.   Yes, I think so.

Q.   And I'm not here to suggest that there's not such a thing as asymptomatic arthritic changes on an x-ray, okay?

A.   Okay.

Q.   But it certainly is consistent with having the type of symptoms that he had, based on the level or the amount of arthritis that he had?

A.   Yes.

Q.   And I think at that point you said that there was some restricted movement. And I apologize. Can you tell me, like, what the movement was, in terms of the metacarpal phalangeal joint? Which joint is that, on your thumb?

A.   It's this joint.

Page 31

Q.   So you're pointing to the back?

A.   Well, it goes through to the front also.

Q.   It goes through to the front?

A.   Right.

Q.   Okay. But that's what; at the bottom of your thumb; that's the joint we're talking about?

A.   "The bottom of the thumb" is a very loose term. It will be interpreted by many people in different ways, so I wouldn't call it the bottom of the thumb. It's the metacarpal phalangeal joint.

Q.   And where was the limitation in the movement; forward or backwards?

A.   Each way.

Q.   And what's the normal range of motion?

A.   Well, that's a problematic question, because it's a joint that has a very wide variety of "normal." So what we're always left doing is comparing it to the opposite side and assuming that that's the normal for that person if it's a joint without symptoms and without any evidence of arthritis. And his opposite side seemed to me,

Page 32

based upon my examination, to be normal. So I would assume that his opposite side is the normal one.

Q.   Okay. And so it was from zero to seventy on the opposite side?

A.   On the opposite side. That means it got to straight and it bent seventy degrees. And on the injured -- or the side with the arthritis -- it lacked thirty degrees of straightening to neutral, and it flexed to forty-five, which means it had a total arc of fifteen degrees, whereas the other one had a total arc of seventy degrees.

Q.   Okay. And that's a relatively significant finding, would you agree?

A.   That's a significant finding.

Q.   And that development of lack of a range of motion, that's not something that happens overnight, would you agree?

A.   Well, it --

Q.   Or can it?

A.   It can happen overnight, so I -- I don't know for sure, but -- in this instance, I don't know for sure, but I made the presumption, accurate or otherwise, that it had not happened

Page 33

overnight.

Q.   Okay. Well, I certainly -- did you collect a history from Mr. Crowther whether or not he had any traumatic injuries to his thumb?

A.   I assume that I did. My recollection is that he told me that he had not had a single major injury, a single injury to it.

Q.   Could that range of motion result from a fall where you might land on your hand?

A.   It could.

Q.   And if that happened, is that something that you would be able to see on an x-ray?

A.   Well, you wouldn't be able to see that it resulted from a fall, and you can't see range of motion on an x-ray.

Q.   Does the x-ray show any fractures or anything like that?

A.   I didn't see any.

Q.   And what's the significance of the tenderness in the region of the joint, if anything?

A.   It's consistent with his having arthritis in that joint.

9 (Pages 30 to 33)

Page 34

1    Q.   Was there anything else significant
2  about the first time you saw him?
3    A.   I'm not sure what you mean by
4  "significant." There were other findings on the
5  exam.
6    Q.   And what were the other findings,
7  generally?
8    A.   Well, he had some complaints referable
9  to the ulnar corner of his wrist, but not a lot of
10 abnormality on the examination there. So that's a
11 relatively important negative finding. And he had
12 some complaints, suggestive of a possible
13 diagnosis of carpal tunnel syndrome, but not a lot
14 of hard findings in that respect either.
15   Q.   Did you diagnose him with any other
16 disorders?
17   A.   I didn't diagnosis him with any other
18 disorders. I wondered about whether he might have
19 any.
20   Q.   And so based on his clinical -- your
21 clinical findings from your examination and the
22 testing that you had done, you basically
23 determined that he had an arthritic joint but no
24 other abnormalities?

Page 35

1    A.   Correct.
2    Q.   OKay. And on Page 2 of your report,
3  there's another reference to an x-ray of the left
4  wrist; and I think that was "PA and lateral x-ray
5  of the thumb metacarpal phalangeal joint."
6    A.   Right.
7    Q.   It showed advanced arthritic change
8  with a deviation of the thumb tip in the ulnar
9  direction.
10   A.   Correct.
11   Q.   And that there were surrounding
12 peripheral osteophytes and marked joint space
13 narrowing, correct?
14   A.   Correct.
15   Q.   And is that from December of 2005?
16   A.   That's from September of 2005.
17   Q.   That was the September 2005 x-ray?
18   A.   Correct.
19   Q.   Do you recall another x-ray being
20 done?
21   A.   Well, I know he had x-rays following
22 his surgery. But I don't recall that.
23   Q.   And I'm not sure if you reviewed this
24 or not. But let me see if I can find it.

Page 36

1            Do you have a Dr. Pacitti in your
2  office? P-A-C-I-T-T-I.
3    A.   Mr. Pacitti, physician assistant.
4    Q.   Okay. I'm sorry. He's a physician
5  assistant. I apologize.
6    A.   That's okay.
7    Q.   And do you recall seeing a notation
8  from December of 2005?
9    A.   I recall seeing it previously, yes.
10   Q.   And there's a notation; it says,
11 "Pacitti," and then there's a space, and then it
12 has a slash, JWH. Do you know who JWH is?
13   A.   She's the transcriptionist.
14   Q.   And there's a notation under "Physical
15 Exam," at that point, saying that the thumb MP
16 joint is slightly deformed. Do you see that?
17   A.   I do.
18   Q.   And do you know what that refers to?
19   A.   I'm not sure what you mean by what it
20 refers to.
21   Q.   Okay. Well, does he have a congenital
22 deformity?
23   A.   No. He just meant it didn't look
24 normal. I mean, I'm assuming. It's not my note.

Page 37

But I'm assuming that he meant that it didn't look
normal.
     Q.   Okay. And when you looked -- when you
did your x-ray and your diagnostic testing, did
you see any deformities, or is that something you
would see on an x-ray, where you would see marked
deformities?
     A.   Well, this is not referring to the
x-ray. This is referring to the examination, his
statement. So you might see deformity looking at
the thumb itself. You might see deformity looking
at the x-ray. I noted deformity looking at the
x-ray. I'm not sure that I noted deformity in
looking at his thumb. But as I look at my x-ray
report, I believe that he must have had deformity
of his thumb that would have been visible.
     Q.   And that deformity would be that his
thumb would be in a different position than
normal?
     A.   It would be tilted a little bit to the
side and swollen and thick.
     Q.   Did he have any of those types of
issues with any of his other fingers?
     A.   Not that my notes indicate. Not that

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 38

1    I recall.
2         Q.   Do you remember him having a deformity
3    in his pinky --
4         A.   I don't recall it.
5         Q.   -- that he -- that resulted from a
6    fall?
7         A.   I don't recall.  Sorry.
8         Q.   And it's my understanding that the
9    procedure that you had done was an arthrodesis of
10   the metacarpal phalangeal left thumb joint?
11        A.   Correct.
12        Q.   And can you explain -- and I note that
13   there was a discussion of alternatives of the
14   cervical or surgical treatment that you were going
15   to give him, and that you did an arthrodesis
16   instead of an arthroplasty.  And I was wondering
17   if you could explain the difference and the
18   reasoning why you did the arthrodesis, as opposed
19   to the arthroplasty?
20        A.   Well, an arthrodesis is an operation
21   to stiffen the joint permanently.  Fuse it is the
22   common terminology used.  It's a very good
23   operation for relief of pain.  It lasts forever.
24   You don't put in implants that may break or pop

Page 39

1    out of place.  And if somebody is going to use
2    their hands for heavy work, then there's a
3    reasonably good chance that it will stand up to
4    that.
5             An arthroplasty is an operation that
6    preserves some movement, not excellent movement in
7    the thumb, but some movement.  It carries with it
8    the drawback that the implant which you put in
9    there could break or come out of place.  The
10   likelihood of that happening is higher if somebody
11   uses the hand very aggressively, such as for heavy
12   work, like he did.
13        Q.   Okay.  And so when you did the
14   surgery, was the anticipated -- or you did the
15   arthrodesis -- was it the anticipation that he
16   would be going back to work at the Railroad?
17        A.   Well, I always do it, planning on
18   somebody going back to doing what they normally
19   do, so I try to choose appropriately.
20        Q.   Okay.  And would you agree that Mr.
21   Crowther had a good or excellent result?
22        A.   From the surgery that I did?
23        Q.   Yes.
24        A.   I thought he did.

Page 40

1         Q.   And would you agree that Mr. Crowther
2    could go back to work at the Railroad with his
3    thumb condition as it currently exists?
4         A.   If it were just his thumb and no other
5    part of his body?
6         Q.   Yes, just his thumb.
7         A.   I do.
8         Q.   And so that would -- you would return
9    him back to heavy work?
10        A.   Um-hum.
11        Q.   Okay.  And, I'm sorry, that was a yes?
12        A.   Yes.  Sorry.
13        Q.   No.  That's okay.
14        A.   That's a yes.
15        Q.   And when is the last time you saw Mr.
16   Crowther, do you recall?
17        A.   I think it was April of 2007.
18        Q.   And how was he doing at that time?
19        A.   I think he was doing fine.  His
20   arthrodesis was solidly united.
21        Q.   And his prognosis was good?
22        A.   Regarding his thumb, I thought his
23   prognosis was good.
24        Q.   And based on what you said, the

Page 41

1    arthrodesis doesn't ordinarily result in any
2    future surgery, is that right?
3         A.   That's correct.
4         Q.   And you don't expect any future
5    surgery with regard to Mr. Crowther?
6         A.   Regarding his thumb?
7         Q.   Regarding his thumb.  I'm sorry.
8         A.   Correct.
9         Q.   You've not treated him for anything
10   else, other than his hand?
11        A.   No, I don't believe I have.
12        Q.   And are you aware of any scientific
13   literature that has shown that the type of work
14   duties that Mr. Crowther does may cause or
15   contribute to the development of problems in the
16   left metacarpal joint?
17        A.   No, not specific literature addressing
18   that.
19        Q.   Are you aware of any scientific
20   literature that shows that there are specific
21   changes that could be done to the type of work
22   that Mr. Crowther did, that would prevent him from
23   developing the type of problems he had in his left
24   thumb?

Page 42

1    A.   I'm not.
2    Q.   Is there any way to prevent the type
3 of injury or the type of condition that Mr.
4 Crowther had in his left thumb?
5    A.   Well, I think if none of those factors
6 that I mentioned to you before happened to you in
7 your lifetime, then you are likely not to get this
8 kind of arthritis.
9    Q.   Could you explain -- well, maybe
10 that's a bad word, a bad word choice.
11        It's my understanding that, based on
12 all the records I've seen anyway, that the problem
13 he was having was in his non-dominant left hand,
14 is that right?
15   A.   Yes.
16   Q.   And he didn't have similar problems in
17 his metacarpal joint of his right thumb, correct?
18   A.   Not that I know of, right.
19   Q.   And that it's my understanding that,
20 unless -- please correct me, if I'm wrong, Tom --
21 but he's right-handed, and that's his dominant
22 hand?
23   A.   I think so.
24   Q.   And does it make any sense why the

Page 43

1 unilateral versus bilateral?
2    A.   If you examine -- listen to patients'
3 hand-related complaints and examine their hands
4 for long enough, you'll learn that lots of things
5 are unilateral, not bilateral, even though you do
6 the same thing with both hands; that when things
7 become bilateral, they don't necessarily do so at
8 the same time; and that there is no particular
9 predilection for something affecting the dominant
10 hand, rather than the non-dominant hand, even
11 though common sense might indicate that it should.
12   Q.   Okay.
13   A.   With thirty years of being in this
14 business, that's how it is.
15   Q.   Yes, because, you know, there's no
16 evidence that he's had any problems with his right
17 hand.
18   A.   Understood.
19   Q.   And you didn't note any problem with
20 his right hand either, correct?
21   A.   Correct.
22   Q.   And do you know what type of -- I
23 apologize.  I think I already asked you that.
24       Would you agree with me -- I think

Page 44

1 that you -- part of your opinion anyway -- was
2 that -- on the addendum anyway -- was that, in
3 terms of this aggravation of the arthritis in his
4 left thumb -- that would you agree that non-work-
5 related hand activity would also aggravate the
6 problem he was having in his left thumb?
7    A.   Well, non-related-work -- non-related-
8 work activity did you say?
9    Q.   Non-related -- I'm sorry.  Non-work-
10 related.
11   A.   Non-work-related.  That's what you
12 said.  Non-work-related activity might make it
13 hurt, but it's -- I believe -- would be much less
14 likely to truly aggravate the underlying problem
15 than heavy use of it.  So if his non-work-related
16 activity was doing heavy construction around his
17 home, for example, then I would expect that would
18 not only make it hurt, but also aggravate the
19 basic problem.  And if the non-work-related
20 activity was jogging or reading or something like
21 that, then I would expect that it would not
22 aggravate the basic problem.
23   Q.   How about, like, chopping wood; would
24 that aggravate it?

Page 45

1    A.   Chopping wood, if you do it, you know,
2 once a month for two hours, it would make it hurt,
3 but it probably wouldn't be a true aggravating
4 factor.
5    Q.   Okay.  How about --
6    A.   If you chop word every day, all day,
7 that's a different story.
8    Q.   How about, like, riding a bicycle?
9    A.   No, I don't think so.
10   Q.   And I apologize if I'm repeating, but
11 in terms of the things that you reviewed, the
12 materials you reviewed, I think we were in
13 agreement that you've not seen any objective
14 scientific change in the arthritis that was
15 contained in his left thumb as a result of his
16 job, is that right; we don't have any objective
17 scientific evidence that the disease process was
18 actually increased due to his work, is that right?
19   A.   I think that's correct.
20   Q.   If you give me just a minute or two, I
21 want to maybe just go through my notes.  And I
22 understand you've got to be out of here in fifteen
23 minutes, so I'm going to try to speed it up.
24   A.   Go ahead.

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 46

1    Q.   I appreciate it.  Thank you.
2         Okay.  I have a quick question.  I was
3    looking at an October of '06 record and there was
4    an x-ray discussed and it talked about advanced
5    arthritis which looked to be due to a
6    malalignment, secondary to chronic RCL injury.
7    A.   Yes.
8    Q.   What's RCL?  I'm sorry.
9    A.   It's the radial collateral ligament.
10   Q.   Okay.  That's what I thought, but I
11   was -- just wanted to make sure.
12        Would you agree with me, Doctor, that
13   arthritis cannot be prevented?
14   A.   It depends upon how much of a bubble
15   you put yourself in, seriously.
16   Q.   Well, would you agree that if you're
17   an active adult, doing normal activities --
18   A.   The odds are that you're going to get
19   arthritis at some point, somewhere in your body.
20   Q.   And you would agree with me that
21   there's not a dose response relationship between
22   hand activity and the development of arthritis in
23   the joint Mr. Crowther had?
24   A.   I'm not sure I agree with you

Page 47

1    entirely.  I think, you know, that at some point,
2    that the lack of a dose response relationship --
3    can you hear me?  Okay.  -- the lack of a dose
4    response relationship breaks down if the dose is
5    too large.  So it's speculation for me to say that
6    there's no relationship between the two.
7    Q.   And in terms of Mr. Crowther, we don't
8    know -- and the type of things that he did -- we
9    don't have a dose response relationship; would you
10   agree with that?
11   A.   Yes.  I don't anyway, but --
12   Q.   I'm sorry.  You said you don't have a
13   dose --
14   A.   I do not.
15   Q.   And did he have any arthritis in any
16   other joints in his thumb or his fingers?
17   A.   Not that I noted in my office records.
18   Q.   Okay.  Did you examine --
19   A.   My normal examination would be all of
20   the joints from his elbows down.  That's my
21   standard.
22   Q.   And then I know that in terms of --
23   A.   Including all the joints of the thumb.
24   Q.   And my understanding is that you did a

Page 48

1    comparison to the right hand --
2    A.   Correct.
3    Q.   -- in terms of the range of motion;
4    but did you look for arthritic changes in the
5    other hand, as well?
6    A.   I would have been looking for that.
7    Q.   And in terms of his job duty, was
8    there anything in particular that you thought was
9    problematic, in terms of his hand use
10   specifically, causing a problem in terms of his
11   symptoms or aggravation as you've stated? because
12   I understand you've not given a causation opinion,
13   but you've said there's an aggravation of some
14   sort.
15   A.   Right.
16   Q.   What was it specifically about his job
17   that aggravated his thumb?
18   A.   Well, the nature of gripping large
19   heavy objects is you have to wrap your thumb
20   around it.  And so if you haven't -- and that
21   joint, his arthritic metacarpal phalangeal joint,
22   will make contact with any large handle.  That's
23   how you're -- that's how your hand grips
24   something.  It always makes contact there.  So a

Page 49

1    large handle, for example, would be the handle of
2    a sledgehammer, that he would make contact with,
3    and that might be a problematic thing for him to
4    do.  A large handle might be the handle on a big
5    pair of pliers, or maybe large wrenches.
6    Q.   And it's those things that you think
7    aggravated his pre-existing condition?
8    A.   I think so.
9    Q.   And was there anything the Railroad
10   could have done to prevent him from aggravating
11   it; I mean, what could they have done, in your
12   estimation?
13        MR. JOYCE:  Objection.  He's not here
14   as our ergonomic expert; he's here as a
15   medical expert, so I think that opinion is
16   outside the scope of his testimony.  It's a
17   negligence question.
18   Q.   (By Mr. Hall)  Are there any specific
19   changes that the Railroad could have made in his
20   job, that could have prevented him from having an
21   aggravation, as you've described it?
22   A.   I guess not having him used those
23   tools.
24   Q.   So anything that would have him

13 (Pages 46 to 49)

Page 50

1  touching a tool or gripping a tool would be
2  problematic for him?
3      A.   I'm not sure "anything."  But
4  repetitive use of -- pounding with heavy tools
5  with big handles that he would need to use would
6  tend to aggravate it.
7      Q.   And when you saw him in 2005, did you
8  put any work restrictions on Mr. Crowther?
9      A.   I don't recall putting any work
10 restrictions on him.
11     Q.   Are there any work restrictions in
12 your file? because I've not seen any, but --
13     A.   If you haven't, then I -- then there
14 probably aren't.  But I don't recall any specific
15 work restriction.
16     Q.   And you reviewed your records in
17 advance of your deposition, right?
18     A.   Well, I reviewed these records which
19 are my narrative notes.  I did.
20     Q.   Okay.  And so no one else would have
21 put him on a work restriction --
22     A.   No.
23     Q.   -- someone other than you, right?
24     A.   I or the physician assistant who was

Page 51

1  working, helping me take care of him.
2      Q.   And you reviewed all of those things?
3      A.   I did.
4      Q.   And so when you -- he worked past
5  2005.  I think his last day of work was in '07.
6  And so that time period while you were treating
7  him, other than while he was in surgical care,
8  there were no work restrictions from you?
9      A.   I think that that's correct.
10     Q.   And you didn't write a letter to the
11 Railroad, or to anyone at the Railroad, indicating
12 that Mr. Crowther would have a problem grasping or
13 handling tools, is that fair to say?
14     A.   I think that's probably accurate.  But
15 I'm not certain.
16     Q.   And if you would have told Mr.
17 Crowther to avoid -- did you tell Mr. Crowther to
18 avoid using those things because it might
19 aggravate his condition?
20     A.   I don't recall telling him that.
21     Q.   If you did tell him that, would there
22 be a record of it?
23     A.   There probably would be.
24     Q.   Okay.  And if he was going to have a

Page 52

1  problem at work, is that something that you would
2  have written down in a notation to give him on,
3  like, a medical pad?
4      A.   Well, we have forms for that.
5      Q.   Okay.  You have forms for that?
6      A.   And they're generally copied into the
7  record.
8      Q.   And there's no form that's in the
9  record?
10     A.   Not that I've seen.
11     Q.   And if you do find one, would you let
12 Mr. Joyce know so that I can have it? because I've
13 not seen it.
14     A.   Absolutely.
15     Q.   And, you know, I just want to make
16 sure.  But as you sit here today, it's fair to say
17 that you didn't place him on any work restrictions
18 in 2005 or 2006, with regard to gripping or using
19 tools, is that correct?
20     A.   I think that's correct.
21     Q.   And as you sit here today, you're
22 unaware of whether or not you warned Mr. Crowther
23 that his gripping of tools or use of tools could
24 aggravate his condition, is that correct?

Page 53

1      A.   Correct.
2      Q.   And as you sit here today, you don't
3  have any information where Mr. Crowther or you put
4  the Railroad on notice of that?
5      A.   I think that's correct.
6      Q.   As a matter of fact, even after his
7  surgery there's not a work restriction because you
8  returned him to work, isn't that right?
9      A.   Correct.
10     Q.   And did you meet with Mr. Joyce before
11 your deposition today?
12     A.   I did.
13     Q.   And can you tell me what you guys
14 discussed?
15     A.   Mr. Joyce asked me about the addendum,
16 and asked me, I think, if that was effectively a
17 representation of my opinion about his
18 aggravation, and mentioned -- Mr. Joyce mentioned
19 to me that I had wondered about the possibility of
20 carpal tunnel syndrome, but, with testing, had not
21 substantiated it.  That was about it.
22     Q.   And so as far as you were concerned,
23 he didn't have carpal tunnel syndrome?
24     A.   In the end, that's correct.

Page 54

1    Q.   And what's your understanding of what
2  his problem was; was it a nerve impingement in the
3  neck?
4    A.   I think so.
5    Q.   And that's a subject for Dr. Cowan?
6    A.   Yes.
7    Q.   And did you discuss anything else?
8    A.   I don't think.  But I would defer to
9  Mr. Joyce.  But I don't remember discussing
10 anything else.
11   Q.   And, you know, if you think of
12 anything else, or you recall anything else about
13 Mr. Crowther's job duties, or your opinions
14 changing in any way, would you please let Mr.
15 Joyce know so that he could let me know?
16   A.   I will.
17   Q.   And if you find any further
18 documentation with regard to the work restriction,
19 which I don't think there is one, but I'd
20 certainly appreciate a copy of that; and I would
21 like to talk to you about it, if that does exist,
22 later on, okay?
23   A.   Yes.
24      MR. HALL:  With that, I don't think I

Page 55

1  have any further questions.
2      MR. JOYCE:  Just real briefly.
3      EXAMINATION
4    Q.   (By Mr. Joyce)  Dr. Wenner, do you
5  have your April 13, 2007 note?
6    A.   I think I do, yes.
7    Q.   Is that the last time you saw Jeff in
8  conjunction with his thumb problem?
9    A.   I believe it is.
10   Q.   It looks like you did have some sort
11 of discussion about his ability to return to work.
12 I'm looking at that third paragraph.  It looks
13 like you had a discussion about what he did.
14   A.   Yes.
15   Q.   And it looks like at least there was
16 some sort of a conversation.  Maybe you can read
17 to me what you told him about his return to work.
18   A.   My note says, "He has previously
19 undergone an anterior cervical arthrodesis" -- two
20 levels is what that means -- "arthrodesis of the
21 left thumb MPJ and is soon to have a TKR," meaning
22 total knee replacement.  "It seems to me that he's
23 had too much orthopedic breakdown, multiple bone
24 and joint problems, to make it sensible for him to

Page 56

1  return to such heavy labor.  I would be inclined
2  to not permit it.  I told him that today."
3    Q.   So your -- and that was as of April of
4  '07?
5    A.   Right.
6    Q.   So your discussion with Jeff was not
7  focused on his thumb; it was really his total
8  orthopedic picture with regard to his neck and his
9  knees, as well?
10   A.   Yes, his total orthopedic status.  And
11 I should -- that reminds me that Mr. Joyce asked
12 me about that when we were in the other room.
13   Q.   Okay.  And just lastly, am I correct
14 that your opinion is that Geoff's job as a
15 trackman aggravated and worsened his thumb
16 arthritis?
17   A.   That's correct.
18      MR. JOYCE:  That's all I have.  Thank
19 you.
20      MR. HALL:  Just to follow-up real
21 quick.
22      EXAMINATION
23   Q.   (By Mr. Hall)  But in terms of -- you
24 would agree that for his knees and for his neck,

Page 57

1  you didn't treat him, right?
2    A.   That's correct.
3    Q.   And your expertise is in the thumb,
4  correct?
5    A.   That's correct.
6    Q.   And you didn't do a disability rating
7  at all?
8    A.   I did not.
9    Q.   And were you aware, at least for the
10 knees, that he got the best possible disability
11 rating?
12   A.   I wasn't aware of it, until you just
13 told me now.
14   Q.   And --
15   A.   What does "best" mean?  Most disabled?
16   Q.   No.  On the AMA guidelines, he had the
17 best possible result, in terms of disability.
18   A.   Okay.
19   Q.   Okay?  I'm sorry.  So that's what I
20 meant by that.  And your opinion hasn't changed,
21 from what you just told me, that it's not his left
22 thumb that's keeping him out of work, correct?
23   A.   Well, his left thumb contributes to
24 it, as part of multiple things.  What I said

0f281510-eeb6-4bd4-965b-fc1c27495147

Page 58

1  before is:  If it was just his thumb, I thought he
2  could work.
3       Q.   And even with the other orthopedic
4  complaints that he has, would it be fair to say
5  that he could do a light, sedentary-type job?
6       A.   Sedentary-type job.  I think so.
7       Q.   A light-duty job?
8       A.   It depends upon what "light duty"
9  means.
10      Q.   I mean somebody who's like a
11 supervisor, you know, at a manufacturing plant, or
12 something like that is, you know --
13      A.   Not handling tools?
14      Q.   Yes.  But who is doing --
15      A.   Not having to walk around on concrete
16 all day? because you can't do that with total
17 knees I don't think.
18      Q.   Well, I'll leave that to Dr. Lehman?
19      A.   But you're asking me my opinion about
20 whether he can return to work, and I've already
21 said that if it's just his thumb, he can return to
22 even heavy work.  So if I'm -- I've answered that
23 part of it.  So he can certainly return to light
24 work with his thumb.

Page 59

1       Q.   And in terms of his other orthopedic
2  conditions, in relationship to what you've just
3  talked with Mr. Joyce about, you would agree that
4  he could go back to some lighter, sedentary-type
5  job?
6       A.   Yes, I think so.
7       Q.   And is that something you would
8  encourage your patients to do, is to go back to
9  doing some type of gainful employment?
10      A.   I do.
11      Q.   And remaining active is a good thing?
12      A.   I do (sic.)
13      Q.   And are you aware of whether or not
14 Mr. Crowther is looking for a job or looking for
15 some type of employment?
16      A.   I don't know.
17      Q.   But you wouldn't have any problem with
18 him doing a lighter, medium or -- I'm sorry --
19 lighter, sedentary-type job?
20      A.   That's correct.
21           MR. HALL:  That's all the questions I
22 have.
23           (Deposition concluded at 6:33 p.m.)
24

Page 60

CERTIFICATE OF REPORTER

   I, Jonathan P. Lodi, a Notary Public in and for
the Commonwealth of Massachusetts, do hereby
certify that STEVEN M. WENNER, M.D., came before
me on December 15, 2008, at New England Orthopedic
Surgeons, 300 Birnie Avenue, Springfield,
Massachusetts, and was by me duly sworn to testify
to the truth and nothing but the truth as to his
knowledge touching and concerning the matters in
controversy in this cause; that he was thereupon
examined upon his oath and said examination
reduced to writing by me; and that the statement
is a true record of the testimony given by the
witness, to the best of my knowledge and ability?
   I further certify that I am not a relative or
employee of counsel/attorney for any of the
parties, nor a relative or employee of such
parties, nor am I financially interested in the
outcome of the action.
   WITNESS MY HAND this  day of        , 2008.

Jonathan P. Lodi         My Commission Expires:
Notary Public            8/8/14

16  (Pages 58 to 60)