UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | |
|---|---|
| GEOFFREY CROWTHER,<br>          Plaintiff,<br>          v.<br><br>CSX TRANSPORATION, INC. and<br>CONSOLIDATED RAIL CORP,<br>          Defendant<br><br>AND<br><br>GEOFFREY CROWTHER,<br>          Plaintiff,<br>          v.<br><br>CSX TRANSPORTATION, INC. | 3:09-cv-10334-MAP<br><br><br><br><br><br><br><br><br>3:09-cv-11467-MAP |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION IN LIMINE TO PRECLUDE PLAINTIFF'S MEDICAL EXPERT, ANDREW P. LEHMAN, M.D., FROM TESTIFYING AT TRIAL**

Defendants CSX Transportation, Inc. ("CSXT") and Consolidated Rail Corporation ("Conrail") submit this Reply in support of their Motion in Limine to Preclude Plaintiff's Medical Expert, Andrew P. Lehman, M.D., from Testifying at Trial. In support thereof, Defendants state as follows:

On November 29, 2010, the parties conducted Dr. Lehman's videotaped trial deposition. (See Dep. of Andrew P. Lehman, M.D., a copy of which is attached as Exhibit A.) As such, this Court has the luxury of previewing Dr. Lehman's testimony in advance of trial to determine its admissibility. Once reviewed, it is doubtful that this Honorable Court will permit Dr. Lehman to testify. Indeed, in further support of their Motion, Defendants are compelled to bring to this

1

Honorable Court's attention several admissions Dr. Lehman made at his recent trial deposition which clearly demonstrate that Dr. Lehman's opinions are unreliable and inadmissible.

First and foremost, Dr. Lehman has failed to offer the opinion: (1) that Plaintiff's job duties caused his bilateral knee osteoarthritis; and/or (2) that Plaintiff's job duties aggravated his bilateral knee osteoarthritis. Instead, Dr. Lehman admitted over and over again that Plaintiff's bilateral knee osteoarthritis was directly caused by injuries he sustained in the '70s and '80s as well as the resulting surgeries, and not as a result of his job duties with Defendants.[1] (Ex. A at 86:5-9, 94:10-23, 96:11-17, 113:9-13.) Moreover, Dr. Lehman confirmed that absolutely no evidence exists to support Plaintiff's theory of liability that Plaintiff's job duties aggravated his bilateral knee degeneration. In fact, Dr. Lehman testified that, in order to reach a conclusion regarding aggravation, he would have to know Plaintiff's related medical history including prior imaging study findings. (Id. at 98:6-19.) Dr. Lehman admitted, however, that Plaintiff's counsel never provided him with any of Plaintiff's prior radiograph imaging studies, despite requests for same, to support his opinion that Plaintiff's job duties aggravated his underlying bilateral knee osteoarthritis. (Id. at 98, 99:2-13.) This is not at all surprising given that an April 1986 x-ray of Plaintiff's right knee revealed extremely severe degree of osteoarthritic change involving the medial and lateral aspects of the joints. See Berkshire Medical Center x-ray report dated April 1986, a copy of which is attached as Exhibit B. In short, Plaintiff's April 1986 x-ray confirmed that Plaintiff had severe osteoarthritis in all three compartments of his right knee in at least 1986. (Ex. A at 100.)

More importantly, after reviewing the April 1986 x-ray report, Dr. Lehman conceded that the results in 1986 were strikingly similar to the results he obtained in 2007, including the

---

[1] It is undisputed that in the 1970s Plaintiff underwent bilateral open meniscectomies followed by open ACL reconstruction with grafting in 1986.

location of osteophyte formations, which were in the same places. (Ex. A at 105:2-25, 113:14-18.) Dr. Lehman certainly did not offer the opinion that Plaintiff's job duties aggravated his underlying bilateral knee osteoarthritis. Instead, he has merely confirmed that the severe arthritic condition Plaintiff suffered from in 1986 was exactly the same condition he suffered from in 2007. (Id. at 104:17-25; 105:2-25; 106:2-20; 113:14-18.)

In addition, Dr. Lehman's opinions, to the extent he offers any, are entirely unreliable because they lack the necessary factual foundation and the requisite scientific support required under Daubert v. Merrell Dow Pharm., 509 U.S. 579, 589-591 (1993). That is, Dr. Lehman did not apply any scientific facts to this case. Instead, Dr. Lehman's trial testimony bears out that his opinions rest on the mere fact that a temporal relationship existed between Plaintiff's job duties and his knee pain. As this Court well-knows, however, the existence of a temporal relationship is entirely insufficient to pass muster under Daubert. In short, Dr. Lehman's reasoning is as follows:

- Plaintiff had bilateral knee osteoarthritis as early as the '70s or '80s; (Ex. A at 93:12-17.)

- Plaintiff worked for the railroad for approximately thirty years;

- Toward the end of his career, he developed bilateral knee pain; see NEOS medical record dated February 28, 2007, a copy of which is attached as Exhibit C;

- Thus, because Plaintiff worked for the railroad for thirty years, it must have been the railroad activities that caused his bilateral knee pain.

Dr. Lehman's reasoning is precisely the type of *post hoc ergo proctor hoc* testimony that Daubert and its progeny protects against. Accordingly, this Honorable Court should preclude Dr. Lehman from testifying at trial.

In addition, Dr. Lehman is admittedly unaware of any scientific literature that supports the conclusion that Plaintiff's job activities aggravated his underlying bilateral knee

osteoarthritis. (Ex. A 122-123, 125-126, 46-48.) Based on Dr. Lehman's testimony, it is clear that his opinions are based exclusively on his own subjective belief and speculation, and not on any reliable scientific literature.

**A.     Dr. Lehman's Opinion Are Wholly Insufficient to Establish Causation Under The FELA**

**1.     Dr. Lehman Conceded That Plaintiff's Job Duties Did Not Cause His Bilateral Knee Osteoarthritis**

It is absolutely indisputable that Plaintiff developed bilateral knee osteoarthritis as a direct result of previous injuries and surgeries, and not as a result of his job duties with Defendants. At his deposition, Dr. Lehman confirmed that Plaintiff would have developed bilateral knee osteoarthritis regardless of what he did for a living, including railroad work, because of his prior knee injuries. (Dep. of Andrew P. Lehman, dated November 29, 2010 at 86, relevant portions of which are attached as Exhibit A.) Dr. Lehman further conceded that, in his medical opinion, Plaintiff's prior surgeries, and not his work activities, caused his bilateral knee osteoarthritis. Indeed, the following exchanges occurred at Dr. Lehman's deposition:

Q.     In your opinion Mr. Crowther was going to develop osteoarthritis in his knee no matter what he did for a living because he doesn't have any meniscus, correct?

A.     Correct.

\*\*\*

Q.     But your opinion here in this case, as you expressed it before tonight, was that Mr. Crowther's disease process, his arthritis was caused by these prior injuries and these prior surgeries, correct?

A.     Correct.

Q.     The activities of his work did not cause it correct?

A.     They caused the symptoms related to it.

Q.      They caused the symptoms.  In other words, eventually he started to feel pain, correct?

A.      Correct.

***

Q.      And just to make sure we are clear, your opinion is the disease itself was caused by these surgeries, correct?

A.      The prior injuries, the two meniscectomies, the ACL along with the results and surgeries.

***

Q.      I think you have been pretty clear that your opinion is he got the arthritis because he had prior surgeries and injuries back in the '70s and '80s correct?

A.      Correct.

(Id. at 86:5-9, 94:10-23, 96:11-17, 113:9-13.)  Dr. Lehman has clearly offered the opinion that Plaintiff's job duties **did not cause** his underlying bilateral knee osteoarthritis.  Accordingly, this Court should preclude Dr. Lehman from offering any expert testimony at trial.

**2.      Dr. Lehman Admitted That Plaintiff's Job Duties Did Not Aggravate His Underlying Bilateral Knee Arthritis**

It is absolutely indisputable that Plaintiff's job duties with Defendants did not aggravate his underlying bilateral knee osteoarthritis.  At his deposition, Dr. Lehman merely offered the opinion that Plaintiff's job duties likely contributed to his *symptoms*, that is, that Plaintiff felt pain as a result of being active at work.  Dr. Lehman admitted, however, that Plaintiff would have felt pain with any activity he performed and with any occupation that involved physical activity.  Dr. Lehman also opined that, based on radiographs of Plaintiff's knees, Plaintiff's underlying bilateral knee osteoarthritis did not worsen between 1986 and 2007, when Plaintiff initially presented to him for treatment.  In fact, the 1986 and 2007 x-rays revealed the same condition.  Indeed, the following exchanges took place at Dr. Lehman's deposition:

5

Q.      Then you've also given an opinion that, you know, activity is what is going to bring out the symptoms whether it is activity in his railroad workplace or at home or even if he was doing some other job, correct?

A.      Correct.

***

Q.      And it didn't matter where he was moving around. Eventually he was going to feel those symptoms, correct?

A.      Eventually he probably would have felt those symptoms, but there is no saying when.

Q.      No saying when?

A.      Yes.

Q.      Eventually it is going to get bad enough. His arthritic condition is going to get bad enough that it's going to cause him pain, correct?

A.      Eventually, correct.

Q.      That is what happens in every one of these patients that has knees like Mr. Crowther, correct?

A.      Some sooner than others.

Q.      Whether they work for the railroad or some other place, correct?

A.      Correct.

Q.      Some of them don't even work at all, do they?

A.      Correct, sadly.

Q.      Just activities of daily living. Getting up and walking to the fridge can cause it, correct?

A.      Correct?

Q.      That can bring about the symptoms, correct?

A.      It can. Sure.

Q.      Which is completely different than actually causing the disease itself, correct?

A.      Correct.

***

Q.      So this is where you were talking about he has his symptoms due to the activities

that he was experiencing in his life, correct?

A.      Yes.

Q.      I think we went over this before but he could have been a carpenter.  He could
have been a plumber.  He could have had any number of jobs and they would
have likely in your opinion have caused him to feel pain, correct?

A.      Yes.

Q.      They would not have caused the osteoarthritis.  That was there anyway.  But they
would have eventually brought out the pain, correct?

A.      Yes, if they were physical enough.

Q.      Eventually, no matter what this guy did, not matter what Mr. Crowther did, he
was going to experience pain, correct?

A.      More likely than not.

(Id. at 95:2-24, 114:5-10, and 157:8-25, 158:2-4.)  Dr. Lehman has clearly not offered the

opinion that Plaintiff's underlying bilateral knee osteoarthritis was worsened or aggravated by

Plaintiff's job duties.  Rather, at best, Dr. Lehman simply expressed the opinion that Plaintiff

was a physically active man who likely felt pain, a known symptom of arthritis.  As noted supra,

Dr. Lehman's opinions rest on the fact that a temporal relationship existed between Plaintiff's

job duties and his knee pain.  Dr. Lehman's reasoning is precisely the type of *post hoc ergo*

*proctor hoc* testimony that Daubert and its progeny protects against.

More importantly, Dr. Lehman was forced to concede that radiographs from 1986

revealed the same conditions Plaintiff suffered from in 2007 thereby indicating that Plaintiff's

underlying degenerative knee condition had not necessarily worsened in 21 years.  (Id. at 113:14-

18.)  To the extent Plaintiff's underlying bilateral knee osteoarthritis worsened in any way over 21 years, Dr. Lehman specifically attributed those changes to Plaintiff's previous surgeries.  (Id. at 109:10-19.)

Finally, Plaintiff, through his counsel, has alleged on the record that the aggravation of his pre-existing bilateral knee osteoarthritis occurred as a direct result of the working conditions in New Bedford, Massachusetts in 2005.[2]  (See Dep. of Geoffrey Crowther dated Jan. 22, 2010, at 289, relevant portions of which are attached as Exhibit D.)  Interestingly, Dr. Lehman testified that he knows absolutely nothing about the New Bedford Project.  (Ex. A at 154:23-25, 155:2-4.)  Perhaps of even greater significance is the fact that Dr. Lehman provided no testimony linking Plaintiff's knee symptoms to the New Bedford Project, or the job he was performing during that time, and therefore offered no opinion regarding Plaintiff's professed theory of liability.  In fact, Dr. Lehman admitted that, in his opinion, Plaintiff's bilateral knee symptoms predated the New Bedford Project by at least six months.  (Id. at 155:5-21.)

It is indisputable that Dr. Lehman has not offered the opinion that Plaintiff's underlying bilateral knee osteoarthritis was aggravated by his job duties with Defendants.  Accordingly, this Court should preclude Dr. Lehman from offering any expert testimony at trial.

**B.      Dr. Lehman's Opinions Lack The Requisite Reliability to be Admissible at Trial**

**1.      Dr. Lehman Admittedly Has No Factual Foundation for His Opinion**

Dr. Lehman's opinion lacks the reliability required by Daubert and its progeny because, at the time he authored his report as well as at his recent deposition, Dr. Lehman had absolutely no knowledge whatsoever of Plaintiff's job duties with Defendants.  Dr. Lehman admitted: (1)

---

[2] It is undisputed that, between approximately August and September 2005, Plaintiff worked in New Bedford, Massachusetts as a foreman on a project building new track for CSXT ("New Bedford Project").  Plaintiff's counsel has stated on the record that the working conditions in New Bedford, Massachusetts in 2005 aggravated Plaintiff's underlying bilateral knee osteoarthritis.

that he never spoke to Plaintiff about what his job with Defendants entailed; (2) that he never performed any scientific analysis of the activities Plaintiff had to perform at work; and (3) that he never performed any scientific analysis of any exposure Plaintiff had in the workplace.   The following exchange took place at Dr. Lehman's deposition:

Q.      You don't have any independent knowledge of railroad activities, do you?

A.      No.

Q.      In other words, what a trackman might do?

A.      No.

Q.      You've never even talked to Mr. Crowther himself about his job activities, have you?

A.      Not that I can remember.

Q.      You've done no scientific analysis yourself of the activities he had to do in the workplace?

A.      No.

Q.      Or the exposures that he had in the workplace?

A.      No.

Q.      In other words, you don't know how often he had to walk?

A.      No.

Q.      How often he had to kneel?

***

A.      No.

Q.      How often he had to sit or stand?

A.      No.

Q.      How long he had to kneel, sit, stand or crouch at any one period of time?

9

A.      No, sir.

Q.      You don't know anything about his workplace other than what Mr. Joyce told you
        in that one paragraph of that letter back in '08, correct?

\*\*\*

A.      Correct.

(Ex. A at 109-111 and Ex. A.)

More surprisingly, Dr. Lehman clearly based his opinion exclusively on self-serving

information provided by Plaintiff's counsel and not, as required, on objective factual

information.  Indeed, Dr. Lehman admittedly based his opinion solely on a one paragraph job

description provided by Plaintiff's counsel in his 2008 retention letter.  (Id. at 58, 114:11-16 and

Ex. A.)  Plaintiff's letter stated:

> His tasks required him to stoop, bend, and kneel while welding and repairing
> railroad track.  These tasks also exposed him *to an **extreme** amount of **repetitive**
> **strenuous** motion, vibration, force and **awkward** postures, heavy lifting and
> carrying along with **excessive** walking on uneven ballast*.

(Id. at Ex. A.) (Emphasis added.)  Dr. Lehman conceded that he formed his opinions based on

the job description in Plaintiff's counsel's letter.  The following exchange took place at Dr.

Lehman's deposition:

Q.      You agree with me when you wrote that report you didn't have any printouts of
        job activities, did you?

A.      All I had was the description of the jobs by Attorney Joyce.

Q.      In other words, he put down in this letter here, this letter he wrote to you, it's been
        marked as Lehman A for identification, there is a paragraph in here where Mr.
        Joyce, Mr. Crowther's attorney in this injury lawsuit, has described what the job
        activities were, right?

A.      Correct.

Q.      And you relied on that without double checking it, correct?

A.      That is correct.

Q.      And then you form the opinions that are expressed in the November 2008 letter?

A.      Based on Mr. Joyce's description of the job.

(Id. at 58:2-21.)

Dr. Lehman's exclusive reliance on Plaintiff's counsel's self-serving letter is entirely insufficient to pass muster under Daubert.  Not a single piece of information provided in Plaintiff's counsel's letter is factually correct nor has it been verified.  Moreover, the description includes unqualified, non-specific and undefined (and obviously one-sided and prejudicial) adjectives including "excessive," "extreme," and "strenuous," to name a few, to describe Plaintiff's purported job duties.  Moreover, as noted supra, Dr. Lehman has absolutely no knowledge whatsoever of the percentage of time Plaintiff spent kneeling, sitting, standing, crouching or resting for that matter.  In short, Dr. Lehman does not have the first clue as to what Plaintiff's job duties with the railroad entailed outside of what Plaintiff's counsel has told him. The Court cannot allow an expert, who has merely relied on the hyperbole of Plaintiff's counsel, to offer an opinion at trial.

Even more surprising than the fact that Dr. Lehman only relied on the job description authored by Plaintiff's counsel to form his opinion, is the fact that the job description is completely and utterly inapplicable.  During the last five years of his career, from 2002 to 2006, (and immediately prior to treating with Dr. Lehman) Plaintiff was not employed as a trackman, but rather served as a flagman 50% of the time, a track inspector 40% of the time, and as a welder 10% of the time.[3]  (Id. at 117:18-25; 118:2-11.)  Plaintiff's counsel, however, never provided Dr. Lehman with the job description of a flagman, track inspector or welder and Dr. Lehman admittedly has no idea what those positions entail.  (Id. at 118:18-24.)  In fact, prior to

_____
[3] It is undisputed that Plaintiff stopped working for the railroad in December 2006.

forming his opinions, Dr. Lehman was merely provided with Plaintiff's counsel's one-sided self-serving job description.

Approximately one hour before his deposition on November 29, 2010, Plaintiff's counsel provided Dr. Lehman with the CSXT and Conrail job descriptions of a trackman.  (Id. at 60-61.) This is somewhat irrelevant given that, to date, Dr. Lehman still has absolutely no idea what job duties a track inspector, flagman or welder performs.  Dr. Lehman admitted that, before offering an opinion on whether Plaintiff's job activities as a flagman, welder or track inspector had anything to do with Plaintiff's knee pain, he would have to review the job description for those positions.  (Ex. A at 119.)  Dr. Lehman, therefore, cannot provide an opinion regarding whether Plaintiff's positions as a track inspector, welder or flagman (the positions he held during the last five years of his career) had anything to do with his bilateral knee condition.  In addition to basing his opinion on a self-serving job description authored by Plaintiff's counsel, Dr. Lehman clearly also based his opinion on an invalid assumption as to what Plaintiff was doing for work.

Based on the foregoing, this Honorable Court should preclude Dr. Lehman from offering any expert testimony at trial on the grounds that his opinion is unreliable because it lacks the requisite factual foundation.

### 2.      Dr. Lehman Admittedly Offers No Scientific Basis for His Opinion

In Daubert, the Supreme Court held that, when faced with the proffer of expert testimony under Rule 702, the trial judge must preliminarily assess whether the testimony's underlying reasoning or methodology is scientifically or technically valid and can properly be applied to the facts at issue.  Daubert, 509 U.S. at 592-93.  The judge must consider the following factors when determining whether an expert's opinion meets the minimum standards of reliability:

(1)      Whether the theory or technique in question can be (and has been) tested;

(2)     Whether the theory or technique has been subjected to peer review and publication;

(3)     The known potential rate of error and the existence and maintenance of standards controlling the techniques, operation; and

(4)     General acceptance by the relevant scientific community.

Id. at 591-95.

Dr. Lehman admitted that his opinion lacks the reliability required by Daubert because it is not based on any scientific evidence. At best, Dr. Lehman has offered the medical causation opinion that Plaintiff's bilateral knee osteoarthritis became symptomatic, while Plaintiff performed work activities for the Defendants.[4]  Dr. Lehman admitted, however, that he is completely unaware of any scientific literature that supports his opinion. (Ex. A at 122-123.) Dr. Lehman first confirmed that there are absolutely no American studies, that he is aware of, that support his opinion. (Id. at 125-126.) Dr. Lehman then submitted that, although he found two European studies on point, he did not read them nor do they directly support the conclusion that Plaintiff's bilateral knee osteoarthritis was caused and/or aggravated by his job duties. (Id. at 46.) Indeed, the following exchange took place at Dr. Lehman's deposition:

Q.     I think there is also no studies which would even show that symptoms back when you were deposed in December of '08, there weren't any studies that even showed that symptoms could be caused by activities of any work or those on the railroad, correct?

A.     None that I was aware of.

Q.     And as you sit here today, there still aren't any that would link any railroad job even to the development of symptoms, correct?

***

A.     No, not that I am aware of.

***

Q.     You have access to American studies, correct?

_____

[4] It is of particular importance that Dr. Lehman admitted that Plaintiff's work activities **did not cause** his bilateral knee osteoarthritis. (See Ex. A at 94:7-23.)

13

A.      Correct.

Q.      And of course there aren't any?

A.      Not that I am aware of.

Q.      You looked?

A.      I looked.  I couldn't find any.

***

Q.      Understood.  You did say at the deposition there is nothing out there?

A.      Correct, so I was curious.  And I found out that outside of the American literature, there are some European studies.

***

Q.      And you didn't read the actual articles.  You just read the abstracts?

A.      No.  They are not available to me.

Q.      So you haven't double-checked whether the methods here were something you would rely on or anything like that?

A.      No.

***

Q.      And what they show is basically that among other -- they don't call them risk factors or they do.  Among other risk factors, obesity and everything else there is a person that has the disease known as osteoarthritis?

A.      Mm-hmm.

***

Q.      Let me read this.  Here is the first one.  "Individual and occupational risk factors for knee osteoarthritis results of a case control study in Germany."

A.      Correct.

Q.      "Conclusions: The results support a dose-response relationship between kneeling, squatting and symptomatic knee osteoarthritis," right?

A.    Okay. Sure.

\*\*\*

Q.    Is going to hurt, right.  It's not going to cause the arthritis.  It's just going to cause it to hurt.

A.    Again, I would have to read it again myself.  But from what you are reading to me, yes, that is what it sounds like, correct.

Q.    Which is basically what you said at your deposition and what you said in the report?

A.    Yes.

Q.    That kneeling doesn't cause the osteoarthritis.  It simply causes a person to feel pain when they have the arthritis.

A.    That is what I have been taught.

(Id. at 122-123, 125-126, 46-48.)

Dr. Lehman's opinion is clearly based exclusively on his own subjective belief and speculation, and not on any reliable scientific literature.  To the extent Dr. Lehman attempts, in any way, to rely on the European studies, he cannot.  First, the studies constitute double-hearsay. Second, the studies' conclusions specifically rest on a the finding of a dose-response relationship.  Here, however, Dr. Lehman admittedly has absolutely no knowledge whatsoever of what Plaintiff's job duties entailed.  Thus, it is impossible for him to offer the opinion that a dose-response relationship existed.  Accordingly, Dr. Lehman's opinion is inadmissible as unreliable.

WHEREFORE, for all the above-stated reasons, Defendants' Motion should be **ALLOWED**.

Respectfully submitted,
CSX Transportation, Inc.,
by its attorneys,


 /s/  Heather M. Gamache_____
Michael B. Flynn, BBO# 559023
mflynn@flynnwirkus.com
Heather M. Gamache, BBO# 671898
hgamache@flynnwirkus.com
FLYNN & WIRKUS, P.C.
400 Crown Colony Drive, Suite 200
P.O. Box 699242
Quincy, MA 02269
T: (617) 773-5500
Dated:  December 15, 2010                        F: (617) 773-5510


G:\F & A\CASE FILES\CSX OCCUPATIONAL\Worn\Crowther - WORN - 61-123\Trial\Motions in Limine\MIL to Preclude Lehman\Def. Reply Brief\12.9.10 Reply Brief

## CERTIFICATE OF SERVICE

I, Heather M. Gamache, attorney for Defendants hereby certify that I have served true and correct copies of the foregoing upon all counsel of record electronically via *CM/ECF* this 15th day of December, 2010.

/s/ Heather M. Gamache_____
Heather M. Gamache, Esq.